UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, *et al*,<br><br>Defendants. | No. 05-cv-1004 (ESH) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Plaintiffs respectfully submit this memorandum in support of their motion for a preliminary injunction.

**INTRODUCTORY STATEMENT**

In this action, plaintiffs challenge the Federal Bureau of Investigation's refusal to respond expeditiously to two requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The first request seeks records related to the FBI's monitoring, surveillance, and infiltration of certain political and religious organizations. The second request seeks records related to the functions and activities of the FBI's Joint Terrorism Task Forces ("JTTFs"), a primary mechanism by which the FBI appears to be engaged in surveillance of political and religious organizations. Both requests seek disclosure of information that is critical to the public's understanding of the FBI's expanded investigative and surveillance authority under relaxed guidelines implemented by former Attorney General John Ashcroft. The subject of these requests – increased FBI

1

surveillance of groups and individuals on the basis of political and religious affiliation and activity – has serious implications for the constitutionally protected rights of speech and association; accordingly, there has been increasing public concern about the nature and scope of the FBI's information-gathering activities.

Plaintiffs submitted their FOIA requests on December 2, 2004, seeking expedited processing. Defendants failed to respond to these requests within the mandated time period. Plaintiffs thereafter sent two letters to defendants, in February and April of 2005, inquiring into the status of their expedited processing request. Defendants again failed to respond. On May 25, 2005 – exactly one week after plaintiffs commenced the present action – defendant FBI denied the request for expedited processing with respect to the first request, explaining that it could "not find that there is a particular urgency to inform the public about an actual or alleged government activity beyond the public's right to know about government activity generally," and, moreover, that DOJ's Director of Public Affairs "did not detect 'widespread and exceptional media interest,' nor questions concerning the government's integrity regarding the issues raised in [the] request." (Exhibit E, Letter from D. Hardy to A. Beeson.) On June 6, 2005, defendant FBI issued an identical denial with respect to the second request. (Exhibit F, Letter from D. Hardy to A. Beeson.)

The government's refusal to grant expedited processing is entirely unsupported. Indeed, in a recent case involving the same parties and a materially indistinguishable record, this court held that the government's denial of expedited processing was contrary to law. *See American Civil Liberties Union v. United States Dept. of Justice*, 321 F. Supp. 2d 24 (D.D.C. 2004) ("*ACLU v. DOJ*"). As in this court's recent decision,

2

plaintiffs have demonstrated beyond doubt that their requests pertain to matters of widespread media interest and that there exists an urgency to inform the public about alleged government activity. For those reasons and others set forth below, plaintiffs' motion for a preliminary injunction should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 30, 2002, former Attorney General John Ashcroft announced that he had substantially revised decades-old guidelines restricting the FBI's ability to investigate political and religious activities and organizations. The Attorney General's decision marked a fundamental change in policy. The guidelines had been instituted in response to scandalous revelations of widespread political surveillance by the FBI under the leadership of J. Edgar Hoover. Following those revelations, Congress convened hearings and established a commission to investigate the FBI's abuses and to explore how best to prevent future excesses.

The hearings, chaired by Idaho Senator Frank Church, revealed that the FBI had infiltrated civil rights and peace groups, had burglarized political groups to gain information about their members and activities, and had "swept in vast amounts of information about the personal lives, views, and associations of American citizens."[1] In 1976, in response to the Church Commission's findings, Attorney General Edward Levi instituted a series of guidelines to regulate the FBI's domestic intelligence gathering, and to make clear that constitutionally protected advocacy of politically unpopular ideas or political dissent could not alone serve as bases for FBI investigation. Rather, the FBI was

---

[1] INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, BOOK II: FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES. UNITED STATES SENATE. APRIL 26, 1976. *Available at* http://www.icdc.com/~paulwolf/cointelpro/churchfinalreportIIa.htm.

to commence investigations only when "specific and articulable facts" indicated criminal activity. These guidelines were later amended slightly to permit investigations when the FBI possessed information pointing to a "reasonable indication" of criminal activity.

