IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civ. A. No. 1:05-CV-1004 (ESH) |
| | ) |
| | ) Judge Ellen S. Huvelle |
| v. | ) |
| | ) |
| FEDERAL BUREAU OF INVESTIGATION, | ) |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

**INTRODUCTION**

Pursuant to Local Rule 7(h), Defendants, by and through their undersigned counsel, hereby submit their statement of facts as to which there is no genuine issue in support of Defendants' Motion for Partial Summary Judgment.

**STATEMENT OF MATERIAL FACTS**

**I.      Plaintiffs' FOIA Requests.**

1.      At issue in this case are two FOIA requests made by the plaintiffs to the Department of Justice, Federal Bureau of Investigation (FBI).  First, plaintiffs requested records about the National Joint Terrorism Task Force ("NJTTF") and local Joint Terrorism Task Forces ("JTTFs").  Declaration of David M. Hardy ¶ 6 and Exhibit A (FOIA Request No. #1).  Second, plaintiffs requested documents that concerned any monitoring, surveillance, observation, questioning, interrogation, investigation, and infiltration specifically about several organizations, including the plaintiffs themselves (ACLU, Arab-American Anti-Discrimination Committee ("ADC"), Greenpeace, People for the Ethical Treatment of Animals ("PETA"), and United for

Justice and Peace ("UFJP").  <u>See</u> Hardy Decl. ¶ 6 and Exhibit B (FOIA Request No. #2).

    2.    By letter dated December 23, 2004, FBIHQ acknowledged receipt of plaintiffs'

requests to FBIHQ and the seven field offices.  Hardy Decl. ¶ 9 & Exh. D thereto.

    3.    The two FOIA requests at issue in this case were among numerous other multi-part

FOIA requests submitted on the same day to the FBI by the several ACLU chapters nationwide.

Hardy Decl. ¶ 6 and n.1 and Exhs. C1 to C5 thereto.  All together, these ACLU requests seek

records on 93 separate subject matters.

    4.    Each subject matter has resulted in a different outcome.  <u>See</u> Hardy Decl. ¶ 10 and

Exhibit E.

    5.    Some searches have yielded no responsive records, and the FBI has informed the

appropriate ACLU chapter/requester of these results.  Hardy Decl. ¶ 10.   By letter dated March

3, 2005, FBIHQ advised plaintiffs that in response to FOIPA No. 1010244 regarding Code Pink,

a search of the automated indices to the Central Records System had located no responsive

records.  <u>Id.</u>  By letter dated March 16, 2005, FBIHQ advised plaintiffs that in response to

FOIPA No. 1010247 regarding PETA, a search of the automated indices to the Central Records

System had located no responsive records in the Richmond Field Office.  <u>Id.</u>  Plaintiffs were

advised of their right to file an administrative appeal with respect to these requests.  <u>Id.</u>

    6.    Other searches have yielded relatively small numbers of potentially responsive

pages, and the FBI has been processing these pages for interim release.  Hardy Decl. ¶ 11.

    7.    The FBI's efforts in responding to all of the ACLU's December 2, 2004 FOIA

requests has been based on a methodical, organized approach designed to identify records

responsive to each of the ACLU chapter requests, with no regard to which ACLU chapter would

choose to file a lawsuit challenging the FBI's actions.   Hardy Decl. ¶ 12.  As a result, no

particular set of requests were placed ahead of another set, and each has been addressed in the

normal course.  Id.

**II.    Plaintiffs' Request for Expedited Processing**.

8.    Plaintiffs included a request for expedited processing in both of the  FOIA

requests at issue in this case.  See Hardy Decl. ¶ 18 and Exhibits A and B.

9.    Plaintiffs argued that they were entitled to expedition under 28 C.F.R.

§ 16.5(d)(I)(ii) by stating that the request "implicates a matter of urgent public concern; namely,

the consequences of a recent change in government policy that has likely resulted in increased

surveillance and infiltration of political, religious and community organizations by the FBI  . . .

