IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN CIVIL LIBERTIES UNION, *et al.*,    )
                                             )
                        Plaintiffs,          )   Civ. A. No. 1:05-CV-1004 (ESH)
                                             )
            v.                               )   Judge Ellen S. Huvelle
                                             )
                                             )
FEDERAL BUREAU OF INVESTIGATION,             )
UNITED STATES DEPARTMENT OF JUSTICE,         )
                                             )
                        Defendants.          )
_____     )

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND DEFENDANTS' MOTION FOR AN <u>OPEN AMERICA</u> STAY**

Respectfully Submitted

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

ANTHONY J. COPPOLINO
Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 6102
Telephone:  (202) 514-4782
Facsimile:  (202) 616-8460
Email:  tony.coppolino@usdoj.gov

Dated:  July 5, 2005

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.     Statutory and Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          a.    The 1996 FOIA Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          b.    Department of Justice Regulations . . . . . . . . . . . . . . . . . . . . . . . 4

    2.     Plaintiffs' FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.     Plaintiffs' Request for Expedited Processing . . . . . . . . . . . . . . . . . . . . . . . . 9

Part 1 - Expedited FOIA Processing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       PLAINTIFFS' DEMAND FOR EXPEDITED PROCESSING
       IS MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Plaintiffs Failed to Satisfy the "Urgency to Inform" Standard . . . . . . . . . . . . 12

          1.    The ACLU Is Not Primarily Engaged in Disseminating
               Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.    Plaintiffs' FOIA Requests Do Not Involve an
               "Urgency to Inform" the Public . . . . . . . . . . . . . . . . . . . . . . . . . 17

               (a)    The Record of Media Reports Relied on by Plaintiffs Does
                     not Demonstrate a Current, Exigent Concern in the Subject
                     of the FOIA Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

               (b)    The Court's Decision in *ACLU v. DOJ*, Involving Public
                     Interest in the Patriot Act, Is Readily Distinguishable . . . . . . . 30

    B.    Plaintiffs Failed to Satisfy the DOJ Media-Related Standard . . . . . . . . . . . . . 32

Part 2 - Stay of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     A.    The FBI's FOIA Processing System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     B.    Processing of Plaintiffs' Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     A STAY OF PROCEEDINGS TO COMPLETE THE PROCESSING
     OF PLAINTIFF'S VOLUMINOUS FOIA REQUESTS IS
     WARRANTED HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     A.    The FBI Is Operating Under Exceptional Circumstances . . . . . . . . . . . . . . . . . 40

     B.    The FBI Is Making Reasonable Progress in Reducing Its Backlog
             of Pending Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGES**

ACLU of Northern California v. DOJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Al-Fayed v. Central Intelligence Agency,
254 F.3d 300 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

American Civil Liberties Union v. United States Department of Justice,
321 F. Supp. 2d 24 (D. D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brown v Board of Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cecola v. FBI, No. 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Cohen v. FBI, 831 F. Supp. 850 (S.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

EPIC v. Dep't of Defense, 241 F. Supp. 2d 5 (D. D.C. 2003) . . . . . . . . . . . . . . . . 12, 15, 16, 17

Edmond v. United States Attorney, 959 F. Supp. 1 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . 39

Electronic Privacy Information Center v. Department of Defense,
     355 F. Supp. 2d 98 (D. D. C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

Ferguson v. FBI, 722 F. Supp. 1137 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Guzzino v. FBI, No. 95-1780, 1997 WL 22886 (D.D.C. Jan. 10, 1997) . . . . . . . . . . . . . . . . . 42

Haddon v. Freeh, 31 F. Supp.2d 16 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Jimenez v. FBI, 938 F. Supp. 21 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 43

Judicial Watch of Florida, Inc. v. DOJ, No. 97-2869
     (D.D.C. Aug. 25, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Grecco v. DOJ, No. 97-0419 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Narducci v. FBI, No. 98-0130 (D.D.C. Jul. 17, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Kuffel v. United States Bureau of Prisons, 882 F. Supp. 1116 (D.D.C. 1995) . . . . . . . . . . . . 39

Lisee v. CIA, 741 F. Supp. 988 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

-iii-

Manna v. DOJ, No. 93-81, 1994 WL 808070 (D.N.J. Apr. 13, 1994) . . . . . . . . . . . . . . . . . . . . 42

National Security Archive v. Department of Defense,
  880 F.2d 1381 (D.C. Cir. 1989), cert. denied, 494 U.S. 1029 (1990) . . . . . . . . . . . . . . 16

Oglesby v. Dep't of the Army, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ohaegbu v. FBI, 936 F. Supp. 7 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Open America v. Watergate Special Prosecution Force,
  547 F.2d 605 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods,
  708 F. Supp. 359 (D. D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Reed v. DOJ, No. 97-2150 (D. Ariz. Nov. 10, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . 11

Summers v. CIA, No. 98-1682 (D.D.C. July 26, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Taylor v. RTC, 56 F.3d 1497 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES AND REGULATIONS**:

Electronic Freedom of Information Amendments:
  Pub. L. 104-231, § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

  5 U.S.C. § 552(a)(6)(E)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  5 U.S.C. § 552(a)(6)(E)(i)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
  5 U.S.C. § 552(a)(6)(E)(v)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

  16 C.F.R. § 16.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  28 C.F.R. § 16.5(d)(1)(i)-(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

  63 Fed. Reg. 29591 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  63 Fed. Reg. at 29592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 32

**LEGISLATIVE MATERIALS**

  H.R. Rep. No. 104-795, at 26 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

  H.R. Rep. No. 106-50, 106th Cong., 1st Sess., 1999 WL 132731, at 13
   (Mar. 11, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

<u>INTRODUCTION</u>

Plaintiffs, the American Civil Liberties Union and several other organizations, filed this lawsuit against the Department of Justice ("DOJ" or the "Department") and the Federal Bureau of Investigation ("FBI") challenging the FBI's denial of plaintiffs' request to expedite processing of Freedom of Information Act ("FOIA") requests and demanding disclosure of the records requested under the FOIA.  Plaintiffs now move for a preliminary injunction specifically seeking expedited processing of, and access to, FBI documents responsive to their FOIA requests.

The Court should deny plaintiffs' motion and grant summary judgment in favor of defendants on plaintiffs' claim for expedited processing.  Plaintiffs did not remotely demonstrate to DOJ and the FBI that the subject matter of their FOIA requests deserved expedited treatment at the expense of other, earlier-submitted requests pending in the FBI's first-in, first-out processing queue.  Specifically, plaintiffs failed to show that their FOIA requests concern a matter of current exigency to the American public or a matter of widespread and exceptional media interest, as required to obtain expedition.  Moreover, contrary to their argument, plaintiffs' demand for expedition in this case stands in sharp contrast to the circumstances found by this Court in *American Civil Liberties Union v. United States Department of Justice*, 321 F. Supp. 2d 24 (D. D.C. 2004) ("*ACLU v. DOJ*").   Indeed, Judge Phyllis Hamilton of the Northern District of California recently denied a request for expedited processing made by the ACLU of Northern California for a similar set of records based on much the same record at issue here.  <u>See</u> *ACLU of Northern California v. DOJ and FBI*, (Civ. A. No. 04-4447) slip op. (Order Granting Defendants' Motion for Summary Judgment) (Exhibit A to the Declaration of Anthony J. Coppolino).

For these reasons, and those set forth at length below, plaintiffs' motion for a preliminary injunction should be denied, and defendants' cross-motion for partial summary judgment should be granted. In addition, the Court should allow the FBI time to complete its processing of the plaintiffs' request in the normal course by granting an *Open America* stay of proceedings.

<u>BACKGROUND</u>

1.    <u>Statutory and Regulatory Framework</u>

    a.    <u>The 1996 FOIA Amendments</u>

Agencies ordinarily process FOIA requests for agency records on a first-in, first-out basis. In 1996, Congress amended the FOIA to provide for "expedited processing" of certain categories of requests. <u>See</u> Electronic Freedom of Information Amendments of 1996, Pub. L. 104-231, § 8 (<u>codified</u> <u>at</u> 5 U.S.C. § 552(a)(6)(E)) ("E-FOIA"). Expedition, when granted, entitles requesters to move immediately to the front of an agency processing queue, ahead of requests filed previously by other requesters.

As part of E-FOIA, Congress directed agencies to promulgate regulations providing for expedited processing of requests for records. Specifically, Congress directed agencies to enact regulations providing for expedited processing "(i) in cases in which the person requesting the records demonstrates a compelling need;" 5 U.S.C. § 552(a)(6)(E)(i)(I); and "(ii) in other cases determined by the agency." <u>Id.</u> § 552(a)(6)(E)(i)(II). The statute defines "compelling need" to mean:

> (I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

> (II) with respect to a request made by a person primarily engaged in
> disseminating information, urgency to inform the public concerning actual or
> alleged Federal Government activity.

Id. § 552(a)(6)(E)(v)(I), (II).  Requests for expedited processing which an agency grants are to be

processed "as soon as practicable."  Id. § 552(a)(6)(E)(iii).

The E-FOIA House Report, upon which the D.C. Circuit has relied in construing the

amendments, states that the E-FOIA expedition categories should be "narrowly applied."  *Al-*

*Fayed v. Central Intelligence Agency*, 254 F.3d 300, 310 (D.C. Cir. 2001) (quoting Electronic

Freedom of Information Amendments of 1996, H.R. Rep. No. 104-795, at 26 (1996)).  As the

D.C. Circuit explained in *Al-Fayed*:  "Congress' rationale for a narrow application is clear:

'Given the finite resources generally available for fulfilling FOIA requests, unduly generous use

of the expedited processing procedure would unfairly disadvantage other requestors who do not

qualify for its treatment.' . . .  Indeed, an unduly generous approach would also disadvantage

those requesters who do qualify for expedition, because prioritizing all requests would

effectively prioritize none."  254 F.3d at 310 (quoting H.R. Rep. No. 104-795, at 26).

The requestor bears the burden of showing that expedition is appropriate.  See *Al-Fayed*,

254 F.3d at 305 n.4 (quoting H.R. Rep. No. 104-795, at 25).  Agency decisions to deny or affirm

denial of a request for expedited processing are subject to judicial review.  5 U.S.C.

§ 552(a)(6)(E)(iii).  Such judicial review "shall be based on the record before the agency at the

time of the determination."  Id.

