IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>          Defendants. | )<br>)<br>)   Civ. A. No. 1:05-CV-1004 (ESH)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Exhibit A to Coppolino Declaration

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN CIVIL LIBERTIES
UNION OF NORTHERN
CALIFORNIA,

Plaintiff,

v.

DEPARTMENT OF JUSTICE, and
FEDERAL BUREAU OF
INVESTIGATION,

Defendants.
_____/

No. C 04-4447 PJH

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

The parties' cross-motions for summary judgment came on for hearing on March 2,

2005. Plaintiff appeared by its counsel Amitai Schwartz and Elizabeth Letcher, and

defendants appeared by their counsel Marcia Berman. Having read the parties' papers and

carefully considered their arguments and the relevant legal authority, and good cause

appearing, the court hereby GRANTS defendants' motion and DENIES plaintiff's motion as

follows.

**INTRODUCTION**

This is an action brought under the Freedom of Information Act, 5 U.S.C. § 552

("FOIA"), for injunctive and declaratory relief. Plaintiff American Civil Liberties Union of

Northern California ("ACLU-NC") seeks an order requiring expedited processing and release

of agency records by defendant United States Department of Justice ("DOJ") and defendant

Federal Bureau of Investigation ("FBI"). The parties seek summary judgment on the question

whether ACLU-NC is entitled to expedited handling of its FOIA request.

United States District Court
For the Northern District of California

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted FOIA "to facilitate public access to Government documents." U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991). Members of the public may request information and copies of public records from agencies of the Executive Branch of the United States government pursuant to the FOIA. 5 U.S.C. § 552. All federal agencies are required to disclose records upon receiving a written request for them. Id. § 552(a).[1]

Agencies ordinarily process requests for records and information on a "first-in, first-out" basis. See, e.g., 28 C.F.R. § 16.5(a) (DOJ components[2] generally shall respond to requests according to their order of receipt). Congress amended the FOIA in 1996 to provide for the "expedited processing" of certain categories of requests. See Electronic Freedom of Information Amendments of 1996, Pub. L. 104-231, § 8, codified at 5 U.S.C. § 552(a)(6)(E) ("EFOIA"). If a request for expedited processing is granted, the request moves to the front of the processing queue, ahead of previously filed requests.

As part of the EFOIA, Congress directed each agency to promulgate regulations providing for the expedited processing of requests for records, in two situations – when the person requesting the records "demonstrates a compelling need," and "in other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i)(I), (II). The EFOIA defines "compelling need" as either "that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." Id. § 552(a)(6)(E)(v)(I), (II). Requests for expedited processing which an agency grants are to be processed "as soon as practicable." Id. § 552(a)(6)(E)(iii).

The regulations promulgated by the DOJ for administering the FOIA are published at

---

[1] Under FOIA, a governmental agency is required to produce information unless it is subject to one of the Act's nine exemptions. 5 U.S.C. § 552(b).

[2] A DOJ component is "each separate bureau, office, board, division, commission, service, or administration of the Department of Justice." 28 C.F.R. § 16.1(b). Requests for DOJ records are submitted to the component that maintains those records. See 28 C.F.R. § 16.3.

1    28 C.F.R. § 16, Subpart A.  Under those regulations, requests will be taken out of order and

2    given expedited treatment whenever it is determined that they involve

3      (i) Circumstances in which the lack of expedited treatment could reasonably be
     expected to pose an <u>imminent threat</u> to the life or physical safety of an
4      individual;

5      (ii) An <u>urgency to inform the public</u> about an actual or alleged federal
     government activity, if made by a person primarily engaged in disseminating
6      information;

7      (iii) The loss of <u>substantial due process rights</u>; or

8      (iv) A matter of <u>widespread and exceptional media interest</u> in which there exist
     possible questions about the government's integrity which affect public
9      confidence.

10    28 C.F.R. at § 16.5(d)(1)(i)-(iv) (emphasis added).  Of these four grounds, the ones set forth in

11    subsections (i) and (ii) implement the statutory "urgency to inform" standard under 5 U.S.C.

12    § 552(a)(6)(E)(v)(I), (II).  Those set forth in subsections (iii) and (iv) define the "other cases

13    determined by the agency" that the DOJ has determined qualify for expedited processing.

14    <u>See</u> 5 U.S.C. § 552(a)(6)(E)(i)(II).

15      The only opinion issued to date by a Circuit Court of Appeals interpreting these

16    "expedited processing" provisions is the decision in <u>Al-Fayed v. Central Intelligence Agency</u>,

17    254 F.3d 300 (D.C. Cir. 2001).  The D.C. Circuit noted that the legislative history of the EFOIA

18    indicates Congress' intent that the rule allowing expedited processing be "narrowly applied."

19    <u>Al-Fayed</u>, 254 F.3d at 310 (quoting EFOIA Amendments of 1996, H.R. Rep. No. 104-795, at

20    26 (1996), and stating that Congress' rationale was clear, in view of statement in House

21    Report that "given the finite resources available for filling FOIA requests, unduly generous

22    application of the expedited processing procedure would unfairly disadvantage other

23    requesters who do not qualify for its treatment.").  The court also held that the requester bears

24    the burden of showing that it is appropriate that the request be expedited.  <u>Id.</u> at 305 n.4 (citing

25    5 U.S.C. § 552(a)(6)(E)(i)(I); H.R. Rep. No. 104-795, at 25).

