IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. A. No. 05-CV-1004 (ESH) |
| ) | |
| FEDERAL BUREAU OF INVESTIGATION, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the state of Texas since 1980.

(2)     In my current capacity as Section Chief, I supervise the Freedom of Information/Privacy Acts Litigation Support Unit ("FOIPA LSU"). The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act of 1974, 5 U.S.C. § 552a.  Specifically, I am aware of the treatment which has been afforded the multi-part FOIA requests of plaintiffs American Civil Liberties Union ("ACLU"), the ACLU Foundation, the American-Arab Anti Discrimination Committee, Greenpeace, People for the Ethical Treatment of Animals, and United for Peace and Justice (hereinafter collectively "plaintiffs"), who collectively seek access to documents related to the Joint Terrorism Task Forces ("JTTF"), the National Joint Terrorism Task Force ("NJTTF"), in connection with plaintiffs' groups and individuals.

(4)     This declaration is submitted in support of the motion for partial summary judgment submitted by the Department of Justice and FBI concerning plaintiffs' request to expedited processing their FOIA requests at issue in this case.  This declaration is also submitted in support of the FBI's request for a stay of proceedings in order to complete processing of the FOIA requests at issue in this case.  This declaration will: (a) describe the numerous FOIA requests filed by plaintiffs and their associates; (b) describe the FBI and DOJ's response to plaintiffs' request for expedited processing; (c) provide background on the FBI's FOIA process and Central Records System; (d) describe the status of processing of the plaintiffs' FOIA requests at issue in this case; and (e) describe the backlog of FOIA requests and efforts made by the FBI to deal with that backlog.

(5)     The FBI is submitting this declaration in support of a stay of proceedings as

follows: two months (2), until September 1, 2005, for the FBI to complete the processing and release of documents related to the Muslim Public Affairs Counsel requested by ACLU; eight months (8), until March 1, 2006, for the FBI to complete the processing and release of documents related to plaintiff ACLU and ACLU Foundation; eleven (11) months, until June 1, 2006, for the FBI to complete the processing and release of documents related to Greenpeace; and an indeterminate amount of months for the FBI to complete the processing and release of documents related to the NJTTF, due to the volume of the records collected thus far.

## (A)    ACLU FOIA REQUESTS

(6)    On December 2, 2004, the ACLU, through six of its chapters across the United States,[1] authored a total of seven letters addressed to FBIHQ and numerous field offices (New York, Detroit, Boston, Los Angeles, Washington Field Office, Richmond, San Francisco, Portland, Denver, Chicago, Omaha and the Des Moines Resident Agency), seeking access to FBI documents created from January 1, 2000 to the present "prepared, received, transmitted, collected and/or maintained by the FBI, the [NJTTF], or any [JTTF] relating to" a particular set of requesters in each of the letters. At issue in this case are two letters dated December 2, 2004 letters, authored by Ann Beeson of the ACLU. One of Ms. Beeson's letters was addressed only to FBIHQ and sought access to FBI documents created from January 1, 2000 to the present regarding 40 categories, including the creation, purpose, composition and policies of the NJTTF. **See Exhibit A.** The second of Ms. Beeson's letters, dated December 2, 2004 was addressed to

---

[1] Each letter was authored as follows: **See Exhibits A and B** -- Ann Beeson/ACLU of New York/ACLU Foundation (2 letters) – the subjects of this FOIA lawsuit. **See Exhibit C** -- Andrea R. Myer/ACLU of Oregon (1 letter); Michael Steinberg/ACLU of Michigan (1 letter); Mark Silverstein/ACLU of Colorado (1 letter); Harvey Grossman/ACLU of Illinois (1 letter); and Randall Wilson/ACLU of Nebraska (1 letter).

the FBIHQ and to field offices in New York, Detroit, Boston, Los Angeles, Washington, and San

Francisco, and specifically sought documents related to the monitoring, surveillance, and

investigation by JTTFs of several organizations who made the FOIA request: the American Civil

Liberties Union; the Arab-American Anti-Discrimination Committee ("ADC"); Code Pink;

Greenpeace; the Muslim Public Affairs Council ("MPAC"); People for the Ethical Treatment of

Animals (PETA); and United for Justice and Peace ("UJP"). **See Exhibit B.**

(7)     In order to deal with the numerous requests and sub-requests from the ACLU

chapters, the FBI methodically organized each of the seven ACLU letters and assigned each of

the subjects a different FOIPA number. The specific requests associated with the other ACLU

FOIA requests not at issue in this lawsuit are set forth at **Exhibit C.**

(8)     In particular, insofar as the Ann Beeson letters sought access to documents related

to the NJTTF and the JTTFs (**see Exhibit A**), and particular groups or organizations located at

