Articles 1 through 12:

Article 1 - Daily Star 10/06/04

Article 2 - Shepardson Detroit News 10/01/04

Article 3 - Lichtblau 08/30/04 Subpoenas

Article 4 - Bradley Mayer 09/02/04

Article 5 - Lichtblau NYT 08/28/04 Protestors Debate

Article 6 - NPR 08/17/04

Article 7 - Greene Denver Post 08/26/04

Article 8 - Lichtblau NYT 08/16/04 FBI Goes Knocking

Article 9 - Herdy Denver Post 08/08/04

Article 10 - Srikantiah SFGate 08/06/04

Article 11 - Taiara S F Guardian 08/10/04

Article 12 - Thornton San Diego Union 08/02/04

**Article 1 - Daily Star 10/06/04**

🖨 Print

# THE DAILY STAR

**Copyright (c) 2004 The Daily Star**

Wednesday, October 06, 2004

## American Arabs concerned over FBI's 'October Plan'

*Initiative will enact aggressive surveillance*

**By Daily Star Staff**

BEIRUT: The Arab American Institute has expressed concern over recent reports that the Federal Bureau of Investigation (FBI) and Department of Homeland Security (DHS) have already or soon will be enacting an aggressive new initiative, the so-called "October Plan."

According to news reports, the initiative will include "aggressive - even obvious - surveillance" of individuals "suspected of being terrorist sympathizers, but who have not committed a crime," said a statement released Tuesday by the AAI. Furthermore, "other 'persons of interest,' including their family members, may also be brought in for questioning," and "mosques will be revisited and members asked whether they've observed any suspicious behavior."

Additional reports suggest that the DHS component of this initiative will include a massive immigration sweep in major metropolitan areas with the purpose of detaining those who are "out of status." DHS's Bureau of Immigration and Customs Enforcement (ICE) will concentrate its efforts on individuals who had to report as part of the Student Visitor Information System (SEVIS), the National Security Entry/Exit Registration System (NSEERS), and the U.S. Visitor and Immigrant Status Indicator Technology Program (U.S. VISIT). It should be noted that NSEERS, or Special Registration, required citizens from 24 Arab and Muslim countries and North Korea to register with immigration authorities. The national origin based program was suspended by DHS in December 2003.

"We oppose ICE's use of selective enforcement at this time. While doing little to prevent terrorism, these tactics will further alienate Arab and Muslim Americans, the very people with whom law enforcement needs to build trust," said James Zogby, President of the AAI. "We are also concerned, given the pre-election nature of this initiative, that these tactics may have a chilling effect on the participation of some segments of the Arab American and American Muslim communities in the coming election," he added.

# THE DAILY STAR

**Copyright (c) 2004 The Daily Star**

**Article 2 - Shepardson Detroit News 10/01/04**




▶ Previous Story    ▶ Next Story

▶ Latest Met

Marketpla
• Browse
• New & U
• Employr
• Homes (
• Shop Or

Home Del
• Start hor
• Renew s
• Custom



HEAL
HEAL

S

P

Ci

Metro/St
• Metro/St

**SEARCH**
detnews.com

Home Page
Essentials
CyberSurveys
Forums
Photo Galleries
Weather
Horoscope
Lottery
Giveaways
Crossword
Advanced Search
Contact Us
Autos
Autos Insider
Drive
-- Car Reviews
-- Latest Deals
-- Model Reports
Joyrides
Business
Business
Money & Life
Careers
-- Find a Job
Real Estate
-- Find a Home
Metro
Metro/State
Wayne
Oakland
Macomb
Livingston
Commuting
Obituaries
-- Death Notices
Schools
Special Reports
Editorials
Columnists
Detroit History
Nation/World
Nation/World
Politics/Gov
Census
Health
Religion
Technology
Sports
Sports Insider
Lions/NFL
Pistons/NBA
Red Wings/NHL
Tigers/MLB
Shock/WNBA
MSU
U-M
*More Colleges*
High Schools
Golf
Motor Sports
Outdoors

Friday, October 1, 2004

# FBI agents hunt for terror leads

## Agency combs Muslim neighborhoods for help in preventing Election Day attack.

**By David Shepardson / The Detroit News**

FBI agents stepped up dozens of interviews this week in Arab-American neighborhoods, in an effort to prevent another terrorist attack before the Nov. 2 election, the bureau said Thursday.

Arab-American civil rights leaders are warning community members that they don't have to submit to door-to-door interviews by the Detroit FBI, and advising them to have a lawyer present if they choose.

"We are out in the community conducting our interviews as part of our continuing investigation," said FBI Special Agent Dawn Clenney, a spokeswoman in Detroit. "We're redoubling our efforts. We are very concerned about preventing any terrorist attacks and we know al-Qaida wants to attack us before the election."

The checks have the Arab-American and Muslim communities concerned.

"Already people are very scared and very intimidated," said Imad Hamad, regional director of the American Arab Anti-Discrimination Committee. He expressed concern that Arabs who have overstayed their visas will be targeted for arrest.

"The challenge of illegal immigration goes beyond the Arab community."

Clenney said the FBI had a significant number of interviews to conduct — enough that will require agents to continue their efforts beyond the election.

U.S. Immigration and Customs Enforcement agents in Detroit also are working to follow up terror-related leads and intelligence, but aren't engaged in a wide-scale arrests of Arab-Americans who have overstayed visas, a spokesman said.

"We're not targeting Middle Easterners. We are targeting individuals

### What's going on

\* In May, FBI Director Robert S. Mueller created the '04 Fall Threat Task Force to focus agents and resources toward preventing a terrorist attack before Election Day.

\* As part of that effort, the Detroit FBI has increased efforts to interview people, especially those of Middle Eastern descent.

### Related reports

**More on Terrorism**

● **Snooping on Airline Records Violates Passenger Privacy** - 10/01/04

● **Ruling limits search rules** - 09/30/04

● **Ex-terror suspect returned to jail** - 09/29/04

▶ Comment on this story
▶ Send this story to a friend
▶ Get Home Delivery

More Sports
*Scoreboards*
Entertainment
Entertainment
Rant/Rave
Events
-- Event Finder
-- State Fair
Movies/TV/DVD
-- Movie Finder
-- TV Listings
Eats & Drinks
-- Restaurants
-- Wine Report
Books
CD Reviews
Escapes
Casino Guide
Michigan's Best
Living
Lifestyle
Homestyle
Fitness
Forums
News Talk
Faith Talk
Autos Talk
Wings Talk
Lions Talk
Pistons Talk
Tigers Talk
Big 10 Talk
High Schools
Movie Talk
Tech Talk
Weblogs
Politics Blog
Pistons Blog
Tigers Blog
Lions Blog
Big 10 Blog
Rant/Rave

that possibly intend to do harm to the American people," said Greg Palmore, a spokesman for the office in Detroit.

The FBI has conducted several rounds of interviews, including one shortly after the September 11 attacks, when it interviewed about 300 young Arab men in Metro Detroit. A second major round of more than 100 interviews was conducted in March 2003 around the start of the Iraq war.

The FBI is committed to tracking down every terror lead phoned in, which often means that agents spend hours or days checking out false threats.

