Articles 13 through 24:

Article 13 - Schmitt Horowitz LA Times 07/13/04

Article 14 - Abbot Rocky Mountain News 07/27/04

Article 15 - Sheridan Wash Post 07/17/04

Article 16 - Echkoff Siebert Des Moine 02/07/04

Article 17 - Eckhoff Siebert Des Moine 02/10/04

Article 18 - Davey NYT 02/10/04

Article 19 - Davey NYT 02/11/04

Article 20 - Goldberg Salon Outlawing Dissent 02/11/04

Article 21 - Goldberg Salon Thousand Hoovers 02/12/04

Article 22 - Ginis Fresno Bee 02/27/04

Article 23 - Lichtblau NYT 11/23/04

Article 24 - Lichtblau NYT 08/18/04

**Article 13 - Schmitt Horowitz LA Times 07/13/04**



factiva.

7/18/04 LATIMES A17

7/18/04 L.A. Times A17
2004 WL 55925927

Los Angeles Times
Copyright 2004 The Los Angeles Times

Sunday, July 18, 2004

Main News; National Desk

The Nation; FBI Starts to Question Muslims in U.S . About Possible
Attacks ; Islamic advocacy groups contend that the latest program
'stigmatizes the entire community.'

Richard B. Schmitt and Donna Horowitz
Special to The Times

WASHINGTON  FBI agents are beginning another round of interviews with
Muslims and Arab Americans around the country as part of an effort to
root out a possible terrorist attack in the U.S. this summer or fall,
civil rights activists and attorneys for some of the people questioned
said Saturday.

The interviewing program was announced in late May at a news conference
by U.S. Atty. Gen. John Ashcroft and FBI Director Robert S. Mueller
III. Officials are concerned that terrorists may seek to disrupt the
national political conventions in late July and late August or the
general election in November, among other possible targets. But the
actual questioning of people has taken weeks to get off the ground.

Muslim advocacy groups and lawyers said that, in recent days, the FBI
had begun interviewing dozens of people in Virginia, Florida, New York
and California, among other states. The individuals questioned include
a U.S. citizen of Iranian descent in Missouri and a Yemeni college
student in Arizona. None of the people interviewed so far had been told
that he or she was a suspect in a terror investigation.

To many, the interviews are a bewildering case of deja vu. The FBI
interviewed thousands of Muslims and Arab Americans after the Sept. 11
attacks and in the walk-up to the war in Iraq last year, fueling
accusations of racial profiling by the government. Hundreds of people
were jailed or deported for alleged visa and immigration violations
after the Sept. 11 roundup.

FBI officials said in announcing the latest set of interviews in May that they would work to ensure that the process would be driven by specific intelligence rather than race or ethnicity. The approach recently was cited by one bureau official as a reason why the interviewing had taken so long to begin.

But Muslim leaders said Saturday that they were concerned that the FBI was repeating mistakes of the past.

Nihad Awad, executive director of the Council on American-Islamic Relations, or CAIR, in Washington said his office had received dozens of reports of Muslims being questioned at their workplaces and homes by the FBI. He criticized the operation, saying it inexplicably seemed to target even respected community leaders.

"The way it's being done stigmatizes the entire community and makes Muslims objects of suspicion to their neighbors and co-workers," Awad said. "This is not right. This is more politics than security."

He said he hoped to meet with FBI officials on Monday to express his concerns and appeal to them to more closely cooperate with the community during their investigations.

"Muslims should be enlisted in the war on terror, not blacklisted," he said.

An FBI spokeswoman, Michelle Palmer, declined comment Saturday about the latest interviews.

Bureau officials have been meeting in recent weeks with Islamic groups, seeking to enlist their support at a time when Ashcroft and other officials have said the chances of a terrorist attack on the U.S. are as high as any time since Sept. 11.

One FBI official in Washington indicated recently that the bulk of the interviewing would not begin until late this month. And although sources said the FBI in Southern California had started conducting narrowly tailored interviews, officials with some Islamic groups in the region were unaware of recent problems -- or even of any questioning having taken place.

Stacy Tolchin, an attorney with the National Lawyers Guild in San Francisco, said her group got four calls recently from Muslims and Arab Americans contacted by the FBI or the local Joint Terrorism Task Force. Tolchin said she accompanied a Turkish woman to an interview Tuesday in which two agents asked a wide range of questions -- including whether the client engaged in prayer.

Tolchin said she didn't know why the agents picked her client, a relatively new immigrant of Kurdish descent who was granted asylum based on her fear of returning to Turkey. She said the single woman in her 30s, a professional from Northern California, was unable to help them.

During the interview -- which lasted less than an hour, Tolchin said -- the agents asked whether her client knew people who had traveled to

Pakistan, and whether she had information about a school in Syria where some American converts to Islam had studied the Koran.

"They asked if she knew any suspicious people who had come from Mexico and Canada," Tolchin said. "They asked if she knew people who had licenses to drive commercial trucks or transport firearms."

Tolchin said her client had no answers to any of these questions.

In response to the question about prayer, Tolchin said, her client told the agents that, although she is a Muslim, she doesn't pray.

Deedra Abboud, the director of CAIR's Arizona office, said she met with the FBI in Phoenix on Tuesday after receiving phone calls from people who had been recently approached by the bureau for questioning.

The FBI is "really stressing that these people are not under investigation, and that this is just a friendly chat," Abboud said. "We tried to get them to understand they are not having friendly chats with non-Muslims."

Abboud said the FBI told her that it was trying to identify people who may have crossed paths with individuals who could be of use to investigators, including "people who may be six degrees of separation away from somebody who at some point in time may have been under investigation."

She said officials in Arizona told her they were moving ahead aggressively with interviews in part because a proposed presidential debate is planned for Tempe in October.

James Hacking, a Muslim lawyer in St. Louis, said he thought the FBI was on a fishing expedition.

Hacking said he accompanied an Iranian graduate student to an interview with the FBI in St. Louis on Wednesday. He said the client was asked a variety of general questions, including information about Iranian groups operating in the U.S. and abroad, and whether he had traveled recently to Iran. His client, he said, was unable to provide the investigators with much useful information.

"This kid was born and raised in the Midwest. He is as American as apple pie," Hacking said. "I think they are just beating the bushes."

*

Times staff writer Schmitt reported from Washington and Times correspondent Horowitz from San Rafael. Staff writers Teresa Watanabe, David Pierson and Greg Krikorian in Los Angeles contributed to this report.

**Article 14 - Abbot Rocky Mountain News 07/27/04**

Rocky 7/27/04 (1 of 2)

# FBI's queries rattle activist

## Agents seek info on possible violence at political conventions

By Karen Abbott
ROCKY MOUNTAIN NEWS

The FBI questioned a Fort Collins resident about potential plots to disrupt the nation's political conventions, a day after some Denver residents were quizzed.

The 45-year-old software engineer in Fort Collins said he was questioned Friday by the FBI's Joint Terrorism Task Force.

"Apparently my name came up at headquarters in (Washington) D.C. as a person who might know some information about terrorist plots at the conventions — plans for people to get hurt and so forth," said Paul Bame, who described himself as "rattled and scared" when he was questioned by an FBI agent at his workplace on Friday.

Colorado FBI spokeswoman Monique Kelso said she didn't know if similar questioning is occurring nationwide, but Colorado ACLU Legal Director Mark Silverstein said he has been told that it is happening in several states.

Bame's questioning followed a similar inquisition last week by task force members of some young activists in two Denver homes.

One, an intern with the American Friends Service Committee — a Quaker group devoted to nonviolence — said the officers asked if they planned to commit any crimes at the national conventions, if they knew anyone who did and if they knew that failure to report such plans was a crime.

Some members of that group had participated the day before in a protest of a Denver police shooting of a 63-year-old disabled man.

They also have participated in other protests and said they suspect that's why they were questioned.

Denver Deputy Police Chief Mike Battista, who is in charge while Chief Gerry Whitman is on vacation, did not return a telephone call Monday about the questioning. The Den-

Flip to QUESTIONING on 10A

*Rocky 7/27/04 (2 of 2)*

# Questioning: FBI denies targeting protesters

**Continued from 5A**

ver Police Department contributes officers to the FBI's Joint Terrorism Task Force.

Last year, Denver settled a federal civil lawsuit filed by the American Civil Liberties Union by agreeing to purge its files of surveillance information on peaceful political activists and to stop keeping "spy files" on them.

Files kept by police officers categorized the American Friends Service Committee, which once won the Nobel Peace Prize, as a "criminal extremist" organization.

Silverstein said that settlement may not apply to Denver police officers who participate in the FBI's Joint Terrorism Task Force. When asked that question in 2002 at a meeting about the spy files settlement, Whitman said the new rules applied to Denver officers on the Joint Terrorism Task Force, but the then-city attorney said they didn't, Silverstein said.

Kelso said Monday that the young people in Denver were not selected for questioning because they had protested.

"It's an ongoing investigation that we've been working for some time now," she said.

She said the investigation is not over, that no one has been arrested to her knowledge and that she could not answer questions about who authorized the questioning.

Justice Department headquarters in Washington referred inquiries to the FBI.

A spokesman at FBI headquar-

ters in Washington asked that questions be e-mailed but did not respond to them Monday.

Bame said he has been arrested twice during anti-globalization protests, in Washington in 2000 and Miami last year. Police arrested hundreds of people at those two events.

Bame said he pleaded guilty in Washington to parading without a permit, and the Florida charge against him, obstructing a sidewalk, was dismissed.