Attorney General Ashcroft's shift in policy eliminated the requirement that the FBI possess a reasonable indication of criminal activity, thus potentially reopening the door to widespread spying on domestic political and religious organizations in the absence of facts indicating criminal activity. Attorney General Ashcroft insisted that the change was necessary because, under the previous guidelines, "FBI investigators cannot surf the web the way you or I can. Nor can they simply walk into a public event or a public place to observe ongoing activities."[2] He explained that he had previously authorized the FBI to "waive the guidelines, with headquarters approval, in extraordinary cases to prevent and investigate terrorism. That authority has been used, but I am disappointed that it was not used more widely."[3] To ensure that the authority to operate outside the parameters of the guidelines would be used "more widely," the Attorney General eliminated those parameters and authorized agents to enter any public place, including political meetings or houses of worship, without any basis to believe that criminal activity was afoot. The revised guidelines further authorized field agents to collect and maintain political intelligence files on citizens and groups without oversight from FBI headquarters. In a press release issued the same day, plaintiff ACLU warned: "Under the new Ashcroft guidelines, the FBI can freely infiltrate mosques, churches and

---

[2] http://www.DOJ.gov/ag/speeches/2002/53002agpreparedremarks.htm.

[3] *Id.*

synagogues and other houses of worship, listen in on online chat rooms and read message boards even if it has no evidence that a crime might be committed."[4]

Attorney General Ashcroft's revision of the domestic surveillance guidelines appears to have borne immediate results.  In November of 2003, a front-page article in the New York Times reported that the FBI had advised local law enforcement officials to step up surveillance and monitoring of peaceful political protesters, and to report any suspicious activity to the FBI's counterterrorism squads.  *See* Eric Lichtblau, *FBI Scrutinizes Antiwar Rallies*, NY Times A1, November 23, 2003.  The article cited an FBI memorandum sent to local law enforcement agencies in preparation for upcoming anti-war demonstrations in Washington, D.C. and San Francisco.  "The FBI memorandum," according to the article, "appears to offer the first corroboration of a coordinated, nationwide effort to collect intelligence regarding demonstrations."  The article went on to note that the FBI's "recent strategy in policing demonstrations is an outgrowth" of former Attorney General John Ashcroft's 2002 decision to relax decades-old guidelines on FBI investigations of political activities.

On December 2, 2004, plaintiffs the American Civil Liberties Union ("ACLU"), American-Arab Anti-Discrimination Committee, Greenpeace, People for the Ethical Treatment of Animals, and United for Peace and Justice, submitted their FOIA requests to determine whether Attorney General Ashcroft's revised guidelines had resulted in FBI and JTTF surveillance of plaintiffs and their members, and to educate the public about their findings.  Plaintiffs sought expedited processing of their requests.

---

[4] http://www.aclu.org/NationalSecurity/NationalSecurity.cfm?ID=10417&c=111

The first request sought records relating to the FBI's monitoring, surveillance, observation, questioning, interrogation, investigation, and/or infiltration of any of the plaintiffs in this action, as well as two other non-parties. (Exhibit A, Letter from ACLU to FBI, December 2, 2004.) Plaintiffs are membership organizations engaged in lawful political and/or religious advocacy. The request sought information regarding FBI or JTTF orders to monitor, interrogate, investigate, or infiltrate these organizations; the collection and maintenance of records on these organizations; and the role of JTTFs in any such actions.

Plaintiffs' second FOIA request sought records relating to the purpose, mission, and tactics of the Joint Terrorism Task Forces. (Exhibit B, Letter from ACLU to FBI, December 2, 2004.) According to defendant FBI's website: "JTTFs are teams of state and local law enforcement officers, FBI Agents, and other federal agents and personnel who work shoulder-to-shoulder to investigate and prevent acts of terrorism . . . . Although the first JTTF came into being in 1980, the total number of task forces has nearly doubled since September 11, 2001. Today, there are 66 JTTFs, including one in each of the FBI's 56 main field offices and ten in smaller offices." In 2002, the FBI created a National JTTF, in which "[n]early 30 agencies are represented, spanning the fields of intelligence, public safety, and federal, state, and local law enforcement."[5]

Specifically, the FOIA request sought records relating to domestic surveillance by JTTFs on the basis of political viewpoint, participation in demonstrations or protest activity, or the religion, race, ethnicity, or national origin of an organization's or group's staff, members, and/or constituents. The request also sought information relating to JTTF

---

[5] http://www.fbi.gov/terrorinfo/counterrorism/partnership.htm

6

infiltration of campus groups, religious organizations, or political protest groups; the maintenance or dissemination of information by any JTTF about such groups and organizations; the methods employed by JTTFs engaged in such activity; and any potentially abusive or unlawful practices undertaken by any JTTF.