[and] [s]uch government activity may infringe upon the public's free speech, free association and

privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to

the United States Constitution."  Hardy Decl. ¶ 18.  Plaintiffs also argued that they were entitled

to expedition under 28 C.F.R. § 16.5(d)(I)(iv) by stating that the request "relates to possible

violations of Constitutional rights by federal law enforcement and potential targeting of groups

by federal law enforcement based on illicit categories of political viewpoint, race, religion, and

nationality."  Id.  Plaintiffs also argued that there was "exceptional media interest in this issue

[as] reflected in widespread news coverage at both the local and national level."  Id.

10.    By letter dated February 8, 2005, plaintiffs reminded both the FBI and DOJ OPA

that the deadline to grant or deny expedited processing of their December 2, 2004 requests had

passed six weeks earlier on December 19, 2004.  Hardy Decl. ¶ 19 and Exh. I.  Plaintiffs

requested a determination on the issue of expedition from both the FBI and OPA no later than

February 21, 2005.  Id.

11.    The FBI concluded that the ACLU requests at issue in this case did not warrant expedited treatment at the expense of other, earlier-submitted requests waiting in the FBI's "first-in, first-out" processing queue.  Hardy Decl. ¶ 20-22.   Specifically, the FBI found that the ACLU failed to show that it is "primarily engaged in disseminating information" as the DOJ regulations require in order to justify expedited processing, or that there is an "urgency to inform" the public about the many subjects of its FOIA requests.   Id.

12.    Plaintiffs also sought expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), through which DOJ, by regulation, expedites treatment whenever the Director of the Office of Public Affairs ("OPA") determines that a FOIA request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  Hardy Decl. ¶ 23.   Requests for expedition under 28 C.F.R. § 16.5(d)(1)(iv) must be submitted to DOJ's OPA, DOJ's "media specialists," 63 Fed. Reg. at 29592.  Id.

13.    The FBI was advised by the Director of OPA of her conclusion that the ACLU FOIA requests at issue in this case did not involve "matter[s] of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  Hardy Decl. ¶ 23.  As a result, the FBI informed plaintiffs of OPA's decision to deny their requests for expedited processing by letters dated May 25, 2005 and June 6, 2005 respectively.  Id. and Exhibits J and K.

**A.    The ACLU Is Not Primarily Engaged in Disseminating Information.**

14.    Although ACLU may disseminate information, the primary activity of the organization is to litigate high-impact cases to defend and promote civil liberties.

15.    The ACLU website states on its "About Us" page that it works "daily in courts, legislatures, and communities to defend and preserve individual liberties . . .". See Exh. B to Declaration of Anthony J. Coppolino.

16.    The ACLU's "About Us" web page contains a link to another ACLU document, a position paper entitled "*Freedom is Why We're Here*," in which the ACLU states that it is the nation's "largest public interest law firm" in a "50-state network of staffed, autonomous affiliate offices." See Exh. C to the Coppolino Declaration.

17.    The ACLU position paper states that "[m]ore than 60 ACLU staff attorneys on the national and affiliate levels collaborate with more than 2,000 volunteer attorneys in handling close to 6,000 cases annually." See Exh. C to the Coppolino Declaration.

18.    The ACLU paper also states that the ACLU "appears before the U.S. Supreme Court more than any other organization except the U.S. Department of Justice." See Exh. C to the Coppolino Declaration.

19.    The ACLU position paper also describes significant litigation that it has been involved with over decades, from the Scopes trial in 1925 on the teaching of evolution, to the 1954 decision on school desegregation in *Brown v Board of Education*, to litigation over abortion rights and the regulation of indecent material on the internet. See Exh. C to the Coppolino Declaration.

20.    Most of the listings in the "Supreme Court," "News" and "Press Room" sections

of the ACLU's website involves a lawsuit with which the ACLU is involved.  See Exhs. D, E

and F to the Coppolino Declaration.