The standard for reviewing agency decisions to deny expedition depends on the ground

for decision.  As noted above, an agency may grant expedition "in cases in which the person

requesting the records demonstrates a compelling need," 5 U.S.C. § 552(a)(6)(E)(i)(I), or "in

other cases determined by the agency." Id. § 552(a)(6)(E)(i)(II); see also Al-Fayed, 254 F.3d at

307 n.7 (noting this latter provision gives agencies "'latitude to expand the criteria for expedited

access' beyond cases of 'compelling need'") (quoting H.R. Rep. No. 104-795, at 26).  A decision

denying expedited processing for failure to establish "compelling need" under Section

552(a)(6)(E)(i)(I) is reviewed de novo.  See Al-Fayed, 254 F.3d at 308; ACLU v DOJ, 321 F.

Supp. 2d at 29.  A decision denying expedited processing for failure to meet criteria established

by an agency under Section 552(a)(6)(E)(i)(II) is reviewed under a more deferential

"reasonableness" standard.  See Al-Fayed, 254 F.3d at 307 n.7 (noting that, "to the extent [the

agency FOIA] regulations expand the criteria for expedited processing beyond 'compelling need,'

the agencies reasonably determined that plaintiffs' requests did not meet the expanded criteria");

see also ACLU v DOJ, 321 F. Supp. 2d at 31.

       b.    <u>Department of Justice Regulations</u>

     The Department of Justice implemented E-FOIA by final rule effective July 1, 1998.  See

Revision of Freedom of Information Act and Privacy Act Regulations and Implementation of

Electronic Freedom of Information Act Amendments of 1996, 63 Fed. Reg. 29591 (1998).  This

rule, which governs FOIA requests directed to DOJ components like the FBI (see 16 C.F.R. §

16.1(b)), states that "[r]equests and appeals" will be "taken out of order and given expedited

treatment whenever it is determined that they involve:

     (i)    Circumstances in which the lack of expedited treatment could reasonably
         be expected to pose an imminent threat to the life or physical safety of an
         individual;

     (ii)    An urgency to inform the public about an actual or alleged federal
         government activity, if made by a person primarily engaged in
         disseminating information;

(iii)    The loss of substantial due process rights; or

(iv)    A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

28 C.F.R. § 16.5(d)(1)(i)-(iv).  Categories (i) and (ii) implement the statutory "compelling need" standard; categories (iii) and (iv) define additional categories for expedition.  See 5 U.S.C. §  552(a)(6)(E)(v).

As Congress recognized, agency expedition decisions depend on "factual and subjective judgments about the circumstances cited by requesters to qualify them for 'expedited processing.'"  H.R. Rep. No. 104-795, at 26.  Accordingly, DOJ requires requesters to "explain[] in detail the basis for" their expedition requests.  28 C.F.R. § 16.5(d)(3); see also H.R. Rep. No. 104-795, at 26 ("the requestors will need to explain in detail their basis for seeking such treatment").  For requests based on urgency (category (ii) above), the requestor "must establish a particular urgency to inform the public about the government activity involved in the request, beyond the public's right to know about government activity generally."  Id.; see also H.R. Rep. No. 104-795, at 26.  A requestor within category (ii) who is not a full-time member of the news media must establish that he or she "is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation."  28 C.F.R. § 16.5(d)(3).

Requests for expedition based on categories (i), (ii), and (iii) must be submitted to the component that maintains the records requested.  See 28 C.F.R. § 16.5(d)(2).  Requests for expedition based on category (iv) – DOJ's "special media-related standard" (see 63 Fed. Reg. at 29592) – must be submitted to DOJ's Director of the Office of Public Affairs ("OPA").  See 28

C.F.R. § 16.5(d)(2).  This enables "the Department's media specialists [to] deal directly with

matters of exceptional concern to the media."  63 Fed. Reg. at 29592.  A granted request for

expedition "shall be given priority and shall be processed as soon as practicable."  28 C.F.R.

§ 16.5(d)(4).

    2.   <u>Plaintiffs' FOIA Request</u>

Two distinct FOIA requests are at issue in this case.

*Records Concerning the Policies, Practices, and Procedures of the National and Local*

*Joint Terrorism Task Forces*:  First, plaintiffs requested records about the National Joint

Terrorism Task Force ("NJTTF") and local Joint Terrorism Task Forces ("JTTFs").  <u>See</u>

Declaration of David M. Hardy ¶ 6 and Exhibit A (Request No. 1).  The scope of this request is

vast.  Plaintiffs seek records related to the creation of the NJTTF and local JTTFs, their purpose,

relationship to each other, funding, and much more.  <u>See</u> Request No. 1, ## 1-7.  Indeed, this

request encompasses all documents nationwide that relate to the policies, practices, and

procedures of the JTTF for surveillance, monitoring, investigation, and infiltration.[1]

---

[1]  <u>See</u> Request No. 1 (Exh. A to Hardy Declaration).  Plaintiffs also seek the identities of
employees and officials involved in the task forces, <u>id.</u> ## 8-10, federal and local agencies
participating and their role and the identity of employees and officers involved, <u>id.</u> ## 11-17; any
policies, practices and procedures of the national and local JTTFs for identifying Potential Threat
Elements, and for monitoring, surveillance, questioning, interrogating potential threat elements,
<u>id.</u> 18-19;  policies, practices and procedures by the national or local task forces for gathering
information concerning universities, <u>id.</u> # 20, or based on national origin, race, ethnicity,
religion, membership, political views, protest activities as to individuals and organizations, <u>id.</u> #
21-22; policies, practices, and procedures of the national or local task forces for the undercover
infiltration of organizations based on political views, protest activities, or the national origin,
race, religion os staff members of organization constituencies; <u>id.</u> # 23; criteria, techniques, and
policies, practices and procedures utilized by national and local task forces for initiation the
gathering of information, <u>id.</u> # 24 and 25; the type of information gathered by the national and
local task forces through monitoring, surveillance or infiltration, <u>id.</u> ## 26-27; policies for
maintaining, storing, and sharing information, and cross-referencing information, <u>id.</u> ## 28-32;

*Records Concerning Surveillance of Specific Organizations:*  Second, plaintiffs requested documents that concern any monitoring, surveillance, observation, questioning, interrogation, investigation, and infiltration specifically about several organizations, including the plaintiffs themselves (ACLU, Arab-American Anti-Discrimination Committee ("ADC"), Greenpeace, People for the Ethical Treatment of Animals ("PETA"), and United for Justice and Peace ("UFJP").  See Hardy Decl. ¶ 6 and Exhibit B (FOIA Request No. #2).   Each sub-part of this request specifically concerns alleged surveillance of the plaintiffs by the FBI or JTTFs.[2]

By letter dated December 23, 2004, FBIHQ acknowledged receipt of plaintiffs' requests to FBIHQ and the seven field offices.  Hardy Decl. ¶ 9 & Exh. D thereto.  Plaintiffs were further notified that their multi-part requests were also forwarded from the appropriate field offices to

---

policies concerning the suspension of monitoring or surveillance, id. #33; policies concerning the destruction of information, id. # 34; policies for protecting the privacy of individuals on whom information is gathered; id. # 35; records concerning the constitutionality and legality or monitoring and surveillance investigations, id. #36; records concerning any actual or potential violations of task force policies on gathering information, id. # 37-38;  the number of any colleges as to which there has been any monitoring or surveillance investigation by the national or local task forces, id. # 39, 40.

[2]  See Request No. 2 (Exh. B to Hardy Declaration).  This request specifically sought records related to orders to collect information about requesters, id. # 2;  how, when, and why requesters were selected for information-gathering, id. # 3; how the collection of information on the requesters was or will be conducted, id. # 4; the identity of other agencies participating in gathering information on the requesters and their role; id. ## 5, 7; the role of the local or national JTTF in gathering information on requesters; id. # 6; how records about the requesters were used; id. # 8; any policies and procedures for analyzing records about the requesters or cross-referencing those records with any database, other organization or individuals, or other information, id. ## 9-12; any policies and procedures regarding the retention or destruction of records about the requesters, including how they were or might be destroyed;  id. ## 13-15; records identifying the recipients of any records about the requesters, id. # 16; any policies or procedures about protecting the privacy of records about the requesters, id. # 17; and any records about when any information-gathering about the requesters would cease, id. # 18.

FBIHQ and would be handled in conjunction with the FBIHQ request.  Id.  Plaintiffs were also advised of the assigned FOIPA numbers.

The two FOIA requests at issue were among numerous other multi-part FOIA requests submitted on the same day to the FBI by the several ACLU chapters nationwide.  Hardy Decl. ¶ 6 and n.1 and Exhs. C1 to C5 thereto.  All together, these ACLU requests seek records on 93 separate subject matters.  The FBI has been working diligently to address all of the ACLU FOIA requests.  Hardy Decl. ¶ 10.  Each subject matter has resulted in a different outcome -- some searches have yielded no responsive records, and the FBI has informed the appropriate ACLU chapter/requester of these results.  Id.  For example, by letter dated March 3, 2005, FBIHQ advised plaintiffs that in response to FOIPA No. 1010244 regarding Code Pink, a search of the automated indices to the Central Records System had located no responsive records.  Id.  In addition, by letter dated March 16, 2005, FBIHQ advised plaintiffs that in response to FOIPA No. 1010247 regarding PETA, a search of the automated indices to the Central Records System had located no responsive records in the Richmond Field Office.  Id.  Plaintiffs were advised of their right to file an administrative appeal with respect to these requests.  Id.  Other searches have yielded relatively small numbers of potentially responsive pages, and the FBI has been processing these pages and endeavoring to make interim releases as it completes each subject matter review.  Id. ¶ 11.

The FBI's efforts in responding to all of the ACLU's December 2, 2004 FOIA requests has been based on a methodical, organized approach designed to identify records responsive to each of the ACLU chapter requests, with no regard to which ACLU chapter would choose to file

a lawsuit challenging the FBI's actions.   Hardy Decl. ¶ 12.  As a result, no particular set of

requests were placed ahead of another set, and each has been addressed in the normal course.  Id.

       3.      <u>Plaintiffs' Request for Expedited Processing</u>.