26                  **FACTUAL BACKGROUND**

27      ACLU-NC is an affiliate of the American Civil Liberties Union, described in the

28    complaint as "a national organization that works to protect the civil liberties of all people,

**United States District Court**
For the Northern District of California

3

1  including immigrants to the United States." Cplt. ¶ 7. ACLU-NC primarily serves the

2  population of Northern California. Id. It is a "non-profit, non-partisan membership organization

3  [that] publishes newsletters, provides news briefings, publishes and disseminates right-to-

4  know documents, and other materials that are distributed to the public." Id. ¶ 8. It also

5  disseminates information through its website and its monthly newsletter. Id.

6      ACLU-NC represents that in the summer of 2004, it received reports that the FBI, as

7  part of its effort to combat terrorism, had been interrogating numerous individuals throughout

8  California solely because they were Muslims or were persons of Middle Eastern descent.

9  ACLU-NC asserts that numerous news articles stated that the FBI was questioning these

10  individuals about their association with other people and groups, about their political views on

11  the war in Iraq and on other issues related to the Middle East, and about what mosques

12  people attended.

13      On August 20, 2004, ACLU-NC submitted a FOIA request to multiple DOJ components

14  – including FBI Headquarters in Washington D.C., various FBI Field Offices and Resident

15  Agencies in Northern California, the Executive Office for United States Attorneys ("EOUSA"),

16  the United States Attorneys for the Northern and Eastern Districts of California, and the

17  Director of Public Affairs for DOJ.

18      The request states that the National Lawyers' Guild ("NLG") has "[r]ecently . . . been

19  receiving telephone calls from individuals living throughout Northern California, who have been

20  interrogated by the Federal Bureau of Investigation (FBI) for no apparent reason other than

21  having been born in and/or traveled to the Middle East." The request states further that these

22  random interviews or interrogations "raise the concern that the FBI and the Joint Terrorism

23  Task Forces operating in Northern California are infringing upon the civil rights and civil

24  liberties of immigrants, U.S. Citizens and organizations by interrogating them without any valid

25  basis, rationale, or individualized suspicion for doing so."

26      The FOIA request contains four numbered requests, each seeking a broad range of

27  records and information.

28      Request No. 1 seeks all records relating to any agreement between the FBI or

4

1  Department of Homeland Security and the State of California or any counties or cities in

2  Northern California,[3] to form a Joint Terrorism Task Force ("JTTF").

3      Request No. 2 seeks all records created by or transmitted by or between the FBI, any

4  JTTF in Northern California, any Sheriff's or Police Department in Northern California, the

5  California Anti-Terrorism Information Center, the California Justice Department, or the

6  California Highway Patrol Anti-Terrorism Unit relating to

7      (a) the monitoring or questioning of individuals in Northern California on the

8  basis of national origin, ethnic background, religious affiliation, organizational membership,

9  political affiliation, or participation in protest activities;

10      (b) the factors used to decide if a person is to be the target of such monitoring

11  or questioning;

12      (c) the types of information law enforcement agents are instructed to obtain

13  about individuals or organizations that are subject to such monitoring or questioning;

14      (d) the policies or procedures addressing the sharing of information obtained as

15  a result of such monitoring or questioning;

16      (e) the way in which the information described in (c) has been or might be used;

17      (f) any procedures for cross-referencing the information described in (c) with

18  information in other databases or information about other individuals or organizations;

19      (g) the policies and procedures regarding destruction of information received

20  through monitoring or questioning of such individuals or organizations;

21      (h) the policies and procedures that protect the privacy of persons who are

22  observed or contacted during such monitoring or questioning;

23      (i) California's constitutional right to privacy and the manual issued by the

24  California Attorney General entitled Criminal Intelligence Systems: A California Perspective;

25      (j) cumulative data obtained about individuals or organizations that are subject

26  to monitoring or questioning as in (a).

27

28

_____

[3]  The request lists 47 of California's 58 counties as "Northern California" counties.

5

United States District Court
For the Northern District of California

Request No. 3 seeks the following records with regard to information collected or maintained by the FBI and or any JTTF in Northern California relating to individuals in Northern California who were born, lived, or worked in, or traveled to, the Middle East or South Asia:

(a) cumulative data obtained about such individuals or organizations;

(b) the types of information law enforcement officers are instructed to obtain about such individuals or organizations;

(c) whether such information is contained in any agency databases, and any regulations regarding entry of such information in databases;

(d) the manner in which such information will be obtained;

(e) procedures for selecting such individuals and organizations as subjects to investigate or interrogate;

(f) agreements or instructions to gather data regarding such individuals or organizations;

(g) the way in which the info about such individuals and organizations has been or will be used;

(h) any procedures for analyzing such information;

(i) any procedures for cross-referencing information about such individuals or organizations with information in other databases and/or information about other individuals or organizations;

(j) how such information has been or will be used, including timelines and procedures for document retention and destruction.

Request No. 4 seeks all records containing the following information, to the extent not included in above three requests, relating to Northern California and for each year starting with 2000:

(a) the amount of federal funding for each Fiscal Year ("FY"), starting with FY 2000 for the operation of JTTFs, broken down by each JTTF;

(b) the amount of local and state funding for each such FY, broken down by each contributing law enforcement authority;

United States District Court

For the Northern District of California

1    (c) the number of individual officers of the FBI or any JTTF that have participated

2  in the questioning of individuals in Northern California, for each year;

3    (d) the number of "incidents" of monitoring or questioning, broken down by each

4  JTTF, conducted by local police officers serving on any JTTF, for each year;

5    (e) the number of individuals who were monitored or questioned by the FBI or

6  any JTTF, for each year;

7    (f) the number of individuals in Northern California who were born or lived in, or

8  traveled to, the Middle East, who have been monitored or questioned by the FBI or any JTTF

9  for each year;

10    (g) the number of political, religious, or community organizations in Northern

11  California that have been monitored or infiltrated by the FBI or any JTTF for each year.

12    ACLU requested expedited processing of its FOIA request under the statutory

13  "compelling need" provision, and also under three provisions of the DOJ regulation providing

14  for expedited processing – the provisions relating to urgency to inform the public,  to loss of

15  substantial due process rights, and to matters of widespread and exceptional media interest

16  with questions about the government's integrity.