FBIHQ and certain field offices (**see Exhibit B**), the FBI assigned FOIPA numbers and

proceeded to search for documents at FBIHQ and in designated field offices as follows:

| *SUBJECT* | *FBI FOIPA NUMBER* | *SEARCHES AT FBIHQ AND FIELD OFFICES* |
|---|---|---|
| ACLU and ACLU Foundation | 1010242 | FBIHQ, New York, Detroit, Boston, Los Angeles, Washington Field Office, Richmond, San Francisco, Portland, Denver, Chicago, Omaha and the Des Moines Resident Agency |

| American-Arab Anti-Discrimination Committee ("ADC") | 1010243 | San Francisco, Detroit[2] |
| Code Pink | 1010244 | Boston[3] |
| Greenpeace | 1010245 | FBIHQ, New York, Detroit, Boston, Los Angeles, Washington Field Office, Richmond, San Francisco, Portland, Denver, Chicago, Omaha and the Des Moines Resident Agency |
| Muslim Public Affairs Council ("MPAC") | 1010246 | FBIHQ, New York, Detroit, Boston, Los Angeles, Washington Field Office, Richmond, San Francisco, Portland, Denver, Chicago, Omaha and the Des Moines Resident Agency |
| People for the Ethical Treatment of Animals ("PETA") | 1010247 | Richmond[4] |

---

[2] In accordance with plaintiff's December 2, 2004 letter, p.1, n. 1 and n.4, as well as based on a March 14, 2005 telephone conversation between RIDS' Service Request Unit Chief Margaret Jackson and plaintiff's counsel, Ben Wizner, only the San Francisco Field Office and the Detroit Field Office were searched for records related to the ADC.

[3] In accordance with plaintiff's December 2, 2004 letter, p.1, n.2, as well as based on a March 14, 2005 telephone conversation between RIDS' Service Request Unit Chief Margaret Jackson and plaintiff's counsel, Ben Wizner, only the Boston Field Office was searched for records related to Code Pink; plaintiffs appear not to challenge documents related to Code Pink in their Complaint.

[4] In accordance with plaintiff's December 2, 2004 letter, p.1, n. 3, as well as based on a March 14, 2005 telephone conversation between RIDS' Service Request Unit Chief Margaret Jackson and plaintiff's counsel, Ben Wizner, only the Richmond Field Office was searched for records related to PETA.

| United for Peace and Justice ("UFPJ") | 1010248 | Boston[5] |
| NJTTF | 1010249 | FBIHQ |

(9)     By letter dated December 23, 2004, FBIHQ acknowledged receipt of plaintiffs'

requests to FBIHQ and the seven field offices.  Plaintiffs were further notified that their multi-

part requests were also forwarded from the appropriate field offices to FBIHQ and would be

handled in conjunction with the FBIHQ request.  Plaintiffs were also advised of the assigned

FOIPA numbers.  **(See Exhibit D).**

(10)     As the enclosed detailed chart demonstrates, **(see Exhibit E),** since

acknowledging plaintiffs' FOIA requests (both the ones that eventually became the subject of this

lawsuit, as well as the additional ones discussed earlier), the FBI has been working diligently to

respond to each of the 93 subject matter requests the ACLU simultaneously lodged on December

2, 2004.  Each subject matter has resulted in a different outcome – some searches have yielded no

responsive records, and the FBI has informed the appropriate ACLU chapter/requester of these

results.  For example, by letter dated March 3, 2005, FBIHQ advised plaintiffs that in response to

FOIPA No. 1010244 regarding Code Pink, a search of the automated indices to the Central

Records System had located no responsive records at FBIHQ and the Boston, Los Angeles, New

York, and Washington Field Offices.[6]  Plaintiffs were advised of their right to file an

---

[5] In accordance with plaintiff's December 2, 2004 letter, p.1, n. 2, as well as based on a March 14, 2005 telephone conversation between RIDS' Service Request Unit Chief Margaret Jackson and plaintiff's counsel, Ben Wizner, only the Boston Field Office and the Detroit Field Office were searched for records related to the UFPJ.

[6] This March 3, 2005 letter erroneously indicated that FBIHQ had searched for records related to Code Pink in the Los Angeles, New York and Washington Field Offices, and FBIHQ.

administrative appeal with the Office of Information and Privacy ("OIP"), U.S. Department of

Justice ("DOJ").  (See Exhibit F).  In addition, by letter dated March 16, 2005, FBIHQ advised

plaintiffs that in response to FOIPA No. 1010247 regarding PETA, a search of the automated

indices to the Central Records System had located no responsive records in the Richmond Field

Office.  Again, plaintiff was advised of their right to file an administrative appeal with OIP, DOJ.

(See Exhibit G.)