*You can reach David Shepardson at (313) 222-2028 or dshepardson@detnews.com.*

▶ Previous Story    ▶ Next Story

Friday, Oct
• Reward
catch man
year-old gi
• State go
support
• FBI ager
terror leads
• Teen fac
charges
• Deer get
suburbs' c
• Kilpatric
Detroit res
• No mira
skunk smel
• Vessel p
Detroit
• Wayne (
soar
• Police d
was beaten
shot
• Feds: C
cost of refo
• Michigan
fret over dr
• Omni De
robbed

Sections
Friday, (
[Select inc

Copy
The L
Use of this
agreemen
Service (up

**Article 3 - Lichtblau 08/30/04 Subpoenas**



factiva.

8/30/04 NYT-ABS 10

8/30/04 N.Y. Times Abstracts 10
2004 WL 89205268

The New York Times Abstracts
(c) 2004 New York Times Company

Monday, August 30, 2004

P

### SUBPOENA SEEKS RECORDS ABOUT DELEGATE LISTS ON WEB

By ERIC LICHTBLAU

Justice Dept opens criminal investigation and is demanding records
regarding Internet postings by critics of Bush administration that list
names of Republican delegates and urge protesters to give them
unwelcome reception in New York City; prosecutors say information is
needed as part of investigation into possible voter intimidation;
protesters and civil rights advocates argue that postings are
legitimate political dissent and that investigation has chilling effect
on free speech (M)
TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT
DISPLAYABLE

**Article 4 - Bradley Mayer 09/02/04**



| | | |
|---|---|---|
| FEATURE: News<br>Surveillance/Harassment | 02-Sep-04 03:00 | **NEWS** |



stories-commentary-announcements<br>audio-video-photo-flyers

# The War at Home: Nationwide Crackdown on Activists Part

author: Alex Bradley and John Mayer (The NewPeople)

Harassment, intimidation, and arrests hallmarks of increasing government campaign against dissent



"The history of totalitarian regimes is reflected in the evolution and perfection of the instruments of terror and more especially the police." - Carl J. Friedrich

While many civil libertarians have watched in horror as varied types of political protest have come under increasing pressure and restrictions, the government's war on dissent is no longer confined to the battlegrounds of courtrooms and street protests. It has come home, to activists' doorsteps and meeting rooms, and is increasingly blurring the lines between peoples' private lives and their more public attempts to work for social change. As the stakes get higher, both sides are digging in for a long and exhaustive battle that may determine what rights we have left, and how far is too far to go for those seeking to change the status quo and those seeking to maintain it.

On July 24th, four FBI agents and two Denver police officers "visited" the home of Sarah Bardwell. Bardwell, a Quaker youth and militarism intern with the Denver branch of the American Friends Service Committee, was questioned about a range of topics including the identities of everyone in the intentional community where she lives and whether anyone she knew planned to protest the upcoming Democratic or Republican conventions. She was told the FBI was investigating "anarchists and terrorists." The agents and officers refused to give ID when asked, and did not leave any type of business cards that could confirm their identities.

**NEWS**

Justice Dept. Begins Study of Safety of Taser Electric Gun
22:09 Dec-07

Articles and Graphics on Tasers, Seattle PI
21:30 Dec-07

Police are too quick to grab for Taser's power, say critics (data included)
16:48 Dec-07

Most victims of tasers are minorities
14:44 Dec-07

Tasers marketed for public use
14:37 Dec-07

NYC's Kerik Named to Head Department of Homeland Security
12:27 Dec-03

Raytheon delivers 'nonlethal.' weapon
00:39 Dec-03

ACLU Launches Nationwide Effort to Expose Illegal FBI Spying
20:21 Dec-02

Is 'non-lethal' Taser deadly?
00:09 Dec-02

Excessive and lethal force? Amnesty International report on Taser abuse
01:55 Nov-30

Documents Show Pier 57 Contained Asbestos, Lead, and Fire Hazards; HPRT Aware of Problems
20:47 Nov-27

Documents Show Pier 57 Violated Written Agreement; Questions Remain About C.O.
20:46 Nov-27

Students urge less-lethal weapons ban (Emerson)
17:30 Nov-27

Peace activist receives 51-month prison term
16:45 Nov-27



**MAIN MENU**

Home
About Us
Background
Congressional Info Packet
Topics and Categories
Press Room
Contact Us

**TAKE ACTION**

Learn & Educate
Contact Public Officials
Write Op-Eds
Join Campaign
Sign Petition
Subscribe
Submit News & Information
Donate

**SEARCH**

☐ images
☐ audio



# TOPICS

Abuse & Injury
Censorship
Community Organizing
Information Warfare
Legal & Judicial
Miami Model
Politics & Legislation
RNC
Surveillance/Harassment
Timoney
Weapons
Immigrants

# CATEGORIES

Announcement/Action Alert
Commentary
Evidence
Flyer/Art
News
Press Release
Report
Press Clipping
Resources
Testimonial

# REGIONS

Miami
New York City
Quebec City
Washington, D.C.
Boston
Philadelphia
Georgia (G8)
Bay Area
Pittsburgh
Portland
Seattle
Chicago

# COMMUNITY

FTAA IMC
STOP FTAA
Miami Activist Defense
United for Peace and Justice
Citizen's Trade Campaign
Public Citizen
Florida Fair Trade Coalition
AFLCIO
USWA
Campaign to Demilitarize the
Police
Free Speech Savannah
Black Tea Society
RNC Not Welcome

Shortly after leaving Bardwell's residence, another team of agents and officers descended on a second Denver house. This time they entered the property without a warrant, aggressively demanding identification of all who resided there, and again focused their questions on the activist's possible participation in the upcoming conventions. They threatened and otherwise coerced people into providing identification. Following their refusal to answer any other questions without first consulting a lawyer, the FBI arrested two well-known anarchists for charges related to outstanding bike parking tickets. The night before the agents and police visited these activists' homes, there had been a legal and non-disruptive demonstration at the City and County Building calling for police accountability and reform. At the demo, there had been one counter-protestor with a sign. This counter-protestor was with the agents who came to Bardwell's home, and at that time identified himself as an agent of the Federal Bureau of Investigation.

What happened in Denver was not an isolated incident. From July 8th to 27th FBI agents, local police, and individuals from unidentified Federal agencies visited and contacted activists in Kansas City, Boston, New York City, Atlanta, Ft. Collins, Lawrence, Topeka, Kirksville, Columbia, Denver, and St. Louis. The FBI worked to locate and question at least 20 anarchists in Lawrence, Kansas alone. The type of contact included visits to homes, searching private mailboxes, leaving cards in windows, following activists to gas stations, sitting outside their houses for days, and calling and visiting workplaces, relatives, co-workers, neighbors and friends. There were three primary questions they had: Are you planning to be involved in any criminal acts at the national conventions? Do you know anybody who is? Are you aware that if you assist or know anybody planning any criminal acts and do not report them, it's a crime? With a definite focus on the DNC and RNC, officers also asked questions about the presidential debates, and the presidential elections. Several anarchists in St. Louis have also been served with a federal grand jury subpoena as part of an undisclosed investigation. Those served were therefore unable to attend the DNC protests as they'd planned.