Bame said he declined to answer the FBI agent's question without a lawyer present and offered to have his lawyer get in touch.

He said the agent didn't seem interested in questioning him with his lawyer present. "I'm going to have my lawyer contact him anyway," he said.

Bame also declined to answer the question directly for the *Rocky Mountain News* Monday, but he said, "I'm also very concerned that people don't get hurt, and I found that I couldn't help him."

He said the agent first left a message on his home telephone Thursday, but when he returned the agent's call on Friday, the agent wasn't available.

Then, when Bame returned to his office after lunch on Friday, a security officer with his company was waiting at his desk to escort him to the lobby to meet with the agent.

Bame went to the lobby with "much fear," he said.

"He said that it was not intended to be embarrassing or accusatory, but they were just checking with peo-

ple who might have information," Bame said.

"He mentioned that the 9/11 Commission had treated the FBI pretty badly, and he implied they were being really careful or really thorough," he said.

He said the agent seemed "really intelligent" and that he suspected the agent "realized he was really not talking to somebody who was going to have the kind of information they were looking for."

Bame said he volunteers at a community radio station in Fort Collins and that he works with a group called The Pagan Cluster.

"We're a bunch of middle-aged weird people," Bame said.

The Pagan Cluster, among other things, objects to economic globalization — the merging of world economies as in the North American Free Trade Agreement. Opponents think globalization jeopardizes the environment and workers' rights.

Bame isn't attending the Democratic National Convention under way in Boston, but he plans to attend the Republican National Convention in New York in August. He may protest there or support demonstrators, he said.

"I'm sure if we were to ask the FBI why they're doing this, they would say we have to be real careful about terrorism," Bame said. "The practical effect of this is scaring the crap out of people, which is going to end up scaring people from using their First Amendment rights," he said.

*abbottk@RockyMountainNews.com or 303-892-5188*

**Article 15 - Sheridan Wash Post 07/17/04**



factiva.
Dow Jones & Reuters

7/17/04 WASHPOST A01

7/17/04 Wash. Post A01
2004 WL 82769846

The Washington Post
Copyright 2004, The Washington Post Co. All Rights Reserved

Saturday, July 17, 2004

A Section

Interviews Of Muslims To Broaden ; FBI Hopes to Avert A Terrorist
Attack

Mary Beth Sheridan
Washington Post Staff Writer

FBI agents have launched a series of interviews of Muslims and Arab
Americans in the Washington area and across the country, hoping to
glean information that could prevent a major terrorist attack during
this election year. A few dozen voluntary interviews of community
leaders, students, businesspeople and others have been conducted so
far, according to attorneys and Muslim activists. Authorities said they
do not know how many people will be contacted, but the effort is
expected to expand significantly in the next week or so.

The new round of questioning is also far more targeted than an earlier
program of voluntary interviews with men from Arab and Muslim
countries, which followed the Sept. 11, 2001, terrorist attacks and was
criticized for being ineffective and using profiling.

"This is not a general population. They are identified by intelligence
or investigative information," said an FBI official who spoke on
condition of anonymity, in line with department policy. He added that
the questioning did not signify that the people were under
investigation themselves.

The questions being posed vary widely, according to attorneys,
activists and interviewees. Several people in California and Arizona
have been asked whether they knew anyone who had recently been in the
Pakistani border region of Waziristan, regarded as a possible refuge
for al Qaeda figures. They were also asked about Abu Nour, which agents
identified as a mosque and school in Syria that was popular with
American converts to Islam, the attorneys and activists said.

"We were told by the FBI agents that they're concerned there could be a
coming threat from people who are recent converts to Islam," said Stacy

Tolchin, a San Francisco lawyer who accompanied a Turkish Kurdish immigrant to an interview this week.

Law enforcement officials decided to step up efforts to contact Muslims and Arab Americans because of intelligence reports that al Qaeda is planning a large-scale attack in coming months in the United States, Attorney General John D. Ashcroft said recently.

"While we currently lack precise knowledge about when, where and how they are planning to attack, we are actively working to gain that knowledge," Ashcroft said in a news release July 9. "As part of that effort, we are again reaching out to partners in the Muslim and Arab American communities for any information they may have."

Law enforcement officials appear to be using different approaches in the interviews. In some cases, they have asked prominent local Muslim figures to simply pass on any helpful information, activists said. Asim Ghafoor, a Muslim attorney in Washington who was visited by two FBI agents about a week ago, said they noted that he had represented various Muslim organizations and charities and asked, "Is there anything we need to know?" He said he assured them that there was not.

Other interviews are highly specific. James Hacking, a Muslim activist in St. Louis, accompanied a U.S. graduate student of Iranian descent to an interview with the FBI this week. The student was asked about Iranian groups based in the Middle East and in the United States and whether he knew people who had been in contact with the Iranian Mission to the United Nations, Hacking said.

The young man did not have such information, Hacking said.

"I recognize the FBI are in a tough spot. They're just trying to do their job. They have information they want to investigate," Hacking said. But he added that he was uneasy that a U.S.-born person was singled out. The young man declined to offer information about people he knew.

Some of the interview subjects were also asked broad questions, such as their opinion of the U.S. invasion of Iraq or of the Syrian government, activists said.

Those being sought for interviews appear to represent a broad spectrum. Attorneys and activists said they had heard from students, high-tech professionals, Muslim leaders and others who had been contacted. Most were immigrants, but at least one African American Muslim and some U.S.-born residents were also included.

"Within two days, I received 10 calls from people freaking out because the FBI was contacting them," said Deedra Abboud, executive director of the Arizona chapter of the Council on American-Islamic Relations.

She said that the FBI agents went out of their way to be low-key but that Muslims were fearful when they got the calls, worrying that they were under investigation themselves.

Leaders of Muslim and Arab American organizations have been trying to

build bridges with federal officials since the Sept. 11, 2001, attacks on the World Trade Center and the Pentagon. Many say that the earlier interviews cast too wide a net and reflected the wrong approach.

"It creates fear in the community and accomplishes absolutely nothing," said James Zogby, president of the Arab American Institute. The Justice Department has defended earlier interviews with Middle Eastern men and Iraqi immigrants, saying they provided useful information and were a way to build contacts.

Some activists said that Muslims and Arabs were nervous about responding to the FBI, in part because thousands of immigrants wound up being deported after being contacted in earlier phases of the government's anti-terrorism campaign. Several people in the Washington area have told FBI officers that they will meet with them only if their attorney is present.

Ghafoor said he was happy to talk to the FBI. But he was concerned that they were going to people's workplaces.

"I said, 'Hey, some people lose their jobs when the FBI shows up at their offices,' " he said.

The FBI is carrying out the interviews in collaboration with the regional Joint Terrorism Task Forces, which include law enforcement officers from other agencies. Those officers have sometimes done the interviews on behalf of the FBI.

Yaser Alamoodi, a student at Arizona State University, was surprised to get a visit at home recently from a campus police officer with the local Joint Terrorism Task Force. The 27-year-old student, who is a Yemeni citizen applying for U.S. residency, said that he agreed to the interview and that the officer was friendly and polite.

Alamoodi said the questions included whether he knew anyone who had recently returned from Pakistan, anyone who had shown interest in a government building or agency or anyone who had shown extreme hostility toward Americans.

"The questions were just ridiculous," he said. "I said, 'You guys really think you're going to get anywhere with these kind of questions?' "

Alamoodi said he was puzzled about why he was selected for an interview.

"I don't go to the mosque that often," he said, "unless they have free food."

Staff writer Dan Eggen contributed to this report.

**Article 16 - Echkoff Siebert Des Moine 02/07/04**

Westlaw. 

2/7/04 DMREG 1

2/7/04 Des Moines Reg. 1
2004 WL 60231286

The Des Moines Register
(c) Copyright 2004, The Des Moines Register. All Rights Reserved.

Saturday, February 7, 2004

Main News; A

Group fights anti - war inquiry

Eckhoff Jeff; Siebert Mark
Staff

Deck: Lawyers move to block subpoenas  By JEFF ECKHOFF and MARK SIEBERT

REGISTER STAFF WRITERS

Lawyers worked Friday to derail a federal grand jury investigation into
an anti-war conference held three months ago at Drake University.

Federal officials have refused to say why they want information about
the conference, the legal group that hosted it and four Des Moines-area
peace activists involved.

But officials with the National Lawyers Guild, host of the Nov. 15
conference, said they intend to move Monday to block the subpoena, one
of five delivered this week by the FBI's Joint Terrorism Task Force.

Bruce Nestor, a Minneapolis lawyer representing the guild, said he will
argue that the subpoena has a ?chilling effect on the rights of people
to associate with the National Lawyers Guild and with the rights of our
members.??

Four of the subpoenas went to Des Moines peace activists, who were told
to appear Tuesday before a federal grand jury. One went to Drake
University, asking for information about the anti-war conference and
records of the National Lawyers Guild local chapter.

The U.S. attorney's office in Des Moines convinced a judge Thursday to
issue an order under seal -described by peace-movement sources as a gag
order -to prohibit Drake employees from talking about the document
search.

The subpoena demanded records from campus security reflecting any
observations of the Nov. 15 conference, including ?any records of
persons in charge or control of the meeting, and any records of
attendees of the meeting.?? Drake University President David Maxwell

declined to comment Friday on how the university would respond.

Meanwhile, members of the Iowa congressional delegation and legal experts expressed concern about the appearance that the government is investigating activists involved in peaceful opposition to war.

?I don't like the smell of it,?? said Sen. Tom Harkin, adding that he did not know details of the investigation. ?It reminds me too much of Vietnam when war protesters were rounded up, when grand juries were convened to investigate people who were protesting the war.??