On February 8, 2005, nearly six weeks after plaintiffs submitted their requests, plaintiff ACLU wrote to defendants to inquire into the status of the requests for expedited processing. (Exhibit C, Letter from A. Beeson to M. Corallo and D. Hardy, Feb. 8, 2005.) Plaintiff ACLU noted that defendants were in violation of 28 C.F.R. § 16.5(d)(4), which requires that a decision to grant or deny expedited processing be made within ten calendar days of the submission of a FOIA request. Defendants did not respond to this letter.

On April 28, 2005, plaintiff ACLU again wrote to defendant DOJ regarding the status of plaintiffs' request for expedited processing, and demanded a response no later than May 6, 2005. (Exhibit D, Letter from A. Beeson to T. Scolinos, April 28, 2005.) Defendant DOJ did not respond to this letter.

On May 18, 2005, plaintiffs commenced this action for injunctive relief, requesting an order requiring defendants to process immediately the records requested by plaintiffs and to disclose the requested records in their entirety. Plaintiffs now move for a preliminary injunction seeking expedited processing and prompt disclosure of the requested documents.

**STATUTORY FRAMEWORK**

"The animating principle behind the Freedom of Information Act is safeguarding the American public's right to know what 'their Government is up to.'" *Ctr. for Nat'l*

7

*Sec. Studies v. United States Dep't of Justice*, 215 F.Supp.2d 94, 96 (D.D.C. 2002) (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). "In enacting [the FOIA], Congress recognized that access to government records is critical to earning and keeping citizens' faith in their public institutions and to ensuring that those institutions operate within the bounds of the law." *Id.* at 96.

Expedited processing of FOIA requests is warranted "in cases in which the person requesting the records demonstrates a compelling need," 5 U.S.C. § 552(a)(6)(E)(i)(I), and "in other cases determined by the agency," § 552(a)(6)(E)(i)(II). Agency regulations elaborate on these standards, providing that expedited processing is warranted when a request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 28 C.F.R. § 16.5(d)(1)(ii), or when it involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," § 16.5(d)(1)(iv). If a requester applies for expedited processing, the agency is required to grant or deny the request within 10 days. 5 U.S.C. § 552(a)(6)(E)(ii)(I).

Agency denials of requests for expedited processing are subject to judicial review in accordance with 5 U.S.C. § 552(a)(6)(E)(iii), which states:

> Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under [5 U.S.C. § 552(a)(4)], except that the judicial review shall be based on the record before the agency at the time of the determination.

8

5 U.S.C. § 552(a)(6)(E)(iii).   An agency's refusal to grant a request for expedited processing is reviewed by the district court *de novo*.  *Al-Fayed v. Central Intelligence Agency*, 254 F.3d 300, 308 (D.C. Cir. 2001).

### ARGUMENT

In evaluating plaintiffs' request for the entry of a preliminary injunction, this court must assess:

> (1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest.

*Al-Fayed,* 254 F.3d at 303; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  Consideration of these factors establishes plaintiffs' clear entitlement to injunctive relief.

I. <u>Plaintiffs Are Likely to Succeed on the Merits of their Claim for Expedited Processing</u>

  A. <u>Plaintiffs Are Entitled to Expedited Processing Under the "Urgency to Inform" Standard of 28 CFR § 16.5(d)(1)(ii)</u>

Under 28 CFR § 16.5(d)(1)(ii), plaintiffs may establish their "compelling need for expedition" by demonstrating that their requests involve an "urgency to inform the public concerning actual or alleged Federal Government activity," made by a person or entity "primarily engaged in disseminating information."  *See also ACLU v. DOJ,* 321 F. Supp. 2d at 28.  In denying plaintiffs' requests for expedited processing under this standard, defendant FBI maintained that the information provided by plaintiffs did not present a "particular urgency to inform the public about government activity beyond the public's right to know about government activity generally," and further that the "primary activity

9

of the American Civil Liberties Union [was] not information dissemination . . . ." (Exhibits E and F.)  Under the law of this circuit, both contentions are incorrect.