      **B.**      **The Media Reports On Which Plaintiffs Rely Does not Demonstrate a
Current, Exigent Concern in the Subject of the FOIA Requests.**

     21.    Plaintiffs cited a list of newspaper and internet articles to support their expedition

request and submitted these articles to the FBI.  Exhibit A at 9-10 and Exhibit B at 12-13 to the

Hardy Declaration.  The specific articles cited by plaintiffs are attached at Exhibits A1 and A2 to

the Hardy Declaration, ## 1-24.  This constitutes the record for review of plaintiffs' claim for

expedition.

     22.    None of the articles concerns or even refers to political surveillance of the

plaintiffs by the FBI – the subject of one of the FOIA requests.

     23.    The record supplied by plaintiffs likewise fails to establish that there is a current,

exigent interest in the JTTFs alleged surveillance and monitoring activities.  The articles on

which plaintiffs rely concern specific past investigative activity by the FBI in the summer of

2004.

       *i.*     *Articles Concerning the Questioning of Muslim and Arab Americans*

     24.    Several of the articles on which plaintiffs rely, dated from July to October 2004,

report on the same story: a program by the FBI to conduct interviews of Muslim and Arab

Americans in investigating the threat of possible terrorist attacks in the summer of 2004.  See

Exhibits A1 and A2 to the Hardy Declaration (*Arab Americans Concerned Over FBI's "October

Plan"*, www.dailystar.com, October 6, 2004, (Article #1 ); *FBI Agents Hunt for Terror Leads:

Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack,* by David

Shepardson, Detroit News, October 14, 2004 (Article #2); *Few Benefits to Questioning Targeted*

*Groups*, by Jayashri Srikantiah, <u>San Francisco Chronicle</u>, August 6, 2004, (Article # 10); *New FBI Witch Hunt*, by Camile T. Tamara, <u>San Francisco Bay Guardian</u>, August 4-10, 2004 (Article #11); *FBI's Home Visits Have Some Muslims Feeling Harassed, Alienated*, by Kelly Thornton, <u>www.Signonsandeigo.com,</u> August 4, 2004 (Article #12); *FBI Starts to Question Muslims in U.S. About Possible Attacks*, by Richard Schmitt and Donna Horowitz, <u>www.latimes.com</u>, July 18, 2004 (Article #13); *Interviews of Muslims to Broaden*, by Mary Beth Sheridan, <u>www.washingtonpost.com</u>, July 17, 2004 (Article #15).

25.     The foregoing articles do not refer to political surveillance of the plaintiffs, which is the subject of one of the FOIA requests at issue.

26.     The foregoing articles do not specifically discuss the role, function, policies and procedures of the JTTFs, which is the subject of plaintiffs' other FOIA request at issue.

27.     The foregoing articles report that the FBI engaged in questioning Muslim and Arab Americans in 2004 in an effort to stave off a terrorist attack.

28.     The <u>Washington Post</u> article by Mary Beth Sheridan on July 17, 2004, *Interviews of Muslims to Broaden; FBI Hopes to Avert A Terrorist Attack* (Exh. A2 to Hardy Declaration, Article #15), specifically reports about an FBI effort to interview Muslims and Arab Americans in the summer of 2004 directed at "hoping to glean information that could prevent a major terrorist attack during this election year."  The article quotes a July 9, 2004, press release by the Attorney General describing an effort by the government to obtain knowledge of a possible terrorist attack by "again reaching out to partners in the Muslim and Arab-American communities for any information they may have."  <u>Id.</u>  The article makes no mention of alleged surveillance of the plaintiffs or political organizations in general by the JTTFs, which is the

focus of the FOIA requests.  See Pl. Mem. at 3-4 (FOIA requests seek information about an

alleged shift in investigative policy to conduct "widespread political surveillance" of civil rights

and peace groups).   Local JTTFs are mentioned in the article only as collaborating with the FBI

on these interviews.