      Plaintiffs included a request for expedited processing in both of the  FOIA requests at

issue in this case.  Hardy Decl. ¶ 18 and Exhibits A and B.  Plaintiffs argued that they were

entitled to expedition under 28 C.F.R. § 16.5(d)(I)(ii) by stating that the request "implicates a

matter of urgent public concern; namely, the consequences of a recent change in government

policy that has likely resulted in increased surveillance and infiltration of political, religious and

community organizations by the FBI  . . . [and] [s]uch government activity may infringe upon the

public's free speech, free association and privacy rights, which are guaranteed by the First,

Fourth, Fifth, and Fourteenth Amendments to the United States Constitution."  <u>Id.</u>  Plaintiffs also

argued that they were entitled to expedition under 28 C.F.R. § 16.5(d)(I)(iv) by stating that the

request "relates to possible violations of Constitutional rights by federal law enforcement and

potential targeting of groups by federal law enforcement based on illicit categories of political

viewpoint, race, religion, and nationality."  <u>Id.</u>  Plaintiffs also argued that there was "exceptional

media interest in this issue [as] reflected in widespread news coverage at both the local and

national level."  <u>Id.</u>   Plaintiffs cited a list of newspaper and internet articles to support their

expedition request and submitted these articles to the FBI.  <u>Id.</u> and Exhibit A at 9-10 and Exhibit

B at 12-13.   The specific articles cited by plaintiffs are attached at Exhibits A1 and A2 to the

Hardy Declaration, Articles ## 1-24.  This constitutes the record for review of plaintiffs' claim

for expedition.

By letter dated February 8, 2005, plaintiffs reminded both the FBI and DOJ OPA that the deadline to grant or deny expedited processing of their December 2, 2004 requests had passed six weeks earlier on December 19, 2004.  Hardy Decl. ¶ 19 and Exh. I.  Plaintiffs requested a determination on the issue of expedition from both the FBI and OPA no later than February 21, 2005.  Id.

After carefully reviewing both the December 2, 2004 letters and the articles cited therein, see Exhibits A1 and A2 to Hardy Declaration, the FBI concluded that the ACLU requests at issue in this case did not warrant expedited treatment at the expense of other, earlier-submitted requests waiting in the FBI's "first-in, first-out" processing queue.  Hardy Decl. ¶ 20-22. Specifically, the FBI found that the ACLU failed to show that it is "primarily engaged in disseminating information" as the DOJ regulations require in order to justify expedited processing, or that there is an "urgency to inform" the public about the many subjects of its FOIA requests.   Id.

Plaintiffs also sought expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), through which DOJ, by regulation, expedites treatment whenever the Director of the Office of Public Affairs ("OPA") determines that a FOIA request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  Hardy Decl. ¶ 23.   Requests for expedition under 28 C.F.R. § 16.5(d)(1)(iv) must be submitted to DOJ's OPA, DOJ's "media specialists," 63 Fed. Reg. at 29592.  Id.  The FBI was advised by the Director of OPA of her conclusion that the ACLU FOIA requests at issue in this case did not involve "matter[s] of widespread and exceptional media interest in which there exist possible questions about the government's

-10-

integrity which affect public confidence."  Id.  As a result, the FBI informed plaintiffs of OPA's

decision to deny their requests for expedited processing by letters dated May 25, 2005 and June

6, 2005 respectively.  Id.  and Exhibits J and K.

## Part 1 - Expedited FOIA Processing

## ARGUMENT

**PLAINTIFFS' DEMAND FOR EXPEDITED PROCESSING IS MERITLESS.**

Plaintiffs' claim for expedited FOIA processing plainly lacks merit, and the Court should

not only deny plaintiffs' motion for a preliminary injunction but enter partial summary judgment

for defendants on this claim.[3]

As a threshold matter, defendants dispute that the ACLU is an organization that is

"*primarily* engaged in disseminating information" for purposes of expedited processing under

FOIA.   By any fair reading of that standard, the ACLU is primarily a litigating entity that also

disseminates information (most notably about the lawsuits it is litigating).   Contrary to ACLU's

argument, the standard for determining whether an entity is primarily engaged in disseminating

information for purposes of expedition under the FOIA and DOJ regulations is not the standard

for determining fee waivers.

---

[3] A party can obtain preliminary injunctive relief only when it demonstrates that:  (1) it is substantially likely to succeed on the merits of the suit; (2) it will suffer irreparable harm for which there is no adequate legal remedy; (3) the injunction would not substantially harm other parties; and (4) the injunction would further the public interest.  *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  Granting emergency injunctive relief is an extraordinary and unusual remedy that should be used sparingly in limited circumstances that clearly demand it.  *Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 708 F. Supp. 359, 362 (D. D.C. 1988).  While plaintiffs cannot meet their burden for obtaining preliminary relief under any of these standards, the lack of merit to their claim is dispositive of their request for preliminary injunctive relief.

On their merits of ACLU's claim for expedition, this case is not a replay of *ACLU v. DOJ*, as plaintiffs assert throughout their motion.  See Pl. Mem. at 2, 10, 11, 13.   The record submitted by plaintiffs to DOJ and the FBI does not at all demonstrate a current exigency or widespread media interest in the subject of their FOIA requests.  Notably, not a single one of the media reports on which plaintiffs rely concerns the subject of one request – political surveillance of the plaintiff requesters.   Beyond that, the media reports at issue concern specific investigative actions taken by the FBI in the summer of 2004 to detect a terrorist attack before the political conventions and election.  These reports do not concern or reflect a current, exigent interest in the subject of plaintiffs' other FOIA request – the policies, practices and procedures of the JTTFs for engaging in alleged political surveillance.  The Court should readily see that the ACLU's basis for seeking expedition here is not fairly comparable to the public (and ongoing) debate over re-authorization of the USA Patriot Act at issue in *ACLU v. DOJ*.

## A.    Plaintiffs Failed to Satisfy the "Urgency to Inform" Standard.

The first basis on which plaintiffs seek to justify expedition of their FOIA requests is that ACLU is "primarily engaged in disseminating information" and the requests involve an "urgency to inform" the public about an actual or alleged federal government activity.  5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(d)(1)(ii).   Neither is the case, as addressed in turn below.

### 1.    The ACLU Is Not Primarily Engaged in Disseminating Information.

The ACLU's contention that it is "primarily engaged in disseminating information" under 28 C.F.R. § 16.5(d)(1)(ii) is meritless.  The ACLU bases its argument on what it calls the "applicable standard" – whether an entity is a representative of the news media for purposes of obtaining a fee waiver under FOIA.  See Pl. Mem. at 12 (citing *EPIC v. Dep't of Defense*, 241 F.

-12-

Supp. 2d 5, 11 (D. D.C. 2003)).   While the ACLU may think it "easily satisfies that standard," <u>see</u> Pl. Mem. at 12, this is not the test applicable for the expedition of FOIA requests.

The operative word in the "primarily engaged in disseminating information" standard is "primarily."   As Judge Hamilton found for purposes of expedition under FOIA, the issue is not whether disseminating information is "<u>a</u> main activity but <u>the</u> main activity" of the requester. *ACLU of Northern California v. DOJ*, slip op. at 22 (Exh. A to Coppolino Declaration).  The legislative history of E-FOIA makes clear that the word "primarily" was meant to constrain the application of the "urgency to inform" category for demonstrating compelling need.  The legislative history expressly states that "[t]he specified categories for compelling need are intended to be narrowly applied."  H.R. Rep. No. 104-795, at 26 (1996); <u>see</u> <u>also</u> *Al-Fayed*, 254 F.3d at 310.  It elucidates this directive by explaining the following about the "primarily engaged in disseminating information" standard:

> A person "primarily engaged" in the dissemination of information should not include individuals who are engaged only incidentally in the dissemination of information.  The standard of "primarily engaged" requires that information dissemination be the main activity of the requestor, although it need not be their sole occupation.  A requestor who only incidentally engages in information dissemination, besides other activities, would not satisfy this requirement.

H.R. Rep. No. 104-795, at 26.  DOJ regulations incorporate this legislative intent.  28 C.F.R. § 16.5(d)(3) ("a requestor within the category in paragraph (d)(1)(ii) of this section, if not a full-time member of the news media, must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation.").

The ACLU does not fall within this category.  Although ACLU may disseminate information, the primary activity of the organization, according to its own website, is to litigate high-impact cases to defend and promote civil liberties.  The ACLU website states on its "About Us" page that it works "daily in courts, legislatures, and communities to defend and preserve individual liberties . . .".  <u>See</u> Exh. B to Coppolino Declaration.  This web page contains a link to another ACLU document, a position paper entitled "*Freedom is Why We're Here*," in which the ACLU states that it is the nation's "largest public interest law firm" in a "50-state network of staffed, autonomous affiliate offices."  <u>See</u> Exh. C to Coppolino Declaration.  According to the ACLU, "more than 60 ACLU staff attorneys on the national and affiliate levels collaborate with more than 2,000 volunteer attorneys in handling close to 6,000 cases annually."  <u>Id.</u>  The ACLU states that it "appears before the U.S. Supreme Court more than any other organization except the U.S. Department of Justice."  <u>Id.</u>  This ACLU paper also describes significant litigation that it has been involved with over decades, from the Scopes trial in 1925 on the teaching of evolution, to the 1954 decision on school desegregation in *Brown v Board of Education*, to litigation over abortion rights and the regulation of indecent material on the internet.  <u>Id.</u>  Beyond this, nearly everything listed in the "Supreme Court," "News," and "Press Room" sections of the ACLU's website involves a lawsuit with which the ACLU is involved.  <u>See</u> Exhs. D, E, F to Coppolino Declaration.

Thus, while there is no dispute that the ACLU disseminates information, there also can be no doubt that ACLU is primarily a litigation organization.  The ACLU disseminates information about its primary activity – litigation – and about other ACLU activities such as lobbying legislative bodies.  Judge Hamilton correctly rejected an argument advanced by the

-14-

ACLU of Northern California that "two or more activities could be 'primary'" as "not supported by either the DOJ regulations or legislative history." See *ACLU of Northern California v. DOJ*, slip op. at 22.

Absent facts to support its position, the ACLU argues the law. It asserts that the standard set forth in *EPIC v. DOJ*, 241 F. Supp. 2d 5 (D. D.C. 2003), for determining who is eligible for a fee waiver under section 552(a)(4)(A)(ii)(II) of the FOIA supplies the standard for those eligible for expedited treatment of their FOIA requests under section 552(a)(6)(E)(v)(II). The *EPIC v. DOJ* decision does not so hold: the court there simply held that EPIC was a news media representative for purposes of the FOIA's fee waiver provision. See 241 F. Supp. 2d at 9–15. Moreover, the legislative history for the expedited processing provisions of E-FOIA makes clear how the Court is to interpret the "primarily engaged in disseminating information" standard, and there is no need to search for the meaning of this phrase in other provisions of the FOIA. See H.R. Rep. No. 104-795, at 26.