17    In support of its claim that the request involved matters of widespread and exceptional

18  public and media interest, ACLU-NC cited eight articles or reports – six newspaper articles,

19  an op-ed piece published in a San Francisco newspaper, and a report broadcast on National

20  Public Radio – which it argued demonstrated that the subject of the FOIA request had

21  received "substantial media attention."  ACLU-NC did not attach copies of the articles, the op-

22  ed piece, or the broadcast transcript to the FOIA request, although it did provide the court with

23  copies of the articles and the op-ed piece with its motion for summary judgment.  The eight

24  reports are the following:

25    •    An article by Mary Beth Sheridan, "Interviews of Muslims to Broaden,"

26  published in the Washington Post on July 17, 2004.  This article stated that the FBI had

27  launched a series of interviews of Muslims and Arab-Americans in the Washington D.C. area

28  and across the country, hoping to obtain information that could prevent a major terrorist attack

7

United States District Court
For the Northern District of California

1  in the 2004 election year, and referred to an announcement by Attorney General John Ashcroft

2  in a July 9, 2004, news release.  The article referred to FBI visits to Muslims in California,

3  Arizona, and Missouri, and quoted the executive director of the Council on American-Islamic

4  Relations ("CAIR") and the director of CAIR's Arizona office, both of whom reportedly

5  described incidents of Muslims being questioned at their homes or workplaces; and an

6  attorney with the National Lawyers Guild in San Francisco, who said NLG had received four

7  calls from Muslims and Arab-Americans contacted by the FBI or the local JTTF.

8      •      An article by Richard Schmitt and Donna Horowitz, "FBI Starts to Question

9  Muslims in U.S. About Possible Attacks," published in the Los Angeles Times on July 18,

10  2004.  This article stated that the U.S. Attorney General John Ashcroft and FBI Director Robert

11  Mueller had announced at a news conference in late May 2004 that the FBI would begin

12  interviewing Muslims and Arab-Americans around the United States as part of an effort to

13  learn about possible terrorist attacks planned for the summer or fall of 2004, possibly in

14  connection with the national political conventions scheduled for late July and late August.  The

15  article referred to FBI visits to Muslims in California, Arizona, Missouri, Virginia, Florida, and

16  New York, and quoted, among others, the NLG lawyer in San Francisco who was quoted in the

17  July 17, 2004, Washington Post article; the executive director of CAIR, also quoted in the July

18  17, 2004, article; and the president of the Arab-American Institute.

19      •      An article by Kelly Thornton, "FBI's Home Visits Have Some Muslims Feeling

20  Harassed," published on August 2, 2004, at Signonsandiego.com, the website maintained by

21  the San Diego Union Tribune, a San Diego newspaper.  This report discussed FBI visits to

22  and questioning of Muslims and Arab-Americans in the San Diego and Los Angeles areas,

23  and noted that two of the September 11th hijackers had lived in San Diego and had possible

24  ties to the Arab community there.

25      •      An article by Camille T. Taiara, "New Targeted Groups," published in the San

26  Francisco Bay Guardian in the edition for the week of August 4-10, 2004.  This article

27  discussed the FBI's questioning of Muslim and immigrant groups in San Francisco Bay Area,

28  and quoted Jayashri Srikantiah, the director of Stanford University Law School's Immigrant

8

United States District Court

For the Northern District of California

1  Rights Clinic and former associate legal director at ACLU-NC.  It also quoted a National

2  Lawyers Guild "program assistant" regarding calls received by NLG by people approached by

3  the FBI for interviews, and quoted ACLU-NC lawyer Mark Schlosberg, one of ACLU-NC's

4  attorneys in the present action.

5        • An op-ed piece by Jayashri Srikantiah, "Few Benefits to Questioning Targeted

6  Groups," published in the San Francisco Chronicle on August 6, 2004.  This opinion

7  discussed the FBI's questioning of Muslim and immigrant groups in San Francisco Bay Area

8  and across the United States, and provided much the same information as the article that

9  appeared in the August 4-10, 2004, issue of the San Francisco Bay Guardian.

10        • An article by Eric Lichtblau – "FBI Goes Knocking for Political Troublemakers,"

11  published in the New York Times on August 16, 2004.  This article reported that three

12  Democratic congressmen had requested a DOJ inquiry into the FBI's questioning of would-be

13  demonstrators about possible violence at Republican National Convention, scheduled to

14  begin August 30, 2004, in New York City.[4]  The article stated that at some point prior to the

15  Democratic National Convention,[5] FBI agents had begun interviewing numerous people in at

16  least six states, including past protestors and their friends and family, about possible violence

17  at the two conventions.  The article referred to questioning of individuals in Missouri, Iowa,

18  Colorado, and New York, but did not mention Northern California.

19        • A report by Larry Abramsom, broadcast on August 17, 2004, on National Public

20  Radio's "All Things Considered" – "FBI Questioning Political Demonstrators."  ACLU-NC did

21  not provide a transcript of this broadcast to the court, and the transcript is not available on

22  NPR.org (the National Public Radio website), although it is apparently possible to listen to the

23  audio on NPR's website, assuming one has the computer capability.[6]  This report apparently

24  stated that the FBI had questioned or was planning to question political activists regarding

25  _____

26    [4] The Republican National Convention ran from August 30, 2004, through September 2, 2004.