(11)    Other searches have yielded relatively small numbers of potentially responsive

pages, and the FBI has been processing these pages and endeavoring to make interim releases as

it completes each subject matter review.  (See Exhibit H -- letter dated June 27, 2005 from

FBIHQ to Ann Beeson, releasing six pages in full regarding UFPJ, FOIPA No. 1010248.)

(12)    Prior to the filing of this lawsuit, the FBI's efforts in responding to the 93

December 2, 2004 FOIA requests had been based on a methodical, organized approach designed

to identify records responsive to each of the ACLU chapter requests, with no regard to which

ACLU chapter would choose to file a lawsuit challenging the FBI's actions.  As a result, no

particular set of requests were placed ahead of another set, and each has been addressed in the

normal course.

**(B)  PLAINTIFFS' REQUESTS FOR EXPEDITION**

(13)    Members of the public may request information and copies of agency records

from agencies of the Executive Branch of the United States government pursuant to the FOIA,

5 U.S.C. § 552.  Federal agencies are required to disclose records upon receiving a written

request for them, unless all or part of the record is exempt from disclosure pursuant to one of the

---

In fact, as indicated supra, only the Boston Field Office was searched.

Act's nine exemptions. 5 U.S.C. §§ 552(a) & (b).

(14)    Agencies ordinarily process requests for records and information on a "first-in, first-out" basis. See, e.g., 28 C.F.R. § 16.5(a) (DOJ component generally shall respond to requests according to their order of receipt). Congress amended the FOIA in 1996 to provide for the "expedited processing" of certain categories of requests. See Electronic Freedom of Information Amendments of 1996, Pub. L. 104-231, § 8, codified at 5 U.S.C. § 552(a)(6)(E) ("E-FOIA"). If a request for expedited processing is granted, the request moves to the front of the processing queue, ahead of previously filed requests.

(15)    As part of the E-FOIA, Congress directed each agency to promulgate regulations providing for the expedited processing of requests for records, in two situations – when the person requesting the records "demonstrates a compelling need," and "in other cases determined by the agency." 5 U.S.C. §§ 552(a)(6)(E)(i)(I) and (II). The E-FOIA defines "compelling need" as either "that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(I), (II). Requests for expedited processing which an agency grants are to be processed "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

(16)    The regulations promulgated by the DOJ for administering the FOIA are published at 28 C.F.R. § 16, Subpart A. Under those regulations, requests will be taken out of order and given expedited treatment whenever it is determined that they involve:

(i) Circumstances in which the lack of expedited treatment could reasonably be

-8-

expected to pose an imminent threat to the life or physical safety of an individual;

(ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information;

(iii) The loss of substantial due process rights; or

(iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

28 C.F.R. § 16.5(d)(1)(i)-(iv).

(17)    With respect to the above-stated four grounds or "prongs," the ones set forth in subsections (i) and (ii) implement the statutory "urgency to inform" standard under 5 U.S.C. §§ 552(a)(6)(E)(v)(I) and (II). Those set forth in subsections (iii) and (iv) define the "other cases determined by the agency" that the DOJ has determined qualify for expedited processing. See 5 U.S.C. § 552(a)(6)(E)(i)(II).

(18)    In this case, plaintiffs included a request for expedited processing in both of their December 2, 2004 letters. First, plaintiffs asserted their entitlement to expedition under prong (ii) -- 28 C.F.R. § 16.5(d)(I)(ii) by stating that the request "implicates a matter of urgent public concern; namely, the consequences of a recent change in government policy that has likely resulted in increased surveillance and infiltration of political, religious and community organizations by the FBI . . . [and] [s]uch government activity may infringe upon the public's free speech, free association and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution." Second, plaintiffs asserted their entitlement to expedition under prong (iv) -- 28 C.F.R. § 16.5(d)(I)(iv) by stating that the request "relates to possible violations of Constitutional rights by federal law enforcement and potential

targeting of groups by federal law enforcement based on illicit categories of political viewpoint,

race, religion, and nationality." Plaintiffs argued that there was "exceptional media interest in

this issue [as] reflected in widespread news coverage at both the local and national level."

Plaintiffs cited a lengthy list of newspaper and internet articles. **(See Exhibit A at 9-10 and**

**Exhibit B at 12-13.)**

(19)    By letter dated February 8, 2005, plaintiffs reminded both the FBI and DOJ OPA

that the deadline to grant or deny expedited processing of their December 2, 2004 requests had

passed six weeks earlier on December 19, 2004.  Plaintiffs requested a determination on the issue

of expedition from both the FBI and OPA no later than February 21, 2005.  **(See Exhibit I).**

(20)    After carefully reviewing both the December 2, 2004 letters as well as copies of

the articles relied upon by plaintiffs, I reached the conclusion that plaintiffs did not demonstrate

that their FOIA requests deserved expedited treatment at the expense of other, earlier-submitted

requests waiting in the FBI's "first-in, first-out" processing queue.  Specifically, plaintiffs failed

to show that the ACLU is "primarily engaged in disseminating information" as the DOJ

regulations require in order to justify expedited processing, or that there is an "urgency to

inform" the public about the many subjects of its FOIA requests.