While the FBI stated that they were merely following up on leads indicating protesters planned to firebomb news media trucks at the DNC, many activists believe their true purpose was to discourage participation in protests and create a climate of fear, all just the latest step in an increasingly brutal campaign the government is waging against political resistance movements. A couple of days after the last FBI visit, corporate news reported that the feds were now claiming it was right-wing white supremacists that they suspected of originating the threat. There was never any substantiation of the intelligence that supposedly justified the investigation or change in who it was attributed to.

Many of the agents and officers participating in the "visits" were members of local Joint Terrorism Task

Personal Defense Sprays:Effects And Management Of Ocular And Systemic Exposure
13:59 Nov-27

Claims Over Tasers' Safety Are Challenged
22:30 Nov-26

WTO: FIVE YEARS AFTER: What the Cops Learned
12:37 Nov-26

Police Use Stun Gun In Arrest Of NBA Player
07:13 Nov-26

More Students Tasered this week
13:14 Nov-25

Police Tasered teen repeatedly
17:30 Nov-24

newswire archive »

KNO Not Welcome
Counter Convention
Still We Rise Coalition

## NON-PROFIT SPONSORS

Fiscal Sponsor



Web Host



Force's (JTTF). The FBI's own website states, "JTTFs are teams of state and local law enforcement officers, FBI Agents, and other federal agents and personnel who work shoulder-to-shoulder to investigate and prevent acts of terrorism." JTTF's, which were created to merge the resources and expertise of the FBI with those of local law enforcement, exist as part of each of the FBI's 56 field offices. While much publicity has focused on the work of these bodies in combating threats such as Al-Qaeda, there has been scant mention of the attention they are giving progressive movements for social change.

The FBI and JTTF have not been content to gather information on groups from the sidelines. They have been infiltrating groups, sending bulletins to local police encouraging surveillance and compiling illegal spy files.

For over six months in 2003, Peace Fresno was infiltrated and under surveillance by "Aaron Stokes," a member of the JTTF actually named Aaron Kilner. Even though the investigation was in violation of California's constitutional guarantee preventing law enforcement from investigating community groups or individuals without evidence of criminal conduct, Peace Fresno has been unable to get any official explanation as to why the investigation took place or who authorized it, nor have they received any assurance that similar operations have ceased. Also last year, a memo was leaked showing that the FBI was asking local police to report protest activity to their local Joint Terrorism Task Force. The bulletin said, "While the FBI possesses no information indicating that violent or terrorist activities are being planned as part of these protests, the possibility exists that elements of the activist community may attempt to engage in violent, destructive, or dangerous acts." Just what were the acts that should have been of so much concern to a Terrorism Taskforce? The bulletin listed such things as marches and sit-ins, while claiming police should also be on the lookout for the "aggressive tactics" of "extremist elements," including vandalism, trespassing, physical harassment, and the formation of human chains.

Before their actions were discovered through an ACLU lawsuit, the Denver Police Department's Intelligence Bureau had compiled permanent computerized files on 208 organizations and approximately 3,200 individuals. The scope and scale of the investigations, and their ties to the JTTF are staggering. The spy files included; names and license numbers of peaceful demonstrators, intercepted emails, membership in groups such as the American Friends Service Committee and Amnesty International, teach-ins and conferences they had attended, descriptions of peoples' vehicles and homes, as well as the address of private homes activists were known to "frequent." A three-ring binder maintained by the Denver Intelligence Unit contains a section labeled "Colorado and Local Links: JTTF Active Case List." The pages in that section consist of printouts made in April, 2002, from the web sites of such local Colorado groups as Colorado Campaign for Middle East Peace, American

Friends Service Committee, Denver Justice and Peace Committee, and the Rocky Mountain Independent Media Center. Just what the scope of an active JTTF investigation was has not been determined. In the lead-up to the 2002 Olympics in Utah, the JTTF added "anarchists" and eight other categories of "extremists" to the FBI's computer database known as the Violent Gang and Terrorist Organization File (VGTOF). When officers pull someone over and check the name of the driver or a suspect in the computer of the National Crime Information Center (NCIC), the VGTOF database is automatically searched too.

Part II of this series will appear in the October issue of The NewPeople. As government and corporate power continue to clash with movements for peace and social justice, how is the war on dissent playing out locally?

It will examine how the Pittsburgh police and the FBI are dealing with demonstrations and activist groups and try to answer questions such as: What happens to the video and photographs police and undercover agents take at protests? Are local groups being infiltrated? Do spy files exist? Who has the FBI been watching? How are people fighting back? What steps can activists take to stay safe and effective?

source url:
http://thomasmertoncenter.org/The_New_People/Sept2004/war_at_home.htm

**Add a comment on this article**

**Article 5 - Lichtblau NYT 08/28/04 Protestors Debate**

Source: News & Business > News > § Major Newspapers 📰
Terms: byline (lichtblau) and headline (protest! or subpoena)  (Edit Search)

⚡Select for FOCUS™ or Delivery
☐

*The New York Times August 28, 2004 Saturday*

Copyright 2004 The New York Times Company
The New York Times

August 28, 2004 Saturday
Late Edition - Final

**SECTION:** Section A; Column 3; National Desk; Pg. 9

**LENGTH:** 698 words

**HEADLINE: Protesters** at Heart of Debate on Security vs. Civil Rights

**BYLINE:** By ERIC **LICHTBLAU**

**DATELINE:** WASHINGTON, Aug. 27

**BODY:**

Chris Scheets, a part-time cook and full-time anarchist in a college town in Missouri, piled into a van on Friday with some friends to make the trek to New York City to protest the Republican National Convention.

It was a trip he had not figured he would be making.

Late last month, F.B.I. agents followed him for days, Mr. Sheets said, and he and two friends were subpoenaed before a federal grand jury to tell what they knew about possible violent protests in New York. That led the three to cancel a trip to Boston to demonstrate that day at the Democratic National Convention, and Mr. Scheets said he was so frazzled that he scrapped plans to go to New York.

He changed his mind, he said in an interview, because "I still think it's necessary to protest things going on in this country."

Mr. Scheets, 20, now finds himself at the center of a brewing debate on security at major political events and maintaining civil rights, as the Federal Bureau of Investigation has mounted an extensive effort to identify and question people who it suspects may be planning acts of violence at political demonstrations.

Mr. Scheets and his friends, Ben Garrett, 24, and Daniel Coate, 22, have maintained low profiles since their case surfaced last week, with their lawyers refusing to identify them publicly. Breaking their silence, the three men insisted in interviews that they were not planning any violence at the conventions and that they could not explain the F.B.I.'s interest in them.

The three, all from Kirksville, Mo., received letters from federal prosecutors last month informing them that they were targets of an investigation into domestic terrorism. A federal law enforcement official said this week that the inquiry was active.

Federal law enforcement officials in Missouri and Washington refused to comment specifically on the inquiry or say why the men were subpoenaed, because it is a grand jury case. They repeated that the inquiries in Missouri and elsewhere were just focused on identifying violent demonstrators, not chilling political protests.

Attorney General John Ashcroft was asked about the official interviews last week at a news conference. Mr. Ashcroft defended the inquiry and added that it was "an outrageous distortion to suggest that any interviews we conducted were designed to thwart freedom."

He suggested that the interviews were largely limited to efforts at disrupting a reported plot to bomb a news van at the Democratic convention.