The Nov. 15 conference was called ?Stop the Occupation! Bring the Iowa Guard Home!??

Organizers widely advertised their intention to hold the conference and then demonstrate the following day outside the Iowa National Guard headquarters in Johnston.

A flier was sent to the Des Moines Police Department and media outlets. A Des Moines television station shot video footage.

On Friday, the Iowa Civil Liberties Union entered the case and plans to represent one of those subpoenaed. Two other activists are scheduled to meet with a lawyer Monday.

Officials with the civil liberties group wonder whether the investigation is being conducted under the Patriot Act, controversial legislation designed to expand the government's ability to pursue domestic terrorists.

Michael Greenberger, director of the Center for Health and Homeland Security at the University of Maryland, tracks counter-terrorism efforts nationwide.

?Without knowing the details,?? Greenberger said, ?these facts tend to evidence exactly the kinds of things that people are worried about with regard to the Patriot Act and other prosecutorial excesses. It seems like people are being challenged for their free-speech rights.??

Other members of Iowa's congressional delegation want to know more.

Rep. Leonard Boswell, a Des Moines Democrat and member of the House Intelligence Committee, said he understands the need for secrecy when dealing with matters of national security.

?However, I am increasingly concerned about Attorney General John Ashcroft's disregard for explaining the actions of the Justice Department to the public,?? Boswell said.

Officials with the U.S. Justice Department in Washington, D.C., said they would return a telephone call Friday, but failed to do so.

Rep. Steve King, a Republican from Kiron, said it appeared the government was using significant resources to investigate a relatively minor protest.

?It definitely has my attention, and I will be asking questions,?? King said.

Register staff writers Jane Norman and Madelaine Jerousek contributed to this report.

Anti-war conference and investigation

Nov. 15, 2003: A conference at Drake University features morning workshops on topics such as U.S. foreign policy and the economic roots of terrorism.

Nov. 16: Twelve protesters are arrested at a demonstration at the Iowa National Guard headquarters in Johnston.

Feb. 3, 2004: Subpoenas are served on three antiwar activists involved in the conference and demonstration, as well as Drake University.

Feb. 5: A fourth peace activist is subpoenaed. Drake receives a secret order from a federal judge barring employee comments on the subpoena.

Feb. 10: The four peace activists and a Drake administrator are to appear before a federal grand jury.

Photo By: ANDREA MELENDEZ/REGISTER FILE PHOTO

Peace protesters at Camp Dodge are led away by authorities in November.

---- INDEX REFERENCES ----

NEWS SUBJECT:        (Domestic Politics (GPOL); Political/General News (GCAT))

REGION:              (United States (USA); North American Countries (NAMZ))

Language:  EN

OTHER INDEXING:    IA; Midwest; EN

Word Count: 802

2/7/04 DMREG 1

END OF DOCUMENT
        Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**Article 17 - Eckhoff Siebert Des Moine 02/10/04**





2/10/04 DMREG 1

2/10/04 Des Moines Reg. 1
2004 WL 60231401

The Des Moines Register
(c) Copyright 2004, The Des Moines Register. All Rights Reserved.

Tuesday, February 10, 2004

Main News; A

### Anti - war inquiry unrelated to terror

Eckhoff Jeff; Siebert Mark
Staff

Deck: Probe focuses on unlawful entry at Camp Dodge  By JEFF ECKHOFF
and MARK SIEBERT

REGISTER STAFF WRITERS

Federal officials Monday said a grand jury inquiry involving four peace
activists and Drake University is not part of an anti-terrorism
investigation.

U.S. Attorney Stephen Patrick O'Meara said late Monday that the
investigation focuses on unlawful entry onto military property at Camp
Dodge on Nov. 16, and whether plans were laid for that at a conference
the day before at Drake.

Suggestions that the investigation is related to the Patriot Act ?are
not accurate,?? O'Meara said.

O'Meara's statement and comments from the FBI broke nearly a week of
silence from federal officials, who also slowed the investigation
Monday, postponing grand jury testimony that had been scheduled for
today.

FBI spokesman Jeff Tarpinian in Omaha also denied the investigation was
part of a terror probe, and said federal officials might look into
whether Polk County Sheriff's Deputy Jeff Warford identified himself
inappropriately in delivering the subpoenas.

Last week, Warford served grand jury subpoenas on the peace activists
and Drake officials.

Warford left behind at least two business cards identifying himself as
a member of an FBI-Joint Terrorism Task Force -alarming those
subpoenaed as well as other peace activists.

?There is no connection in this case with his duties -as far as being
part of that task force -and this grand jury investigation.??- Tarpinian

said.

Chief Sheriff's Deputy Bill Vaughn defended the longtime deputy, stressing that Warford never intended to intimidate anyone. ?I think people's minds are racing just because of Jeff's business card,?? Vaughn said.

O'Meara, the U.S. attorney based in Des Moines, said the investigation focuses on an incident Nov. 16 when protesters trespassed at Camp Dodge, and not a demonstration about the same time at Iowa National Guard headquarters, which is publicly accessible.

Authorities are looking at possible criminal violations on Nov. 16 or ?prior agreements to violate federal law.?? Twelve activists were arrested Nov. 16, most for trespassing. A Grinnell College librarian also was charged with assault after she allegedly kicked a sheriff's deputy during her arrest.

On Nov. 15, the four activists subpoenaed were among those at an anti-war conference at Drake.

Federal authorities last week ordered the university to turn over campus security records reflecting any observations of the conference, including ?any records of persons in charge or control of the meeting and any records of attendees of the meeting.??

That subpoena also requires the university to hand over membership information for the conference's host, the Drake chapter of the National Lawyers Guild.

The investigation has alarmed peace activists in Iowa and around the country, who question whether the federal government is trying to silence dissent.

?We're very alarmed,?? said Bill Dobbs, spokesman for United for Peace and Justice, a coalition of roughly 600 anti-war groups. ?I sure hope those subpoenas are quashed, and I hope there's an investigation into just how this happened.??

O'Meara said his office does not prosecute people who are peacefully and lawfully engaged in rallies.

?The United States attorney emphasizes that the investigation regarding any attempted breach of the security fence at the Iowa National Guard Base is dangerous both to the person or persons attempting to breach the security fence, as well as a legitimately perceived danger to the base itself,?? he said.

Earlier Monday, O'Meara's office postponed court appearances for the four activists. They had been scheduled to appear before a grand jury today. All now have been told to appear on March 9.

?They've informed my attorney that this is a scheduling conflict,?? said Brian Terrell, who was subpoenaed along with Elton Davis, Patti McKee and Wendy Vasquez. ?But of course what are they going to say? They're not going to publicize it if they're retreating, if that's what

they're doing.??

Lawyers say the government also has decided to move more slowly on a demand for Drake University records involving the anti-war conference.

Bruce Nestor, a Minneapolis attorney for the National Lawyers Guild, filed court papers Monday asking that government investigators be forced to explain what they're looking for and why Drake records are necessary.

?To the extent that the grand jury is being employed for the purposes of . . . intimidating and harassing supporters of the peace or anti-war movement, the grand jury has clearly overstepped its authority,?? Nestor wrote.

Drake University officials again declined to comment Monday. Sources say university employees since Thursday have been under a federal judge's sealed order that forbids them from talking about the subpoena.

A lawyer for Sally Frank, Drake's local contact for the National Lawyers Guild, filed court papers late Monday asking the judge to set aside an unspecified ?Order of Nondisclosure.?? That request argues that the Thursday order was unconstitutional.

Peace activists said they intend to go ahead with a civil liberties demonstration planned for 12:15 p.m. today at the federal courthouse, 123 E. Walnut St. in Des Moines.

Subpoenaed

At least four Des Moines-area peace activists have been subpoenaed to appear before a federal grand jury. They are:

* Elton Davis, 41, a member of the Catholic Worker community.

* Patti McKee, 47, former coordinator of the Iowa Peace Network.

* Brian Terrell, 47, executive director of the Catholic Peace Ministry.

* Wendy Vasquez, 51, an English as a Second Language tutor for the Des Moines school district.

**Article 18 - Davey NYT 02/10/04**



factiva

2/10/04 NYT-ABS 14

2/10/04 N.Y. Times Abstracts 14
2004 WL 59682602

The New York Times Abstracts
(c) 2004 New York Times Company

Tuesday, February 10, 2004

A

AN ANTIWAR FORUM IN IOWA BRINGS FEDERAL SUBPOENAS

By MONICA DAVEY

Drake University chapter of National Lawyers Guild goes to court in
effort to block federal subpoenas for data about guild and forum
opposed to Iraq war it sponsored last fall at Des Moines, Iowa,
university; at least four people who attended forum and got subpoenas
to appear before federal grand jury fear probe is intended to quash
protest; federal prosecutors, in unusual move, confirm probe, stressing
scope is limited to learning more about person who tried to scale
security fence at Iowa National Guard base in protest day after forum;
deny effort to prosecute people for taking part in peaceful rallies;
delay grand jury appearances by month; American Civil Liberties Union
executive director Anthony Romero fears news of supoenas, which spreads
rapidly among activist organizations, might discourage protest;
Catholic Peace Ministry official Brian Terrell, who got subpoena, says
he helped run 'nonviolence training' at forum; says forum was open and
filmed by local television a! nd police

were notified; calls demonstration next day at national guard base,
Johnston, routine; photo (M)
TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT
DISPLAYABLE

**Article 19 - Davey NYT 02/11/04**



2/11/04 NYT-ABS 18

2/11/04 N.Y. Times Abstracts 18
2004 WL 92536256

The New York Times Abstracts
(c) 2004 New York Times Company

Wednesday, February 11, 2004

A

## SUBPOENAS ON ANTIWAR PROTEST ARE DROPPED

By MONICA DAVEY

Federal prosecutors in Iowa, facing growing pressure from civil
liberties advocates, drop subpoenas that they issued last week ordering
antiwar protesters to appear before grand jury and ordering Drake
University to turn over information about protesters; protesters, who
had said they feared unusual federal inquiry was intended to silence
and scare people who disagreed with government positions, declare
victory; photo (M)
TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT
DISPLAYABLE

**Article 20 - Goldberg Salon Outlawing Dissent 02/11/04**



## NEWS YOU WON'T FIND ON CNN

✉ E-MAIL TO A FRIEND

# Outlawing Dissent

Spying on peace meetings, cracking down on protesters, keeping secret files on innocent people -- how Bush's war on terror has become a war on freedom.