      Whether plaintiffs "have established an 'urgency to inform' and hence a 'compelling need' for the documents they seek . . . hinges on three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity."  *ACLU v. DOJ,* 321 F. Supp. 2d at 29 (*citing Al-Fayed,* 254 F.3d at 310).  Because the requests by their clear terms seek information about federal government activity, plaintiffs' entitlement to expedited processing turns on the first two factors, each of which is easily met.

      Notwithstanding defendant FBI's boilerplate denials, it cannot seriously be disputed that the alleged domestic political surveillance activities that form the basis for plaintiffs' requests, like the Patriot Act provisions at issue in *ACLU v. DOJ,* "unquestionably implicate[] important individual liberties and privacy concerns which are of immediate public interest," 321 F. Supp. 2d at 29, as demonstrated by the numerous articles cited in plaintiffs' requests.  *See, e.g.,* Eric Lichtblau, *FBI Scrutinizes Antiwar Rallies*, New York Times, November 23, 2003, at A1 (describing FBI intelligence-gathering at anti-war protests despite internal FBI memorandum noting that the Bureau "possesses no information indicating that violent or terrorist activities are being planned as part of these protests"); Monica Davey, *An Antiwar Forum in Iowa Brings Federal Subpoenas,* New York Times, Feb. 10, 2004, at A14 (noting First-Amendment concerns raised by issuance of federal subpoenas seeking information about membership, agendas, and reports of Lawyers' Guild forum on nonviolent philosophies

10

and disobedience); Michelle Goldberg, *Outlawing Dissent*, Salon.com, Feb. 11, 2004 (noting resemblance between Hoover-era governmental surveillance and recent law-enforcement tactics that include undercover infiltration of anti-war groups); Eric Lichtblau, *FBI Goes Knocking for Political Troublemakers*, New York Times, August 16, 2004, at A1 (describing dispute over legitimacy of FBI tactics including interviewing political demonstrators across the country prior to national political convention); *see also* Exhibit A at 12-13, Exhibit B at 9-10 (citing additional articles).  Further, as in *ACLU v. DOJ,* "[b]ecause the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of a finding of expediency." 321 F. Supp. 2d at 30.

This case bears an additional and critical similarity to *ACLU v. DOJ*: the information sought by plaintiffs is of vital importance to the public in evaluating the efficacy and propriety of a much-heralded shift in law enforcement policy.  The revision of the FBI's domestic intelligence guidelines was deemed noteworthy enough by defendants that the Attorney General himself announced the policy at a public news conference; plaintiff ACLU joined the debate by immediately issuing a competing press release decrying the move.  The debate about the proper limits of federal surveillance authority has only broadened in scope and significance since then.  Indeed, since these FOIA requests were submitted, the city of Portland, Oregon has become the first in the nation to withdraw its local law enforcement officers from a Joint Terrorism Task Force, citing civil liberties concerns.  *See* William McCall, *Portland Becomes First to Pull out of FBI-led Terror Team,* The Associated Press, April 29, 2005 (describing city council's 4-1 vote to withdraw from JTTF and quoting one councilman as stating that terrorism

11

could be prevented while protecting "basic rights of all people"). Although this event occurred after plaintiffs had submitted their requests, it plainly underscores that the information sought by plaintiffs will contribute to an "ongoing national debate," *ACLU v. DOJ,* 321 F. Supp. 2d at 30 – a debate whose public significance defendants have been all too willing to highlight outside the context of open-government laws.

Finally, under applicable standards, plaintiff ACLU has established that it is "primarily engaged in disseminating information." 28 CFR § 16.5(d)(1)(ii). In *ACLU v. DOJ,* this court held that the Electronic Privacy Information Center satisfied the Agency standard "because it 'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience . . . .'" 321 F. Supp. 2d 30 n.5 (*quoting EPIC v. Dep't of Defense,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).[6] The ACLU easily satisfies that standard. As set forth in plaintiffs' requests:

> Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Specifically, the ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily visited web site: http://www.aclu.org/. The web site addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The website specifically includes features on information obtained through the FOIA. See, e.g.,

---

[6] The legislative history of the FOIA supports this court's analysis, explaining that the standard was intended to exclude requesters who disseminated information "only incidentally." H.R. Rep. No. 104-795, at 26 (1996) ("A requester who only incidentally engages in information dissemination, besides other activities, would not satisfy this requirement."). As described above, the dissemination of information to the public is central, not merely incidental, to the ACLU's activities.