29.     An article published the next day (July 18, 2004) by Richard Schmitt and Donna

Horowitz on www.latimes.com, *FBI Starts to Question Muslims in U.S. About Possible Attacks*

(Exh. A2 to the Hardy Declaration, Article # 13), repeats the story.  It again describes the

questioning of Muslims and Arab Americans in connection with possible terrorist attacks in the

summer and fall of 2004.  Id.   It also reports that the interview program was publicly announced

in May 2004 by the Attorney General and FBI Director, and reports that FBI officials "have been

meeting in recent weeks with Islamic groups, seeking to enlist their support at a time" when

government officials believed there was as high a risk of terrorist attack since 9/11.  Id.  The

article does not concern surveillance of the plaintiffs.  The article mentions the JTTF in

connection with gathering information about a terrorist attack in the summer of 2004.

30.     An article by Kelly Thornton published a few weeks later on

www.Signonsandiego.com, *FBI's Home Visits Have Some Muslims Feeling Harassed, Alienated*

(August 4, 2004) (Exh. A1 to Hardy Declaration, Article # 12) also focuses on the questioning of

Muslims in 2004 to stave off possible terrorist attack last summer.  Again, however, this story

contains no mention of any surveillance of plaintiffs or general political surveillance of civil

rights and peace groups, and no mention of the JTTFs.  The article does discuss an "outreach

program" by the FBI in San Diego to "reconnect with" and "cultivate sources" among Muslim

and Arab Americans by making appointments to speak with community leaders.  Id.  The article

also reports that FBI questioning in San Diego concerned a particular individual – a deported Saudi citizen – who had links to one of the 9/11 hijackers.  Id.

31.    A Detroit News story in October 2004 again concerned the questioning of Muslims and Arab Americans – this time specifically in Detroit – in an effort to prevent a terrorist attack prior to the 2004 election.  See Exh. A1 to Hardy Declaration (Article #2), *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack*, by David Shepardson, October 1, 2004.   Only one of the plaintiffs is mentioned in the article – the American Arab Anti-Discrimination Committee – whose regional director expressed concern with these interviews – not that ADC itself is being investigated by the FBI, which is the subject of ADC's FOIA request.  There is no mention of the JTTF in the article.

32.    Also in October 2004, the Daily Star reported on a press release in which the Arab American Institute expressed concern over unspecified reports that the FBI and Department of Homeland Security have or will be enacting a new initiative of surveillance of individuals "suspected of being terrorist sympathizers."  See Exh. A1 to the Hardy Declaration (Article #1), *Arab Americans Concerned Over FBI's "October Plan"*).  The article makes no reference to any of the plaintiffs or the JTTF.  Indeed, aside from parroting a press-release by the AAI, the article's longest paragraph discusses an initiative by the Department of Homeland Security – not the FBI – for an alleged "immigration sweep" of metropolitan areas.

33.    An article published on August 6, 2004 in the San Francisco Chronicle by Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups* (Exh. A1 to Hardy Declaration, Article # 10) is an opinion piece written by a Professor at Stanford University Law

School criticizing the questioning of Muslim people in the San Francisco Bay Area in the summer of 2004. The article does not mention surveillance of the plaintiff FOIA requestors, nor the JTTF.

34.     An article published that same week in the <u>San Francisco Bay Guardian</u> by Camile T. Taiara (<u>see</u> Exh. A1 to Hardy Declaration, Article # 11), *New FBI Witch Hunt*, August 4-10, 2004) repeats the views of Professor Srikantiah's and again focuses on the FBI's questioning of Muslim and Arab Americans in 2004. The article does not mention alleged surveillance of the plaintiff organizations nor of general political surveillance of civil rights and peace groups by the JTTFs.

35.     Several of the articles on which the ACLU relies to demonstrate an urgent public interest in the subject of their FOIA requests set forth the concerns of the ACLU itself and those of its associates.

36.     The author of the opinion article in the <u>San Francisco Chronicle</u>, Jayashri Srikantiah, is reportedly the former associate legal director at the ACLU. <u>See</u> Exh. A1 to Hardy Declaration, Article #10.

37.     Ms. Srikantiah's views are then quoted in the article by Camille T. Taiara in the <u>San Francisco Bay Guardian</u>, along with the views of another official of the ACLU of Northern California. <u>See</u> Exh. A1 to Hardy Declaration, Article #11.