The two standards are distinguishable and are not interchangeable. They relate to different provisions of the FOIA with different underlying purposes. As discussed above, the "primarily engaged in disseminating information" standard is to be narrowly applied in order to avoid unfairly disadvantaging requestors who do not obtain expedited processing. H.R. Rep. No. 104-795, at 26; *Al-Fayed*, 254 F.3d at 310. In contrast, the "representative of the news media" standard is to be broadly interpreted consistent with the purpose of the fee waiver provision of encouraging the dissemination of information in government files, as *EPIC* itself indicates. See *EPIC v. DoD*, 241 F. Supp. 2d at 10; see also *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1386 (D.C. Cir. 1989), cert. denied, 494 U.S. 1029 (1990).

-15-

Accordingly, any person or organization which regularly publishes or disseminates information

to the public "should qualify for [fee] waivers as a 'representative of the news media[,]'"

*National Security Archive*, 880 F.2d at 1386 (quoting legislative history at 132 Cong. Rec.

S14298 (daily ed. Sept. 30, 1986)), but only those persons who are "primarily engaged" in

disseminating information qualify for expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II)

and 28 C.F.R. § 16.5(d)(1)(ii).

Plaintiffs' reliance on this Court's decision in *ACLU v DOJ* to argue that the fee waiver

standard applies to expedition, see Pl. Mem. at 12, is misplaced. This Court in *ACLU v. DOJ*

expressly found, on the record that was before it, that the EPIC organization "is indeed

'primarily engaged in disseminating information.'" 321 F. Supp. 2d at 30, n. 5 (citing *EPIC v.*

*DoD*, 241 F. Supp. 2d at 11). The Court referred to the *EPIC* decision for its synopsis of the

facts about EPIC's activities. Plaintiffs, however, read the Court's reference to the *EPIC*

decision to mean that the "applicable standard" for whether an entity is eligible for expedition

under FOIA lies in the fee waiver provision. This Court held nothing of the kind in *ACLU v*

*DOJ.* Indeed, the Court observed that the government's position on EPIC's status in *ACLU v*

*DOJ* was unclear and that the government "seems to have abandoned this ground for refusal to

expedite" the FOIA request at issue in that case. The government's position in this case is clear:

the ACLU's primary activity is not the dissemination of information for purposes of expedition.

See Hardy Decl. ¶ 21.[4]

---

[4] If this Court in *ACLU v. DOJ* did mean to hold, by its reference to the *EPIC* decision,
that the standard for determining whether an entity is eligible for expedited processing is the
same standard for determining whether an entity is a "media representative" for fee waivers
under FOIA, defendants believe that conclusion is incorrect as a matter of law for the reasons
noted above, and the Court should re-assess the issue now that it is clearly joined.

### 2. Plaintiffs' FOIA Requests Do Not Involve an "Urgency to Inform" the Public.

Even if ACLU is deemed to qualify for expedition as an entity that "primarily" disseminates information, its requests here do not satisfy the "urgency to inform" standard. Congress made clear that this standard is to be narrowly applied:

> The standard of "urgency to inform" requires that the information requested should pertain to a matter of a current exigency to the American public and that a reasonable person might conclude that the consequences of delaying a response to a FOIA request would compromise a significant recognized interest. The public's right to know, although a significant and important value, would not by itself be sufficient to satisfy this standard.

H.R. Rep. No. 104-795, at 26; see also *Al-Fayed*, 254 F.3d at 310. Courts consider three factors in determining whether a requestor has demonstrated "urgency to inform:" (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. Plaintiffs rely on the first two factors, see Pl. Mem. at 10, neither of which are satisfied here. [5]

### (a) The Record of Media Reports Relied on by Plaintiffs Does not Demonstrate a Current, Exigent Concern in the Subject of the FOIA Requests.

This Court's review of whether plaintiffs' requests satisfies the "urgency to inform" standard is restricted to the record as it existed before the FBI when it denied plaintiffs' expedition requests. 5 U.S.C. 552(a)(6)(E)(iii); *Al-Fayed*, 254 F.3d at 304. The articles cited by plaintiffs in their request for expedition are attached to the Hardy Declaration at Exhibits A1 and

---

[5] Defendants do not dispute that plaintiffs' FOIA requests concern federal government activity.

-17-

A2, Articles ## 1-24.  This is the record for review in this case and it fails to support plaintiffs'

position.[6]   The articles submitted do not show that plaintiffs' FOIA requests concern a matter of

current exigency to the public, or that any significant recognized interest would be compromised

if plaintiffs' expedition request were denied.

First and most notably, none of the articles concerns or even refers to political

surveillance of the plaintiffs by the FBI – the subject of one of the FOIA requests.  The fact that

these media reports concern FBI questioning of other groups, such as Muslim Americans, or

those participating in protests at political conventions in 2004, is far too attenuated a basis on

which to find any urgent public concern regarding the subject of the FOIA request: alleged

political surveillance by the FBI or JTTFs of the plaintiffs or "civil rights and peace groups" in

general.  See Electronic Privacy Information Center v. Department of Defense, 355 F. Supp. 2d

98, 102 (D. D. C. 2004) (Kollar-Kotelly, J.) (Only public interest in the specific subject of a

FOIA request is sufficient to weigh in favor of expedited treatment) (citing  Al-Fayed, 254 F.3d

at 310-11.

Second, the record supplied by plaintiffs likewise fails to establish that there is a current,

exigent interest in the JTTFs alleged surveillance and monitoring activities.  The articles on

which plaintiffs rely concern specific past investigative activity by the FBI in the summer of

2004, not a "currently unfolding story."  See Al-Fayed, 254 F.3d at 310.  Several articles deal

with an DOJ/FBI outreach program to obtain information from Muslim and Arab Americans in

_____

[6]  Plaintiffs' reliance on a media report that was not in the record before the FBI or DOJ,
see Pl. Mem. at 11-12 (citing William McCall, *Portland Becomes First to Pull Out of FBI-led
Terror Team,* The Associated Press, April 29, 2005), is obviously not permitted under the proper
scope of review in this case.

connection with possible terrorist attacks in the summer of 2004.  Several other articles concern

questioning by the FBI and JTTF related to concerns about violence at the political conventions

in 2004.  Even if such matters were related to the FOIA requests, they are not current.   And even

if they were current, they cannot fairly be said to be a matter of exigency – that is of "substantial

interest" on the part of the American public or news media.  Indeed, the ACLU's evidence as to

the urgent public interest in their requests is replete with media references to the ACLU's own

concerns.  Plaintiffs' showing here is not fairly comparable to public interest in the re-

authorization of the USA Patriot Act at issue in *ACLU v. DOJ*, supra.

     i.       *Articles on Questioning of Muslim and Arab Americans*

Several of the articles on which plaintiffs rely, dated from July to October 2004, report

on the same story: a program by the FBI to conduct interviews of Muslim and Arab Americans

in investigating the threat of possible terrorist attacks in the summer of 2004.[7]  This is not the

subject of either pending FOIA request.  None of these articles refers to surveillance of the

plaintiffs.  None of these articles concern the role, function, policies and procedures of the

JTTFs.  The articles report that the FBI engaged in questioning Muslim and Arab Americans in

2004 in an effort to stave off a terrorist attack.  While that may have been newsworthy in 2004,

---

    [7]  See Exhibits A1 and A2 to the Hardy Declaration (*Arab Americans Concerned Over FBI's "October Plan"*, www.dailystar.com, October 6, 2004, (Article #1 ); *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack,* by David Shepardson, Detroit News, October 14, 2004 (Article #2); *Few Benefits to Questioning Targeted Groups*, by Jayashri Srikantiah, San Francisco Chronicle, August 6, 2004, (Article # 10); *New FBI Witch Hunt*, by Camile T. Tamara, San Francisco Bay Guardian, August 4-10, 2004 (Article #11);  *FBI's Home Visits Have Some Muslims Feeling Harassed, Alienated*, by Kelly Thornton, www.Signonsandeigo.com, August 4, 2004 (Article #12); *FBI Starts to Question Muslims in U.S. About Possible Attacks,* by Richard Schmitt and Donna Horowitz, www.latimes.com, July 18, 2004 (Article #13); *Interviews of Muslims to Broaden*, by Mary Beth Sheridan, www.washingtonpost.com, July 17, 2004 (Article #15).

such reports fall far short of demonstrating that the subject of plaintiffs' FOIA requests – alleged

"widespread political surveillance" by the JTTF, including of the plaintiffs – is a matter of

current urgency.  See Al-Fayed, 254 F.3d at 310 (subject, while "newsworthy," was not a matter

of "current exigency").

Taken chronologically, the Washington Post article by Mary Beth Sheridan on July 17,

2004, *Interviews of Muslims to Broaden; FBI Hopes to Avert A Terrorist Attack* (Exh. A2 to

Hardy Declaration, Article #15), specifically reports about an FBI effort to interview Muslims

and Arab Americans in the summer of 2004 directed at "hoping to glean information that could

prevent a major terrorist attack during this election year."  The article quotes a July 9, 2004,

press release by the Attorney General describing an effort by the government to obtain

knowledge of a possible terrorist attack by "again reaching out to partners in the Muslim and

Arab-American communities for any information they may have."  Id.  The article makes no

mention of alleged surveillance of the plaintiffs or political organizations in general by the

JTTFs, which is the focus of the FOIA requests.  See Pl. Mem. at 3-4 (FOIA requests seek

information about an alleged shift in investigative policy to conduct "widespread political

surveillance" of civil rights and peace groups).  Local JTTFs are mentioned in the article only as

collaborating with the FBI on these interviews.