27    [5] The Democratic National Convention ran from July 26, 2004, through July 29, 2004.

28    [6] The court was unable to do this.

9

United States District Court
For the Northern District of California

1    possible protests during the August 2004 Republican National Convention in New York City.

2    There is no indication in ACLU-NC's papers that the report mentioned Northern California.

3    •    An article by Eric Lichtblau – "Inquiry Into FBI Question is Sought," published

4    in the New York Times on August 18, 2004, which repeated the assertion in the August 16,

5    2004, New York Times article, that three Democratic Congressmen had called for a DOJ

6    investigation into the FBI's questioning of would-be demonstrators about possible violence at

7    the Republican National Convention.  The August 18, 2004, article also stated that the FBI had

8    sought to interview people in Colorado, Illinois, Kansas, Massachusetts, Missouri, and New

9    York, but did not mention Northern California.

10    On August 27, 2004, the assistant director of the FOIA unit of the EOUSA, responding

11    to the request for expedited processing made by ACLU-NC to EOUSA, stated that the

12    request "merits expedited treatment by this office."

13    On September 1, 2004, the Section Chief of the Record/Information Dissemination

14    Section, of the FBI's Records Management Division, wrote ACLU-NC, denying the request for

15    expedited processing made to the FBI, on the grounds that ACLU-NC had not met the

16    standard of showing that there was an urgency to inform the public about an actual or alleged

17    federal government activity, or of showing that it met the other requirements of the applicable

18    statute or regulations.  On September 7, 2004, a second letter from the FBI stated that the

19    request submitted to the FBI's Director of Public Affairs was being denied because of lack of

20    a showing of "widespread and exceptional media interest" or any questions regarding the

21    government's integrity.

22    On September 10, 2004, ACLU-NC wrote the FBI to appeal the denial of the request

23    for expedited processing.  On September 22, 2004, the Co-Director of the FBI's Office of

24    Information and Privacy affirmed the action of the FBI and the FBI's Office of Public Affairs.

25    ACLU-NC filed this action on October 21, 2004.

26    **DISCUSSION**

27    A.    Legal Standard

28    Agency decisions to deny or affirm denial of a request for expedited processing are

10

United States District Court
For the Northern District of California

1  subject to judicial review. 5 U.S.C. § 552(a)(6)(E)(iii). Such review "shall be based on the

2  record before the agency at the time of the determination." Id. A decision denying expedited

3  processing for failure to establish "compelling need" under § 552(a)(6)(E)(i)(I) is reviewed de

4  novo. Al-Fayed, 254 F.3d at 304-05 (citing § 552(a)(6)(E)(i)).[7]

5      The parties dispute what standard should be applied in reviewing an agency decision

6  denying expedited processing of a request made pursuant to § 552(a)(6)(E)(i)(II) – "other

7  cases as determined by the agency." Defendants contend that the court should apply a

8  "reasonableness" standard, while ACLU-NC argues that the review should be de novo, as with

9  requests based on a claim of "compelling need."

10     Defendants rely on commentary in footnote 7 of Al-Fayed, where the D.C. Circuit noted

11 that according to the legislative history of EFOIA, the provision that allows agencies to

12 promulgate regulations providing for expedited processing "in other cases determined by the

13 agency" gives an agency "latitude to expand the criteria for expedited access" beyond cases

14 of "compelling need." Al-Fayed, 254 F.3d at 307 n.7 (citing H.R. Rep. No. 104-795 at 26).

15 The court indicated that a regulation promulgated in response to such an express delegation

16 of authority to an individual agency is entitled to judicial deference, as each agency's

17 reasonable interpretation of its own regulations. Id. (citing United States v. Mead Corp., 533

18 U.S. 218, 227-28 (2001); United States v. Cleveland Indians Baseball Co., 532 U.S. 200,

19 218-20 (2001)). Based on this discussion, defendants argue that the court should review only

20 the reasonableness of the FBI's denial of expedited processing under the "widespread and

21 exceptional media interest" provision of the regulation.

22     ACLU-NC, on the other hand, contends that the EFOIA requires de novo review of any

23 agency action to affirm or deny denial of a request to expedite. ACLU-NC also asserts that

24 the "deference to agency interpretation" requirement applies only in cases where such

25 _____

26     [7] Subsection (a), paragraph (6) provides that any action granting or denying expedited
   processing "shall be subject to judicial review under paragraph (4)." 5 U.S.C. § 552(a)(6)(E)(iii).
27 Subsection (a), paragraph (4), which concerns the fees charged for processing of records
   requests, provides that "[i]n any action by a requester regarding the waiver of fees under this
28 section, the court shall determine the matter de novo," provided that the court's review shall be
   limited to the record before the agency. 5 U.S.C. § 552 (a)(4)(A)(vii).

1  interpretation relates to matters in which the agency has special expertise.  ACLU-NC argues

2  that DOJ has no special expertise in interpreting government-wide statutes like the FOIA, and

3  the mere fact that the DOJ has added some "other cases as determined by the agency" to the

4  list of situations in which expedited review might be available, does not mean that the DOJ

5  should also be permitted to be the sole arbiter – subject only to a "reasonableness"

6  requirement – of when and if specific requests fall within those cases.

7           The court agrees with ACLU-NC's reading of the statute.  As noted above,

8  § 552(a)(6)(E)(iii) provides that "[a]gency action to deny or affirm denial of a request for

9  expedited processing pursuant to this subparagraph . . . shall be subject to judicial review

10  under paragraph (4)."  The reference to "this subparagraph" can only be a reference to

11  subparagraph (E), which contains all the statutory provisions regarding expedited processing.