(21)    First, the ACLU did not show that the dissemination of information is their

*primary* activity, only that they do disseminate information, whether it be through the ACLU

website, a bi-monthly newsletter, reports, or public speaking engagements.  While the ACLU

stated that it is primarily engaged in disseminating information, it provided no information to

support this conclusion.  The ACLU's own website indicates that the primary mission activity of

the organization is to litigate high-impact cases to defend and promote civil liberties, not to

disseminate information. See http://www.aclu.org/about/aboutmain.cfm. There was no basis on

which to conclude that the dissemination of information as the ACLU's primary activity.

(22)    Second, based on my review of the articles cited by the ACLU in the two requests

at issue in this case, see **Exhibits A1 and A2**, determined that plaintiffs have failed to

demonstrate an "urgency to inform" the public regarding the actual or alleged federal government

activities related to the JTTFs and NJTTF -- their requests do not concern a matter of current

exigency to the American public; and the consequences of delaying a response would not

compromise a significant recognized interest. Accordingly, I also found that my decision not to

expedite plaintiffs' requests will not compromise a significant recognized interest. For all of

these reasons, I determined that plaintiffs are not entitled to expedited processing of their

requests, and informed plaintiffs of my decision by letters dated May 25, 2005 and June 6, 2005

respectively. **(See Exhibits J and K.)**

(23)    In addition, plaintiffs also sought expedited processing under 28 C.F.R. §

16.5(d)(1)(iv), through which DOJ, by regulation, expedites treatment whenever the Director of

the Office of Public Affairs ("OPA") determines that a FOIA request involves "[a] matter of

widespread and exceptional media interest in which there exist possible questions about the

government's integrity which affect public confidence." Requests for expedition under 28 C.F.R.

§ 16.5(d)(1)(iv) must be submitted to DOJ's OPA, DOJ's "media specialists," 63 Fed. Reg. at

29592. In this case, I was informed that the Director of OPA concluded that plaintiffs' FOIA

requests did not involve "matter[s] of widespread and exceptional media interest in which there

exist possible questions about the government's integrity which affect public confidence." As a

result, I informed plaintiffs of OPA's decision to deny their requests for expedited processing by

letters dated May 25, 2005 and June 6, 2005 respectively.  (**See** **Exhibits J and K.**)

**(C)    HOW A FOIA REQUEST IS PROCESSED IN RIDS**

(24)    Over the years, the FOIA Section at FBIHQ has engaged in a continual re-engineering process in an effort to better serve the needs of requesters who seek information from the FBI.  In 2002, reorganization of various divisions at FBIHQ resulted in the formation of the Records Management Division, which now handles all FOIA and Privacy Act requests through the Record/Information Dissemination Section.  These most recent re-engineering efforts have resulted in the following organizational plan which will be discussed in more detail below.

(25)    The mission of RIDS is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information.  RIDS is responsible for providing program and policy management pertaining to the researching, reviewing, analyzing, processing, and classification/declassification work relating to FOIA and Privacy Act, Executive Order 12958, as amended, Presidential, Attorney General, and FBI policies and procedures, judicial decisions, and other Presidential and Congressional directives.  RIDS also provides prepublication review of material written by current and/or former FBI employees concerning FBI matters as mandated by the FBI's employment agreement.  RIDS currently employs 245 employees, most of whom are Legal Administrative Specialists ("LASs"), and who are assigned among the ten (10) Units within RIDS, whose shared function is to intake, review, process, and release information in response to FOIA and Privacy Act requests.  To accomplish this mission, RIDS consists of the following ten Units: the Service Request Unit ("SRU"), two Work Process Units ("WPU"), three Classification Units ("CU"), three Freedom of Information and Privacy Acts ("FOIPA") Units ("Disclosure Units"), and the Litigation Support Unit ("LSU").

-12-

(a)      The **Service Request Unit** ("SRU") is responsible for reviewing and sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (i.e., FBI field offices, Legats).  The SRU handles various initial tasks required to "perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests, advising a requester to provide identifying data so that an accurate records search can be made and/or to submit a notarized signature/Privacy Act waiver, or advising a requester when no responsive records are located; opens new requests and assigns a FOIPA Request Number; and enters the perfected requests into the FDPS tracking system.  The Negotiation Team, also a part of SRU, works with requesters whose requests generate a large volume of records in an attempt to narrow the scope of responsive records and facilitate a more rapid response.  Finally, the Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other federal agencies and other DOJ components with regard to referrals of documents – either sent for a consultation or for direct response to the requester – which are either FBI-originated or contain FBI-originated information.[7]

(b)      The two **Work Process Units** ("WPUs") are responsible for preparing SRU's "perfected" requests for transfer to the three Disclosure Units.  The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp

---

[7] The Government Response Team ("GRT") was formerly known as the "Government Response & Prepublication Review Unit."  However, an internal reorganization recently resulted in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team and its functions of prepublication review of all material written by current and/or former FBI employees concerning FBI matters as mandated by the FBI's employment agreement to the RIDS front office.

files for retention, forward files requiring classification review to the three Classification Units,

address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into

FDPS, respond to status inquiries, handle administrative appeals, and maintain requests prior to

their in-turn transfer to the Disclosure Units.