"The interviews," Mr. Ashcroft said, "were designed to support freedom, to enrich it, to make sure it was not interrupted or otherwise disrupted by violent criminal terrorist activities and plans."

The attorney general said "a very few individuals" had been questioned. Law enforcement officials placed the number at no more than about 24. Civil rights monitors and protest leaders said they believed that at least 50 people, and perhaps many more, had been contacted in Atlanta, Boston, Denver, Kansas City, New York, St. Louis and elsewhere. In the Missouri case, Mr. Garrett said he knew of 25 or 30 friends and relatives contacted by the F.B.I.

Several people questioned by the bureau said agents never asked specifically about a possible bomb plot in Boston. Instead, the people said they had generally been asked the same set of questions: whether they were planning violence at the conventions or other major political events, whether they knew anyone who was and whether they realized it could be considered a crime to withhold such information.

Although the three from Missouri described themselves as anarchists intent on creating a "nonhierarchical" structure in American society, they said they opposed violence. Their recent experience, they said, has only intensified their concerns.

"On the one hand, this whole experience has made me more reluctant to go to protests, because I'm worried about what the F.B.I. might do," said Mr. Coate, a graduate student in English at Truman State University in Kirksville. "But mostly, it's made me more determined than ever, because I want to exercise my right to free speech whether they want me to or not."

**URL:** http://www.nytimes.com

**LOAD-DATE:** August 28, 2004

Source: News & Business > News > ℥ Major Newspapers 📰
Terms: byline (lichtblau) and headline (protest! or subpoena)  (Edit Search)
View: Full
Date/Time: Wednesday, December 8, 2004 - 5:21 PM EST

About LexisNexis | Terms and Conditions

**Article 6 - NPR 08/17/04**



Politics & Society
## FBI Questioning Political Demonstrators



Reuters

Protests of the Republican
Convention have already
begun in New York. Left, a
boy spun the wheel of
characters at a protest in
Brooklyn.

_All Things Considered_, August 17, 2004 · The FBI questions political protesters to learn more about the potential for violence at this summer's political conventions. The FBI says potential crimes, not political expression, sparked its interest in the Democratic Convention, held last month. The Republican National Convention begins Aug. 30 in New York. NPR's Larry Abramson reports.

### Related NPR Stories

- Jul. 26, 2004
Iraq War Protesters Greet Democrats in Boston

- Aug. 17, 2004
Protest Rights vs. Healthy Grass in Central Park

- Jul. 27, 2004
Convention Draws Range of Colorful Protesters

- Aug. 16, 2004
Republican Convention Protesters Questioned

**Article 7 - Greene Denver Post 08/26/04**

# The Denver Post

**Activists decry pre-convention security tactics**
**By Susan Greene**
**Denver Post Staff Writer**

Thursday, August 26, 2004 -

In five years of peace activism, little has infuriated Fort Collins software engineer Paul Bame more than a visit last month from a man who introduced himself as Ted.

Ted is an FBI agent who, on behalf of the Joint Terrorism Task Force, showed up at his office inquiring about his plans to protest at the Republican National Convention, which begins Monday, or elsewhere this election season. That same week, agents also questioned two dozen other activists in Colorado, Kansas and Missouri.

"Since when is a street protest considered a terrorist threat?" asked Bame, 45, a ponytail-wearing anarchist who speaks softly of a fairer, more beautiful world, not about violently overthrowing the government.

U.S. Attorney General John Ashcroft said Friday that the interviews "were designed to support freedom, to enrich it, to make sure it was not interrupted or otherwise disrupted by violent criminal terrorist activities."

After Sept. 11, 2001, Ashcroft eased restrictions on the FBI's domestic political surveillance. The bureau increasingly has focused on the anti-globalization groups that protested the World Trade Organization in Seattle in 1999 and several events since, including next week's Republican convention.

Civil libertarians question those actions.

"There's a kind of regression in law enforcement where the FBI is questioning people for having the wrong ideas," said Donna Lieberman, executive director of the New York Civil Liberties Union. "There's something fundamentally wrong with our government when it can't tell the difference between terrorism and advocates for peace."

Many in the movement organize in small, decentralized cells. Most profess to be peaceful but note that they don't consider property damage violence.

An October 2003 FBI memo advises law enforcement officials nationwide to track peaceful protesters forming human chains, wearing gas masks to ward off tear gas and videotaping protests to record police brutality.

The directive is sensitive in Denver, where the American Civil Liberties Union sued the city in 2002 after learning that police improperly kept thousands of "spy files" on peaceful protesters. Denver police promised to stop tracking people attending peaceful rallies.

Still, at least six Denver cops and FBI agents showed up July 22 at two homes on Lipan Street to question young Denverites about their plans to protest at the Democratic or Republican national conventions, presidential debates or on Election Day.

Sarah Bardwell - who, like most of the Lipan residents, had no plans to go East and protest - said the knock on her door felt like harassment.

"It's amazing that they'd consider me a possible terrorist," said the 21-year-old youth organizer for the anti-war American Friends Service Committee, a Quaker organization.

Ashcroft said Friday that agents were seeking information from people the government thought were plotting - or knew about plans - to firebomb media vehicles at the Democratic National Convention in Boston in July.

"Don't they have something better to be working on?" asked Alex Vitale, a Brooklyn College sociology professor who

studies police tactics toward demonstrations. "There's all this criticism about the failure of intelligence agencies. Using (anti-terrorism) resources against kids who want to protest seems like a crazy misuse."

Concerns are swelling in advance of next week's protests in New York, where police have received $50 million in federal money to prepare, more than $10 million of it for crowd-control devices, including nonlethal weaponry and high-tech video surveillance devices.

An umbrella group called United for Peace and Justice wants to use Central Park's Great Lawn for a huge march planned for Sunday. Republican Mayor Michael Bloom- berg's administration refused a permit, saying more than 100,000 expected protesters would hurt the grass. Many have resolved to risk arrest by converging in Central Park.

"They can intimidate and they can harass," said Bame, who will head to New York on Friday. "But I, for one, am not going to shrink away until Election Day before making my voice heard."

**Article 8 - Lichtblau NYT 08/16/04 FBI Goes Knocking**

**The New York Times**
nytimes.com

August 16, 2004

# F.B.I. Goes Knocking for Political Troublemakers

### By ERIC LICHTBLAU

WASHINGTON, Aug. 15 - The Federal Bureau of Investigation has been questioning political demonstrators across the country, and in rare cases even subpoenaing them, in an aggressive effort to forestall what officials say could be violent and disruptive protests at the Republican National Convention in New York.

F.B.I. officials are urging agents to canvass their communities for information about planned disruptions aimed at the convention and other coming political events, and they say they have developed a list of people who they think may have information about possible violence. They say the inquiries, which began last month before the Democratic convention in Boston, are focused solely on possible crimes, not dissent, at major political events.

But some people contacted by the F.B.I. say they are mystified by the bureau's interest and felt harassed by questions about their political plans.

"The message I took from it," said Sarah Bardwell, 21, an intern at a Denver antiwar group who was visited by six investigators a few weeks ago, "was that they were trying to intimidate us into not going to any protests and to let us know that, 'hey, we're watching you.' "

The unusual initiative comes after the Justice Department, in a previously undisclosed legal opinion, gave its blessing to controversial tactics used last year by the F.B.I in urging local police departments to report suspicious activity at political and antiwar demonstrations.