**By Michelle Goldberg**

Feb. 11, 2004: (Salon) The undercover cop introduced herself to the activists from the Colorado Coalition Against the War in Iraq as Chris Hoffman, but her real name was Chris Hurley. Last March, she arrived at a nonviolence training session in Denver, along with another undercover officer, Brad Wanchisen, whom she introduced as her boyfriend. The session, held at the Escuela Tlatelolco, a Denver private school, was organized to prepare activists for a sit-in at the Buckley Air National Guard Base the next day, March 15. Hurley said she wanted to participate. She said she was willing to get arrested for the cause of peace. In fact, she did get arrested. She was just never charged. The activists she protested with wouldn't find out why for months.

Chris Hurley was just one of many cops all over the country who went undercover to spy on antiwar protesters last year. Nonviolent antiwar groups in Fresno, Calif., Grand Rapids, Mich., and Albuquerque, N.M., have all been infiltrated or surveilled by undercover police officers. Shortly after the Buckley protest, the Boulder group was infiltrated a second time, by another pair of police posing as an activist couple.

Meanwhile, protesters arrested at antiwar demonstrations in New York last spring were extensively questioned about their political associations, and their answers were entered into databases. And last week, a federal prosecutor in Des Moines, Iowa, obtained a subpoena demanding that Drake University turn over records from an antiwar conference called "Stop the Occupation! Bring the Iowa Guard Home!" that the school's chapter of the National Lawyers Guild, a civil libertarian legal group, hosted on Nov. 15 of last year, the day before a protest at the Iowa National Guard headquarters. Among the information the government sought was the names of the leaders of the Drake University Chapter of the National Lawyers Guild, its records dating back to January of 2002, and the names of everyone who attended the "Stop the Occupation!" conference. Four antiwar activists also received subpoenas in the investigation.

On Tuesday, after a national outcry, the U.S. Attorney's Office canceled the subpoenas. Still, says Bruce Nestor, a former president of the National Lawyers Guild who is serving as the Drake chapter's attorney, "We're concerned that some type of investigation is ongoing."

In the early 1970s, after the exposure of COINTELPRO, a program of widespread FBI surveillance and sabotage of political dissidents, reforms were put in place to prevent the government from spying on political groups when there was no suspicion of criminal activity. But once again, protesters throughout America are being watched, often by police who are

supposed to be investigating terrorism. Civil disobedience, seen during peaceful times as the honorable legacy of heroes like Gandhi and Martin Luther King Jr., is being treated as terrorism's cousin, and the government claims to be justified in infiltrating any meeting where it's even discussed. It's too early to tell if America is entering a repeat of the COINTELPRO era. But Jeffrey Fogel, legal director of the Center for Constitutional Law in Manhattan, says, "There are certainly enough warning signs out there that we may be."

As a new round of protests approaches -- including worldwide antiwar demonstrations on March 20 and massive anti-Bush actions during the Republican National Convention in August and September -- experts say the surveillance is likely to increase. "The government is taking an increasingly hostile stance toward protesters," says Michael Avery, president of the National Lawyers Guild and a professor of constitutional law at Suffolk University. In the run-up to the Republican Convention, he says, "I'm sure the government will be attempting to infiltrate political groups. They may send agent provocateurs into political groups. They're no doubt compiling reports on people. We have to stand up against that."

No one knows the extent of the political spying and profiling currently being carried out against critics of the Bush administration and American foreign policy -- which may be the most disturbing thing about the entire phenomenon. "Presumably if they're doing their jobs well, we'll never know," says Fogel. Activists have also been unsuccessful at finding out why they're being watched, and under whose authority.

What we do know, though, is that several of the police departments that have been accused of spying on protesters -- including the Aurora, Colo., Police Department, where Hurley works -- are part of Joint Terrorism Task Forces. These are programs in which local police are assigned to work full-time with FBI agents and other federal agents "to investigate and prevent acts of terrorism," as the FBI's Web site says. According to the FBI, such JTTFs have been around since 1980, but the total number has almost doubled since Sept. 11, 2001, to 66.

A Polk County deputy sheriff assigned to a Joint Terrorism Task Force served the subpoenas in Iowa. According to Nestor, the deputy sheriff even handed out business cards that identified him as part of the JTTF. On Monday, though, after what Nestor describes as a "tremendous public reaction" following news reports of the JTTF's involvement, the U.S. Attorney's Office in Des Moines issued a written statement denying that the investigation was being conducted by the task force.

The U.S. Attorney's Office confirms that the investigation is a collaboration between the FBI, the Polk County Sheriff's Department and the U.S. Attorney's Office -- all of whom, Nestor notes, serve on the JTTF. It focuses on a case of misdemeanor trespassing on government property that took place on Nov. 16, near the antiwar protest. According to Nestor, the case involves someone who "walked up to a closed gate" outside the National Guard's armory, "had a conversation with the guards and got charged with trespassing." The police and FBI are now investigating whether people at the antiwar conference entered into some kind of conspiracy to break the law -- in other words, whether they planned acts of civil disobedience.

"They appear to be taking the stance that if any individual, as part of or in relation to a protest, commits an act that might be a violation of federal law, that they can subpoena and investigate any records of any meeting that person may have gone to in the days or even months proceeding," says Nestor.

Avery suggests that such investigations will have a chilling effect on the planning for future

protests. "The risk is that if there's some kind of demonstration or protest activity that involves trespassing, [the JTTF] is saying they can ask people what political meetings have you been to lately, who was there, what did you talk about," says Avery. "People are allowed to meet and talk and debate political issues without being spied on by the government." At least, they used to be.

Whether or not a Joint Terrorism Task Force was behind the Iowa investigation, JTTFs have already been implicated in political spying. In a three-ring binder from the Denver Police Department Intelligence Unit obtained by the Colorado ACLU, a section labeled "Colorado and Local Links: JTTF Active Case List" contained printouts made in April 2002 from the Web sites of the Colorado Campaign for Middle East Peace, American Friends Service Committee, Denver Justice and Peace Committee and the Rocky Mountain Independent Media Center. One of the printouts, a copy of which is available on the ACLU's Web site, is the American Friends Service Committee's calendar of upcoming antiwar events.

Last November, the New York Times revealed a leaked FBI memo asking local police to report protest activity to their local Joint Terrorism Task Force. The bulletin, sent to law enforcement agencies on Oct. 15, 2003, warned about antiwar protests planned for Oct. 25, saying, "While the FBI possesses no information indicating that violent or terrorist activities are being planned as part of these protests, the possibility exists that elements of the activist community may attempt to engage in violent, destructive, or dangerous acts."

The bulletin went on to list common protest methods including marches and sit-ins, as well as "aggressive tactics" used by "extremist elements," including vandalism, trespassing, physical harassment, formation of human chains and the use of weapons.

"Even the more peaceful techniques can create a climate of disorder, block access to a site, draw large numbers of police officers to a specific location in order to weaken security at other locations, obstruct traffic, and possibly intimidate people from attending the events being protested," it warned.

It ended by saying, "Law enforcement agencies should be alert to these possible indications of protest activity and report any potentially illegal acts to the nearest FBI Joint Terrorism Task Force."

The Colorado activists who attended nonviolence training with Chris Hurley remember her as shy and timid. She didn't arouse suspicion at either the training session, where people practiced staying calm even when confronted by aggressive police, or the next day, when she showed up at the demonstration.

On March 15, around 300 people protested near the Buckley base, but only 18 (not including Hurley) engaged in civil disobedience by sitting in the road and blocking the base's entrance. The action was no secret -- the Colorado Coalition Against the War had informed police of what it intended to do in advance. "We always have a police liaison when we have a civil disobedience," says participant Terry Leichner, a 54-year-old psychiatric social worker and veteran activist. "We always work with police so there's no violence."

The Aurora Police Department doesn't deny that the activists told them exactly what they planned to do. Indeed, they use that fact as a rationale for infiltrating the group. "Prior to the actual protest, this group came to the police department and told us they were going to conduct criminal acts in our city," says Kathleen Walsh, public information officer for the Aurora

County Police Department. "We have a responsibility to the citizens of Aurora to investigate." Walsh insists that the activists' willingness to tell the police their plans didn't mitigate the need to spy on the group. "Can you guarantee me that people don't lie to police?" she said. Walsh asked that further questions -- including those about Hurley's connection to counterterrorism investigations -- be submitted in writing. She has yet to answer them.