>www.aclu.org/patriot_foia; www.aclu.org/torturefoia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.
>
>In addition to the national ACLU offices, there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These offices further disseminate ACLU material to local residents, schools and organizations through a variety of means including their own websites, publications and newsletters. Further, the ACLU makes archived material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. ACLU publications are often disseminated to relevant groups across the country, which then further distribute them to their members or to other parties.

Ex. A, at p. 9; Ex. B, at p. 6. Only by ignoring this court's recent guidance could defendants find the ACLU ineligible for expedition under this standard.

In sum, this case presents the paradigmatic example of requests entitled to expedition under the Department's "urgency to inform" standard.

> B.   <u>Plaintiffs Are Entitled to Expedited Processing Under the "Media Interest" Standard of 28 CFR 16.5(d)(1)(iv)</u>

Plaintiffs are also entitled to expedited processing under 28 CFR § 16.5(d)(1)(iv) if the subject of their request involves a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." Defendants' implausible insistence that the "DOJ's OPA did not detect 'widespread and exceptional media interest,' nor questions concerning the government's integrity regarding the issues raised [plaintiffs'] requests" – if true – can only mean that the Director chose not to read either the requests themselves or any of the articles cited therein. This court has made clear that "OPA cannot simply turn a blind eye to the flurry of media attention" generated by Department policies as a means of denying expedition. *ACLU v. DOJ,* 321 F. Supp. 2d at 32. Defendants' denial of expedited

13

processing under this standard "fails to pass the reasonableness test." *Id.* at 31 (*citing Al-Fayed,* 254 F.3d 307 n.7).

Plaintiffs cited to numerous articles that amply demonstrate widespread media interest in the FBI's domestic intelligence-gathering activities, and many of those articles raise serious questions about government integrity. *See, e.g.,* Eric Lichtblau, *Subpoena Seeks Records About Delegate Lists on Web*, NY Times, August 30, 2004, at A10 (noting controversy surrounding DOJ's subpoenaing of records relating to political internet posting by critics of President Bush); Eric Lichtblau, *Protesters At Heart of Debate on Security vs. Civil Rights*, NY Times, August 28, 2004, at A9 (same); Susan Greene, *Activists Decry Pre-Convention Security Tactics*, Denver Post, August 26, 2004 (describing reaction among protestors to the governmental investigation of their protest plans); Eric Lichtblau, *FBI Goes Knocking for Political Troublemakers*, *supra*; Amy Herdy, *Teaching the Silent Treatment*, Denver Post, August 8, 2004 (noting suspicion among protestors of ill motive behind governmental questioning of activists); Kerri Ginis, *Peace Fresno Seeks Damages*, The Fresno Bee, Feb. 28, 2004 (noting litigation surrounding undercover officer's infiltration of community activist group); Monica Davey, *An Antiwar Forum in Iowa Brings Federal Subpoenas, supra*; Kelly Thornton, *FBI's Home Visits Have Some Muslims Feeling Harassed, Alienated*, Signonsandiego.com, August 4, 2004 (noting disagreement about intent behind FBI home visits to question Muslims); David Shepardson, *FBI Agents Hunt for Terror Leads*, The Detroit News, Oct. 1, 2004 (noting concern among Arab-American and Muslim communities about FBI door-to-door questioning); *see also* Exhibit A at 12-13, Exhibit B at 9-10 (citing additional articles).

14

Moreover, much of the coverage cited by plaintiffs specifically addressed the role of JTTFs in alleged political surveillance activity. *See, e.g.,* Camille T. Taiara, *New FBI Witch-Hunt*, San Francisco Bay Guardian, August 4-10, 2004 (detailing JTTF role in targeting Muslims and Arabs for FBI monitoring); Karen Abbott, *FBI Queries Rattle Activist*, Rocky Mountain News, July 27, 2004 (describing JTTF infiltration and investigation of political activists); Jeff Eckhoff & Mark Siebert, *Group Fights Anti-War Inquiry*, Des Moines Register, Feb. 7, 2004 (noting JTTF investigation of anti-war groups); Jeff Eckhoff & Mark Siebert, *Anti-War Inquiry Unrelated to Terror*, Des Moines Register, February 10, 2004 (same); Alex Bradley & John Mayer, *The War at Home*, www.saveourcivilliberties.com, Sept. 2, 2004 (reporting JTTF role in monitoring peace groups and political activists); Michelle Goldberg, *Outlawing Dissent*, Salon.com, *supra*.