38.     The <u>Washington Post</u> and <u>latimes.com</u> articles (Exh. A2 to Hardy Declaration, Article ## 13, 15) quote the National Lawyers Guild and the Council on American-Islamic Relations ("CAIR"), both of which are reportedly working with the ACLU to monitor government surveillance tactics and provide services for impacted communities. <u>See</u> ACLU

Oct. 5, 2004 press release, <u>FBI's New Surveillance Plan Chills Religious and Political Activity – Bay Area Civil Rights Groups Warn</u>, Exh. G to Coppolino Declaration.  Both the <u>Washington Post</u> and <u>LA Times</u> reports quote James Hacking, identified as a Muslim lawyer in St. Louis, who happens to be the head of CAIR's St. Louis chapter.  <u>See</u> Coppolino Decl. ¶ 9 and Exhibit H.

ii.    <u>*Articles Concerning the 2004 Political Conventions*</u>

39.    In an effort to show a current, exigent interest in their FOIA requests, Plaintiffs also rely on several stories about FBI inquiries into whether political protests, primarily those planned for the national political conventions in the summer of 2004, might turn violent.

40.    The report on which plaintiffs principally rely to demonstrate a current, exigent interest in the subject of their FOIA requests was written in November 2003 and quotes the concerns of the ACLU itself.  <u>See</u> *FBI Scrutinizes Antiwar Rallies* by Eric Lichtblau, <u>New York Times</u>, November 23, 2003 (Exh. A2 to Hardy Declaration, Article #23).  This article does not refer to surveillance of the plaintiffs or the practices of the Joint Terrorism Task Forces.  It concerns a purported FBI memorandum sent to local law enforcement agencies in October 2003 in advance of anti-war demonstrations that month in Washington and San Francisco.  The FBI memo in question reportedly provided intelligence information on the tactics, training, and organization of antiwar demonstrations to help local law enforcement deal with the threat of potential violence at these protests.  This is not the subject of either FOIA request.

41.    Other articles cited by plaintiffs concern specific events in the summer of 2004 in which the FBI sought to gather information about potential violence at the Republican and

11

Democratic National Conventions.  These articles reflect no current, exigent concern in the subject of either FOIA request.

42.     On July 27, 2004, an article that appeared on Rocky Mountain News by Karen Abbot, entitled *FBI's Queries Rattle Activists: Agents Seek Information on Possible Violence at Political Conventions (*Exh. A2 to the Hardy Declaration, Article #14), is devoted almost entirely to an interview of a Colorado man about potential violence at the 2004 political conventions. The article also contains speculation by an ACLU official that such FBI questioning is happening elsewhere.  Id.   No mention is made of surveillance of the plaintiffs.  The sole mention of the local JTTF is that it receives assistance from the Denver Police, which had been involved in a lawsuit brought by ACLU over whether the Denver Police improperly maintained files on individuals.  Id.

43.     Plaintiffs also rely on another story out of Colorado published on August 8, 2004 in the Denver Post by Amy Herder, called *Teaching the Silent Treatment* (Exh. A1 to Hardy Declaration, Article #9).  This article likewise concerns efforts by the FBI and JTTF to gather intelligence for any plans for violence at the 2004 political conventions and presidential inauguration.  Id.  It reports on how one Colorado group provided advice on how to respond to such questioning.  Id.  The article includes concerns expressed by the ACLU itself.  Id.

44.     Plaintiffs cite another Denver Post article by Susan Green, published on August 26, 2004, *Activists Decry Pre-Convention Security Tactics, Questions by FBI, The Feds Say They Are Trying to Avoid Terror Threats But many People Say the Steps Veer Toward Intimidation* (Exh. A1 to Hardy Declaration, Article #7).  Again this article concerns questioning by the FBI and JTTF in connection with the Republican National Convention (RNC) in 2004.

Id.  It mentions the JTTF solely in that context.  Id.  It mentions only one of the plaintiff FOIA requestors – United for Justice and Peace - noting that it planned to hold a protest in Central Park during the RNC.  Id.  It does not address surveillance of the plaintiffs or any political surveillance by JTTFs – just efforts to prevent violence at the 2004 conventions.