An article published the next day (July 18, 2004) by Richard Schmitt and Donna

Horowitz on www.latimes.com, *FBI Starts to Question Muslims in U.S. About Possible Attacks*

(Exh. A2 to the Hardy Declaration, Article # 13), repeats the story.  It again describes the

questioning of Muslims and Arab Americans in connection with possible terrorist attacks in the

summer and fall of 2004.  Id.   It also reports that the interview program was publicly announced

in May 2004 by the Attorney General and FBI Director, and reports that FBI officials "have been meeting in recent weeks with Islamic groups, seeking to enlist their support at a time" when government officials believed there was as high a risk of terrorist attack since 9/11.  Id.  Again, however, the article does not concern surveillance of the plaintiffs, and it mentions the JTTF solely with respect to gathering information about a terrorist attack in the summer of 2004.

An article by Kelly Thornton published a few weeks later on www.Signonsandeigo.com, *FBI's Home Visits Have Some Muslims Feeling Harassed, Alienated* (August 4, 2004) (Exh. A1 to Hardy Declaration, Article # 12) also focuses on the questioning of Muslims in 2004 to stave off possible terrorist attack last summer.  Again, however, this story contains no mention of any surveillance of plaintiffs or general political surveillance of civil rights and peace groups, and no mention of the JTTFs.  The article does discuss an "outreach program" by the FBI in San Diego to "reconnect with" and "cultivate sources" among Muslim and Arab Americans by making appointments to speak with community leaders.  Id.  The article also reports that FBI questioning in San Diego concerned a particular individual – a deported Saudi citizen – who had links to one of the 9/11 hijackers.  Id.   Neither topic specifically concerns the plaintiffs' FOIA requests.

Next, a Detroit News story in October 2004 again concerned the questioning of Muslims and Arab Americans – this time specifically in Detroit – in an effort to prevent a terrorist attack prior to the 2004 election.  See Exh. A1 to Hardy Declaration (Article #2), *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack*, by David Shepardson, October 1, 2004.  Only one of the plaintiffs is mentioned in the article – the American Arab Anti-Discrimination Committee – whose regional director expressed

concern with these interviews – not that ADC itself is being investigated by the FBI, which is the subject of ADC's FOIA request.  There is no mention of the JTTFs in the article.

Also in October 2004, the Daily Star reported on a press release in which the Arab American Institute expressed concern over unspecified reports that the FBI and Department of Homeland Security have or will be enacting a new initiative of surveillance of individuals "suspected of being terrorist sympathizers."  See Exh. A1 to the Hardy Declaration (Article #1), *Arab Americans Concerned Over FBI's "October Plan"*).  The article makes no reference to any of the plaintiffs or the JTTF.  Indeed, aside from parroting a press-release by the AAI, the article's longest paragraph discusses an initiative by the Department of Homeland Security – not the FBI – for an alleged "immigration sweep" of metropolitan areas.

Two other articles on this topic relied upon by plaintiffs hardly qualify as evidence of widespread, exigent public concern about the subject of the FOIA requests.  An article published on August 6, 2004 in the San Francisco Chronicle by Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups* (Exh. A1 to Hardy Declaration, Article # 10) is an opinion piece written by a Professor at Stanford University Law School criticizing the questioning of Muslim people in the San Francisco Bay Area in the summer of 2004.  The article does not mention surveillance of the plaintiff FOIA requestors, nor the JTTF.  A related article published that same week in the San Francisco Bay Guardian by Camile T. Taiara (see Exh. A1 to Hardy Declaration, Article ## 11, *New FBI Witch Hunt*, August 4-10, 2004) repeats the views of Professor Srikantiah's and again focuses on the FBI's questioning of Muslim and Arab Americans in 2004.  The article does not mention alleged surveillance of the plaintiff organizations nor of general political surveillance of civil rights and peace groups by the JTTFs.

Indeed, it is noteworthy that, for several of the articles, the ACLU is citing its own views as evidence of an exigent public interest in the ACLU's FOIA requests.  The author of the opinion article in the <u>San Francisco Chronicle</u>, Jayashri Srikantiah, is reportedly the former associate legal director at the ACLU.   <u>See</u> Exh. A1 to Hardy Declaration, Article #10.  Ms. Srikantiah's views are then quoted in the article by Camille T. Taiara in the <u>San Francisco Bay Guardian</u>, along with the views of another official of the ACLU of Northern California.  <u>Id.</u>, Article #11.  In addition, the <u>Washington Post</u> and <u>latimes.com</u> articles (Exh. A2 to Hardy Declaration, Article ## 13, 15) quote the National Lawyers Guild and the Council on American-Islamic Relations ("CAIR"), both of which are reportedly working with the ACLU to monitor government surveillance tactics and provide services for impacted communities.  <u>See</u> ACLU Oct. 5, 2004 press release, <u>FBI's New Surveillance Plan Chills Religious and Political Activity – Bay Area Civil Rights Groups Warn</u>, Exh. G to Coppolino Declaration.  Both the <u>Washington Post</u> and <u>LA Times</u> reports quote James Hacking, identified as a Muslim lawyer in St. Louis, who happens to be the head of CAIR's St. Louis chapter.  <u>See</u> Coppolino Decl. ¶ 9 and Exhibit H.  The ACLU's own statements in the media, and those of its associates, cannot credibly be cited as evidence of an exigent public concern in the subject of the ACLU's own FOIA requests.

Judge Hamilton of the Northern District of California rejected the sufficiency of these very media reports in denying a request by the ACLU of Northern California to expedite a similar FOIA request.  <u>See</u> *ACLU of Northern California v. DOJ and FBI* (Exh. A to Coppolino Declaration).   The ACLU of Northern California sought records related to the JTTFs operating in Northern California.  <u>Id.</u> Slip Op. at 4-7.  ACLU-NC relied upon several of the same articles that ACLU relies on in this case.  <u>Id.</u> at 8-9.  Judge Hamilton found that these articles "do not

sufficiently reflect significant media and public interest in the subjects of the FOIA requests."
Id. at 21.  In particular, the court noted that articles about the questioning of Muslim or Arab
Americans "contain only a few generalized references to JTTFs, and no discussion in any of the
articles of the organization, funding, policies, or procedures of the JTTFs" that are the subject of
the FOIA requests."  Id.

        ii.      *Articles Concerning the 2004 Political Conventions*

The next group of media reports on which plaintiffs rely to show an urgent and
widespread public interest in the subject of their FOIA requests also miss the mark widely.
Plaintiffs cite several stories about FBI inquiries into whether political protests, primarily those
planned for the national political conventions in the summer of 2004, might turn violent.  Once
again, none of these reports concerns surveillance of the plaintiffs or civil rights and peace
groups in general by the JTTFs.

The report on which plaintiffs principally rely to demonstrate a current, exigent concern
was written in November 2003 and quotes the concerns of the ACLU itself.  See *FBI Scrutinizes
Antiwar Rallies* by Eric Lichtblau, New York Times, November 23, 2003 (Exh. A2 to Hardy
Declaration, Article #23).  This article does not refer to surveillance of the plaintiffs or the
practices of the Joint Terrorism Task Forces.  It concerns a purported FBI memorandum sent to
local law enforcement agencies in October 2003 in advance of anti-war demonstrations that
month in Washington and San Francisco.  The FBI memo in question reportedly provided
intelligence information on the tactics, training, and organization of antiwar demonstrations to
help local law enforcement deal with the threat of potential violence at these protests.   However
newsworthy in 2003, this is not the subject of either FOIA request.  The article does refer to the

Attorney General's decision in May 2002 to relax investigative guidelines – a matter plaintiffs cite in their brief as motivating their requests. See Pl. Mem. at 3-5. But the FOIA requests concern political surveillance of the plaintiffs and the practices of the JTTF, and this New York Times article from 2003 does not discuss those subjects, let alone stand as evidence of a current public urgency in those topics. Also, to the extent the article gives voice to the ACLU's own concerns, it does not stand as evidence of the public interest in the FOIA requests.

Other articles cited by plaintiffs concern specific events in the summer of 2004 in which the FBI sought to gather information about potential violence at the Republican and Democratic National Conventions. As should be apparent, these articles reflect no current, exigent concern in the subject of either FOIA request.

On July 27, 2004, an article that appeared on Rocky Mountain News by Karen Abbot, entitled *FBI's Queries Rattle Activists: Agents Seek Information on Possible Violence at Political Conventions (*Exh. A2 to the Hardy Declaration, Article #14), is devoted almost entirely to an interview of a Colorado man about potential violence at the 2004 political conventions. The article also contains speculation by an ACLU official that such FBI questioning is happening elsewhere. Id. This is simply not sufficient to demonstrate a current exigent concern in the subject of the FOIA requests. No mention is made of surveillance of the plaintiffs. The sole mention of the local JTTF is that it receives assistance from the Denver Police, which had been involved in a lawsuit brought by ACLU over whether the Denver Police improperly maintained files on individuals. Id.

Plaintiffs also rely on another story out of Colorado published on August 8, 2004 in the Denver Post by Amy Herder, called *Teaching the Silent Treatment* (Exh. A1 to Hardy

Declaration, Article #9).  This article likewise concerns efforts by the FBI and JTTF to gather

intelligence for any plans for violence at the 2004 political conventions and presidential

inauguration.  Id.  It reports on how one Colorado group provided advice on how to respond to

such questioning.  Id.  Once again, the ACLU's own concerns about the FBI's questioning in

advance of the 2004 conventions are set forth in this article.  Id.

Plaintiffs cite another Denver Post article by Susan Green, published on August 26, 2004,

*Activists Decry Pre-Convention Security Tactics, Questions by FBI, The Feds Say They Are*

*Trying to Avoid Terror Threats But many People Say the Steps Veer Toward Intimidation* (Exh.

A1 to Hardy Declaration, Article #7).  Again this article concerns questioning by the FBI and

JTTF in connection with the Republican National Convention (RNC) in 2004.  Id.   It mentions

the JTTF solely in that context.  Id.  It mentions only one of the plaintiff FOIA requestors –

United for Justice and Peace - noting that it planned to hold a protest in Central Park during the

RNC.  Id.  It does not address surveillance of the plaintiffs or any political surveillance by JTTFs

– just efforts to prevent violence at the 2004 conventions.