12  In the absence of any controlling Ninth Circuit authority to the contrary, the court finds that

13  judicial review of any denial of a request for expedited processing – whether the request is

14  made pursuant to the "compelling need" provision of subparagraph (E)(i)(I), or is made

15  pursuant to the "other cases determined by the agency" provision of subparagraph (E)(i)(II) –

16  must be conducted de novo.

17  B.    The Cross-Motions

18           ACLU-NC argues that it is entitled to expedited processing of its FOIA request under

19  three provisions – the "compelling need" provision of § 552(a)(6)(E)(i)(I), and two of the four

20  grounds set forth in the "other cases as determined by the agency" in 28 C.F.R. § 16.5(d)(1) –

21  (ii) (urgency to inform the public about government activity, by person primarily engaged in

22  disseminating information), and (iv) (matter of widespread and exceptional media interest w/

23  possible questions about government's integrity which affects public confidence).[8]  For

24  purposes of this analysis, however, the court considers that ACLU-NC is seeking expedited

25  processing under two provisions – the "urgency to inform" standard and the "exceptional

26

27  _____

28        [8] ACLU-NC originally also asserted that it was entitled to expedited processing under 28
     C.F.R. § 16.5(d)(1)(iii) – loss of substantial due process rights – but had abandoned that claim
     by the time of the hearing on the parties' cross-motions.

United States District Court
For the Northern District of California

1  media interest" standard – not three, as the "urgency to inform" prong of the statutory

2  "compelling need" provision is repeated as the "urgency to inform" provision in the regulation.

3        1.  The Parties' Arguments

4            a.  Urgency to inform the public

5       Under this standard, the requesting party must establish that it is "primarily engaged in

6  disseminating information" and that there is "urgency to inform the public about actual or

7  alleged federal government activity."  ACLU-NC first asserts that it is an organization primarily

8  engaged in disseminating information to the public, noting that it sends out a bi-monthly

9  newsletter to 40,000 people, maintains a website, and issues right-to-know documents, press

10  releases, brochures, and pamphlets on civil liberties.  It claims that even though it may not be

11  an actual "news organization" – a newspaper or a television/radio news department –

12  information dissemination is nonetheless central to its activities.

13       Defendants dispute ACLU-NC's claim that it is primarily engaged in disseminating

14  information.  DOJ regulations provide that "a requester within [this] category . . . , if not a full-

15  time member of the news media, must establish that he or she is a person whose main

16  professional activity or occupation is information dissemination, though it need not be his or

17  her sole occupation."  28 C.F.R. § 16.5(d)(3).  The legislative history of EFOIA further clarifies

18  that the category "person . . . primarily engaged in the dissemination of information" does not

19  include individuals who are engaged only incidentally in the dissemination of information, and

20  that information dissemination must be the main activity of the requester – though it need not

21  be his/her/its sole occupation.  H.R. Rep. No. 104-795 at 26.

22       Defendants argue that while ACLU-NC has shown that it disseminates information –

23  whether it be through a website, a bi-monthly newsletter, reports, or public speaking

24  engagements – it has not shown that information dissemination is its "main activity."

25  Defendants claim that ACLU-NC provided nothing to the FBI to back up its assertion that

26  disseminating information to the public is central, not merely incidental to ACLU-NC's

27  activities.  Defendants note that ACLU-NC's website and the website of the national ACLU

28  both indicate that the primary activity of the organization is to litigate high-impact cases to

1  defend and promote civil liberties. Defendants point to ACLU-NC's website, which states that

2  the ACLU is the only national organization "dedicated to defending and expanding the civil

3  liberties of all people," and that it engages in activities to disseminate information "[i]n addition

4  to the direct litigation for which the ACLU has been known over the past seven decades."

5      Second, ACLU-NC contends that the records it seeks are urgently needed to inform

6  the public about federal government activity. The legislative history suggests that Congress

7  intended that the information requested under the "urgency to inform" provision should pertain

8  to a matter of current exigency to the American public and that a reasonable person might

9  conclude that the consequences of delaying a response to a FOIA request would compromise

10  a significant recognized interest. See Al-Fayed, 254 F.3d at 310 (citing H.R. Rep. No. 104-

11  795 at 26, which also states that "[t]he public's right to know, although a significant and

12  important value, would not by itself be sufficient to satisfy this standard.").

13      Thus, in determining whether requesters have demonstrated "urgency to inform the

14  public,"

> courts must consider at least three factors: (1) whether the request concerns a
> matter of current exigency to the American public; (2) whether the consequences
> of delaying a response would compromise a significant recognized interest; and
> (3) whether the request concerns federal government activity.

Id. at 310. ACLU-NC asserts that it satisfies all three of these factors. There appears to be

no dispute that the subject of the request concerns federal government activity. The parties do

dispute whether ACLU-NC has made a showing of the first two factors.

With regard to the first factor, ACLU-NC argues that the subject of the requests concern

a matter of great exigency to the American public because there is substantial interest on the

part of both the public and the media, evidenced by news reports. Citing to the same eight

reports that it cited in its request to the FBI for expedited processing under the "widespread

and exceptional media interest" provision,[9] 28 C.F.R. § 16.5(d)(1)(iv), ACLU-NC asserts that

---

[9] ACLU-NC includes an additional four articles with its motion for summary judgment – an article published by the Contra Costa Times on October 6, 2004; an article published by the New York Times on September 28, 2004; an article published by the Washington Post on September 27, 2004; and an undated report from the Associated Press. The court does not consider these articles, however, because ACLU-NC did not present them to DOJ or the FBI in

United States District Court
For the Northern District of California

1   as of August 2004, news outlets from around the United States were reporting on the FBI's

2   terrorism-related monitoring and surveillance. It also contends that local and national scrutiny

3   has focused on how the FBI will use the information it gathers, and whether the interviews are

4   being used to intimidate political protestors or chill expression (again citing the same articles).