      (c)     The three **Classification Units** ("CUs") are responsible for complying

with the classification/declassification review of FBI records under Executive Order 12958, as

amended, and the July 1995 DOJ Memorandum of Understanding. The CUs review documents

responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional

and Presidential mandates, Presidential Library requests, mandatory declassification requests,

Office of Inspector General Reports, and other federal agency requests in order to determine

whether such material should remain classified or be declassified. In addition, the CUs review

and prepare classified material for review by the Department of Justice Review Committee

("DRC").[8]

      (d)     The three **FOIPA Units** ("Disclosure Units") perform the actual

processing of all records pursuant to the provisions of the FOIA and Privacy Act. "Processing"

involves a page-by-page, line-by-line review of the responsive documents to determine which, if

any, FOIA and/or Privacy Act exemptions may apply. This includes redaction of the exempt

material and notation of the applicable exemption(s) in the margins of each page and/or

preparation of deleted page information sheets when pages are withheld in their entireties (now

done electronically in FDPS). During the course of their review, the Disclosure Units consult

---

    [8]   The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. <u>See</u> 28 C.F.R. § 17.14 (2003).

with other government agencies for their determination as to the releasability of their information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response. The Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been applied properly, that no releasable material has been withheld, that no material meriting protection has been released, that all necessary classification reviews have been completed, and that other government agency information and/or entire documents originating with other government agencies have been properly handled.

(e)     The **Litigation Support Unit** ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Associate Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, coordinates the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and coordinates the referral of documents to other DOJ components and government agencies. The LSU prepares the administrative record, drafts both procedural and substantive declarations and court pleadings, codes documents processed by the Disclosure Units, and drafts detailed declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions.

(26)     After SRU and WPU perfect a request, the request is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of three queues according to sound administrative

-15-

practices.[9]  The FBI uses a three-queue system as a way to perfect and assign new requests.[10]  The

three-queue system established "multi-track" processing for requests, based on the amount of

time and work involved in handling a particular request.[11]  The system nevertheless preserves the

principle that, within the three queues, requests are still assigned and processed on a first-in/first

out basis.  The placement of a request in one of the three queues depends on the total amount of

material responsive to that request -- 500 pages or less ("small queue"), 501 to 2,500 pages

("medium queue"), or more than 2,500 pages ("large queue").  This standard operating

procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in

the order in which they are received, while obviating the inequities to other requesters whose

interests relate only to a small number of documents.  As described earlier, requesters whose

requests have been placed in the large queue are given the opportunity, through contact with

SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their

requests by relocating them to a more advantageous queue.

(27)    LASs frequently work on more than one request at a time because it is not always

administratively efficient to work only one request to completion before proceeding to the next.

Processing of a complex case may be halted midstream for a variety of reasons, such as resolving

a classification issue, locating records that may be missing, or consulting with other government

agencies as to the nature and propriety of releasing certain information.  In the interest of

---

[9]  See 28 C.F.R. § 16.5 (a) (2003).

[10]  This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[11]  See 5 U.S.C. § 552 (a) (6) (D) (i) and 28 C.F.R. § 16.5 (b) (2001).

-16-

efficiency during this waiting period, other requests may be processed and released. Therefore, large requests are often processed in conjunction with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS resources.

(28)    Consistent with standard administrative procedure, any records which may be referred to the FBI from other DOJ components in response to a particular request may be added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient, since the same issues presented by the referred records will already have been addressed by the LAS in processing the responsive FBI files.

**(D)    THE FBI'S CENTRAL RECORDS SYSTEM**

(29)    The Central Records System ("CRS"), which is utilized by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables it to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices.