The bulletins that relayed that request detailed tactics used by demonstrators - everything from violent resistance to Internet fund-raising and recruitment.

In an internal complaint, an F.B.I. employee charged that the bulletins improperly blurred the line between lawfully protected speech and illegal activity.

But the Justice Department's Office of Legal Policy, in a five-page internal analysis obtained by The New York Times, disagreed.

The office, which also made headlines in June in an opinion - since disavowed - that authorized the use of torture against terrorism suspects in some circumstances, said any First Amendment impact posed by the F.B.I.'s monitoring of the political protests was negligible and constitutional.

The opinion said: "Given the limited nature of such public monitoring, any possible 'chilling' effect caused by the bulletins would be quite minimal and substantially outweighed by the public interest in maintaining safety and order during large-scale demonstrations."

Those same concerns are now central to the vigorous efforts by the F.B.I. to identify possible disruptions by anarchists, violent demonstrators and others at the Republican National Convention, which begins Aug. 30 and is expected to draw hundreds of thousands of protesters.

In the last few weeks, beginning before the Democratic convention, F.B.I. counterterrorism agents and other federal and local officers have sought to interview dozens of people in at least six states, including past protesters and their friends and family members, about possible violence at the two conventions. In addition, three young men in Missouri said they were trailed by federal agents for several days and subpoenaed to testify before a federal grand jury last month, forcing them to

cancel their trip to Boston to take part in a protest there that same day.

Interrogations have generally covered the same three questions, according to some of those questioned and their lawyers: were demonstrators planning violence or other disruptions, did they know anyone who was, and did they realize it was a crime to withhold such information.

A handful of protesters at the Boston convention were arrested but there were no major disruptions. Concerns have risen for the Republican convention, however, because of antiwar demonstrations directed at President Bush and because of New York City's global prominence.

With the F.B.I. given more authority after the Sept. 11 attacks to monitor public events, the tensions over the convention protests, coupled with the Justice Department's own legal analysis of such monitoring, reflect the fine line between protecting national security in an age of terrorism and discouraging political expression.

F.B.I. officials, mindful of the bureau's abuses in the 1960's and 1970's monitoring political dissidents like the Rev. Dr. Martin Luther King Jr., say they are confident their agents have not crossed that line in the lead-up to the conventions:

"The F.B.I. isn't in the business of chilling anyone's First Amendment rights," said Joe Parris, a bureau spokesman in Washington. "But criminal behavior isn't covered by the First Amendment. What we're concerned about are injuries to convention participants, injuries to citizens, injuries to police and first responders."

F.B.I. officials would not say how many people had been interviewed in recent weeks, how they were identified or what spurred the bureau's interest.

They said the initiative was part of a broader, nationwide effort to follow any leads pointing to possible violence or illegal disruptions in connection with the political conventions, presidential debates or the November election, which come at a time of heightened concern about a possible terrorist attack.

F.B.I. officials in Washington have urged field offices around the country in recent weeks to redouble their efforts to interview sources and gather information that might help to detect criminal plots. The only lead to emerge publicly resulted in a warning to authorities before the Boston convention that anarchists or other domestic groups might bomb news vans there. It is not clear whether there was an actual plot.

The individuals visited in recent weeks "are people that we identified that could reasonably be expected to have knowledge of such plans and plots if they existed," Mr. Parris said.

"We vetted down a list and went out and knocked on doors and had a laundry list of questions to ask about possible criminal behavior," he added. "No one was dragged from their homes and put under bright lights. The interviewees were free to talk to us or close the door in our faces."

But civil rights advocates argued that the visits amounted to harassment. They said they saw the interrogations as part of a pattern of increasingly aggressive tactics by federal investigators in combating domestic terrorism. In an episode in February in Iowa, federal prosecutors subpoenaed Drake University for records on the sponsor of a campus antiwar forum. The demand was dropped after a community outcry.

Protest leaders and civil rights advocates who have monitored the recent interrogations said they believed at least 40 or 50 people, and perhaps many more, had been contacted by federal agents about demonstration plans and possible violence surrounding the conventions and other political events.

"This kind of pressure has a real chilling effect on perfectly legitimate political activity," said Mark Silverstein, legal director for the American Civil Liberties Union of Colorado, where two groups of political activists in Denver and a third in Fort Collins were visited by the F.B.I. "People are going to be afraid to go to a demonstration or even sign a petition if they justifiably believe that will result in your having an F.B.I. file opened on you."

The issue is a particularly sensitive one in Denver, where the police agreed last year to restrictions on local intelligence-gathering operations after it was disclosed that the police had kept files on some 3,000 people and 200 groups involved in protests.

But the inquiries have stirred opposition elsewhere as well.

In New York, federal agents recently questioned a man whose neighbor reported he had made threatening comments against the president. He and a lawyer, Jeffrey Fogel, agreed to talk to the Secret Service, denying the accusation and blaming it on a feud with the neighbor. But when agents started to question the man about his political affiliations and whether he planned to attend convention protests, "that's when I said no, no, no, we're not going to answer those kinds of questions," said Mr. Fogel, who is legal director for the Center for Constitutional Rights in New York.

In the case of the three young men subpoenaed in Missouri, Denise Lieberman, legal director for the American Civil Liberties Union in St. Louis, which is representing them, said they scrapped plans to attend both the Boston and the New York conventions after they were questioned about possible violence.

The men are all in their early 20's, Ms. Lieberman said, but she would not identify them.

All three have taken part in past protests over American foreign policy and in planning meetings for convention demonstrations. She said two of them were arrested before on misdemeanor charges for what she described as minor civil disobedience at protests.

Prosecutors have now informed the men that they are targets of a domestic terrorism investigation, Ms. Lieberman said, but have not disclosed the basis for their suspicions. "They won't tell me," she said.

Federal officials in St. Louis and Washington declined to comment on the case. Ms. Lieberman insisted that the men "didn't have any plans to participate in the violence, but what's so disturbing about all this is the pre-emptive nature - stopping them from participating in a protest before anything even happened."

The three men "were really shaken and frightened by all this," she said, "and they got the message loud and clear that if you make plans to go to a protest, you could be subject to arrest or a visit from the F.B.I."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

**Article 9 - Herdy Denver Post 08/08/04**

# The Denver Post

**Teaching the silent treatment**
Responding to what some see as federal agents' intimidation, activists are urged to say little when fingered for questioning.
**By Amy Herdy**
**Denver Post Staff Writer**

**Sunday, August 08, 2004 -**

As activist Mark Cohen pointed to the phrases on the dry-erase board, dozens of men and women of various ages and styles of dress repeated them in a single loud chorus: "I intend to remain silent. I wish to speak to an attorney."

"Those are the magic words," Cohen, a member of the human-rights group the Dandelion Center, told the audience. He said if any of them was detained by the police or federal agents, "Don't forget them."

Cohen's advice was part of a presentation called "Know Your Rights," sponsored by the American Friends Service Committee, or AFSC, and the Dandelion Center. The presentation, given Thursday evening in Denver, was in response to federal agents calling activists and community organizers recently in Denver and across the country.