Having been warned in advance, the police arrived quickly to remove the Buckley demonstrators. They wore riot gear, but didn't need it -- the protesters, including Hurley, were arrested without incident, and the whole thing was over in an hour. All 19 arrestees were taken to a holding cell, where the activists say Hurley seemed nervous. Nancy Peters, a 56-year-old protest organizer, recalls trying to comfort her, but Hurley didn't say much. While the rest of the group exchanged stories, Leichner says, Hurley was "noncommittal." When they were released, she didn't attend a meeting the activists had to plan legal strategy, but according to Peters, she asked to be kept informed.

None of the activists found out that Hurley was an Aurora police officer until the discovery phase of their trials last spring.

By then, though, their lawyers had reason to be suspicious. A month after the Buckley protest, the Colorado Coalition was infiltrated again, by an undercover officer from the Arapahoe County Sheriff's Office, which is also part of a Joint Terrorism Task Force. This time, the group realized something was up.

On April 14, the activists planned to meet with Republican Sen. Wayne Allard, a supporter of the war, and ask him to present a "peace resolution" to Congress. Several of the activists planned to refuse to leave his office unless he acceded to their demands, which no one expected him to do.

Peters, who was arrested at Buckley, was one of the organizers of the Allard action and was going to be on hand to bail out activists taken to jail. Again, the Colorado Coalition held a nonviolence training session the day before for those planning to be arrested.

Peters remembers unloading her car outside the church where the training was held when she saw a couple walking by, looking like they were "killing time" before finally going inside. The man, a muscular guy who looked to be in his 30s, introduced himself as Chris Taylor and said the woman with him was his girlfriend. In fact, his name was Darren Christensen and he was an undercover officer, as was Liesl McArthur, the woman he was with. As the Rocky Mountain News reported in December, much of his usual undercover work involved "being solicited on line for deviant sex."

Unlike Hurley, Christensen immediately made the activists nervous. "A couple of people from the group came up and said, 'Who are they? Do you know them from any other events?'" says Peters. "He was pumping for information, asking questions about whether there was a group that was more radical and had a different focus, more like the black bloc or the anarchists."

At the time, though, it didn't occur to anyone that the police would be interested in spying on them. So they let Christensen participate, even after he made what Peters thought was an outlandish suggestion.

"It was in the evening when we were trying to figure out our general plan," she says. "We didn't know whether the police would be blocking the entrance to Allard's office." They were

discussing whether the six people planning the sit-in should go in as a group, or one by one, in order to evade attention. "[Christensen] said, 'Look, why don't we just walk right through their line?' We were like, whoa, nobody wants to get their heads blown off," says Peters. "We are peaceful, nonviolent group. We're not trying to storm a building."

The next day, the group met beforehand to coordinate. Everyone who planned to get arrested gave Peters bond money, except for Christensen, who said his girlfriend would bail him out. The six entered Allard's office at 1 p.m., and by 5 p.m. they'd all been arrested.

"I raced over to the jail," says Peters. "There were several people there, including his 'girlfriend.' I was trying to find out who'd been booked and what their bail was, but none had been put into the system yet."

Peters was standing in the jailhouse lobby and talking on a pay phone when, out of the corner of her eye, she saw Christensen walking out the door. "He had a phony story about how his girlfriend got him out," she says. "I asked, 'Can I see your summons?' He didn't have one."

Peters passed her concerns on to her group's pro bono defense attorneys, who soon found that although six people had been arrested, only five had been charged. Then, while reviewing the Buckley case, they noticed that while 19 people had been arrested there, only 18 were charged. Eventually, by subpoenaing police records, the attorneys figured out that police had sent the undercover agents to infiltrate the group.

Once exposed, Hurley turned up in court to watch the protesters' trials.

"When she came to court, she just seemed so arrogant," says Ellen Stark, a 57-year-old preschool teacher who is part of the group arrested at Buckely. "She was not at all apologetic about her activities and the fact that she had lied to us. She just looked at us with disdain." None of the activists have been able to get any answers from officials about why they were being watched. "I couldn't interest anybody on the Aurora City council to even meet with me," says Stark. "Nobody would talk to me."

America has seen this kind of thing before. Between 1956 and 1971, the FBI under J. Edgar Hoover ran COINTELPRO, a program of surveillance and sabotage against political dissidents. COINTELPRO watched violent groups like the Klu Klux Klan and, later, the Weather Underground and the Black Panthers, but it also spied on and harassed thousands of innocent people, including Martin Luther King Jr.

COINTELPRO's abuses came to light in 1971, when a group of activists calling themselves the Citizens Commission to Investigate the FBI broke into an FBI office in Media, Penn., and stole several hundred pages of files.

In his recent history of COINTELPRO, "There's Something Happening Here: The New Left, the Klan and FBI Counterintelligence," David Cunningham writes, "These files provided the first public disclosure of a range of Bureau activities against targets such as the Black Panther Party, the Venceremos Brigade, the Philadelphia Labor Committee, Students for a Democratic Society, and college students with 'revolutionary' leanings."

Eventually, damaging revelations about COINTELPRO led the FBI to adopt reforms designed to prevent a repeat of Hoover's excesses. Attorney General Edward Levi laid out a set of standards for FBI domestic surveillance. "These so-called Levi Guidelines clearly laid out the

criteria required for initiated investigations, establishing a standard of suspected criminal conduct, meaning activity (rather than merely ideas or writings, which had been adequate cause for targeting groups and individuals as subversive during the COINTELPRO era)," Cunningham writes. "The guidelines also stipulated as acceptable only particular investigative techniques, making it considerably more difficult to initiate intrusive forms of surveillance."

The Levi guidelines didn't end all political spying -- in the 1980s, the FBI targeted the Committee in Solidarity With the People of El Salvador, or CISPES. As the ACLU reports, "Strong evidence suggests that CISPES was targeted for investigation because of its ideological opposition to then-President Reagan's already controversial foreign policy in Latin America. The FBI persisted in an intensive six-month investigation of CISPES in which it often reported the group's activities to the Department of Justice in a prejudicial and biased manner." Yet most civil libertarians believe that even if the rules were occasionally broken, they still worked to protect First Amendment rights.

Contrary to the claims made by defenders of Bush administration policies, the Levi guidelines would not have impeded an investigation of al-Qaida. As Cunningham points out, cases "with suspected ties to 'foreign powers' were not subject to this criminal standard." Nevertheless, after Sept. 11, Attorney General John Ashcroft issued new rules gutting the Levi guidelines. Thanks to Ashcroft, FBI agents are now allowed to monitor public meetings even if they don't have any reason to suspect that there's any criminal activity being committed or planned.

"Now, that means if there is a rally of people who are criticizing the United States and its policies and saying that the United States will someday perhaps be destroyed because of that, the FBI agent can go and listen to what's being said," Ashcroft told CNN's Larry King in May of 2002. In other words, merely arguing that U.S. policies may result in the country's destruction justifies FBI snooping. This gives the FBI investigative license far beyond even that it enjoyed during the COINTELPRO period, let alone under the Levi Guidelines.

There's no way to know how often the FBI is actually monitoring protesters. The cases that have come to light so far have involved local police officers, not federal agents, and in most instances it's unclear whether they've been working in concert with the FBI. For example, last year in Fresno, the antiwar group Peace Fresno discovered they'd been infiltrated when an undercover cop who'd been attending their meetings was killed in a motorcycle accident. When his obituary was published, members of Peace Fresno realized that the man they knew as Aaron Stokes was really Aaron Kilner, a member of the Fresno County Sheriff's Department's anti-terrorism unit.

There is a Joint Terrorism Task Force in Fresno, but members of Peace Fresno and their lawyers have not yet been able to find out whether Kilner was spying on them for the FBI, and whether he gave the FBI any information about their activities.

Not that there's much information to give. "This is a group that passes petitions and goes to city council meetings," says Nicholas DeGraff, a Peace Fresno organizer. "When we have a demonstration, we call the police ahead of time." The group, he says, is made up of "retirees, grandparents, schoolteachers and community workers. Your model citizens just participating in democracy."

The group has around 200 people on its membership roster, says DeGraff, with an active core of about 25 people. In early 2003, Kilner paid a $12 membership fee and joined them. He told the group that he didn't work and lived off an inheritance. In the weeks before the war in Iraq,

he came to meetings and participated in the weekly demonstrations Peace Fresno held at a local intersection.

He said little, DeGraff recalls, and never volunteered to do anything beyond passing out flyers. Most of the time, says DeGraff, he sat in a corner and took notes. Even after the war, he kept coming, showing up at meetings every few weeks. When the group went to Sacramento to protest at a WTO ministerial meeting in June, he went with them. He died in August.

Peace Fresno has since been assured by the Fresno Sheriff's Department that it is not under investigation and has never been under investigation. That may be true in some bureaucratic sense, but the fact remains that an anti-terrorism agent spent half a year surveilling them. "It's equating dissent with terrorism," says DeGraff. "It's saying if you dissent, you're a terrorist."

In fact, that's exactly what some law enforcement officers have said.

On April 2 of last year, the California Anti-Terrorism Information Center, which is under the auspices of the state Justice Department but whose regional task forces include FBI agents, issued a bulletin warning to police about potential violence at an antiwar protest scheduled for the Port of Oakland. An Oakland Tribune investigation found that the Anti-Terrorism Information Center had little substantive information regarding possible violence. "Intelligence records released under open-government laws reveal the thinking of CATIC and Oakland intelligence officials in the days leading up to the protest," said a June 1 story by Ian Hoffman, Sean Holstege and Josh Richman. The agencies, they wrote, "blended solid facts, innuendo and inaccurate information about anti-war protesters expected at the port."