This court has made clear that determination of widespread media interest is not a numbers game, and that "only a handful of articles" may establish entitlement to expedition under this standard. *ACLU v. DOJ,* 321 F. Supp. 2d at 32 and n.11. In this case, plaintiffs have more than satisfied the Department's requirements. Indeed, if expedition is not warranted in this case, it is difficult to imagine a case in which it would be.

 II. Plaintiffs Will Suffer Irreparable Injury in the Absence of the Requested Injunctive Relief

Plaintiffs' FOIA requests are directed at information whose disclosure is necessary for informed public debate about the government's domestic intelligence-gathering activities. As plaintiffs noted in their FOIA requests:

15

> This request implicates a matter of urgent public concern; namely, the consequences of a recent change in government policy that has likely resulted in increased surveillance and infiltration of political, religious, and community organizations by the FBI.  Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease, future violations are prevented, and any chilling effect on public participation in potentially targeted groups and/or political activity be halted.

Ex. A at 11; Ex. B at 8.  Thus, the same considerations that underlie plaintiffs' entitlement to expedited processing inform and dictate this court's irreparable injury determination.  Because plaintiffs have already demonstrated that "the request concerns a matter of current exigency to the American public . . . [and that] the consequences of delaying a response would compromise a significant recognized interest," *Al-Fayed,* 254 F.3d at 310, it follows that plaintiffs have demonstrated sufficient injury to establish their entitlement to preliminary injunctive relief.

Defendants have now delayed the processing of plaintiffs' requests for more than six months; indeed, they waited until six months had passed, and they had been sued, before even *denying* plaintiffs' requests for expedition, although Department regulations mandate that such determinations be made within ten days.  This delay already has obstructed plaintiffs and the public from evaluating the government's use of expanded intelligence-gathering authority.  Permitting the government to postpone further the processing of plaintiffs' requests would render plaintiffs' statutory entitlement to expedited processing meaningless.

      III.      <u>Issuance of an Injunction Would Not Substantially Injure Other Parties</u>

Injunctive relief would impose no burden on defendants beyond that contemplated by the FOIA and the DOJ's own regulations.  The relief sought by plaintiffs requires

16

nothing more of defendant than what the law already mandates – namely, the expedited processing of plaintiffs' FOIA requests. Nor would injunctive relief impose any uncontemplated burden on the interests of other parties that have submitted FOIA requests to defendants. The FOIA expressly provides that expedited requests will take precedence over those requests that do not warrant expedited processing. The subordination of non-expedited requests is therefore a consequence of the statutory scheme, not any injunction imposed to enforce it.

### IV.  The Public Interest Favors the Requested Relief

The D.C. Circuit has long recognized that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). Such adherence is all that plaintiffs seek here. The public interest will also be served by the speedy release of the requested records, because such release will further the FOIA's core purpose of "shed[ding] light on an agency's performance of its statutory duties." *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. at 773. As this court has noted, "[t]here is public benefit in the release of information that adds to citizens' knowledge" of government activities. *Ctr. to Prevent Handgun Violence v. United States Dep't of the Treasury*, 49 F. Supp .2d 3, 5 (D.D.C. 1999). The public interest clearly favors the issuance of injunctive relief.

**CONCLUSION**

For the foregoing reasons, plaintiffs' request for a preliminary injunction should be granted.

Respectfully submitted,

_____
Arthur B. Spitzer
   D.C. Bar No. 235960
American Civil Liberties Union
   of the National Capital Area
1400  20th Street, N.W. #119
Washington, D.C. 20036
Phone:  (202) 457-0800
Fax: (202) 452-1868

Ann Beeson
Ben Wizner
Corey Stoughton (D.C. Bar No. 472867)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2629

Counsel for Plaintiffs

June 16, 2005