45.    Plaintiffs also cite three New York Times articles by Eric Lichtblau around the time of the 2004 Republican Convention in New York City.  The first articled, titled *FBI Goes Knocking for Political Troublemakers,* August 16, 2004 (Exh. A1 to Hardy Declaration, Article #8), refers to "aggressive effort" by the FBI to forestall violent and disruptive protests at the Republican National Convention in New York in 2004.  It makes no reference to surveillance of the plaintiff FOIA requestors and no reference to the policies and procedures of the JTTF or allegations that JTTFs generally monitor peace and civil rights groups.

46.    The second New York Times article, entitled *Protestors at Heart of Debate on Security v Civil Rights*, published on August 27, 2004 (Exh. A1 to Hardy Declaration, Article #5), again concerns the questioning of individuals in connection with possible violence at the 2004 Republican and Democratic Conventions.  There is no reference to the plaintiff organizations or to general surveillance of political groups, and no reference to the JTTFs or its policies and procedures.

47.    The third New York Times article cited by plaintiffs, titled *Subpoena Seeks Records About Delegate Lists on Web,* August 30, 2004 (Exh. A1 to Hardy Declaration, Article #3), is a one-paragraph article that specifically concerns a criminal investigation opened by the Justice Department concerning an Internet posting that names Republican delegates to the 2004 Republican National Convention in New York City and urges protestors to give them an

unwelcomed reception in New York.  This has nothing to do with either FOIA request.

48.    There is no 'urgency to inform the public' about the FBI's activities in connection with investigating possible violence at political conventions which occurred in late August and early September of 2004.

### iii.    *Other Articles Referring to the JTTFs*

49.    Finally, plaintiffs submitted to DOJ and FBI some other articles that make reference to alleged JTTF activities.  None demonstrate an urgent public interest in the subject of either FOIA request.

50.    Plaintiffs cite a set of articles concerning alleged JTTF subpoenas to Drake University in Iowa for documents concerning an anti-war conference that had been held there previously.  See Exh. A2 to the Hardy Declaration, Articles ## 16, 17, 18,19 (*Group Fights Anti-War Inquiry*, by Jeff Eckhoff and Mark Siebert, Des Moine Register, February 7, 2004; *Anti-War Inquiry Unrelated to Terror,* by Jeff Eckhoff and Mark Siebert, Des Moine Register February 10, 2004; *An Anti-War Forum in Iowa Brings Federal Subpoenas*, by Monica Davey, New York Times, February 10, 2004; *Subpoenas on Anti-War Protest Are Dropped,* by Monica Davey, New York Times, February 11, 2004).  The articles themselves indicate that this incident had nothing to do with either the JTTF or any surveillance of the plaintiffs.

51.    The first article in the Des Moine Register on February 7, 2004 claims a subpoena was served on Drake by the Joint Terrorism Task Force.  See Exh. A2 to Hardy Declaration, Article #16.  But a follow-up article three days later on February 10, 2004 reports that the subpoenas at issue were not part of an anti-terrorism probe by JTTF.  Id., Article #17.  The article states that the subpoenas were in connection with a separate investigation of an unlawful

entry into a military post.  Id.  The article reports that a local investigating police officer apparently used a business card which identified himself as a member of the JTTF.  Id.  The New York Times summarized the incident, publishing stories on the issuance of these subpoenas and that they had been withdrawn.  Id., Articles ## 18 and 19.  None of the articles about this incident concern surveillance of the plaintiffs nor, based on the articles themselves, any action taken by the local JTTF to monitor peace or civil rights groups.  None concern a matter of current, exigent public interest.

52.    Plaintiffs also cite an article in the Fresno Bee by Kerri Ginnis published on Feburary 28, 2004, entitled *Peace Fresno Seeks Damages* (Exh. A2 to Hardy Declaration, Article # 24), which reports on an incident where an individual in Fresno, later identified as a member of a local JTTF, had attended meetings of a group called Peace Fresno and was alleged to be a government infiltrator.  The story came to light after an obituary was published of the deceased agent involved.  The story reports that the Fresno Police denied doing any investigation.  This article does not demonstrate the urgency of plaintiffs' FOIA requests.