Plaintiffs also cite three New York Times articles by Eric Lichtblau around the time of

the 2004 Republican Convention in New York City.  The first articled, titled *FBI Goes Knocking*

*for Political Troublemakers,* August 16, 2004 (Exh. A1 to Hardy Declaration, Article #8), refers

to "aggressive effort" by the FBI to forestall violent and disruptive protests at the Republican

National Convention in New York in 2004.  It makes no reference to surveillance of the plaintiff

FOIA requestors and no reference to the policies and procedures of the JTTF or allegations that

JTTFs generally monitor peace and civil rights groups.  The second New York Times article,

entitled *Protestors at Heart of Debate on Security v Civil Rights*, published on August 27, 2004

-26-

(Exh. A1 to Hardy Declaration, Article #5), again concerns the questioning of individuals in connection with possible violence at the 2004 Republican and Democratic Conventions.  There is no reference to the plaintiff organizations, general surveillance of political groups, and no reference to the JTTFs or its policies and procedures.  The third New York Times article cited by plaintiffs, titled *Subpoena Seeks Records About Delegate Lists on Web,* August 30, 2004 (Exh. A1 to Hardy Declaration, Article #3), is a one-paragraph article that specifically concerns a criminal investigation opened by the Justice Department concerning an Internet posting that names Republican delegates to the 2004 Republican National Convention in New York City and urges protestors to give them an unwelcomed reception in New York.  This has nothing to do with either FOIA request.

Once again Judge Hamilton rejected reliance on these very media reports in denying expedition to the ACLU of Northern California for JTTF records.  The court correctly held that "there can be no 'urgency to inform the public' about the FBI's activities in connection with investigating possible protests at a political convention that occurred in late August and early September of 2004."  *ACLU-NC v. DOJ*, Slip Op. at 21.

### iii. Other Articles Referring to the JTTFs

Finally, plaintiffs submitted to DOJ and FBI some other articles that make reference to alleged JTTF activities.  None demonstrate an urgent public interest in the subject of either FOIA request.

Plaintiffs cite a set of articles concerning alleged JTTF subpoenas to Drake University in Iowa for documents concerning an anti-war conference that had been held there previously.[8]  A cursory review of these articles indicates that this incident had nothing to do with either the JTTF or any surveillance of the plaintiffs.  The first article in the Des Moine Register on February 7, 2004 claims a subpoena was served on Drake by the Joint Terrorism Task Force.  See Exh. A2 to Hardy Declaration, Article #16.  But a follow-up article three days later on February 10, 2004 reports that the subpoenas at issue were not part of an anti-terrorism probe by JTTF.  Id., Article #17.  The article states that the subpoenas were in connection with a separate investigation of an unlawful entry into a military post.  Id.  The article reports that a local investigating police officer apparently used a business card which identified himself as a member of the JTTF.  Id.  The New York Times summarized the incident, publishing stories on the issuance of these subpoenas and that they had been withdrawn.  Id., Articles ## 18 and 19.  None of the articles about this incident concern surveillance of the plaintiffs nor, based on the articles themselves, any action taken by the local JTTF to monitor peace or civil rights groups.  None concern a matter of current, exigent public interest.

Plaintiffs also cite an article in the Fresno Bee by Kerri Ginnis published on Feburary 28, 2004, entitled *Peace Fresno Seeks Damages* (Exh. A2 to Hardy Declaration, Article # 24), which reports on an incident where an individual in Fresno, later identified as a member of a local

---

[8]    See Exh. A2 to the Hardy Declaration, Articles ## 16, 17, 18,19 (*Group Fights Anti-War Inquiry*, by Jeff Eckhoff and Mark Siebert, Des Moine Register, February 7, 2004; *Anti-War Inquiry Unrelated to Terror,* by Jeff Eckhoff and Mark Siebert, Des Moine Register February 10, 2004;  *An Anti-War Forum in Iowa Brings Federal Subpoenas*, by Monica Davey, New York Times, February 10, 2004; *Subpoenas on Anti-War Protest Are Dropped,* by Monica Davey, New York Times, February 11, 2004).

JTTF, had attended meetings of a group called Peace Fresno and was alleged to be a government infiltrator.  The story came to light after an obituary was published of the deceased agent involved.  The story reports that the Fresno Police denied doing any investigation.  This scant evidence of an unconfirmed incident in Fresno last year does not demonstrate the urgency of plaintiffs' FOIA requests.

Finally, plaintiffs cite three other articles that discuss many of the same incidents noted above, and speculate that local JTTFs are involved in political surveillance.  See Exh. A2 to Hardy Declaration, Article # 20, *Outlawing Dissent* by Michelle Goldberg, Salon.com (February 11, 2004); and Article # 21, *A Thousand J. Edgar Hoovers* by Michelle Goldberg, Salon.Com (February 12, 2004); and Exh. A1, Article #3, *The War at Home: Nationwide Crackdown on Activists* by Alex Bradley and John Mayer, saveourliberties.com (September 9, 2004).  The first Goldberg article discusses at length an incident in Aurora, Colorado where a police undercover agent infiltrated a group of protestors, and suggests this was linked to the FBI because the Aurora Police is part of a local JTTF.   See Hardy Exh. A2, Article #20.  The second Goldberg article discusses two individuals, in Albuquerque and Grand Rapids, who claimed job reprisal for attending anti-war protests.  Id., Article #21.  Neither article relates specifically to the FOIA requests, nor demonstrates a current, widespread and exigent interest in the subject of those requests.

Viewed individually or as a whole, the record on which the ACLU relies to support expedition here is decidedly underwhelming.  As Judge Hamilton found in rejecting a similar expedition request by the ACLU of Northern California, it is "not sufficient for the plaintiffs to show interest in only the general subject area of the request."  *ACLU-NC v. DOJ*, supra, slip op.

at 20; see also *EPIC v DoD,* 355 F. Supp. 2d at 102.  Articles about FBI questioning of Muslim

or Arab Americans to gain information about possible attacks in 2004, or about protests at the

political conventions last summer, or past incidents involving local police, are insufficient to

demonstrate an exigent public interest in FOIA requests for documents concerning political

surveillance of the plaintiffs or the overall practices of the national and local JTTFs.

### (b)   The Court's Decision in *ACLU v. DOJ*, Involving Public Interest in the USA Patriot Act, Is Readily Distinguishable.

The ACLU's current request for expedition in no way compares to the circumstances

underlying this Court's decision to grant expedition to an ACLU FOIA request concerning the

USA Patriot Act.  See *ACLU v. Department of Justice,* supra, 321 F. Supp. 2d 24 (D. D.C. 2004).

The record in that case – and specific factors cited by the Court which favored expedition – were

markedly distinct from those present here.  The very subject of the FOIA request at issue in that

case was "the ongoing national debate about whether Congress should renew Section 215 and

other Patriot Act surveillance provisions before they expire in December 2005."  Id. at 31.   The

Court found that Section 215 of the Patriot Act "unquestionably implicates important individual

liberties and privacy concerns which are of *immediate public interest in view of the ongoing*

*debate regarding the renewal and/or amendment of the Patriot Act."*  Id. at 29 (emphasis

added).

In contrast to the record in this case, the newspaper articles plaintiffs cited in *ACLU v.*

*DOJ* discussed "how widespread public concern is reflected by the many resolutions passed by

local and state governments urging Congress to narrow provisions of the Patriot Act."  Id. at 29-

30 (*citing* Dan Eggen, *Patriot Monitoring Claims Dismissed,* Washington Post, Sept. 19, 2003,

at A2 ("More than 150 cities and three states have passed resolutions condemning the legislation as an attack on individual liberties.").

As further evidence of the widespread, current exigence of the Patriot Act debate at issue in *ACLU v DOJ*, the Court also cited an article "discussing the Attorney General's August 2003 cross-country tour initiated to defend the Patriot Act against its numerous critics.  Id. at 30 (*citing* Editorial, *Ashcroft's Dragnet,* Boston Globe, Sept. 9, 2003, at A14 ("The invitation-only session [in Boston] is part of Ashcroft's 18-city tour to defend the Patriot Act against mounting claims that it undermines civil liberties.")  The Court also noted that those articles discussed the specific subject of the FOIA request – Section 215 of the Patriot Act.  Id. n. 6.[9]

The Court also found that the request at issue in the Patriot Act case concerned "*current* surveillance efforts" which weighed in favor of expediency.  Id.  (*citing Al-Fayed,* 254 F.3d at 310 (finding expedited processing inappropriate where "[a]ll of the events and alleged events occurred two to three years before plaintiffs made their request for expedited processing" and thus "none of the events at issue is the subject of a currently unfolding story"))  Media reports concerning efforts to detect violence last summer, or about past incidents with an unknown connection to the JTTF or FBI, do not satisfy the "urgency to inform" standard.

_____

[9] *ACLU v. DOJ*, 321 F. Supp. 2d at 30, n. 6 (*citing* Bernie Sanders, *Patriot Act Overreaches,* USA Today, Sept. 23, 2003, at 22A ("The legal standard for obtaining an order [under section 215] is so loose that the government is virtually certain to get whatever it wants, whenever it wants."); Editorial, *Ashcroft's Dragnet,* Boston Globe, Sept. 9, 2003, at A14 ("Of particular concern is section 215, which authorizes searches of private documents including financial, medical, and library records without a warrant, and prevents doctors, librarians and others from informing clients that the records have been requested.");  Bob Egelko & Maria Alicia Gaura, *Libraries Post Patriot Act Warnings,* San Francisco Chronicle, March 10, 2003, at Al ("[I]n the last year, Section 215 has roused organizations of librarians and booksellers into a burst of political activity, and is being cited increasingly by critics as an example of the new law's intrusiveness.").

The Court also observed in *ACLU v. DOJ* that the Attorney General had declassified the number of times Section 215 has been used in an attempt to "counter the troubling amount of public distortion and misinformation in connection with Section 215."  Id.  The Court said: "By finding that declassification was 'in the public interest,' and in the best interest of law enforcement since '[p]ublic confidence in law enforcement is of paramount importance', the Attorney General implicitly, if not explicitly, recognized that information relating to section 215 implicates a matter of current exigency."  Id.

None of the factors found by this Court in *ACLU v DOJ* are present here.  While the Court found that expedition was warranted in the Patriot Act case, it should be mindful that expedition is to be narrowly applied and find here, consistent with Judge Hamilton's ruling, that the record submitted by plaintiffs in this case does not support expedition of these particular FOIA requests.[10]

### B.    Plaintiffs Failed to Satisfy the DOJ Media-Related Standard.

Plaintiffs also sought expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), through which the Department of Justice, by regulation, expedites treatment whenever it determines that a FOIA request involves "[a] matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence." Requests for expedition under § 16.5(d)(1)(iv) must be submitted to DOJ's Office of Public Affairs (OPA), the Department's "media specialists," 63 Fed. Reg. at 29592, whose decisions are

---

[10]  Judge Hamilton specifically contrasted this Court's findings in *ACLU v. DOJ* that expedition was warranted in connection with the Patriot Act debate.  See Slip. Op. at 20-21.

reviewed for reasonableness.  See *Al-Fayed*, 254 F.3d at 307 n. 7.  OPA appropriately denied

plaintiffs' expedition request under § 16.5(d)(1)(iv).