5       With regard to the second factor, ACLU-NC argues that delaying a response would

6   compromise a significantly recognized interest – the public's right to know about its

7   government's activities. It asserts that little is known about the latest round of FBI interviews,

8   and that the public needs that information to evaluate the FBI's activities. It contends that like

9   any agency, the FBI should be accountable to the public and release documents about its

10  activities. ACLU-NC also asserts that delaying a response "could" also affect significant

11  constitutional interests, because the records sought might address concerns about

12  government actions that impinge on freedom of expression, freedom of religion, freedom of

13  association, the right to travel, or the right to privacy. ACLU-NC claims in addition that it has

14  its own interest in providing accurate, reasoned information to the public and in adding its

15  perspective to the national debate.

16      In response, defendants contend that while there is no dispute that the requests involve

17  federal government activity, on the record presented to the FBI,[10] ACLU-NC has not

18  _____

19  connection with the request for expedited processing.

20      [10]   The parties argue at length about whether the contents of the eight reports cited by
    ACLU-NC in its motion should be considered part of the record presented in support of the
21  request for expedited processing. The record presented to the FBI consisted of the August 20,
    2004, letter from ACLU-NC (the FOIA request, which included the request for expedited
22  processing), and included a one-page attachment briefly summarizing ACLU-NC's media and
    publication activities. ACLU-NC's letter provided the dates, titles, and authors of the articles, but
23  ACLU-NC included no copies of any of the articles. Instead, for some of the articles – those
    appearing in the New York Times, the Los Angeles Times, the Washington Post, and the San
24  Diego Union Tribune, and the one broadcast on NPR – it provided the domain name of the news
    organization. For the San Francisco Chronicle and San Francisco Bay Guardian articles, it did
25  not do even that. In all cases, it left to the FBI the task of conducting research and locating the
    articles.

26      Defendants claim that the FBI should not have had to do this research, because the burden
27  was on ACLU-NC to establish the "compelling need." ACLU-NC responds that this argument puts
    form over substance, and asserts that the FBI is demonstrating a lack of good faith when it
28  argues, in this "modern age of electronic court filings," that it could not process the request
    because ACLU-NC provided only the news media domain names, but not the complete website

15

United States District Court
For the Northern District of California

1   established either of the two factors. With regard to the first factor, defendants assert that

2   ACLU-NC has not shown that its request concerns a matter of current exigency. Defendants

3   argue that of the eight articles cited by ACLU-NC, three relate to a subject that is only a minor

4   part of the FOIA request – the questioning of would-be protestors about possible violence

5   during the political party conventions in the summer of 2004[11] – and do not even mention the

6   questioning of Northern California residents, or the targeting of Muslims and Arab-Americans

7   living in Northern California.

8       Defendants argue that the remaining five articles are not directly relevant to the FOIA

9   request because they only incidentally mention the involvement of the JTTFs in the FBI

10  questioning at issue[12] – while the FOIA request is directed specifically at JTTF activities,

11  organization, funding, policies, procedures, mandate, and connections with state and local law

12  enforcement. Defendants also claim that the five articles do not show that the questioning by

13  the FBI of Muslims and Arab-Americans is a matter of current exigency to the American public

14  – rather, the articles show only that the subject is of concern to a narrow segment of the

15  population.

16      Defendants assert further that these five articles seem to have been generated in large

17  part by ACLU-NC and those working with ACLU-NC. The author of the August 6, 2004, op-ed

18  piece was formerly the associate legal director at ACLU-NC, and is also one of the chief

19  sources quoted in the San Francisco Bay Guardian article. Another source quoted in the San

20  _____

21  information. Although the court makes no finding that the articles were not part of the record
    before the agency, and has read and considered the articles (with the exception of the NPR
22  broadcast transcript, which the court has been unable to access) as part of its de novo review of
    the FBI's denial of the request for expedited processing, the court does not agree with ACLU-
23  NC's position that it is acceptable practice for a requester to ask an agency to consider
    expedited processing and then fail to include copies of news articles or other material the
24  requester wants the agency to consider in evaluating the request.

25      [11]  These are the New York Times articles published August 16, 2004, and August 18,
    2004, and the Larry Abramson report that was broadcast on NPR on August 17, 2004.

26      [12]  These articles are the August 6, 2004, op-ed piece published in the San Francisco
27  Chronicle; the article published in the August 4-10, 2004, issue of the San Francisco Bay
    Guardian; the August 4, 2004, article published by the San Diego Union Tribune; the July 18,
28  2004, article published in the Los Angeles Times; and the July 17, 2004, article published in the
    Washington Post.

United States District Court
For the Northern District of California

1  Francisco Bay Guardian article is Mark Schlosberg, police practices director of the ACLU-

2  NC, and the author of ACLU-NC's FOIA request to the DOJ and FBI.  The San Francisco Bay

3  Guardian article also quotes an assistant from a program run by the National Lawyers Guild,

4  which is identified in the FOIA request as being associated with ACLU-NC.  Stacy Tolchin, a

5  NLG attorney, is quoted extensively in the Los Angeles Times story, and is also quoted (in

6  almost identical language) in the Washington Post article.  The articles also quote

7  representatives from the CAIR.  Defendants note that according to one of its press releases,

8  ACLU-NC has been working closely with the NLG to monitor government surveillance tactics,

9  and with CAIR to monitor and provide services for impacted communities.