(30)    Access to the CRS is obtained through the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

> (a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

> (b) A "reference" entry --"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(31)    Access to the CRS files in FBI field offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject, such as documents related to the NJTTF and JTTF, are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

(32)    On or about October 16, 1995, the Automated Case Support ("ACS") system was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. Over 105 million records were converted from automated systems previously utilized by the FBI. The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

> (a)  Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens

a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs") –

formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal

Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that

are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345"

as an example, an explanation of the UCFN is as follows: "111" indicates the classification for

the specific type of investigation; "HQ" is the abbreviated form used for the OO of the

investigation, which in this case is FBIHQ; and "12345" denotes the individual case

file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository

for the FBI's official text-based documents. ECF supports the universal serial concept, in that

only the creator of a document serializes it into a file. This provides a single-source entry of

serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by

providing a complete subject/case index to all investigative and administrative cases. Only the

OO is required to index; however, the LOs may index additional information as needed. UNI, an

index of approximately 89.4 million records, functions to index names to cases, and to search

names and cases for use in FBI investigations. Names of individuals or organizations are

recorded with identifying applicable information such as date or place of birth, race, sex, locality,

Social Security number, address, and/or date of event.

(33)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") assigned to work on the

investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and

-19-

the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, i.e., JTTFs or NJTTF.

**(E)    SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' REQUESTS**

(34)    In this case, the FBI has employed several mechanisms as part of its search efforts to identify documents responsive to plaintiffs' requests. Both the Automated Data Base ("ADB") and the Inactive Indices of the Central Records System ("CRS")[12] at both FBIHQ and the seven field office were searched for any records pertaining to the multiple subjects requested by plaintiffs. In addition, the FBI sent Electronic Communications ("ECs") to affected field offices and all FBIHQ Divisions requesting that hand-searches be conducted in response to plaintiffs' requests. **(See Exhibit L.)**

(35)    As noted above, the FBI's search efforts have yielded various results, ranging from no records to several pages of responsive records, to several hundreds and thousands of

---

[12] As discussed earlier, the CRS enables the FBI to maintain all records which it has generated or acquired in the course of fulfilling its mandated law enforcement responsibilities, including both national security investigations and criminal investigations. The ADB of the CRS contains all records dated after January 1, 1958 for national security applicant, and administrative matters, and after January 1, 1973 for criminal investigative matters. The Inactive Indices of the CRS contain all records dated prior to 1958 for national security matters and all records dated prior to 1973 for criminal investigative matters.

pages of responsive records, as illustrated in the master chart attached as **Exhibit E.**

(36)    The search for documents responsive to plaintiffs' requests for documents has now been completed. In the aggregate, a total of approximately 4000 pages of documents have been identified as potentially responsive to plaintiffs' requests with regard to the JTTF FOIA request (**Exhibit A**), and a minimum of 13,000 pages of documents have been identified as responsive to plaintiff's request with regard to the NJTTF (**Exhibit B**). As outlined in **Exhibit E,** are in various stages of processing/release/response.

| *SUBJECT* | *FBI FOIPA NUMBER* | *STATUS* |
|---|---|---|
| ACLU and ACLU Foundation | 1010242 | Approximately 1173 pages have been identified as responsive -- this is a "medium queue" case. The FBI will need eight months, until March 1, 2006, to process and release these documents.[13] |
| American-Arab Anti-Discrimination Committee ("ADC") | 1010243 | Approximately 64 pages from the Detroit Field Office and no pages from the San Francisco Field Office have been identified as responsive -- this is a "small queue" case. The FBI anticipates that it will make a release of any non-exempt records in the near future.[14] |

---

[13] In order to ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of three queues according to sound administrative practices. Based on the date of this request – December 2, 2004 – there are approximately 150 requests pending ahead of plaintiffs' request in the medium queue. The FBI anticipates that the earliest plaintiffs' request will be assigned to the Disclosure Unit for processing is in six (6) months. In addition, the FBI anticipates it will require approximately two (2) months for the responsive documents to be processed and released to plaintiffs.

[14] As part of their December 2, 2004 FOIA requests, plaintiffs sought limitation of processing fees as well as waiver of all costs. (**See Exhibit A**). Although the FBI has not yet

| Code Pink | 1010244 | No records in the Boston Field Office; plaintiffs notified by letter dated March 3, 2005. |
|---|---|---|
| Greenpeace | 1010245 | Approximately 2383 pages have been identified as responsive -- this is a "medium queue" case.<br>The FBI will need 11 months, until June 1, 2006, to process and release these documents.[15] |
| Muslim Public Affairs Council ("MPAC") | 1010246 | Approximately 274 pages have been identified as responsive -- this is a "small queue" case.<br>The FBI anticipates that it will make a release of any non-exempt records by September 1, 2005. |
| People for the Ethical Treatment of Animals ("PETA") | 1010247 | No records in Richmond Field Office; plaintiffs notified by letter dated March 16, 2005. |
| United for Peace and Justice ("UFPJ") | 1010248 | Six pages have been identified as responsive -- this was a "small queue" case.<br>The FBI made a release of these documents by letter dated June 27, 2005.<br>**See Exhibit H.** |

---

responded to plaintiffs' fee waiver requests, it anticipates it will be adjudicating that issue in the very near future as it prepares the first substantive release of documents.