Denver FBI spokeswoman Monique Kelso said the visits and phone calls by members of the Joint Terrorism Task Force were designed to gather intelligence on any plans for violence at the political conventions or the presidential inauguration. And, she said, they would continue.

"We have an obligation to talk to people in this circumstance," Kelso said.

Agents were questioning those "expected to have specific details of people in groups planning criminal acts," Kelso said.

Yet many believe the encounters have nothing to do with pre-emptive police work and everything to do with intimidating those who have a history of protest in order to prevent activities that are protected under the First Amendment.

"The kinds of questions asked of these activists ... are not the kind of questions being asked in good faith to elicit information on criminal activity," said Mark Silverstein, legal director of the American Civil Liberties Union Foundation of Colorado.

Across the country, the questions are more or less the same, Silverstein said: "Are you planning to commit any crimes? Do you know anyone who plans to commit any crimes? Do you know that withholding such knowledge from us is a crime?"

Sarah Bardwell, a 21-year-old intern for the AFSC in Denver who has protested against the war in Iraq, said the agents who appeared at her house and questioned her and four roommates did not seem to expect answers.

"They didn't wait, after asking one question, for any of us to reply," said Bardwell, who described the

encounter as "snotty chitchat."

"We said, 'You should leave our porch,' and they said, "We'll leave your porch when we want to,'" recalled Bardwell, who said she does not have a history of violence and believes the purpose of the visit was to frighten her and the others.

Kelso, who recognized the three questions but would not confirm them as protocol, said the interviews were not "scare tactics" and no one was under obligation to cooperate.

"They can talk, or if they don't feel confident talking, they can have their attorney present, or they can just ask us to go away," said Kelso (the third option was echoed repeatedly at the training at the AFSC office). Kelso added that the FBI would not hold a grudge against someone for refusing to answer questions.

"We wouldn't look negatively on that at all," she said.

Bardwell said that was not the reaction of the agents she met. "When we wouldn't answer their questions, they said they would make more intrusive efforts to do their job," she said.

The encounter left her angry, confused and upset, Bardwell said, but more determined than ever to be active in her community.

"I feel even more inspired," she said.

*Amy Herdy can be reached at 303-820-1752 or aherdy@denverpost.com .*

**Article 10 - Srikantiah SFGate 08/06/04**

**SFGate.com**    www.sfgate.com    Return to
regular view

<u>Few benefits to questioning targeted groups</u>
- Jayashri Srikantiah
Friday, August 6, 2004

Once again, FBI agents are fanning out in Muslim and immigrant communities in the Bay Area and across the country, targeting people for questioning based on ethnicity and religion. Apparently, the Department of Justice has not learned from the failure of its earlier dragnet questioning plans. None of those resulted in a single terrorism-related criminal arrest. Rather, they created fear and distrust in the very communities with which the FBI should be strengthening relationships.

The first discriminatory questioning plan was announced shortly after Sept. 11, 2001. Under that plan, 5,000 innocent noncitizen men of Middle Eastern and South Asian ancestry were targeted for interrogation based solely on their ethnicity, age and immigration status. These men, including ordinary businessmen and students who live and work with their families in our communities, were treated like terror suspects. They were asked, among other things, about their political beliefs and for the telephone numbers used by family members and friends.

Not surprisingly, the Department of Justice's own report about the first round of interviews revealed that no criminal arrests having any connection to terrorism were made. Rather, several noncitizens were deported for minor immigration violations. Despite this failure, the Department of Justice instituted a second round of questioning in the spring of 2002, this time of 3,000 individuals of South Asian, Middle Eastern or Arab ancestry. Again, no terrorism-related criminal charges were brought.

After the Iraq War began, 11,000 Iraqi immigrants and Iraqi-American citizens, over 350 of them in the Bay Area, were questioned in a third round of interrogations. Refugees who left Iraq to escape Saddam Hussein's oppressive regime were asked whether they knew him, or what they thought of Osama bin Laden. Again, not surprisingly, no terrorism-related criminal arrests were made.

Despite the valuable resources wasted on these previous dragnet questioning plans, and the fear and anxiety created by each plan in immigrant communities, the Department of Justice is now repeating its practice of targeting innocent Americans based on ethnicity. Although FBI officials claim that the interviews are driven by "specific intelligence," all of the interview targets thus far appear to be of Middle Eastern, South Asian or Arab ancestry. Moreover, attorneys representing individuals targeted for interviews confirm that FBI agents are engaging, once again, in fishing expeditions with ordinary people, citizens and noncitizens alike. As with the previous questioning plans, the Department of Justice acknowledges that none of the interview targets are suspected of any wrongdoing.

Immigrant communities know from past experience that, contrary to the department's assertions, the interrogations are far from voluntary. In the typical scenario, FBI agents arrive at people's homes or workplaces demanding to talk with a particular individual. The person is treated like a terror suspect even though he has done nothing wrong.

Worse yet, the threat of potential deportation looms over the interview. In the past, FBI agents have been deputized to make immigration-related arrests. The targeted person knows, moreover, that previous plans have resulted in deportations for even minor immigration violations.

Sadly, the Bush administration's discriminatory practices extend far beyond decisions to target individuals for questioning based on ethnicity and religion. Most recently, the Census Bureau announced that it provided census data to the Department of Homeland Security, ZIP code-level breakdowns of Arab-American populations. The government has also targeted South Asian, Middle Eastern and Arab immigrants for registration, fingerprinting, increased border scrutiny, detention and deportation, among other things.

The administration's practices are based on its ignorant habit of equating terrorists with immigrants. We should all know better. The Bay Area is home to vibrant, productive and diverse immigrant communities. Now is a time when the FBI should be reaching out to these communities to repair the damage caused by previous selective targeting of community members based on religion and ethnicity. The FBI can then start to

build connections with these communities that would encourage community members to come forward with any information they may possess.

Immigrants and citizens alike support our government's efforts to investigate terrorism. Those efforts should include questioning people about whom the government has specific, individualized information of connection to terrorist activity. Those efforts should also include gathering information through collaboration and open communication with immigrant communities. However, dragnet interrogations based on ethnicity and religion hamper communication and stigmatize entire communities. It is time for the Bush administration to stop wasting resources on discriminatory and ineffective plans that give us only the illusion of increased security at huge cost to immigrant communities.

*Jayashri Srikantiah is director of the Immigrants' Rights Clinic at Stanford Law School.*

Page B - 9
URL: http://sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2004/08/06/EDGV682LKA1.DTL

©2004 San Francisco Chronicle | Feedback | FAQ

**Article 11 - Taiara S F Guardian 08/10/04**



THE SAN FRANCISCO BAY

Aug. 4 – Aug. 10 2004 ● Vol. 38, No. 45

# GUARDIAN

CLASSIFIEDS | RESTAURANTS | NUDE BEACHES | PROMOTIONS | BEST OF THE BAY

search

## calendar
Club Guide
8 Days a Week
Music listings
Event listings
Stage listings
Art listings
Film listings
Movie Clock
Rep Clock

## news & culture
alt.sex.column
Techsploitation
Being There
Astrology
This Modern World
Dolezal cartoon
Politics blog

## food & drink
DineOnline menus
Cheap Eats
Without Reservations
Meatless
Bottle Rockets
Table Ready
Take That

## a&e
Sonic Reducer
Press Play
Full Circle
Frequencies
Synthetic Pleasures
Super Ego
Extreme Measures
Wandering Eye

## web extra
Joke of the day
Ralph Nader
MediaBeat
Focus on the Corp.

## classifieds
Read classifieds
Place a classified
Read personal ad
Place a personal ad

## special issues
Nude Beaches 2003
The Sex Issue
Fall Arts Preview

# New FBI witch-hunt
## Agents are once again interrogating immigrants – and U.S. citizens – for no valid reason
## By Camille T. Taiara

Federal Bureau of Investigation agents working with the Joint Terrorism Task Force have been showing up in recent months at the homes and workplaces of Arabs and Muslims – including both immigrants and U.S. citizens – pushing for what they call "informal interviews" and attempting to interrogate people without the presence of an attorney.