The protest did in fact turn violent, but according to documentary evidence the violence was precipitated by the police, who fired on demonstrators with wooden bullets and beanbags. The Tribune reported that, according to videotapes and transcripts of radio transmissions of the event, there's no evidence of "protesters throwing objects at police or engaging in civil disobedience until 20 minutes after police opened fire."

So why was the warning issued in the first place? In an interview with the Tribune, Mike Van Winkle, spokesman for the California Anti-Terrorism Information Center, issued a remarkably broad definition of terrorism. "You can make an easy kind of link that, if you have a protest group protesting a war where the cause that's being fought against is international terrorism, you might have terrorism at that protest," he said. "You can almost argue that a protest against that is a terrorist act."

This egregious statement, in which a law enforcement representative takes it upon himself to judge the legitimacy of democratic protest, seems to confirm the worst fears of civil libertarians that Bush's "war against terror" is actually a war against dissent. Of course, whether Van Winkle actually believes that antiwar protesters are as dangerous to the citizens of California as al-Qaida is impossible to say. But it's not just rhetorical excess or fascistic impulses that lead officials to speak of demonstrators as terrorists. They may actually have a bureaucratic and financial incentive to do so.

"This is a good way for police officers to get terrorism points," says Timothy Edgar, legislative counsel for the ACLU. "They have to justify the dollars they're receiving from the federal government for homeland security. We've seen a massive inflation of terrorism statistics on the federal level. Every Arab who has a phony drivers license is now called a terrorist by the Justice Department, so they can say, 'We've arrested thousands of terrorists.'

"This is the perfect example of not learning the lessons of 9/11," he continues. "The FBI was not sufficiently focused on the possibility that a group like al-Qaida would commit a serious terrorist attack. One real failure since 9/11 is that, when they call everything a 'terrorist,' they're still not sufficiently focused on actual terrorists. There's an overbroad definition of domestic terrorism in the PATRIOT Act, and it's had a spillover effect into state and local governments who want to justify their antiterrorism funding and mission."

In a Nation article from May 2002, Robert Dreyfuss wrote of that spillover effect. The Justice Department, he reported, had offered billions of dollars in anti-terror subsidies to local governments, but first they had to show that there were "potential threat elements" in their area.

"Under the Justice Department program each state was asked to conduct a county-by-county assessment of potential terrorist threats in order to qualify for the federal largesse," Dreyfuss wrote. "In each city and county local police were required to identify up to fifteen groups or individuals called potential threat elements (PTEs). The Justice Department helpfully points out that the motivations of the PTEs could be 'political, religious, racial, environmental [or] special interest.' At a stroke, the Justice Department prompted 17,000 state and local police departments to begin monitoring radicals."

Thus even if the FBI isn't working directly with local police to spy on protesters, the messages coming from the Justice Department influence the agencies below, says Edgar. "The Ashcroft Justice Department has set a terrible example," he says. "They're sending the wrong message around the country to the state and local police. Local and state police will follow the FBI's example on a lot of things. On top of that, add big grants for homeland security and you've got a recipe for a lot more political spying."

About the writer: Michelle Goldberg is a staff writer for Salon based in New York.

Copyright: Salon

---

## NEWS YOU WON'T FIND ON CNN

# Iraqi Lullaby

2 Minute Video

Vocals by Laura Bush and Mothers of America

E-MAIL TO A FRIEND

## Join our Daily News Headlines Email Digest

Fill out your emailaddress
to receive our newsletter!

SUBMIT

Information Clearing House

◉ Subscribe  ○ Unsubscribe

**Daily News Headlines Digest**

Powered by YourMailinglistProvider.com

HOME

COPYRIGHT NOTICE

**Article 21 - Goldberg Salon Thousand Hoovers 02/12/04**

A thousand J. Edgar Hoovers

State and local police are taking it upon themselves to
investigate antiwar activists -- and in the computer
age, the threat to our civil liberties is even greater
than it was in Hoover's day.

- - - - - - - - - - - - By Michelle Goldberg
The second part in the Lost Liberties series at
Salon.com (The first part was Outlawing Dissent)

Feb. 12, 2004 | Political spying has many costs. One is
that it poisons communities, putting dissidents in the
same social position as criminals, co-conspirators or
untrustworthy elements. Jennifer Albright, a 30-year-
old lawyer in Albuquerque, N.M., believes such spying
cost her her job with the Bernalillo County district
attorney's office.

On Tuesday, March 25, two days after marching in a
permitted demonstration against the war, Albright, then
an assistant district attorney, was called into her
boss's office and put on leave. The reason? Local
police said she had identified undercover agents in the
crowd at the protest, which she denies. Three days
later, Albright was fired. .

At the time, Deputy Chief of Police Ruben Davalos told
the Associated Press, "One of the officers said that
(Albright) actually walked straight up to the officer
and stood face-to-face and stared at him for a period
of time." He also said she was "seen pointing directly
at the officers and getting others to see who they were
in the crowd."

Albright denies this. "I didn't identify anybody," she
says. "I don't recall seeing anyone that I knew was an
officer, let alone an undercover officer."

Yet clearly there were undercover officers there,
confirming a belief long held in Albuquerque's activist
community. "Law enforcement has always appeared at any
kind of peace group," says Albright. "At any antiwar
group, it's just assumed that there's at least one
undercover officer." Antiwar meetings, she says, are
typically opened with someone saying, "We welcome all

the law enforcement that is here. If you have any questions you can ask us now, and if you'd like to talk to us discreetly, we understand."

According to Maria Santelli, an employee at the Albuquerque Peace and Justice Center, where many antiwar demonstrations are organized, people are advised not to say anything at the center that they don't want police to hear. "If you want to say something covert, if direct action is planned without cooperation from police, we advise people not to speak in here," she says.

Jeff Arbogast, public information officer for the Albuquerque Police Department, which is part of a Joint Terrorism Task Force, refuses to say whether the department sends undercover cops to antiwar meetings. He defends the department's decision to use undercover agents at antiwar protests, saying, "We received intelligence information regarding the potential for people that could be present for other than peaceful purposes." Arbogast won't say where the intelligence came from.

Today, Albright works for a small criminal defense firm and plans to move into civil rights law. She's contemplating a lawsuit against the D.A.'s office, but says, "In all honesty it hasn't hurt my career. If anything it's bettered my career." Still, she calls what happened to her a "witch hunt."

She believes the police are motivated at least in part by personal hostility. "My point of view, which I tried to discuss with my boss before I was fired, is that I'm being retaliated against by the police department," she says. "Many law enforcement officers have prior military service. In talking to some of the officers, they seemed to take a real personal affront to anyone thinking the war is wrong. They said, 'That's a personal attack on us.' Somehow they equate themselves with the military."

The Albuquerque police haven't returned calls for comment.

Albright's story sounds unique, but across the country, in Grand Rapids, Mich., Abby Puls also had her job threatened by undercover cops who accused her of exposing them.

Puls, a 24-year-old Spanish translator who works on contract in the city court, was part of the People's Alliance, a group of antiwar activists who planned to demonstrate at the Federal Building the day the war started. They had also agreed to meet that night at Grand Rapids' Community Media Center to plan further actions, including acts of civil disobedience.

On March 20, as bombs fell on Baghdad, Puls went to the protest as planned and saw two people she knew. At the courthouse, Puls had gotten to know a few of the undercover cops who work on drug cases -- she even considered them friends. "Really funny, wild guys," she says, but not guys she expected to see protesting the war in Iraq.

So when she saw them at the Federal Building, she asked them what they were doing there. They told her, "Just hanging out, don't tell anyone." She says she didn't, but that other protesters figured out what they were up to. "They are so obviously not part of our group and can't answer questions without sounding like cops," Puls writes in an e-mail from Argentina, where she was traveling with a friend. "One of my friends came with a woman (cop) who started arguing with me in favor of the war at an antiwar protest -- smart." Later, another one of the officers posed for a picture holding a sign. The picture was posted on the Web, where Puls says someone else I.D.'d him.

That evening, about 40 people gathered at the Community Media Center to plan further actions. Puls couldn't make it, but even without her there to identify anyone, antiwar organizer Jeff Smith says one attendee, a quiet, clean-cut, well-built man in his 30s, made him uneasy.

"There were a few people in the room we didn't really know, so we passed around a sheet of paper to get people's names and phone numbers," says Smith, who runs the Grand Rapids Institute for Information Democracy, a group that teaches media literacy and is housed in the Community Media Center. During a break in the meeting, Smith called the number the man had given, and found that it didn't work.

When the meeting resumed, the man was gone. Almost immediately, though, two police cars pulled up, saying that someone had reported "inappropriate behavior." They demanded the name of the owner of the building -- a building the Community Media Center has occupied for three years -- and wanted to know what it was used for.

The next day, there was another rally at the Federal
Building, and Puls was there. As she was leaving, a man
sitting in the passenger seat of a tan Ford Taurus
called her over. There was another man in the driver's
seat and a woman in the back. The passenger asked if
she was the interpreter who works at the court. "Yes,
my name's Abby," she said, and took the first man's
outstretched hand. He shook her hand but didn't let go.

"Abby what?" he said.

"I repeat, 'Abby,' and he repeats the question this
time with a firmer grip," Puls says. "It's starting to
hurt so I tell him my last name."