53.    Finally, plaintiffs cite three other articles that discuss many of the same incidents noted above, and speculate that local JTTFs are involved in political surveillance.  See Exh. A2 to Hardy Declaration, Article # 20, *Outlawing Dissent* by Michelle Goldberg, Salon.com (February 11, 2004); and Article # 21, *A Thousand J. Edgar Hoovers* by Michelle Goldberg, Salon.Com (February 12, 2004); and Exh. A1, Article #3, *The War at Home: Nationwide Crackdown on Activists* by Alex Bradley and John Mayer, saveourliberties.com (September 9, 2004).

54.    The first Goldberg article discusses at length an incident in Aurora, Colorado

where a police undercover agent infiltrated a group of protestors, and suggests this was linked to

the FBI because the Aurora Police is part of a local JTTF.  See Exh. A2 to Hardy Declaration,

Article #20.

55.    The second Goldberg article discusses two individuals, in Albuquerque and

Grand Rapids, who claimed job reprisal for attending anti-war protests.  See Exh. A2 to Hardy

Declaration, Article #21.  Neither article relates specifically to the FOIA requests, nor

demonstrates a current, widespread and exigent interest in the subject of those requests.

56.    The specific factors cited by the Court which favored expedition in *ACLU v.*

*Department of Justice*,  321 F. Supp. 2d 24 (D. D.C. 2004), are not present in this case.

   **C.    The Record Submitted by Plaintiffs Does Not Demonstrate Widespread**
   **Media Interest in the Subject of the FOIA Requests.**

57.    Plaintiffs also sought expedited processing under 28 C.F.R. § 16.5(d)(1)(iv),

through which the Department of Justice, by regulation, expedites treatment whenever it

determines that a FOIA request involves "[a] matter of widespread and exceptional media

interest in which there exists possible questions about the government's integrity which affect

public confidence."

58.    Requests for expedition under § 16.5(d)(1)(iv) must be submitted to DOJ's Office

of Public Affairs (OPA), the Department's "media specialists," 63 Fed. Reg. at 29592, whose

decisions are reviewed for reasonableness.  See Al-Fayed, 254 F.3d at 307 n. 7.  OPA

appropriately denied plaintiffs' expedition request under § 16.5(d)(1)(iv).

59.    Plaintiffs' contention that they established "widespread and exceptional" media

interest relies on the same media reports as it did for its "current exigency" position.  See Pl.

Mem. at 14.  These reports do not demonstrate widespread and exceptional media interest in the

subject of the plaintiffs' FOIA requests.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar No. 418925)
Assistant Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 7152
Telephone:  (202) 514-5302
Facsimile:  (202) 616-8470
Email: Elizabeth.Shapiro@usdoj.gov


  /s/ Anthony J. Coppolino
ANTHONY J. COPPOLINO
(D.C. Bar No. 417323)
Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 6102
Telephone:  (202) 514-4782
Facsimile:  (202) 616-8460
Dated:  July 5, 2005            Email:  tony.coppolino@usdoj.gov

17

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 5, 2005, the foregoing *Defendants' Statement of Material Facts as to Which There is No Genuine Issue* was filed electronically and served by means of the Court's ECF notice system.  <u>See</u> Local Rule 5.4(d)(1).  If otherwise necessary, the foregoing will also be served directly by electronic mail and first-class mail, postage pre-paid, on:

> Arthur B. Spitzer
> <u>artspitzer@aol.com</u>,
> <u>courtfilings@aclu-nca.org</u>
> D.C. Bar No. 235960
> American Civil Liberties Union of the
> National Capital Area
> 1400 20th Street, N.W. #19
> Washington, D.C. 20036
>
> Ben Wizner
> <u>bwizner@aclu.org</u>
> Staff Attorney
> American Civil Liberties Union
> 125 Broad St., 18th Flr.
> New York, NY 10004

                              /s/ Anthony J. Coppolino
                              ANTHONY J. COPPOLINO