Plaintiffs' argument that it established "widespread and exceptional" media interest relies

on the same media reports as it did for its "current exigency" position, see Pl. Mem. at 14, and

should be rejected for the same reasons.  Indeed, based on the record plaintiffs mustered, there

are no articles that concern the surveillance of plaintiffs themselves, and no articles that

specifically concern JTTF policies and procedures for general political surveillance.  Judging

from this record, there is no "widespread interest" in the subject of the FOIA requests at issue.

Compare to *ACLU v. DOJ*, 321 F. Supp. 2d at 29 (newspaper articles cited by plaintiffs

discussed how widespread public concern about renewal of the Patriot Act was reflected by

many resolutions passed by local and state governments urging Congress to narrow the Patriot

Act).

If expedition is granted here, based on such a marginal record that is only tangentially

related to the specific requests at issue, there will be no principled basis on which expedition

could be denied for any of the dozens of pending requests by the ACLU or other similar

requests. The ACLU will have a license to use the judicial process to jump ahead of everyone

else for matters that raise potentially important issues but simply are not of widespread, urgent

concern.

### Part 2 - Stay of Proceedings

Pursuant to 5 U.S.C. § 552(a)(6)(C), defendants also move for a stay of proceedings to

permit the FBI sufficient time to process the FOIA requests in the normal course.  The FOIA

also authorizes a Court to allow the agency additional time to complete its processing of a

plaintiff's request if the Government can show exceptional circumstances exist and that the

agency is exercising due diligence in responding to the request.  5 U.S.C. § 552(a)(6)(C)(i);

*Open America v. Watergate Special Prosecution Force,* 547 F.2d 605 (D.C. Cir. 1976).  As

shown below, because the FBI can demonstrate both exceptional circumstances and due

diligence, the Court should stay these proceedings to allow the FBI time to process plaintiffs'

requests in the normal course.

BACKGROUND

A.    The FBI's FOIA Processing System.

To ensure fairness to all requesters, the FBI assigns a request for processing based on the

date of receipt on a "first in/first out" basis.  Hardy Decl. ¶ 26.  The FBI uses a three-queue

"multi-track" system  based on the amount of time and work involved in processing a particular

request.  Id.   The placement of a request in one of the three queues depends on the total amount

of material responsive to that request -- 500 pages or less ("small queue"), 501 to 2,500 pages

("medium queue"), or more than 2,500 pages ("large queue").  Id.  This standard operating

procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in

the order in which they are received, while obviating the inequities to other requesters whose

interests relate only to a small number of documents.  Id.  Those requests that have been placed

in the large queue are given the opportunity, through consultation with the FBI, to reduce the

scope of their requests and accelerate assignment of their requests by relocating them to a more

advantageous queue.  Id.  Frequently, more than one case is processed at a time while various

stages of review are pending on another case.  Hardy Decl. ¶ 27.[11]

    The FBI's automated records systems also assist in the expeditious processing of FOIA

requests.  The FBI's Central Records System ("CRS") maintains all information which the FBI

has acquired in the course of fulfilling its mandated law enforcement responsibilities.   Hardy

Decl. ¶ 29.  The records maintained in the CRS consist of administrative, applicant, criminal,

personnel, and other files compiled for law enforcement purposes.  Id.  This system consists of a

numerical sequence of files broken down according to subject matter.  Id.  The subject matter of

a file may relate to an individual, organization, company, publication, activity, or foreign

intelligence matter.  Id.   Certain records in the CRS are maintained at FBIHQ, and records that

are pertinent to specific field offices of the FBI are maintained in those field offices.  Id.   Access

to the CRS is obtained through the General Indices, which are arranged in alphabetical order.  Id.

---

[11] The FBI has a well-developed system for processing FOIA requests, even voluminous
ones.  Hardy Decl. ¶ 25.   Its Records Management Division, which handles all FOIA and
Privacy Act requests through the Record/Information Dissemination Section (RIDS), employs
245 employees assigned among ten (10) units within RIDS whose function is to intake, review,
process, and release information in response to FOIA and Privacy Act requests.  Id.   The Service
Request Unit handles various initial tasks required to "perfect" a FOIA/Privacy Act request.  Id.
¶ 25(a).  The SRU's Negotiation Team works with requesters to narrow the scope of responsive
records and facilitate a more rapid response.  Id.   Two Work Process Units ("WPUs") are
responsible for, *inter alia*, conducting searches of the general indices for identifiable records,
confirm responsive documents, stamp files for retention, forward files requiring classification
review to the three Classification Units, retrieve and forward files for scanning into FDPS,
respond to status inquiries, and handle administrative appeals.  Id.  ¶ 25(b).  Three Classification
Units ("CUs") are responsible for determining whether information is documents is classified or
may be declassified.  Id.  ¶ 25(c).  Three Disclosure Units perform the actual processing of all
records pursuant to the provisions of the FOIA and Privacy Act.  Id. ¶ 25(d).

In addition, in October 1995, the FBI's Automated Case Support ("ACS") system was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. Hardy Decl. ¶ 32. Over 105 million records were converted from automated systems previously utilized by the FBI. Id. The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases.[12]

B.    Processing of Plaintiffs' Requests.

In this case, the FBI has employed several mechanisms as part of its search efforts to identify documents responsive to plaintiffs' requests. The Central Records System at both FBIHQ and the seven field offices were searched for any records pertaining to the multiple subjects requested by plaintiffs. Hardy Decl. ¶ 34. In addition, the FBI sent Electronic Communications ("ECs") to affected field offices and all FBIHQ Divisions requesting that hand-searches be conducted in response to plaintiffs' requests. Id.

The Hardy Declaration summarizes the FBI's search efforts in response to the requests at issue in this case. Id. ¶ 36 and Chart. The amount of time that the FBI estimates is necessary to complete processing each portion of the pending requests varies. For example, the ADC request is a small queue case (approximately 64 documents from the Detroit Field Office) which should be completed in the near future. Id. The PETA request involved review of the FBI's Richmond

---

[12] Theses are the: Investigative Case Management ("ICM"), which provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads; Electronic Case File ("ECF"), which serves as the central electronic repository for the FBI's official text-based documents; and the Universal Index ("UNI"), which is an index of approximately 89.4 million records that functions to index names to cases, and to search names and cases for use in FBI investigations. Hardy Decl. ¶ 32

-36-

field office files, which yielded no responsive records.  Id.  The UJFP request, another small

queue case of 6 pages, was released on June 27, 2005.  Id.

    The biggest volume of the pending requests involve plaintiffs ACLU, ACLU Foundation,

and Greenpeace, as well as records related to the NJTTF.  For records related to the ACLU and

ACLU Foundation, the FBI has identified approximately 1173 pages to review – a medium

queue case for which the FBI will need eight months, or to March 1, 2006, to complete

processing.  Hardy Decl.  ¶ 36 (Chart).   The FBI estimates that it would require until June 1,

2006 to complete processing of records related to plaintiff Greenpeace, which total

approximately 2383 pages – another medium queue case.  Id.

    The FBI has not finished identifying the volume of records potentially responsive to the

NJTTF request, but given the broad scope of this request, believes the volume will exceed

13,000.  Id. The FBI has initiated a dialogue with plaintiffs in order to attempt to reduce the

broad scope of this request.  Id. and Exhibit M.  At present, plaintiffs' NJTTF request is clearly

in the FBI's large queue, along with 32 other cases as of June 2005.  Id. n. 17.[13]  Based on the

date of plaintiffs' request, there will be approximately 32 requests pending ahead of plaintiffs'

request in the large queue.  Id.  In light of the large volume of records, it is impossible for the

FBI to provide an estimate as to how long the processing of these records will take once the case

is assigned from the large queue.  Id.  Under current standards, FBI personnel should process

1,000 pages a month.  Id.[14]  Should the FBI be required to make additional shifts in personnel to

_____

    [13]    Of those 32 cases, 9 were opened in 2003; the oldest of those cases was opened on
June 13, 2003; the newest case was opened on April 15, 2005.  Id. n. 17.

    [14]    This time estimate does not take into account the time required by the Classication
Unit, legal review, and final review by the document owners/originators for accuracy prior to
release.  Hardy Decl. ¶ 36 Chart n. 17.  For classification review alone, it is estimated that a

process plaintiffs' request in any other manner than the normal course, this would have a highly

significant and negative impact on the FBI's backlog, substantially delaying the processing of

other cases.  Id.

ARGUMENT

**A STAY OF PROCEEDINGS TO COMPLETE PROCESSING PLAINTIFFS'
VOLUMINOUS FOIA REQUESTS IS WARRANTED HERE.**

Under the FOIA, an agency is required to determine within twenty days of the receipt of

a request for records "whether to comply with such request[,]" and to "immediately notify the

person making such request of such determination and the reasons therefor."  5 U.S.C.

§ 552(a)(6)(A)(i).  This time limit can be extended by ten working days if the agency determines

that "unusual circumstances" exist.  5 U.S.C. § 552(a)(6)(B).  The FOIA also authorizes a Court

to allow the agency additional time to complete its processing of a plaintiff's request:

> If the Government can show exceptional circumstances exist and
> that the agency is exercising due diligence in responding to the
> request, the court may retain jurisdiction and allow the agency
> additional time to complete its review of the records.

5 U.S.C. § 552(a)(6)(C)(i).

In the Electronic Freedom of Information Act Amendments of 1996, Congress amended

this provision by adding the following two subsections:

> (ii)  For purposes of this subparagraph [i.e., 5 U.S.C. § 552(a)(6)(C)], the
> term "exceptional circumstances" does not include a delay that results
> from a predictable agency workload of requests under this section, unless
> the agency demonstrates reasonable progress in reducing its backlog of
> pending requests.

---

review of 1,000 pages would take three reviewers approximately one week to process.  Id.  This
time estimate also does not take into account any referrals and consultations with other agencies
or DOJ components.  Id.