10        Based on all these seeming interrelationships, defendants propose that ACLU-NC had

11  a hand in the creating and publishing of the articles that it now relies on to support the request

12  for expedited processing.  Therefore, defendants assert, ACLU-NC's request should not be

13  viewed as evidencing a "widespread public controversy about the FBI's terrorism-related

14  activities."  Defendants concede that the issue may be "newsworthy," but deny that ACLU-NC

15  has shown that it is a matter of "current exigency."

16        With regard to the second factor, defendants argue that ACLU-NC has made no

17  showing that a delayed response would compromise a significant recognized interest.

18  Defendants claim that ACLU-NC's major argument is that the public has a right to know what

19  the FBI is involved in.  However, defendants assert, the "public's right to know" was specifically

20  rejected by Congress, as shown in the legislative history, and by DOJ, as shown in the

21  applicable regulation, as a main reason for granting a request for expedited processing under

22  the "urgency to inform" standard.  See H.R. Rep. No. 104-795, at 26; 28 C.F.R. § 16.5(d)(3).

23        In response, ACLU-NC reiterates that it is primarily engaged in the disseminating of

24  information, again referring to its public outreach activities.  ACLU-NC also complains that

25  defendants have dissected the FOIA request into unrecognizably small parts and are now

26  improperly attempting to argue that there is no urgency with regard to any part of the request.

27  ACLU-NC claims that the DOJ's "crabbed reading" of the FOIA request and the "tortured logic

28  that flows from it" are flawed, and asserts that the court is required to look at the request "as a

17

United States District Court

For the Northern District of California

1  whole."

2      ACLU-NC shrugs off defendants' claim that some of the articles cited in support of its

3  claim of substantial public and media interest do not mention the questioning of Arab-

4  Americans, and that none of the articles refer to the mechanics, policies, procedures, or

5  funding of the JTTF/FBI cooperation.  ACLU-NC asserts that the fact that the articles do not

6  mention these organizational details is of no consequence, because the information that

7  lawyers seek in a FOIA request focuses on legal issues, whereas the information a reporter

8  would present to the public in a news article focuses on less technical aspects of an issue.  In

9  addition, ACLU-NC argues that its request is not solely about Northern California Muslims or

10  the structure of JTTFs in Northern California, but rather that it seeks "information on a local

11  level about an issue of national impact and interest" – whether the FBI and JTTFs are

12  infringing on the civil rights and civil liberties of immigrants, United States citizens, and

13  organizations.  ACLU-NC claims that the articles it cites show that these subjects are of

14  current exigency to the American public.

15      ACLU-NC also argues that it has shown that significant, multiple, recognized interests

16  would be compromised if the response to the request is delayed.  ACLU-NC contends that the

17  public's right to know is a "weighty interest," but asserts that it does not rely only on that factor.

18  It also relies on "the very real threat to fundamental civil rights and liberties stemming from the

19  FBI's intrusive, constitutionally suspect surveillance and questioning program."  ACLU-NC

20  claims that if the response to the request is delayed, important individual liberties and privacy

21  concerns will be compromised.  ACLU-NC argues in addition that it has its own recognized

22  interest in obtaining the records in order to be able to participate in the public debate

23  knowingly, inform the public, and communicate its perspective on the government's activities

24  to the public.

25          b.    DOJ media-related standard

26      ACLU-NC also seeks expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), through

27  which DOJ, by regulation, expedites treatment whenever it determines that a FOIA request

28  involves a "matter of widespread and exceptional media interest in which there exists possible

United States District Court

For the Northern District of California

1    questions about the government's integrity which affects public confidence."  ACLU-NC

2    supported this request with citation to the eight articles described above in the "Factual

3    Background."  ACLU-NC claims that these articles show widespread and exceptional public

4    interest in the FBI's "interrogation program," for several reasons – because the program

5    appears to target Muslims and Arab-Americans, because its efficacy as a method of fighting

6    terrorism is in question, and because the FBI appears to be using questioning to chill political

7    activism and expression.

8        Defendants contend that ACLU-NC's arguments here essentially repeat its arguments

9    with regard to "current exigency," above, and should be rejected for the same reasons.

10   Defendants contend that the handful of articles cited by ACLU-NC shows that the subject is

11   newsworthy, at best, but not that the FOIA request relates to a matter of "widespread and

12   exceptional" media interest.

13       2.    Analysis

14       The court finds that ACLU-NC's motion must be DENIED and that defendants' motion

15   must be GRANTED.  ACLU-NC has not met its burden of showing that it is entitled to

16   expedited processing under either the "urgency to inform" standard or the "exceptional media

17   interest" standard – both primarily for the same reason:  The news articles that ACLU-NC

18   claims demonstrate both that the subject of the FOIA request concerns "a matter of current

19   exigency to the American public" and that the subject of the FOIA request is "a matter of

20   widespread and exceptional media interest" do not in fact do so.  Although there is not a lot of

21   case law on this issue, the cases that the court has located support defendants' argument that

22   news reports alone cannot provide evidence of "current exigency to the American public" or

23   "widespread and exceptional media interest" if they do not refer to the exact subjects of the

24   FOIA request.

25       In Al-Fayed, the plaintiffs sought expedited processing of a FOIA request for records

26   relating to the deaths of Princess Diana and Dodi Al-Fayed in a 1997 auto accident.  The

27   plaintiffs' specific request was for records relating to allegations that the National Security

28   Agency secretly taped Princess Diana's telephone calls; that in 1988 the United States

19

United States District Court

For the Northern District of California

1   denied entry to an informant with information about the involvement of British foreign

2   intelligence services in the accident; and that in 1998, Dodi's father, Mohammed Al-Fayed,

3   was the victim of an attempted fraud. In holding that expedited processing was not warranted,

4   the D.C. Circuit rejected the request for documents about the alleged fraud because there was

5   "no evidence in the record that there is a substantial interest, either on the part of the American

6   public or the media, in this particular aspect of plaintiff's allegations." Al-Fayed, 254 F.3d at

7   311. Thus, it was not sufficient for the plaintiffs to show interest in only the general  subject

8   area of the request.