[15] Based on the date of this request -- December 2, 2004 – there are approximately 150 requests pending ahead of plaintiffs' request in the medium queue. The FBI anticipates that the earliest plaintiffs' request will be assigned to the Disclosure Unit for processing is in six (6) months. In addition, the FBI anticipates it will require approximately five (5) months for the responsive documents to be processed and released to plaintiffs.

| NJTTF | 1010249 | To date, over 13,000 pages (in addition to the 4000 pages responsive to the JTTF request, **see Exhibit B**) have been identified as potentially responsive -- this is a "large queue" case. The FBI has initiated a dialogue with plaintiffs in order to attempt to reduce the broad scope of this request. **See Exhibit M.**[16] |
|---|---|---|

## (F)    OVERVIEW OF THE FBI'S FOIA/PRIVACY ACT BACKLOG

(37)    The FBI's backlog, as of December 31, 2004, included 2,320 requests in various

stages of processing throughout RIDS. During the past year the FBI has received an average of

940 requests per month, and as of July 1, 2005, the backlog includes 2,242 requests.

Historically, the number of FOIA and Privacy Act requests received by the FBI has increased

---

[16]  While an accurate page count does not yet exist, the FBI roughly estimates that a minimum of approximately 13,000 pages may be responsive to plaintiffs' request for documents related to the NJTTF. In the absence of further reduction of scope of the request, this clearly places the case in the large queue, after it has been scoped and perfected. As of July 1, 2005, there will be 32 cases in the large queue backlog ahead of this request. Of those 32 cases, nine were opened in 2003; the oldest of those cases was opened on June 13, 2003; and the newest case was opened on April 15, 2005. Based on the date of this request, there will be approximately 32 requests pending ahead of plaintiffs' request in the large queue. And at this time, in light of the large volume of records, it is impossible to provide an estimate as to how long the processing of these records will take once the case is assigned from the large queue. Under current standards, an LAS should process 1,000 pages a month. Even if we were to literally shut down one of the three disclosure units of approximately 28 LASs each (two teams of 13 LASs per unit plus a team captain for each team, although vacancies exist) to work on this request alone, it would still take several months to process. This time estimate does not take into account the time required by the CU, legal review, and final review by the document owners/originators for accuracy prior to release. For classification review alone, it is estimated that a review of 1,000 pages would take three reviewers approximately one week to process. This also does not take into account referrals and consultations which may need to be made with other agencies or DOJ components. Should the FBI be required to make additional shifts in personnel to process plaintiffs' request in any other manner than the normal course, this would have a highly significant and negative impact on the FBI's backlog, delaying substantially the processing of other cases which have been waiting their respective turn in the queues.

dramatically since the early 1980s. At that time, the FOIPA Section had sufficient resources to process and administratively maintain a balanced flow of work, which kept the growth in the backlog to a minimum. However, from the mid-1980s until 1996, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially. The number of FOIA and Privacy Act requests on hand at FBIHQ, in various stages of processing, increased from its 1985 level of 4,736 to a total of 16,244 requests in December 1996.

(38)    In addition, the backlog in the FOIPA Section has been exacerbated by the high volume of administrative appeals which require review and response by the FBI's FOIPA Section personnel. RIDS personnel work closely with the staff of the U.S. Department of Justice, Office of Information and Privacy ("OIP") staff in reviewing and assisting with OIP's responses and determinations of pending appeals. During Fiscal Year ("FY") 2003, FY 2004, and the first and second quarter of FY 2005, the FBI received a total of 2,356 administrative appeals. As of July 1, 2005, 640 administrative appeals were pending resolution. Inevitably, the time spent by FOIPA personnel handling these appeals reduces the amount of time for regular processing duties.

(39)    Another factor that has a bearing on the FBI's ability to reduce its backlog is the number of FOIA lawsuits that are pending against the FBI. At the present time, the FBI is involved in over 140 FOIA pending lawsuits in various federal district and appellate courts throughout the United States. As a result, there have been substantial litigation demands placed upon RIDS in the past several years. These lawsuits require a substantial time commitment by various RIDS personnel. At times, specific cases require the devotion of an inordinate amount of personnel and resources. For instance, from February 1997 until the Spring of 2000, Whitehurst

v. FBI, Civ. A. No. 96-572 (D.D.C.) (GK), required the full-time assignment of between six (6)

to twenty-five (25) Legal Administrative Specialists ("LASs") who, pursuant to both a court

order and a subsequent settlement agreement, processed approximately 272,112 pages. Even

today, LASs continue to work on requests stemming from this litigation and settlement

agreement

(40)    Even more recently, several urgent and competing litigation deadlines have

necessitated shifts in RIDS' personnel resources. For example, Judge Susan Illston issued a

September 16, 2004 Memorandum Opinion and Order in Steven Homick v. DOJ, Civ. A. No. C-

98-00557SI (N.D. Cal.), denying in part the FBI's motion for summary judgment, and ordering

the FBI to reprocess and release approximately 12,000 pages of documents by October 15, 2004.