This isn't the first time the FBI has conducted this sort of campaign, and local lawyers say this latest round of interviews still looks more like a witch-hunt than any bonafide antiterrorist investigation.

"This plan is part of a larger practice of targeting people based on race, ethnicity, and religion," rather than on evidence of possible wrongdoing, Jayashri Srikantiah, director of Stanford University Law School's Immigrant Rights Clinic and former associate legal director at the American Civil Liberties Union's northern California office, told the *Bay Guardian.*

According to Srikantiah, the latest campaign represents the fourth round of such interviews in the Bay Area since Sept. 11, 2001. As with the now-infamous Special Registration program (see "Immigration Boondoggle," 12/17/03), the practice has led to a rash of deportations nationwide so far but no "meaningful, terrorist-related investigation," she said.

In 2001 and 2002, federal agents limited their interviews to Muslim and Arab immigrants, Srikantiah said. And while immigrants continue to be the main targets, the JTTF has since begun questioning U.S. citizens as well – particularly recent converts to Islam and Arab and Muslim Americans who've recently traveled to the Middle East.

Ads by Goo

Answering
Combined J
Christian, M
teachings re
deadly argu
www.ofpromi

The War on
The New Yo
brings you th
on the fight
terror.
www.nytimes

Get it!



Project Censored
San Francisco History
Superlists

**connect to us**
Sponsored events
Submit a listing
Letter to the editor
Driving directions
Link to us

**about us**
Our masthead
Editorial staff
Business staff
Jobs & internships





The FBI won't say how many people have been targeted. But local National Lawyers Guild program assistant Mel Campagna told us the NLG has received eight calls from people approached by the FBI for interviews since late April. "In the second week of July, we received four calls within about three days," she said. The agents "have been showing up at people's homes and workplaces and requesting quick turnarounds for interviews. People are being told that they don't need to have lawyers present."

Local lawyers say the targets have included Syrians, Iraqis, a Kurdish woman, and a black Muslim, among others. Only one, a U.S. citizen, would talk to us.

"They tried to get me to talk right away, without legal counsel," said Mohammed, an Indian-born Muslim who asked that we not use his last name. Two FBI agents called on Mohammed at his job in March – a year after he'd spent five weeks filming interviews in Palestine for Berkeley-based Middle East Children's Alliance.



Fortunately, Mohammed, who has lived in the United States since he was three years old and is an activist with Stop U.S. Tax-Funded Aid to Israel Now, is more politically savvy than most of those approached by the JTTF. He agreed to talk to the agents only with his attorney present – and refused to answer questions about family, friends, and people he'd met during his trip.

Local attorneys report that the recent interviews have included questions about particular "terrorist" organizations, individual suspects, and a religious school in Syria called Jamiat Abu Noor. (In most cases, the attorneys report, there's been little if any reason to believe that the interviewees would have any knowledge of such groups or people.) They've also included broad questions, such as whom the person had met while on trips to one of a number of Muslim countries; whether they knew any Muslims in the United States with access to government buildings, hazardous materials, or vehicles for transporting hazardous materials; what mosque people they know attend; and their opinions about the Bush administration, the war on Iraq, and about regimes such as that of Syria's Bashir Assad.



I am

Zip/Post

"If [they determine whom to talk to] based on specific intelligence, then what's the quality of that intelligence?" asked

Mark Schlosberg, police practices policy director at the ACLU's northern California chapter, who insists that the JTTF's criteria should consist of more than a person's religion or country of origin.

"Our point is not that law enforcement should not be investigating terrorism," Schlosberg said. "It's just that any investigation that happens needs to be done in a way that respects people's civil liberties."

**E-mail Camille T. Taiara**

**Article 12 - Thornton San Diego Union 08/02/04**



factiva.

8/2/04 SDUT A1

8/2/04 San Diego Union-Trib. A1
2004 WL 58999854

The San Diego Union-Tribune
Copyright (c) 2004 Bell & Howell Information and Learning Company. All
rights reserved.

Monday, August 2, 2004

NEWS

ATTACK ON AMERICA

A SHAKY RELATIONSHIP     FBI's home visits have some Muslims feeling
                        harassed , alienated

Kelly Thornton
STAFF WRITER

Saudi national Hasan Saddiq Faseh Alddin was jailed without bail and
facing deportation. Five of his closest friends from the Vista mosque
wrote letters or showed up at his bond hearing in June to show support
or testify on his behalf.  In the days that followed, each of those
friends received unannounced home visits from FBI agents. The agents
appeared on doorsteps purporting to want information about Alddin, who
was described by the government as a friend of a friend of two 9/11
hijackers.

But according to Alddin's supporters, they quickly became the subject
of the interviews as agents asked them about their religious beliefs,
their personal lives, their knowledge of weapons and explosives, their
propensity to blow things up, their thoughts on Osama bin Laden and the
Sept. 11, 2001, attacks.

To thwart a possible terrorist attack this summer or fall, the FBI has
begun a new wave of interviews with Muslims and Arabs. But some local
Muslims said agents are alienating the very people they are trying to
win over as partners in the war on terror by ambushing them in their
homes, posing offensive and accusatory questions, misrepresenting the
reason for their visit, and delving into personal lives and politics.

"If I'm an FBI agent and I'm trying to protect the country, I don't go
accusing people of planning on blowing things up and then, you know
what, let's kiss and make up," said Khalid Al Jaludi, one of Alddin's

friends visited by the FBI at his home in Hawthorne.

Another of Alddin's friends, Jesse Bernal of Vista, said he was interviewed recently by federal agents for more than two hours.

"Does the FBI have a right to question people? Yes. Does the FBI have a right to intimidate and coerce? No," he said. "I felt I had to be very careful. I felt anything I said would be used against me. The FBI isn't your friend. They're profiling -- to nail you."

In the FBI's latest outreach program, agents in San Diego County and elsewhere are reconnecting with contacts and cultivating new sources while intelligence analysts search old files for clues that, combined with new information, could become more meaningful.

It's unclear whether the questioning of Alddin's friends is part of that outreach effort or stems from the case against Alddin, who was jailed in May for having two misdemeanor domestic violence convictions. The government was seeking to deport him because the convictions jeopardized his immigration status.

Immigration officials had issued a news release identifying Alddin as having "ties" to two Sept. 11 hijackers because Alddin's former roommate from 1995 became a friend of San Diego-linked terrorists Nawaf Alhazmi and Khalid al-Midhar. Alddin voluntarily returned to Saudi Arabia on July 8.