After she told them her name, the man in the driver's
seat accused her of identifying an undercover cop at
the meeting the night before. He threatened her with
arrest for hindering and opposing an officer. Then he
told her, "I don't know how you are employed at the
court, contract or employee, but if these judges find
out you're choosing sides against the police, they may
not want you in the courthouse translating. I'm not
threatening you, I just want to warn you that if you
I.D. us you'll be arrested. You happen to have an
advantage working at the courthouse."

Puls took the threat seriously. She says she lost work
when, after she was quoted in the paper at an antiwar
demonstration, a conservative judge in the court that
serves the cities of Grandville and Walker mentioned to
her boss that he'd seen her name in the paper, and then
suggested that she not come to his courtroom for a
while, until things "cooled down."

"My boss told me this and, it being his contract, I
agreed," she says, adding that she only lost about
three hours of work. She talked to a lawyer
acquaintance, she says, but the lawyer told her that
while the court couldn't deny her work for her
political views, "being contracted makes it easier for
them to not hire us back under other pretenses."

The next Sunday, there was another meeting at the
Community Media Center. Puls was late, but about a
dozen others had arrived when a man and a woman showed
up whom many of the activists suspected of being
undercover cops. "Someone told them, 'I'm sorry, you
can't come into this meeting,'" says activist Erica

Freshour. "We've never seen them before, and our town
is small enough that we know the regulars. We can also
kind of tell the people who have never been to a
demonstration before but are really into it."

The man threatened to call the police, says Freshour.
"We kind of laughed, thinking, 'You are the police!'"

Just then, Puls arrived. She reached the top of the
stairs when she saw the couple trying to get into the
meeting. It was the driver of the Ford Taurus and the
woman who'd been sitting in the back. Before they saw
her, "someone pushes me into the hallway and says there
is a vice cop and we are moving locations," Puls says.
They had the meeting at a private home.

After that, Smith says, throughout the spring and
summer police cars would frequently park outside the
Community Media Center. He has since met with the
community relations officer for the Grand Rapids Police
Department to try to find out why his group was being
watched, but says the officer hasn't been cooperative.
Working with the ACLU, his group has filed a Freedom of
Information Act request for any documents related to
surveillance of the People's Alliance or the Community
Media Center, but they haven't received anything yet.

Sgt. William Corner of the Grand Rapids Police
Department's Internal Affairs Division acknowledges
that the force uses undercover cops at political
demonstrations to "keep an eye on whether anyone broke
any laws." Asked whether undercover officers were sent
to attend meetings at the Community Media Center, he
said, "As far as I know, there were not, but if there
were I wouldn't tell you that there were," because it's
against department policy to reveal the activities of
undercover police to the general public. Police were
clearly paying attention to the Community Media Center,
though -- Corner said the department was "made aware
of" the meetings and had gathered information about
them on the Internet.

The Grand Rapids Police Department is not part of a
Joint Terrorism Task Force, and it's likely that the
department undertook surveillance of antiwar activists
on its own. Such local, community-based political
spying is nothing new. In the '60s and '70s, says the
ACLU's legislative counsel, Timothy Edgar, local police
established counterintelligence squads that mimicked
COINTELPRO -- and they were actually responsible for
the harassment of activists. --

"Most people who have any memory of the civil rights era and may have attended a demonstration and been observed by the government, the people who were tracking what they were doing, nine times out of 10 that would have been a state or local intelligence squad, not the FBI," says Edgar. "It's really many J. Edgar Hoovers that pose the greatest threat to civil liberties."

One big difference between then and now, though, is that without computers, the information collected by a thousand local J. Edgar Hoovers couldn't be quickly disseminated throughout the nation and the world.

"In the 1950s and '60s, police departments all over the country had 'red squads,'" says Chris Pyle, a politics professor at Mount Holyoke College and one of the country's foremost experts on domestic surveillance. "Although their work was never as well documented as that of the FBI and the military, it was far more extensive. There was considerable swapping, and it tended to go from the locals to the nationals."

Pyle saw it firsthand at the national level. A former captain of Army intelligence, Pyle exposed the military's domestic spying operations and went on to work for Sen. Frank Church during the congressional investigation of COINTELPRO. Today's domestic spying, he says, isn't nearly as extensive as it was at the height of the movement against the Vietnam War, largely because there aren't as many protests. Yet the surveillance we're seeing now, he says, is likely to increase if the antiwar and anti-Bush movements grow, and it may imperil civil liberties more than J. Edgar Hoover ever could.

"What we're seeing is something much larger in scale and danger than anything that occurred in the 1950s and 1960s," he says. "That's because of computers. Now, instead of having these agencies working in semi-isolation or occasional cooperation, there's the equivalent of the great Alaska pipeline running between them, and the information flows in both directions. In addition, in the 1950s or '60s, it took weeks of pavement pounding and doorknobbing for the FBI or police or military to collect personal information about people, the kind of information you need to put them under surveillance. Today that kind of information can be obtained by a few computer keystrokes. The harassment potential is much greater."

Meanwhile, information that's put into the system tends to spread. "Today, you have at least a dozen American agencies contributing information to each other's computer, and scores of foreign intelligence agencies contributing information," says Pyle.

Once a file is started on someone, it's difficult to erase, Pyle says.

That's bad news for protesters interrogated by the New York City Police Department about their political activities last year. As the ACLU reports, between February and April of 2003, the "NYPD had forced hundreds of protesters charged with minor offenses to surrender information about their political affiliations and prior protest activity. That information was being collected on a recently disclosed form titled 'Criminal Intelligence Division / Demonstration Debriefing Form.'"

In response to an ACLU complaint, the police department stopped the interrogations and promised to destroy the records relating to them.

But Pyle says that once created, such files have a way of proliferating -- and smearing the reputations of those on them, in a kind of Orwellian version of the game "telephone." "After Sept. 11, the FBI sent out a list of 'persons of interest' to a few corporations, casinos and airlines in a desperate attempt to increase security," he says. "These security departments then copied the lists, integrated them with their own lists and sent it to their friends. Within a month, there were 50 of these lists on the Internet. They'd been reproduced and reissued, by intelligence agencies, police departments or corporations from as far away as Brazil and Italy. But now most of the lists said these are terrorists or terrorist suspects, not persons of interest."

"I have never been more worried," Pyle says. "I was not nearly as worried when I was on Richard Nixon's enemies list, or when COINTELPRO was exposed."

Back then, he says, "I figured we could stop this kind of stuff."

- - - - - - - - - - - About the writer
Michelle Goldberg is a staff writer for Salon based in New York.

portside (the left side in nautical parlance) is a
news, discussion and debate service of the Committees
of Correspondence for Democracy and Socialism. It
aims to provide varied material of interest to people
on the left.

| | |
|---|---|
| Post | : mail to 'portside@yahoogroups.com' |
| Subscribe | : mail to 'portside-subscribe@yahoogroups.com' |
| Unsubscribe | : mail to 'portside-unsubscribe@yahoogroups.com' |
| Faq | : http://www.portside.org |
| List owner | : portside-owner@yahoogroups.com |
| Web address | : <http://www.yahoogroups.com/group/portside> |
| Digest mode | : visit Web site |

Yahoo! Groups Links

<*> To visit your group on the web, go to:
    http://groups.yahoo.com/group/portside/

<*> To unsubscribe from this group, send an email to:
    portside-unsubscribe@yahoogroups.com

<*> Your use of Yahoo! Groups is subject to:
    http://docs.yahoo.com/info/terms/

**Article 22 - Ginis Fresno Bee 02/27/04**

Westlaw.

factiva.

2/27/04 FRESNOBEE B1

2/27/04 Fresno Bee B1
2004 WL 65878289

The Fresno Bee
Copyright 2004. The Fresno Bee. All Rights Reserved.

Friday, February 27, 2004

LOCAL NEWS

Peace Fresno seeks damages ; Activist group says Fresno County violated
its rights.

Kerri Ginis  THE FRESNO BEE

A community activist group filed a claim against Fresno County on
Thursday, alleging its members' civil liberties were violated when an
undercover sheriff's deputy quietly attended their meetings.  Peace
Fresno members are seeking monetary damages for emotional distress
resulting from "being associated with terrorism when their core belief
is in nonviolence and social justice," the claim states.

The claim can be a precursor to a lawsuit.

The group's attorney, Catherine Campbell, said Peace Fresno members
don't want to file a lawsuit and have offered to settle the dispute.

Peace Fresno said that as part of a settlement it wants the Board of
Supervisors and Sheriff Richard Pierce to attend a one-day community
forum led by the organization. The forum would discuss the Patriot Act
and the threat to civil liberties.

The group also wants Pierce to write a letter of apology to Peace
Fresno acknowledging "that he had no basis for the
infiltration/surveillance of Peace Fresno."

An attorney for Fresno County said he will recommend that the board
reject the settlement offer.

"Otherwise, it would be looked upon as if their claims are true," said
Wes Merritt, chief deputy county counsel. "The sheriff has denied any
kind of investigation by his department of Peace Fresno."

Peace Fresno members claim sheriff's Deputy Aaron Kilner misrepresented
himself when he attended the group's meetings for two months last year.
Peace Fresno knew him as Aaron Stokes, a man who quietly took notes at
meetings.

A member noticed an obituary in The Bee for Kilner, who died in an off-
duty motorcycle accident in August. The obituary, which included a
photo, identified him as a member of the sheriff's "anti-terrorist

team."

At the time, Pierce would not say whether Kilner attended the meetings.
He said the group "was not and is not the subject of any investigation
by the Fresno County Sheriff's Department."

The reporter can be reached at kginis@fresnobee.com or 441-6317.