-38-

> (iii)  Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing the request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. § 552(a)(6)(C)(ii), (iii).

In *Open America v. Watergate Special Prosecution Force,* 547 F.2d 605 (D.C. Cir. 1976). the Court of Appeals held that an agency is entitled to additional time to process a FOIA request under § 552(a)(6)(C) when it

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)).  See also *Oglesby v. Dep't of the Army,* 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").  Courts "cannot focus on theoretical goals alone, and completely ignore the reality that these agencies cannot possibly respond to the overwhelming number of requests received within the time constraints imposed by FOIA."  *Cohen v. FBI,* 831 F. Supp. 850, 854 (S.D. Fla. 1993).  An agency may rely on the volume of both FOIA requests and non-FOIA information demands to demonstrate "exceptional circumstances:"

> Agencies may also make a showing of exceptional circumstances based on the amount of material classified, based on the size and complexity of other requests processed by the agency, based on the resources being devoted to the declassification of classified

-39-

material of public interest, or based on the number of requests for
records by courts or administrative tribunals.

E-FOIA Report, at 23; H.R. Rep. No. 106-50, 106th Cong., 1st Sess., 1999 WL 132731, at 13

(Mar. 11, 1999).

Following the decision in *Open America*, courts "have interpreted [section (a)(6)(C)] as

excusing any delays encountered in responding to a request as long as the agencies are making a

good faith effort and exercising due diligence in processing the requests on a first-in first-out

basis." *Kuffel v. United States Bureau of Prisons,* 882 F. Supp. 1116, 1127 (D.D.C. 1995)

(citations omitted); see also *Edmond v. United States Attorney,* 959 F. Supp. 1, 3 (D.D.C. 1997)

("Courts have uniformly granted the government reasonable periods of time in which to review

FOIA requests when there is a backlog."); *Jiminez v. FBI,* 938 F. Supp. 21, 31 (D.D.C. 1996)

(quoting *Kuffel*, 882 F. Supp. at 1127); *Ferguson v. FBI,* 722 F. Supp. 1137, 1140 (S.D.N.Y.

1989) ("In the D.C. Circuit, courts generally have granted extensions when presented with

evidence of an overburdened agency following necessary procedures.") (citations omitted).

The FBI can satisfy both showings in this case, warranting a stay to allowing processing

of the plaintiffs' requests in the normal course.

A.      **The FBI Is Operating Under Exceptional Circumstances**.

As of December 31, 2004, the FBI's backlog of FOIA requests included 2,320 requests in

various stages of processing throughout RIDS.  Hardy Decl. ¶ 37.  During the past year the FBI

has received an average of 940 requests per month, and as of July 1, 2005, the backlog includes

2,242 requests.  Id.  The number of FOIA and Privacy Act requests received by the FBI has

increased dramatically since the early 1980s.  Id.  The number of FOIA and Privacy Act requests

on hand at FBIHQ, in various stages of processing, increased from its 1985 level of 4,736 to a

total of 16, 244 requests in December 1996.  Id.  While this backlog easily could consume the

RIDS, employees must split their time with other duties.  For example, handling administrative

appeals consumes substantial amounts of staff time, taking employees away from their regular

processing efforts.  Id. ¶ 38.  As of July 1, 2005, a total of 640 administrative appeals were

pending.  The time spent by FOIPA personnel handling these appeals reduces the amount of time

for regular processing duties.

In addition to showing exceptional circumstances, the FBI can show that it is making the number

Another factor that has a bearing on the FBI's ability to reduce its backlog is the number

of FOIA lawsuits that are pending against the FBI.  Hardy Decl. ¶ 39-40.  The FBI is involved in

over 140 FOIA pending lawsuits which place substantial litigation demands on RIDS.  Id.  ¶ 39.

Litigation directly impacts the FBI's ability to expedite the processing of new requests, as

litigation imposed deadlines require shifts in FBI resources.  Id. ¶ 40.

### B.     The FBI Is Making Reasonable Progress in Reducing Its Backlog of Pending Requests.

In addition to showing exceptional circumstances, the FBI can show that it is making

great strides in reducing its backlog.  Requests in the FOIPA Section in various stages of

processing between December 31, 1996 and December 31, 2004, dropped from 16,244 to 2,320

– a reduction of 13,930 requests.   Hardy Decl. ¶ 41.  By revising its processing system, the FBI

has successfully reduced the FBI's backlog of requests by approximately 89 percent.  Id.[15]  In

addition, RIDS has taken all available steps to aid in the streamlining of the work and reduction

---

[15] Indeed, RIDS current three-queue, "first-in, first-out" system is an improvement on the two-track, "first-in, first-out" system that the D.C. Circuit expressly recognized as supporting the due diligence requirement.  See *Open America*, 547 F.2d at 616; *Cohen*, 831 F. Supp. at 854 ("[R]esponding to requests on a 'first-come, first-served basis,' satisfies the 'due diligence' requirement unless the plaintiff has some exceptional or urgent need for the information.").

of the FOIA/Privacy Act backlog, including the use of direct on-line computer searches

conducted to locate responsive records, the use of forms which eliminate delays associated with

word processing, the formation of specific teams to target backlog issues, the development of

alternative methods to handle consultations with other government agencies.  Id.   In addition,

RIDS  has moved to paperless processing through its FOIPA Document Processing System,

which allows the user to scan FBI files, documents, and correspondence, and enables the user to

process pages electronically rather than manually.  Id.

Finally, the FBI has repeatedly sought additional funding for the creation of new FOIPA

positions.  Hardy Decl. ¶ 41.  See Open America, 547 F.2d at 618 (a factor in determining "due

diligence" is whether an agency has applied for funds to meet an upsurge in requests)

(Leventhal, J., concurring).

* * *

For all the foregoing reasons, the FBI has demonstrated both exceptional circumstances

and due diligence warranting a stay of proceedings to complete processing the requests at issue.

Courts have repeatedly recognized the need for such stays, even for extended periods of time,

and the circumstances here warrant such relief.  See, e.g., Haddon v. Freeh, 31 F. Supp.2d 16, 19

(D.D.C. 1998) (court had granted Open America stay until January 1998 on request submitted to

FBI nearly four years before); Judicial Watch of Florida, Inc. v. DOJ, No. 97-2869, slip op. at 6-

9 (D.D.C. Aug. 25, 1998) (Exh. I to Coppolino Declaration) (finding due diligence and granting

stay lasting nearly two years to the FBI); Grecco v. DOJ, No. 97-0419 (D.D.C. Aug. 24, 1998)

(Exh. J to Coppolino Declaration) (order granting partial stay to the FBI lasting over two years);

Narducci v. FBI, No. 98-0130 (D.D.C. Jul. 17, 1998) (Exh. K to Coppolino Declaration) (finding

reasonable progress on backlog and granting thirty-four-month stay because the FBI "is deluged with a volume of requests for information vastly in excess of that anticipated by Congress"); *Guzzino v. FBI*, No. 95-1780, 1997 WL 22886, at 2 (D.D.C. Jan. 10, 1997) (granting more than four-year stay because "[t]he FBI has shown that even though it is exercising due diligence, because of inadequate resources it is unable to respond to plaintiff's request within the statutory 10-day limit"); *Summers v. CIA*, No. 98-1682, slip op. at 1-2 (D.D.C. July 26, 1999) (Exh. L to Coppolino Declaration) (granting stay because "[t]he FBI has demonstrated through its affidavits that exceptional circumstances do exist, the agency is exercising due diligence in processing requests, and it is making reasonable progress in reducing its backlog"); *Ohaegbu v. FBI,* 936 F. Supp. 7, 8 (D.D.C. 1996) (granting stay until July 1997, over three years after request, finding FBI has met due diligence requirement for a stay); *Manna v. DOJ*, No. 93-81, 1994 WL 808070, at 10 (D.N.J. Apr. 13, 1994) (finding the FBI faced exceptional circumstances and exercised "due diligence given the huge number of requests that have overwhelmed the FBI's human and related resources"); *Lisee v. CIA*, 741 F. Supp. 988, 989-90 (D.D.C. 1990) (granting FBI's motion for stay); *Reed v. DOJ*, No. 97-2150, slip op. at 2 (D. Ariz. Nov. 10, 1998) (Exh. M to Coppolino Declaration) (granting eighteen-month stay where "defendant has made a showing of exceptional circumstances and due diligence"); *Jimenez v. FBI*, 938 F. Supp. at 31-32 (issuing Open America stay until March 2000, five years after request filed, so FBI could process 700 pages); *Cecola v. FBI*, No. 94 C 4866, 1995 WL 549066, at 1-2 (N.D. Ill. Sept. 8, 1995) (dismissing case without prejudice to permit FBI until November 1999 to complete processing of over 1,500 pages responsive to a request filed over six years before).

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that the Court: (i) deny plaintiffs' motion for a preliminary injunction; (ii) grant defendants' cross-motion for partial summary judgment on plaintiffs' claim for expedited FOIA processing; and (iii) grant a stay of proceedings to permit further processing of the FOIA requests at issue.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar No. 418925)
Assistant Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 7152
Telephone:  (202) 514-5302
Facsimile:  (202) 616-8470
Email:  Elizabeth.Shapiro@usdoj.gov


  /s/ Anthony J. Coppolino
ANTHONY J. COPPOLINO
(D.C. Bar No. 417323)
Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 6102
Telephone:  (202) 514-4782
Facsimile:  (202) 616-8460
Dated: July 5, 2005          Email:  tony.coppolino@usdoj.gov

-44-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 5, 2005, the foregoing *Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion for Partial Summary Judgment an Defendants' Motion for an Open America Stay* was filed electronically and served by means of the Court's ECF notice system. <u>See</u> Local Rule 5.4(d)(1). If otherwise necessary, the foregoing will also be served directly by electronic mail and first-class mail, postage pre-paid, on:

  Arthur B. Spitzer
  <u>artspitzer@aol.com,</u>
  <u>courtfilings@aclu-nca.org</u>
  D.C. Bar No. 235960
  American Civil Liberties Union of the
  National Capital Area
  1400 20th Street, N.W. #19
  Washington, D.C. 20036

  Ben Wizner
  <u>bwizner@aclu.org</u>
  Staff Attorney
  American Civil Liberties Union
  125 Broad St., 18th Flr.
  New York, NY 10004

        <u>  /s/ Anthony J. Coppolino        </u>
        ANTHONY J. COPPOLINO