9       Similarly, in EPIC v. Dep't of Defense, __ F. Supp. 2d __, 2004 WL 2848316 (D.D.C.,

10  Dec. 8, 2004), the district court found that the failure of the plaintiff's FOIA request to

11  demonstrate current public interest in the specific subject of the request was fatal to the

12  request for expedited processing. In that case, plaintiff Electronic Privacy Information Center

13  submitted a FOIA request to the United States Department of Defense, seeking all records

14  regarding the use of the Verity K2 Enterprise software program for the purpose of analyzing

15  intelligence and detecting terrorist activities. However, EPIC presented the Department only

16  with news articles that showed a public interest in the subject of data mining in general, with no

17  mention of the Verity K2 Enterprise software program that was the specific subject of the FOIA

18  request. Id. at *3. Relying on Al-Fayed, the district court held that the plaintiff had failed to

19  present the agency with evidence of a substantial interest in the particular aspect of its FOIA

20  request and had therefore failed to meet the standard for expedited processing. Id. at *3-4.

21      The facts in those two cases are in contrast to the facts in American Civil Liberties

22  Union v. U.S. Dep't of Justice, 321 F. Supp. 2d 24 (D.D.C. 2004). In that case, the American

23  Civil Liberties Union and the Electronic Privacy Information Center sought information about

24  the Government's use of and exercise of its powers under § 215 of the USA Patriot Act. In

25  finding that the plaintiffs were entitled to expedited treatment of their request, the district court

26  noted that the plaintiffs had provided evidence of media interest in § 215 – the specific section

27  at issue in the FOIA request. See id. at 29-30 & n. 6 (finding that articles cited by plaintiffs in

28  request for expedited processing not only reflected public concern regarding Patriot Act but

20

1    also addressed § 215 specifically).

2         Here, ACLU-NC's FOIA request seeks specific information regarding the organization

3    of JTTFs in Northern California; the relationships between and among the FBI, state and local

4    law enforcement, and the JTTFs; and the activities of the FBI and JTTFs in questioning and

5    monitoring individuals in Northern California based on particular political or religious

6    affiliations or ethnic or racial identities. As did the courts in Al-Fayed and EPIC v. Dep't of

7    Defense, the court finds that the articles cited by ACLU-NC do not sufficiently reflect significant

8    media and public interest in the specific subjects of the FOIA requests.

9         Three of the reports (the two New York Times stories and the report broadcast on

10   National Public Radio) deal only with FBI plans to interrogate individuals regarding possible

11   protests at the Republican National Convention, and do not mention or refer to Northern

12   California or the JTTFs. Moreover, there can be no "urgency to inform the public" about the

13   FBI's activities in connection with investigating possible protests at a political convention that

14   occurred in late August and early September of 2004.

15        Of the remaining articles or reports submitted with the FOIA request, one is an op-ed

16   piece, not a news story; and the remaining four articles refer primarily to the FBI approaching

17   Muslims or Arab-Americans for interviews, some in Southern California and some in Northern

18   California – although the focus of the Los Angeles Times, Washington Post, and San Diego

19   Union Tribune articles is not FBI or other law enforcement activity in Northern California – and

20   some in other states such as Arizona and Missouri. Unlike the specific references to the

21   subject of the FOIA request in ACLU v. U.S. Dep't of Justice, the articles cited in this case by

22   ACLU-NC contain only a few generalized references to JTTFs, and no discussion in any of the

23   articles of the organization, funding, policies, or procedures of the JTTFs or of the

24   interrelationships among the JTTFs, federal agencies, and state and local law enforcement in

25   Northern California.

26        With regard to the "urgency to inform" provision for expedited processing, the court also

27   questions whether ACLU-NC has established that it is an organization primarily engaged in

28   disseminating information to the public. It is certainly true that ACLU-NC engages in

**United States District Court**
For the Northern District of California

1  substantial dissemination of information.  However, the court agrees with defendants that while

2  dissemination of information may be a main activity of ACLU-NC, there is no showing that it is

3  the main activity.  At the hearing on the cross-motions, counsel for ACLU-NC argued that

4  "primary" could refer to more than one – that two or more activities could be "primary."  As

5  defendants have pointed out, however, this interpretation is not supported by either the DOJ

6  regulations or the legislative history.

7                                   **CONCLUSION**

8         In accordance with the foregoing, the court hereby GRANTS the motion of defendants

9  Department of Justice and Federal Bureau of Investigation, and DENIES the motion of plaintiff

10  American Civil Liberties Union of Northern California.

11         This ruling should not be considered a finding that there is no widespread media or

12  public interest in the subjects of ACLU-NC's FOIA request, but simply that the articles

13  submitted by ACLU-NC to the FBI do not establish such media or public interest.  Similarly,

14  this ruling does not reach the question whether the information sought must or should be

15  disclosed, only that ACLU-NC has not established that its request should be processed on an

16  expedited basis.

17

18  **IT IS SO ORDERED.**

19  Dated: March 11, 2005

20                                                    /s/
                                                     PHYLLIS J. HAMILTON
                                                     United States District Judge
21

22

23

24

25

26

27

28

                                        22