In order to comply with Judge Illston's deadline, RIDS LAS's were shifted to assist the FOIPA

Litigation Support Unit in the FBI's efforts to move for reconsideration of the September 16,

2004 Order and to seek relief from the October 15, 2004 deadline, which were mostly unavailing.

As a result, the FBI has had to continue its task of reprocessing the approximately 12,000 pages

and meet the court-imposed deadlines. RIDS personnel also had to be shifted to assist the

FOIPA LSU to comply with Judge Charles R. Breyer's June 15, 2004 Memorandum Opinion and

Order in ACLU, et al. v. TSA, et al., Civ. A. No. C-03-1779 CRB (N.D. Cal.). The June 15,

2004 Order required the FBI to carefully re-review and reprocess documents related to the

Transportation Security Administration's ("TSA") "no fly" and "selectee" lists, produce a

reprocessed set of documents, and a revised Vaughn declaration in excess of 150 pages.

Moreover, on September 15, 2004, Judge Alvin K. Hellerstein presiding over ACLU, et al. v.

DOD, et al., Civ. A. No. 04-4151 (S.D. N.Y.), ordered the FBI by October 1, 2004 (interim

deadline) and October 15, 2004 (final deadline) to either produce or identify and <u>Vaughn</u> all documents responsive to plaintiffs' FOIA requests concerning the treatment, deaths and rendition/repatriation of any individuals apprehended after September 11, 2001 who are currently being held, or were formerly held in United States custody at military bases or detention at facilities outside of the United States. This September 15, 2004 Order has resulted in numerous RIDS employees being diverted to the review and processing of thousands of potentially responsive pages, and to draft the necessary <u>Vaughn</u> declaration. Five additional FOIA LASs were shifted within RIDS to assist the FOIPA LSU with this litigation. Over time, it is not surprising that this diversion of personnel resources in multiple litigations has had a significant impact on the FBI's efforts to reduce the FOIA backlog by interrupting the time that the LASs have to devote to processing the requests assigned to them.

(41)     In the past, the FBI had repeatedly sought additional funding for the creation of new FOIPA positions. For example, Congress appropriated funds in the 1997 fiscal budget providing for 129 additional employees, and in the 1998 fiscal budget, providing for 239 additional employees. However, following 9/11/01, the number of RIDS personnel has been reduced significantly due to the vital need to have FBIHQ personnel redirected towards the goal of fighting the war on terrorism. Nevertheless, despite this necessary shift in personnel resources, the FBI continues to make great strides in reducing its backlog. For example, requests in the FOIPA Section in various stages of processing between December 31, 1996 and December 31, 2004, dropped from 16,244 to 2,320, resulting in a reduction of 13,930 requests. Moreover, as mentioned above, during this past year the FBI has received an average of 940 requests per month. The FBI's re-engineering effort, which was described in more detail above, has

-26-

successfully reduced the FBI's backlog of requests by approximately 89 percent and it is anticipated that future totals should reflect a continuation of this downward trend.

(42)    In addition, RIDS has taken all available steps to aid in the streamlining of the work and reduction of the FOIA/Privacy Act backlog.  These steps include the use of direct on-line computer searches conducted to locate responsive records, the use of forms which eliminate delays associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies, and the formation of the FOIPA LSU, which handles all FOIA/Privacy Act Litigation in RIDS.

(43)    In an attempt to adapt technology to the demands of the FOIA/Privacy Act, RIDS has moved to paperless processing through its FOIPA Document Processing System ("FDPS").  The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually.  RIDS has begun using this system for all new FOIA and Privacy Act requests.

(44)    The FBI takes its responsibilities with regard to the administration of the FOIA/Privacy Act program very seriously, and all reasonable efforts are being made to comply with the statutory deadlines.  As explained supra, the FBI has made tremendous strides in reducing its backlog over time.  This reduction has occurred even while thousands of new FOIA/Privacy Act requests have been received.  Nevertheless, the most equitable way to reduce the backlog and ensure that each request receives the attention it deserves is to process these requests based on the date of receipt according to sound administrative practices as explained above.  It would be unfair to assign plaintiffs' request for processing before other requesters whose requests were in the queue ahead of plaintiff.  Each court order which requires that one

-27-

request be given priority ahead of the others invariably works to the detriment of the other more

patient requesters and encourages other requesters to seek relief in the courts, thereby

undermining the FBI's attempt to manage the thousands of FOIA/Privacy Act requests it receives

annually in a fair and consistent fashion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that **Exhibits A through M** attached hereto are true and correct copies.

Executed this _____ day of July, 2005.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.