The next day, FBI agents visited the mosque Alddin attended. Nader Dehaini, president of the Al-Ittihad mosque in Vista, said agents made an appointment with him and other board members to strengthen their partnership in the war on terror and nurture a spirit of cooperation. The agents were cordial and respectful, he said.

Not all Muslims say they feel harassed by agents, Dehaini said. Some understand the reason for the questions and are glad to help.

"I don't think there is a problem. All they wanted is to come and make sure they're more in touch with the community. Their questions were very normal and straightforward. It went very well. They were nice," Dehaini said.

"It's totally understandable with the high alert. They asked me what is a good idea in reaching out to the community so we can have help from you guys instead of being looked upon as the enemy."

FBI officials in San Diego say relationships between agents and the region's relatively large Muslim population are good and getting better.

"The FBI and the intelligence community have achieved some tremendous successes that would not have been possible without the extraordinary efforts of our partners in the Muslim, Iraqi and Arab- American communities," said Dan Dzwilewski, special agent in charge of the FBI office in San Diego.

"We owe them gratitude for that. Many Muslim and Arab-Americans here

are very loyal Americans. . . . I don't think we're going to be successful without their continued assistance."

Some local Muslims -- particularly those with one-on-one experience with the FBI -- said agents are attempting to connect with a community that is already disenfranchised by a government that is quick to trample on civil rights by questioning, detaining and deporting Muslims and Arabs.

The FBI and federal prosecutors have acknowledged using immigration crimes and deportation as tools in the war on terror, where terrorism cases either cannot be proved or would compromise national security by requiring disclosure of sensitive information. Since Sept. 11, 2001, that has happened in at least a dozen instances in San Diego, where hijackers Alhazmi and al-Midhar lived in 2000.

The FBI's Dzwilewski said his agents are not randomly targeting people because of race or religion. Agents are reaching out to contacts, old and new, renewing pleas for help and thanking them for what they've already done. And, they are following up on tips.

"People always think there's profiling going on. Absolutely not. Department of Justice regulations strongly prohibit profiling. The interviews we do are strictly intelligence-driven," Dzwilewski said.

"There's a lot of intelligence generated from the community reporting suspicious activity. . . . We'll take that, analyze what we're given and work with it from that perspective and decide when intelligence indicates an interview might be useful."

He said agents do not treat people as if they are guilty of something.

"We don't assume when we contact someone they're a terrorist or are going to be supporting terrorists or espousing radical views," the FBI chief said. "We're there to ferret it out and seek their assistance. If it escalates into something that gives us cause to believe they may be involved, then that's a different story."

Uneasy visit

Through large windows in his living room, Jesse Bernal saw the agents walking toward the door of his Vista home. They didn't have to introduce themselves. They fit the stereotype: dark suits and somber, purposeful expressions.

They said they were there to talk about Alddin, but the topics changed within minutes, Bernal said.

For two hours, they asked questions that bothered the retired business consultant: whether he supported the Taliban (no), whether he believes in terrorism (of course not), his thoughts on the Sept. 11 attacks (it was wrong).

Bernal, a native Texan with Hispanic heritage, was raised as a Catholic in Anaheim. At one point he wanted to be a priest. At 16, he became a Protestant and he later ministered to jail inmates and planned to

become a missionary.

By 44, he was disillusioned with Christianity and met a Muslim who influenced him. Five years ago, he grew a beard and started attending the mosque and praying to Allah five times a day.

"I never thought being a Muslim would be this: sitting here, being thought of as a terrorist," Bernal said.

During the FBI interview, the agents asked Bernal's advice, he said. How can we be less threatening? Don't you see we're trying to help the country? Bernal advised them to make an appointment with the leadership of the Vista mosque -- which they did a few days later. But he remained convinced that the FBI was still profiling.

"It's nothing but cold and calculated intimidation," he said. "People in the community are very fearful of the government. They don't want to say anything. They're using third-world tactics."

The FBI made an appointment for a few days later to interview Bernal's roommate, Nabil Al-Deiri, a naturalized U.S. citizen from Jordan who invited a Union-Tribune reporter and photographer to attend. Upon arrival, the two agents aborted the interview when they saw the reporter and photographer, despite protests from Bernal and Al-Deiri, who said they had nothing to hide.

"We don't conduct business that way. We want to keep your confidentiality as well as our own," one agent told Al-Deiri and Bernal.

Questions about profiling

Khalid Al Jaludi, a U.S. citizen born in Jordan and raised in New York City, was asleep in his Hawthorne home when a knock came at 8:30 a.m. June 30, a Wednesday. His wife found two FBI agents at the door. Days before that, the former U.S. Marine had come to federal court in San Diego for Hasan Alddin's hearing.

On his way to answer the door, Al Jaludi nervously recalled faces of friends who had been jailed or deported since Sept. 11.

Hello, the agents said, we are here about Alddin.

It wasn't long before the questions shifted to Al Jaludi and things became tense.

"They asked about three or four questions about Hasan," Al Jaludi said. "They next asked me if I know Jesse (Bernal). After that, they asked me if Jesse and I were planning on blowing anything up in the U.S. And that's when I said I think I need my lawyer."

Al Jaludi's lawyer and close friend, a former FBI agent and prosecutor, accompanied his client to the FBI office in Los Angeles the next day. By that time, Al Jaludi was on the defensive, unwilling to answer questions he considered accusatory.

According to Al Jaludi, again they asked: Have you ever thought about blowing things up?

"It was really a stupid question," Al Jaludi said. "I honestly think this is nothing more than racial profiling and harassment. They're out there fishing."

The lawyer, who asked not to be identified because of his former FBI ties, had a different view of the FBI's tactics. He said they must have been acting on a tip -- however misguided -- and were required to investigate.

"The follow-up didn't seem to me to be particularly onerous," the lawyer said. "It did seem a little bit foolish. Nobody's going to confess if they are planning to blow something up."

The lawyer happened to be with Al Jaludi when a reporter called. What followed was a friendly debate between the lawyer and client, overheard by the reporter. The lawyer both defended and teased Al Jaludi, affectionately calling him "overly sensitive" and a "crybaby."

"I might be oversensitive, but I've got legitimate reason to be oversensitive," Al Jaludi countered. "Someone comes into my home and accuses me of plotting to blow things up? Are these friendly questions? Are they trying to take me out on a date?

"I've been here all my life," Al Jaludi said. "I'm willing to wager that that FBI agent that came to my house has not served in the United States armed forces, and yet I have."

OVERVIEW

The FBI says it wants to build strong contacts with Muslim and Arab residents in San Diego and across the nation.

Some Muslims say the FBI's outreach seems like profiling and harassment because agents ask personal and political questions.

The FBI says it is not profiling. But some Muslims say agents are alienating those they want to befriend.

Kelly Thornton: (619) 542-4571; kelly.thornton@uniontrib.com
TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT
DISPLAYABLE

1 PIC   1 CHART; Caption: 1. Nabil Al-Deiri (left) and roommate Jesse
Bernal awaited a scheduled visit by FBI agents at their Vista home. The
meeting was subsequently postponed. 2. OVERVIEW; Credit: 1. John
Gastaldo / Union-Tribune