**Article 23 - Lichtblau NYT 11/23/04**

121

**The New York Times**
nytimes.com

November 23, 2003

# F.B.I. Scrutinizes Antiwar Rallies

By ERIC LICHTBLAU

**W**ASHINGTON, Nov. 22 — The Federal Bureau of Investigation has collected extensive information on the tactics, training and organization of antiwar demonstrators and has advised local law enforcement officials to report any suspicious activity at protests to its counterterrorism squads, according to interviews and a confidential bureau memorandum.

The memorandum, which the bureau sent to local law enforcement agencies last month in advance of antiwar demonstrations in Washington and San Francisco, detailed how protesters have sometimes used "training camps" to rehearse for demonstrations, the Internet to raise money and gas masks to defend against tear gas. The memorandum analyzed lawful activities like recruiting demonstrators, as well as illegal activities like using fake documentation to get into a secured site.

F.B.I. officials said in interviews that the intelligence-gathering effort was aimed at identifying anarchists and "extremist elements" plotting violence, not at monitoring the political speech of law-abiding protesters.

The initiative has won the support of some local police, who view it as a critical way to maintain order at large-scale demonstrations. Indeed, some law enforcement officials said they believed the F.B.I.'s approach had helped to ensure that nationwide antiwar demonstrations in recent months, drawing hundreds of thousands of protesters, remained largely free of violence and disruption.

But some civil rights advocates and legal scholars said the monitoring program could signal a return to the abuses of the 1960's and 1970's, when J. Edgar Hoover was the F.B.I. director and agents routinely spied on political protesters like the Rev. Dr. Martin Luther King Jr.

"The F.B.I. is dangerously targeting Americans who are engaged in nothing more than lawful protest and dissent," said Anthony Romero, executive director of the American Civil Liberties Union. "The line between terrorism and legitimate civil disobedience is blurred, and I have a serious concern about whether we're going back to the days of Hoover."

Herman Schwartz, a constitutional law professor at American University who has written about F.B.I. history, said collecting intelligence at demonstrations is probably legal.

But he added: "As a matter of principle, it has a very serious chilling effect on peaceful demonstration. If you go around telling people, 'We're going to ferret out information on demonstrations,' that deters people. People don't want their names and pictures in F.B.I. files."

The abuses of the Hoover era, which included efforts by the F.B.I. to harass and discredit Hoover's political enemies under a program known as Cointelpro, led to tight restrictions on F.B.I. investigations of political activities.

Those restrictions were relaxed significantly last year, when Attorney General John Ashcroft issued guidelines giving agents authority to attend political rallies, mosques and any event "open to the public."

Mr. Ashcroft said the Sept. 11 attacks made it essential that the F.B.I. be allowed to investigate terrorism more aggressively. The bureau's recent strategy in policing demonstrations is an outgrowth of that policy, officials said.

"We're not concerned with individuals who are exercising their constitutional rights," one F.B.I. official said. "But it's obvious that there are individuals capable of violence at these events. We know that there are anarchists that are actively involved in trying to sabotage and commit acts of violence at these different events, and we also know that these large

gatherings would be a prime target for terrorist groups."

Civil rights advocates, relying largely on anecdotal evidence, have complained for months that federal officials have surreptitiously sought to suppress the First Amendment rights of antiwar demonstrators.

Critics of the Bush administration's Iraq policy, for instance, have sued the government to learn how their names ended up on a "no fly" list used to stop suspected terrorists from boarding planes. Civil rights advocates have accused federal and local authorities in Denver and Fresno, Calif., of spying on antiwar demonstrators or infiltrating planning meetings. And the New York Police Department this year questioned many of those arrested at demonstrations about their political affiliations, before halting the practice and expunging the data in the face of public criticism.

The F.B.I. memorandum, however, appears to offer the first corroboration of a coordinated, nationwide effort to collect intelligence regarding demonstrations.

The memorandum, circulated on Oct. 15 — just 10 days before many thousands gathered in Washington and San Francisco to protest the American occupation of Iraq — noted that the bureau "possesses no information indicating that violent or terrorist activities are being planned as part of these protests" and that "most protests are peaceful events."

But it pointed to violence at protests against the International Monetary Fund and the World Bank as evidence of potential disruption. Law enforcement officials said in interviews that they had become particularly concerned about the ability of antigovernment groups to exploit demonstrations and promote a violent agenda.

"What a great opportunity for an act of terrorism, when all your resources are dedicated to some big event and you let your guard down," a law enforcement official involved in securing recent demonstrations said. "What would the public say if we didn't look for criminal activity and intelligence at these events?"

The memorandum urged local law enforcement officials "to be alert to these possible indicators of protest activity and report any potentially illegal acts" to counterterrorism task forces run by the F.B.I. It warned about an array of threats, including homemade bombs and the formation of human chains.

The memorandum discussed demonstrators' "innovative strategies," like the videotaping of arrests as a means of "intimidation" against the police. And it noted that protesters "often use the Internet to recruit, raise funds and coordinate their activities prior to demonstrations."

"Activists may also make use of training camps to rehearse tactics and counter-strategies for dealing with the police and to resolve any logistical issues," the memorandum continued. It also noted that protesters may raise money to help pay for lawyers for those arrested.

F.B.I. counterterrorism officials developed the intelligence cited in the memorandum through firsthand observation, informants, public sources like the Internet and other methods, officials said.

Officials said the F.B.I. treats demonstrations no differently than other large-scale and vulnerable gatherings. The aim, they said, was not to monitor protesters but to gather intelligence.

Critics said they remained worried. "What the F.B.I. regards as potential terrorism," Mr. Romero of the A.C.L.U. said, "strikes me as civil disobedience."

Copyright 2003 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top

**Article 24 - Lichtblau NYT 08/18/04**

*New York Times  8/18/04*

*8/18/04*

# Inquiry Into F.B.I. Questioning Is Sought

**By ERIC LICHTBLAU**

WASHINGTON, Aug. 17 — Several Democratic lawmakers called on Tuesday for a Justice Department investigation into the Federal Bureau of Investigation's questioning of would-be demonstrators about possible violence at the political conventions, saying the questioning may have violated the First Amendment.

In a letter to the department's inspector general seeking an investigation, the three lawmakers said the F.B.I. inquiries appeared to represent "systematic political harassment and intimidation of legitimate antiwar protesters."

Signing the letter, which was prompted by an article on Monday in The New York Times, were Representative John Conyers Jr. of Michigan, the ranking Democrat on the House Judiciary Committee, and two other Democrats on the panel, Jerrold Nadler of New York and Robert C. Scott of Virginia.

Officials at the Justice Department and the Federal Bureau of Investigation said they had not seen the letter and could not comment on its specific points. They defended the recent efforts by the bureau to question potential demonstrators around the country, saying the inquiries have been aimed solely at detecting and preventing violence at the Republican convention in New York and other major political events.

"The F.B.I. is not monitoring groups or interviewing individuals unless we receive intelligence that such individuals or groups may be planning violent and disruptive criminal activity or have knowledge of such activity," Cassandra M. Chandler, an assistant director of the bureau, said in a statement released late Monday.

After having received reports of possible violence, Ms. Chandler said, "the F.B.I. conducted interviews, within the bounds of the U.S. Constitution, in order to determine the validity of the threat information."

"Violent acts," she added, "are not protected by the U.S. Constitution, and the F.B.I. has a duty to prevent such acts and to identify and bring to justice those who commit them."

In recent weeks, beginning last month before the Democratic National Convention in Boston, F.B.I. agents have contacted a number of people who have been active in political demonstrations in at least six states: Colorado, Illinois, Kansas, Massachusetts, Missouri and New York. The people who have been contacted have generally been asked whether they planned any acts of violence at protests, whether they knew of anyone who had and whether they realized it was a crime to withhold such information.

Three young men in Missouri were also trailed by federal agents and subpoenaed to appear before a grand jury last month to tell what they knew of protest plans, forcing them

## Democrats ask about interviews with would-be protesters.

to cancel a planned trip to Boston to participate in a demonstration there.

Officials of the F.B.I. would not say how many interviews the bureau had conducted. Civil rights advocates who have monitored the process estimated that at least several dozen people had received visits from agents at their homes and elsewhere in recent weeks. They said they were continuing to collect anecdotal information from demonstrators who had been approached by federal agents.

In a newly disclosed episode in Colorado, two college students said that an F.B.I. agent approached the faculty adviser for their campus group late last month and that the agent showed photographs of the students, Mark Silverstein, legal director for the American Civil Liberties Union of Colorado, said. The students did not want their names or college disclosed, Mr. Silverstein said, because "they're really scared out of their minds."

The inquiries were made after a legal opinion in April by the Office of Legal Counsel in the Justice Department endorsed the constitutionality of past efforts by F.B.I. counterterrorism agents to solicit help from local police forces to gather intelligence on antiwar and political demonstrations. The opinion said any chilling of First Amendment rights was "quite minimal" and was "substantially outweighed" by concerns for public safety at big demonstrations.

Anthony Romero, executive director of the American Civil Liberties Union, said on Tuesday that he was troubled by the pre-emptive nature of the inquiries, which he said had deterred some demonstrators from protesting.

"This looks like it's much more about intimidation and coercion than about criminal conduct," Mr. Romero said. "It's not enough for the F.B.I. to say that there's the potential for criminal activity. That's not the legal threshold, and if that were really the case, they could investigate anybody."

Representative Conyers and his colleagues raised similar concerns in their letter. They asked the inspector general to examine internal documents at the Justice Department and F.B.I. on political protests and to determine if the inquiries "focused on actual threats of violence or merely involved legitimate political and antiwar activity."