IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al.,   ) ) ) | |
|    Plaintiffs,    ) ) | |
|       v.    ) ) | Civil Action No. 05-CV-1004 |
| FEDERAL BUREAU OF INVESTIGATION,  ) et al.,    ) ) | |
|    Defendants.    ) ) | |

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 05-CV-1004 (ESH) |
| | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

# **EXHIBIT C**

The following is a list of ACLU FOIA request submitted to the FBI on December 2, 2004 by various ACLU chapters that are not a part of this lawsuit:

- Andrea R. Myer/ACLU of Oregon (Field Offices To Be Searched: Portland)
  - ▸ FOIPA No. 1010270 -- subject: ACLU/ACLU of Oregon
  - ▸ FOIPA No. 1010271 -- subject: Portland Peaceful Response Coalition
  - ▸ FOIPA No. 1010272 -- subject: Peace and Justice Works
  - ▸ FOIPA No. 1010273 -- subject: American Friends Service Committee
  - ▸ FOIPA No. 1010274 -- subject: In Defense of Animals
  - ▸ FOIPA No. 1010275 -- subject: Oregon Wildfire Federation
  - ▸ FOIPA No. 1010276 -- subject: Back to the Wall
  - ▸ FOIPA No. 1010277 -- subject: Islamic Center of Portland, Masjed AS-Saber
  - ▸ FOIPA No. 1010278 -- subject: David J. (Joseph) Fidanque
  - ▸ FOIPA No. 1010279 -- subject: William R. Seaman
  - ▸ FOIPA No. 1010280 -- subject: Daniel Handelman
  - ▸ FOIPA No. 1010281 -- subject: Martin Gonzalez
  - ▸ FOIPA No. 1010282 -- subject: Matt Rossell
  - ▸ FOIPA No. 1010283 -- subject: Connie Durkee
  - ▸ FOIPA No. 1010302 -- subject: Joseph Keating
  - ▸ FOIPA No. 1010303 -- subject: Alaa Abunijem
  - ▸ FOIPA No. 1010304 -- subject: Shahriar S. Ahmed

- Michael Steinberg/ACLU of Michigan (Field Offices To Be Searched: Detroit)
  - FOIPA No. 1010250 -- subject:  ACLU of Michigan
  - FOIPA No. 1010251 -- subject: Direct Action
  - FOIPA No. 1010252 -- subject: Ann Arbor Area Committee for Peace
  - FOIPA No. 1010253 -- subject: Life for Relief and Development
  - FOIPA No. 1010254 -- subject: National Lawyers Guild (Detroit Chapter)
  - FOIPA No. 1010255 -- subject: Students Allied for Freedom and Equality
  - FOIPA No. 1010256 -- subject: Students for Economic Justice
  - FOIPA No. 1010257 -- subject: Peace Action of Michigan

- Mark Silverstein/ACLU of Colorado (Field Offices To Be Searched: Denver)
  - FOIPA No. 1010305 -- subject: Rocky Mountain Animal Defense
  - FOIPA No. 1010306 -- subject: Campaign for Labor Rights
  - FOIPA No. 1010307 -- subject: Denver Justice Peace Committee
  - FOIPA No. 1010308 -- subject: American Friends Service Committee
  - FOIPA No. 1010309 -- subject: Colorado Campaign for Middle East Peace
  - FOIPA No. 1010310 -- subject: Chiapas Coalition
  - FOIPA No. 1010311 -- subject: End the Politics of Cruelty
  - FOIPA No. 1010312 -- subject: The Human Bean Company
  - FOIPA No. 1010313 -- subject: American Indian Movement of Colorado
  - FOIPA No. 1010314 -- subject: Ancient Forest Rescue
  - FOIPA No. 1010315 -- subject: Transform Columbus Day
  - FOIPA No. 1010316 -- subject: Dandelion Center
  - FOIPA No. 1010320 -- subject: Creative Resistance
  - FOIPA No. 1010321 -- subject: Citizens for Peace in Space
  - FOIPA No. 1010322 -- subject: Denver Cop Watch
  - FOIPA No. 1010323 -- subject: Rocky Mountain Peace and Justice Center
  - FOIPA No. 1010324 -- subject: Kirsten (Dirsten) Atkins
  - FOIPA No. 1010325 -- subject: William Sulzman
  - FOIPA No. 1010326 -- subject: Mark Cohen
  - FOIPA No. 1010327 -- subject: Pavolos Stavropolous
  - FOIPA No. 1010342 -- subject: Kerry Appel
  - FOIPA No. 1010343 -- subject: Sara Bardwell
  - FOIPA No. 1010344 -- subject: Scott Silber
  - FOIPA No. 1010345 -- subject: Stephen Polk
  - FOIPA No. 1010346 -- subject: Mackenzie Liman
  - FOIPA No. 1010347 -- subject: Christopher Riederer
  - FOIPA No. 1010348 -- subject: Denver Joint Terrorism Task Force
  - FOIPA No. 1010349 -- subject: Multi-County Group Intelligence Conference
  - FOIPA No. 1016205 -- subject: Multi-Agency County Group Intelligence Conference (MAGIC)

- Harvey Grossman/ACLU of Illinois (Field Offices To Be Searched: Chicago)
  - ► FOIPA No. 1010362 -- subject: ACLU of Illinois
  - ► FOIPA No. 1010363 -- subject: American Friends Service Committee
  - ► FOIPA No. 1010364 -- subject: Council of American-Islamic Relations Chicago Chapter
  - ► FOIPA No. 1010365 -- subject: Council of Islamic Organizations of Greater Chicago
  - ► FOIPA No. 1010366 -- subject: Community Renewal Society
  - ► FOIPA No. 1010367 -- subject: Fellowship of Reconciliation Chicago Area Chapter
  - ► FOIPA No. 1010368 -- subject: Muslim Bar Association
  - ► FOIPA No. 1010369 -- subject: Muslim Civil Rights Center
  - ► FOIPA No. 1010370 -- subject: Oak Park Coalition for Truth and Justice

  (Field Offices To Be Searched: Chicago and FBIHQ):
  - ► FOIPA No. 1010371 -- subject: Mohammed Rasheed Ahmed
  - ► FOIPA No. 1010372 -- subject: Colleen Connell
  - ► FOIPA No. 1010373 -- subject: Seema Akhtar Imam
  - ► FOIPA No. 1010374 -- subject: Kareem M. Irfan
  - ► FOIPA No. 1010375 -- subject: Zubair Ahmad Kahn
  - ► FOIPA No. 1010376 -- subject: Michael John McConnell
  - ► FOIPA No. 1010377 -- subject: Kevin McDermott
  - ► FOIPA No. 1010378 -- subject: Ed McManus
  - ► FOIPA No. 1010379 -- subject: Calvin Morris
  - ► FOIPA No. 1010380 -- subject: Mohammed Yaser Tabbara
  - ► FOIPA No. 1010381 -- subject: NJTTF
  - ► FOIPA No. 1012202 -- subject: Roger Baldwin Foundation

- Randall Wilson/ACLU of Nebraska (Field Offices To Be Searched: Des Moines Resident Agency and Omaha)
  - ► FOIPA No. 1010464 -- subject: JTTF

  (Field Offices To Be Searched: Des Moines Resident Agency, Omaha and FBIHQ):
  - ► FOIPA No. 1010267 -- subject: Catholic Peace Ministry
  - ► FOIPA No. 1010268 -- subject: Des Moines Catholic Workers
  - ► FOIPA No. 1010269 -- subject: Drake University Law School Chapter of the National Lawyers Guild

  (Field Offices To Be Searched: Omaha and FBIHQ):
  - ► FOIPA No. 1010262 -- subject: Brian Terrell
  - ► FOIPA No. 1010263 -- subject: Elton Lloyd Davis
  - ► FOIPA No. 1010264 -- subject: Wendy Bobbitt Vasquez
  - ► FOIPA No. 1010542 -- subject: STARC/Armory Protests 2003-2004
  - ► FOIPA No. 1010265 -- subject: Frank Joseph Cordaro
  - ► FOIPA No. 1010266 -- subject: Sally Belinkoff





**December 2, 2004**

**U.S. Mail Return Receipt**
Federal Bureau of Investigation
Portland Division
Suite 400, Crown Plaza Building
1500 Southwest 1st Avenue
Portland, Oregon 97201-5828

ACLU/Andrea R. Meyer

Re:    **REQUEST UNDER FREEDOM OF INFORMATION ACT &**
       **PRIVACY ACT/ Expedited Processing Requested**

AMERICAN CIVIL
LIBERTIES UNION
OF OREGON
PO BOX 40585
PORTLAND, OREGON 97240
T/(503) 227-3186
WWW.ACLU-OR.ORG

This letter constitutes a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") and the Department of Justice implementing regulations, 28 CFR § 16.11, and the Privacy Act, 5 U.S.C. § 552a by the American Civil Liberties Union of Oregon ("ACLU of Oregon") on its own behalf and on behalf of the ACLU, Portland Peaceful Response Coalition, Peace and Justice Works, American Friends Service Committee, In Defense of Animals, Oregon Wildlife Federation, Back to the WALL, Islamic Center of Portland, Masjed As-Saber and individuals in leadership roles with those organizations, David Fidanque, William Seaman, Dan Handelman, Martin Gonzalez, Matt Rossell, Connie Durkee, Joe Keating, Alaa Abunijem, and Shahriar Ahmed (collectively "the Requestors"). Attached are signed authorization forms from each individual in compliance with the Privacy Act.[1]

This request seeks records from the Portland Division of the Federal Bureau of Investigation, the FBI Portland Joint Terrorism Task Force, and any other Oregon FBI Joint Terrorism Task Force. It requests records maintained in the offices of the Portland Division of the FBI, the FBI Portland Joint Terrorism Task Force, and any other Oregon FBI Joint Terrorism Task Force as well as records to which those offices have access, for example by means of electronic access to data that may be stored in another location.

I.    **The Requestors**

*101 0270*
*11100 X> ...*

1.    5    **The American Civil Liberties Union of Oregon** is the statewide affiliate of **the American Civil Liberties Union (collectively "ACLU")**,[2] a

---

[1] In addition, attached is a "Supplement" providing additional information on the individual requestors.

[2] The American Civil Liberties Union Foundation and the ACLU Foundation of Oregon are 501(c)(3) organizations that provide legal representation free of charge to individuals and organizations in civil liberties cases, and educate the public about civil liberties issues. The American Civil Liberties Union and its Oregon affiliate, the American Civil Liberties Union of Oregon, are separate non-profit, non-partisan, 501(c)(4) membership organizations that educate the public about the civil liberties implications of pending and proposed state and federal legislation, provide analyses of pending and proposed legislation, directly lobby legislators, and mobilize their members to lobby their legislators.

national organization that works to protect civil rights and civil liberties. As the leading defender of freedom, equality, privacy, and due process rights in the United States, the ACLU has challenged the United States government's broad targeting and surveillance of innocent people as part of the war on terrorism, the government's crackdown on criticism and dissent, the secret and unchecked surveillance powers of the USA PATRIOT Act, the excessive restriction of government information available through the Freedom of Information Act, the unfair questioning and targeting of immigrants, the unfair detention and treatment of people detained in the U.S. as part of the war on terrorism, and the unlawful detention and abuse of prisoners held by the U.S. government in detention facilities overseas.

In particular, ACLU attorneys around the country have provided direct representation to individuals and organizations targeted by the FBI and state and local police for exercising their First Amendment right to criticize the government, including people who participated in numerous rallies and marches to protest the war in Iraq, who were excluded from meaningful participation at public presidential speeches, and who protested at the 2004 Republican and Democratic National Conventions. ACLU advocates have also used litigation, lobbying, and public education to limit oppressive FBI and state and local police monitoring, interrogation, and arrest of people at public rallies, marches, and meetings.

ACLU attorneys also have filed lawsuits challenging three of the most controversial surveillance provisions of the USA PATRIOT Act: Section 215, which authorizes the FBI to obtain an unlimited array of personal records about innocent people through secret court orders; Section 505, which authorizes the FBI to issue National Security Letters (NSL) demanding certain kinds of personal records without court oversight; and Section 218, which greatly expands the FBI's power to obtain wiretaps. In the lawsuit challenging the NSL power, ACLU attorneys represent an anonymous Internet Service Provider that received an NSL from the FBI, and remain under a strict gag order that prevents them from disclosing certain information about the case.

ACLU attorneys and local volunteer attorneys have also provided direct representation to thousands of individuals interrogated by the FBI as part of its "voluntary" interview and special registration programs for Muslims and people of Arab and South Asian descent. The ACLU has also prepared and distributed a "Know Your Rights" brochure in English, Spanish, Arabic, Urdu, Hindi, Punjabi, Farsi, and Somali to educate the public about the rights of individuals during encounters with the police, the FBI, and agents of the Department of Homeland Security.

The ACLU regularly holds public membership meetings at which a wide range of civil liberties issues are discussed and debated. FBI Director Robert Mueller spoke at the ACLU annual membership conference in June 2003. FBI whistleblower Colleen Rowley and former national security advisor Richard Clarke spoke at the ACLU annual membership conference in July 2004. The ACLU also routinely provides information to the public and the media through print and online communications about the erosion of civil rights and civil liberties after September 11, 2001 and encourages ACLU members and activists to oppose government anti-terrorism policies that unnecessarily violate civil rights and civil liberties.

The FBI has a history of surveillance of the ACLU. For example, declassified documents, some released pursuant to previous FOIA requests, reveal that the FBI engaged in extensive spying on the national ACLU and its growing number of regional affiliates throughout the 1940s and 1950s, generating tens of thousands of pages of information.

Since 2000, ACLU, along with other organizations, has worked to end the City of Portland's participation in the FBI's Portland Joint Terrorism Task Force. We have held press conferences, organized individuals and organizations and testified in opposition to the Portland Joint Terrorism Task Force before the Portland City Council.

Beginning in 2002, the ACLU organized over 65 Oregon state-wide and community organizations to oppose any efforts to amend or repeal Oregon Revised Statute (ORS) 181.575, which prohibits state and local law enforcement officials from collecting or maintaining files on the social, political and religious activities of individuals and organizations before the 2003 Oregon Legislature. ORS 181.575 limits the role of local law enforcement participation in Joint Terrorism Task Forces in Oregon. Based upon this law, the City of Portland refused to participate with the FBI in the questioning Arab and Muslim men beginning in the fall of 2001.

Oregon staff and volunteers for the ACLU have appeared at numerous public forums sponsored by other organizations to oppose the USA PATRIOT Act and other policies and actions of the Bush Administration since 2001. ACLU representatives have also criticized the use of federal material witness laws to detain Oregon residents, including Brandon Mayfield.

The FBI and the Portland Police Bureau previously maintained files on the activities of the ACLU in Oregon for more than 30 years, beginning before the incorporation of the ACLU of Oregon in 1955 through the early 1970s. ACLU last obtained a copy of its Oregon FBI file in the mid-1970s. The ACLU also obtained copies of two files that were maintained by the Portland Police Bureau. A copy of the first file was provided to the ACLU on April 15, 1975 by Lt. James Davis, Commander of the Intelligence Division of the Portland Police Department. The ACLU obtained a copy of the second file after the Portland Tribune discovered additional documents dated from 1960 through 1985.                    1|1|00 to present

        ≤        1010271

2.    **Portland Peaceful Response Coalition** (PPRC) was founded shortly after the September 11, 2001 attacks on the World Trade Center and Pentagon. The primary aims of PPRC have been to advocate peaceful, non-military actions in response to the 9-11 attacks, to oppose the targeting of the Arab-American, Muslim, South Asian and other immigrant communities, and to promote a deeper understanding of the U.S. role in international affairs and the roots of anti-U.S. perspectives and actions among peoples outside of the U.S. PPRC's activities and policies evolved over several months, and years, and eventually focused on public demonstrations and community education. PPRC has been involved in publicizing and organizing protest demonstrations on the occasions of visits to Portland by President George W. Bush and Vice President Dick Cheney. These visits, PPRC's members believe, involve White House security and other Federal security and law enforcement agencies, such as the FBI. PPRC has held a weekly rally and march at Pioneer Courthouse Square in downtown Portland every Friday at 5:00 pm since late October 2001. PPRC has hosted speakers on nonviolent direct action, and on the refusenik campaign in Israel. PPRC is registered as a nonprofit organization

3

with the State of Oregon. Local and regional police bureaus and departments have routinely been involved in monitoring and/or providing security for dignitary visits to Portland or for street demonstrations which have been partly or wholly organized by PPRC. These and other activities of the PPRC have brought the group's membership to the attention of law enforcement locally and regionally, and very likely at the federal level as well.

3. Peace and Justice Works (PJW), founded in 1992 as Portland Peaceworks, promotes nonviolent conflict resolution on local, national and international levels. Its two major areas of program work recently have been U.S. policy in Iraq and police accountability. In 1999, the organization obtained a Portland Police Bureau Criminal Intelligence Report listing the Peace and Justice Works Iraq Affinity Group under the heading "non-criminal info," a document created in apparent violation of Oregon state law. That report was written in regards to a demonstration against the U.S. bombing of Iraq in December 1998. Between August 2002 and October 2004, PJW organized several small-scale and co-organized eight large-scale demonstrations against the pending and then actual U.S. attack on Iraq. Meanwhile, mostly through its other main project group, Portland Copwatch, PJW has been organizing community groups to testify against the FBI Portland Joint Terrorism Task Force. Portland Copwatch has also been active in monitoring the Portland police review board, speaking out against police misconduct, and educating people on their rights.

4. American Friends Service Committee (AFSC), winner of the Nobel Peace Prize in 1947, carries out service, development, social justice and peace programs throughout the world. Founded by Quakers in 1917, its work is based on the Quaker belief in the worth of every person and faith in the power of love to overcome violence. In past decades, AFSC activities were under surveillance by Portland Police Department. More recent activities of the AFSC include public opposition to the participation of the Portland police in the FBI Portland Joint Terrorism Task Force, advocacy for the rights of undocumented immigrants, as well as organizing major demonstrations in opposition to the U.S. war on Iraq.

5. In Defense of Animals (IDA) is a 501(c)(3) not for profit animal welfare organization founded by Dr. Elliot Katz and dedicated to protecting the rights, welfare and habitat of animals. IDA has a twenty year history of educating the public and improving the well being of animals using the legal system, publicity campaigns, peaceful demonstrations, educational outreach and conducting investigations on animal industries using information obtained through whistleblowers and public document requests. Over the past several years, IDA staff and volunteers have been routinely photographed and videotaped at lawful demonstrations (including vehicle license plates) by known Portland Police Officers, security staff, and other unknown individuals who refused to identify themselves. IDA is very concerned that its staff and organization are being unjustly targeted by the FBI Portland Joint Terrorism Task Force.

6. Oregon Wildlife Federation (OWF) was founded in 1936 and is the second oldest environmental group in Oregon. OWF's mission is to protect the environment and wildlife of the Northwest. To that end the group has actively engaged in many direct action activities since its founding, including rallies and protests. OWF helped organize several protests objecting to the Eagle Creek Timber sale (1999-2002). One such protest entailed a 1,000 person

rally in Pioneer Square and march to the U.S. Forest Service building in downtown Portland.
Federal authorities closely monitored the protest.

7.    **Back to the WALL** (originally founded as WALL) is a citizens group organized
to protect the forests of the Northwest through direct action. The group, initially known as
WALL, was active in forest defense from 1996 through 1999. It was reinstituted as Back to the
WALL in Spring of 2004 and has organized and participated in several direct action protests
since reforming. One such Portland protest was a 200-person rally and march on the U.S. Forest
Service in June 2004 challenging the administration's plan to cut the Biscuit Timber sale.
Federal authorities have monitored Back to the WALL events.

8.    **Islamic Center of Portland, Masjed As-Saber** ("ICPMA"), is a non-profit
organization that owns and administers a mosque known as Masjed As-Saber and an Islamic
school known as the Islamic School of Portland. Approximately 450 people attend services at the
mosque each Friday and, as many as 3500, attend services on religious holidays. ICPMA
employs approximately 16 people. Approximately 60 students are enrolled at the school.
Because of the relationship between ICPMA, its community members and leaders, and persons
and organizations investigated, questioned, detained, or arrested since September 11, 2001,
ICPMA reasonably believes that the FBI has targeted it and its community members for
investigation. The FBI has interviewed many ICPMA community members and has asked
questions about other worshipers and their political and religious views. In addition, because the
FBI has recorded conversations and services inside the mosque and sought records from ICPMA,
many ICPMA community members are afraid to attend mosque, practice their religion, or
express their opinions about religious and political issues.

9.    **David J. Fidanque** has worked for the ACLU of Oregon since 1982 and has been
the Executive Director since 1993. Since 2001, Mr. Fidanque has made dozens of appearances
throughout the state in local forums, debates, and through the news media, speaking out against
the United States government's broad targeting and surveillance of innocent people as part of the
war on terrorism, the government's crackdown on criticism and dissent, and the government's
use of secret surveillance powers under the USA PATRIOT Act and policy directives of the
Department of Justice.

10.    **William R. Seaman** serves on the Executive Board and is President of the
Portland Peaceful Response Coalition (PPRC). He is a human rights advocate and community
organizer who has been involved in many different organizations focused on a range of human
rights issues. On the day of the September 11, 2001, attacks on the World Trade Center and the
Pentagon, Seaman took part in a large gathering at the Koinonia House Campus Ministries on the
Portland State University campus. That meeting eventually led to the formation of the PPRC, a
group that Seaman has volunteered with up to the present time. Seaman has primarily
volunteered as media liaison for PPRC, but has been involved in many other activities, including
liaison with the Portland Police Bureau in planning for local street demonstrations, including
demonstrations and protests on the occasions of visits to Portland by President George W. Bush
and Vice President Dick Cheney. As a prominent spokesperson and organizer for the PPRC
whose organizing work has frequently involved contact with local city and law enforcement

officials, Seaman's activities are likely to have been brought to the attention of the FBI and possibly also to the attention of the Joint Terrorism Task Forces of the FBI.

    *1010280* \\\\00 to present

11. **Daniel (Dan) Handelman** is a co-founding member of Peace and Justice Works (PJW) and is an active and vocal member of its two main project groups, the Iraq Affinity Group and Portland Copwatch. In 1999, PJW discovered a Portland Police Bureau Criminal Intelligence Report listing Dan "Handelman" [sic] as the "Leader" of the Iraq Affinity Group under the heading "non-criminal info," a document created in apparent violation of Oregon state law. That report was written in regards to a demonstration against the U.S. bombing of Iraq in December 1998. Mr. Handelman has helped organize countless demonstrations and forums against U.S. policy in Iraq, including eight large-scale demonstrations between October 2002 and October 2004. Since 2000, Mr. Handelman has been active in organizing groups and individuals to oppose the City of Portland's participation in the FBI's Portland Joint Terrorism Task Force, mostly on the grounds of lack of local oversight.

    *1010281* \\\\00 to present

12. **Martin Gonzalez** is a social justice activist who has worked for the American Friends Service Committee for the past 18 years in Portland, Oregon. He is also President of the Latino Network. He has organized numerous demonstrations, rallies and press conferences in opposition to police brutality. He has also been active in organizing peace demonstrations calling for an end to the U.S. wars on Afghanistan and Iraq, and for an end to Israeli occupation of the West Bank and Gaza.

    *1010282* \\\\00 to present

13. **Matt Rossell** has been prominent in the Portland animal rights community for the past four years as a NW Outreach Coordinator for In Defense of Animals (IDA), and has previous experience working as an undercover investigator for animal welfare causes. Mr. Rossell worked for two years as a primate technician at OHSU and publicized its violations of the Animal Welfare Act in the summer of 2000. In a conversation with Gary Granger, Head of security at Oregon Health & Science University (OHSU), Mr. Rossell was told that OHSU works closely with the FBI in monitoring animal rights activists in the community.

    *1010283* \\\\00 to present

14. **Connie Durkee** has been prominent in the Portland animal rights community for the past two years as the Assistant NW Outreach Coordinator for In Defense of Animals (IDA). Recently, when peacefully leafleting outside Hurley's Restaurant, Tom Hurley restaurant's owner, informed IDA volunteers that he was told by Portland Police that IDA volunteers have been put on an "eco-terrorism watch list."

    *1010302* \\\\00 to present

15. **Joseph Keating** is the Issues Coordinator and Board Member of the Oregon Wildlife Federation and the Coordinator for Back to the WALL. He has been an environmental and peace activist for 20 years in the Pacific Northwest. Based out of Portland, Oregon, he has organized and implemented scores of direct action protests and rallies to further the issues of the progressive community. Federal authorities have monitored many of the activities related to OWF and Back to the WALL, including two Portland peace marches in 2004, which Mr. Keating helped organize. Over 10,000 people participated in each event.

    *1010303* \\\\00 to present

16. **Alaa Abunijem**, President of the Islamic Center of Portland, Masjed As-Saber, was born in Saudi Arabia and came to the United States in 1989. He became a U.S. citizen in

1996. Mr. Abunijem is married to a U.S. citizen and has four children. He holds a B.S. degree in Electrical Engineering and an M.S. in Engineering and Technology Management. He currently works as an engineer and has lived in Portland, Oregon, since 1999. On December 17, 2002, Mr. Abunijem was stopped at the Seattle airport by U.S. Customs and questioned by both U.S. customs and FBI officials regarding the purpose of his trip to Saudi Arabia. The officials searched his documents, business cards, and credit cards for thirty minutes before returning them to him. On his return from Saudi Arabia on January 9, 2003, his luggage and documents were searched for over an hour and a half, and he was questioned by officials about his trip.

On February 26, 2003, an FBI agent called Mr. Abunijem at his work place and questioned him about a donation he had made to a charity called Help the Needy. Mr. Abunijem had made donations of several hundred dollars to the organization over the past few years. The FBI did not inform Mr. Abunijem how they had learned that he made a donation to Help the Needy. On the same day that the FBI questioned Mr. Abunijem, the Department of Justice announced that a federal grand jury in Syracuse, New York, had returned an indictment charging Help the Needy and four individuals associated with it of transferring funds to persons in Iraq without having obtained the proper license. While Help the Needy was not accused of having providing anything other than humanitarian aid to people living in Iraq, the Justice Department's press release accused Help the Needy of attempting to undermine the President's efforts "to end Saddam Hussein's tyranny and support for terror."

Mr. Abunijem reasonably believes that because of his religion, his ethnicity, his place of birth, his leadership role in ICPMA, and his charitable contributions he is being monitored by the FBI and the Joint Terrorism Task Forces.

17.    **Shahriar S. Ahmed** is President of the Bilal Mosque Association of Oregon. Mr. Ahmed has been involved in establishing the Bilal Mosque of Beaverton and has served as a spokesperson for the Muslim community throughout Oregon. Mr. Ahmed has been vocal and noticeable in exercising his First Amendment rights. Given all of the scrutiny that the Muslim community is facing across the U.S., his position and public activity, Mr. Ahmed believes that he, as well as attendees of his Mosque, are under FBI surveillance.

## II.    The Request for Information

The Requestors[3] seek disclosure of any records[4] created from January 1, 2000 to the present, that were prepared, received, transmitted, collected and/or maintained by the FBI, Portland Division, including the FBI Portland Joint Terrorism Task Force and any other FBI Oregon Joint Terrorism Task Force relating or referring to the following:

---

[3] The term "Requestors" as used herein is defined as all of the organizations (as well as their employees, members, and board of directors) and individuals identified in Section I of this letter.

[4] The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.

1.   Any records relating or referring to the Requestors, including but not limited to records that document any monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors or their activities;[5]

2.   Any orders, agreements, or instructions to monitor, conduct surveillance, observe, question, interrogate, investigate, infiltrate, and/or collect information of any of the Requestors;

3.   Any records relating or referring to how, why or when any of the Requestors was selected to be a subject of monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information;

4.   Any records relating or referring to how monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors was or will be conducted;

5.   Any records relating or referring to the names of any other federal, state, or local government agencies participating in any monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors;

6.   Any records relating or referring to the specific role of the National Joint Terrorism Task Force or any local Joint Terrorism Task Force, including the Portland Joint Terrorism Task Force and any other Oregon Joint Terrorism Task Force in any monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors;

7.   Any records relating or referring to the specific role of any federal, state, or local government agency participating in any monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors;

8.   Any records relating or referring to how records about any of the Requestors have been, will be, or might be used;

9.   Any policies or procedures for analyzing records about any of the Requestors;

---

[5] The term "activities" as used herein includes, but is not limited to, any activities of the Requestors described in Section I above, and any advocacy, provision of services, litigation, lobbying, organizing, fundraising, meetings, marches, rallies, protests, conventions, or campaigns, and any media or communications to, from or about the Requestors in any form (including any oral, written, electronic or online communications, including but not limited to any books, pamphlets, brochures, newsletters, fundraising letters, correspondence, action alerts, e-mail, web communications, discussion groups, or listservs).

10. Any policies or procedures for cross-referencing records about any of the Requestors with information contained in any database;

11. Any policies or procedures for cross-referencing records about any of the Requestors with information about any other organizations or individuals;

12. Any policies or procedures for cross-referencing records about any of the Requestors with any other information not covered in numbers 10 and 11 above;

13. Any policies or procedures regarding retention of records about any of the Requestors;

14. Any records referring or relating to the destruction of records about any of the Requestors, including any policies permitting or prohibiting the destruction of records;

15. Any records referring or relating to how records about any of the Requestors were destroyed or might be destroyed in the future;

16. Any records referring or relating to the recipient(s) of records about any of the Requestors;

17. Any policies or procedures in place to protect the privacy of records that refer or relate to the employees, members, and/or board of directors of any of the Requestors;

18. Any records relating or referring to how, why or when monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information of any of the Requestors was or will be suspended or terminated.

## III.    Limitation of Processing Fees

The ACLU requests a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media . . .") and 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not be charged to "representatives of the news media"). As a "representative of the news media," the ACLU fits within this statutory and regulatory mandate. Fees associated with the processing of this request should, therefore, be limited accordingly.

The ACLU meets the definition of a representative of the news media because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." National Sec. Archive v. Department of Def., 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a state-wide and national organization, dedicated to the defense of civil rights and civil liberties. Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Any information obtained through the Oregon affiliate of the ACLU will be disseminated both through all the means available by national ACLU as well as Oregon ACLU. Specifically, the ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed web site: http://www.aclu.org/. The web site addresses civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The website specifically includes features on information obtained through the FOIA. See, e.g., www.aclu.org/patriot_foia; www.aclu.org/torturefoia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail. Further, the ACLU makes archived material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. Also, the ACLU publications are often disseminated to relevant groups across the country that then further distribute them to their members or to other parties.

In addition, the Oregon affiliate has utilized means of communication, including: through its web site (http://www.aclu-or.org/), bi-annual newsletters sent to over 10,000 Oregon ACLU households, producing briefing papers on civil liberties issues, including *"Don't Let Oregon Police Be Used for Political Spying or as Federal INS Agents"* (published Fall 2002); *"Safe & Free on Tour in Oregon"* (published Spring 2004), as well as additional pamphlets, reports, flyers and brochures on other civil liberties issues; e-mail action alerts on the latest civil liberties developments distributed to Oregon members as well as publicized on its web site; engaging the media including issuing press releases and organizing press conferences related to significant civil liberties issues; appearing frequently on television and radio as ACLU spokespersons; and public speaking and outreach, including regularly attending and speaking at community meetings and other public forums to inform people about various civil liberties issues. The Oregon affiliate regularly assists in the distribution of national ACLU reports on a variety of civil liberties topics. The Oregon affiliates makes its archive material available at the Oregon Historical Society.

Depending on the results of the Request, the ACLU plans to "disseminate the information" gathered by the Request "among the public" through these kinds of publications in these kinds of channels. The ACLU is therefore a "news media entity." Cf. Electronic Privacy Information Ctr. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

Finally, disclosure is not in the ACLU's commercial interest. The ACLU is a "non-profit, non-partisan, public interest organization." See Judicial Watch, 326 F.3d at 1310. Information disclosed by the ACLU as a result of this FOIA will be available to the public at no cost.

## IV.  Waiver of all Costs

The ACLU additionally requests a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters'").

Disclosure of the requested information is in the public interest. This request will further public understanding of government conduct; specifically, the FBI's monitoring, surveillance, and infiltration of organizations on the basis of national origin, racial and/or ethnic background, religious affiliation, organizational membership, political views or affiliation, or participation in protest activities or demonstrations. This type of government activity concretely affects many individuals and groups and implicates basic privacy, free speech, and associational rights protected by the Constitution.

Moreover, disclosure of the requested information will aid public understanding of the implications of the Department of Justice's recent decision to relax guidelines that previously restricted the FBI's ability to spy on organizations without a threshold showing of suspected criminal activity. These restrictions were created in response to the Hoover-era FBI's scandalous spying on politically active individuals and organizations, despite the complete lack of evidence that such individuals and organizations had been involved in any unlawful behavior. Understanding the current scope of the FBI's surveillance and infiltration of law-abiding organizations is, therefore, crucial to the public's interest in understanding the consequences of the Department of Justice's important change in policy.

As a nonprofit 501(c)(3) organization and "representative of the news media" as discussed in Section III, the ACLU is well-situated to disseminate information it gains from this request to the general public as well as to immigrant, religious, politically active, and other targeted communities, and to groups that protect constitutional rights. Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.[6]

The records requested are not sought for commercial use, and the Requestors plan to disseminate the information disclosed as a result of this FOIA request through the channels

---

[6] For example, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA a request submitted by the ACLU in August 2003. In addition, three separate agencies, the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

described in Section III.   As also stated in Section III, the ACLU will make information disclosed as a result of this FOIA available to the public at no cost.

## V.   **Expedited Processing Request**

Expedited processing is warranted where there is "an urgency to inform the public about an actual or alleged federal government activity" by organizations "primarily engaged in disseminating information" 28 C.F.R. § 16.5(d)(1)(ii).[7] This request implicates a matter of urgent public concern; namely, the consequences of a recent change in government policy that has likely resulted in increased surveillance of individuals and surveillance and infiltration of political, religious, and community organizations by the FBI. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease, future violations are prevented, and any chilling effect on public participation in potentially targeted groups and/or political activity be halted.

In addition, this request deals with potential disparate treatment of individuals and groups on the basis of categories such as religion, political viewpoint, and nationality. Such potential unequal treatment is a matter necessitating immediate attention. There is also intense public concern, particularly among potentially targeted individuals and groups, about the actual or alleged federal government activity addressed by this request. This intense public concern is illustrated by the selection of news coverage detailed in the paragraph below.

A requestor may also demonstrate the need for expedited processing by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the requests relate to possible violations of First, Fourth, Fifth, and Fourteenth Amendment Rights and have been subject to substantial media attention. The widespread and exceptional media interest in this issue is reflected in widespread news coverage at both the local and national level. *See e.g.* Daily Star Staff, *American Arabs Concerned Over FBI's 'October Plan,'* www.dailystar.com.lb, October 6, 2004; David Shepardson, *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack,* The Detroit News, October 1, 2004; Eric Lichtblau, *Subpoena Seeks Records About Delegate Lists on Web,* NY Times, August 30, 2004 at P10; Alex Bradley and John Mayer, *The War at Home: Nationwide Crackdown on Activists Part,* www.saveourliberties.com, September 2, 2004; Eric Lichtblau, *Protestors at Heart of Debate on Security vs. Civil Rights,* NY Times, August 27, 2004 at A9; Larry Abramson, *FBI Questioning Political Demonstrators,* NPR.org; Susan Greene, *Activists Decry Pre-Convention Security Tactics: Questions by FBI, The Feds Say They're Trying to Avoid Terror Threats, But Many People Say the Steps Veer Toward Intimidation,* The Denver Post, August 26, 2004 at A-08; August 17, 2004; Eric Lichtblau, *F.B.I. Goes Knocking for Political Troublemakers,* NY Times, August 16, 2004 at A1; Amy Herder, *Teaching the Silent Treatment,* The Denver Post, August 8, 2004 at C-01; Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups,* San Francisco Chronicle, August 6, 2004; Camille T. Taiara, *New F.B.I.*

---

[7] The ACLU is "primarily engaged in disseminating information" as discussed in Sections III and IV.

*Witch-Hunt*, San Francisco Bay Guardian, August 4-10, 2004; Kelly Thornton, *F.B.I.'s Home Visits Have Some Muslims Feeling Harrassed, Alienated*, Signonsandiego.com, August 4, 2004; Richard Schmitt and Donna Horowitz, *FBI Starts to Question Muslims in U.S. About Possible Attacks*, latimes.com, July 18, 2004; Karen Abbott, *FBI's Queries Rattle Activist*, www.rockymountainnews.com, July 27, 2004; Mary Beth Sheridan, *Interviews of Muslims to Broaden*, www.washingtonpost.com, July 17, 2004; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry*, The Des Moines Register, February 7, 2004; Jeff Eckhoff and Mark Siebert, *Anti-war Inquiry Unrelated to Terror, The Des Moines Register*, February 10, 2004 at 1A; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry*, The Des Moines Register, February 7, 2004; Monica Davey, *An Antiwar Forum in Iowa Brings Federal Subpoenas*, NY Times, February 10, 2004 at A14; Monica Davey, *Subpoenas on Antiwar Protest Are Dropped*, NY Times, February 11, 2004 at A18; Michelle Goldberg, *A Thousand J. Edgar Hoovers*, www.salon.com, February 12, 2004; Michelle Goldberg, *Outlawing Dissent*, www.salon.com, February 11, 2004; Kerri Ginis, *Peace Fresno Seeks Damages*, The Fresno Bee, February 28, 2004; Eric Lichtblau, *F.B.I. Scrutinizes Antiwar Rallies*, www.nytimes.com, November 23, 2003.

The potential targeting of individuals and groups by the federal government on the basis of group membership, religion, political protest, nationality, and other similar categorizations raises many questions about the government's integrity, which affect public confidence in a profound way. The government's treatment of persons on the basis of categorizations such as religion and nationality is a critical issue with a long history dating back to the founding of the nation. Questions about the government's integrity in these areas substantially affect the public's confidence in the government's ability to protect all of its citizens. Questions about the government's integrity in this area also affect the public's confidence in the law enforcement and legal systems. This issue has been of concern to lawmakers, including three members of the House of Representatives. *See, e.g.*, Eric Lichtblau, *Inquiry into F.B.I. Question Is Sought*, NY Times A16, August 18, 2004.

Finally, pursuant to applicable regulations and statute, the ACLU expects the determination of this request for expedited processing within 10 calendar days upon receipt of this request and the determination of this request for documents within 20 days. See 28 C.F.R. 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).

If this request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions of the FOIA and the Privacy Act. The ACLU expects you to release all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish all applicable records to: Andrea R. Meyer, ACLU Foundation of Oregon, to our address provided in our attached Supplement.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

Andrea R. Meyer, Counsel
ACLU Foundation of Oregon

## SUPPLEMENT

**Mail Response to:**
Andrea R. Meyer
ACLU of Oregon
620 S.W. 5th Avenue, Suite 910
Portland, Oregon 97204
(503) 227-6928

**Additional Information about Individual Requestors**

**Alaa Abunijem (alternative spelling: Ala'a Abu-nijem)**
Born: April 12, 1972 in Jeddah, Saudi Arabia
US Citizenship
Oregon Address: P.O. Box 80153   Portland, OR 97280

**Shahriar S. Ahmed**
Born: March 2, 1955 Bangladesh
US Citizenship
12826 NW Creekview Drive, Portland Oregon 97229

**Connie Brooking Durkee**
Born: August 19, 1955 in Portland, Oregon

**David Joseph Fidanque**
Born: July 18, 1949 in New York, NY
US citizenship
Oregon address: 2560 Central Blvd., Eugene, Oregon 97403

**Martin Miguel Gonzalez**
Born: October 24, 1956 in Corpus Christi, Texas
US Citizenship
Oregon address: 5726 N. Missouri, Portland, Oregon

**Daniel (Dan) Alex Handelman**
Born: July 14, 1965 in New York
US Citizenship
Oregon address: 4635 N. Congress, Portland, Oregon 97217

**Joseph Keating**
Born: June 6, 1943 in New York, New York
US Citizenship
Oregon address: 3020 SE Yamhill Street, Portland, Oregon 97214

**Matthew Scott Rossell**
Born: May 24, 1969 in Omaha, Nebraska
US Citizenship
Oregon address: 4717 N.E. Garfield, Portland, Oregon 97211

**William Ralph Seaman**
Born: June 23, 1958 in Fort Lauderdale, Florida
US Citizenship
Oregon address: 2105 S.E. Taylor Street, Portland, Oregon 97214

## AUTHORIZATION

I, _____*Alaa Abunijem*_____, hereby authorize the
ACLU of Oregon to submit the attached "Request Under Freedom of Information Act
and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive
any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _*11-29*_, 2004

## AUTHORIZATION

I, Shahriar Ahmed, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 01 , 2004, in Portland, Oregon

## AUTHORIZATION

I, *Connie B. Durkee*, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *Nov. 30*, 2004, in *Portland*, Oregon

*Connie B. Durkee*

## AUTHORIZATION

I, David J. Fidanque, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 1, 2004, in Portland, Oregon

## AUTHORIZATION

I, _MARTIN M. GONZALEZ_, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _11/30_, 2004, in _PORTLAND_, Oregon

## AUTHORIZATION

I, Dan Handelman, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 29___, 2004, in Portland, Oregon

## AUTHORIZATION

I, JOSEPH KENTOR, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __11/29__, 2004, in __PORTLAND__, Oregon

## AUTHORIZATION

I, MATT ROSSELL, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11·30·04, 2004, in PORTLAND, Oregon

## AUTHORIZATION

I, <u>William R. Seaman</u>, hereby authorize the ACLU of Oregon to submit the attached "Request Under Freedom of Information Act and Privacy Act" to the Federal Bureau of Investigation (Portland Division) and receive any responsive records on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>November 30, 2004</u>, in <u>Portland</u>, Oregon



| American Civil Liberties Union | **Detroit Office** | **Legislative Office** |
| American Civil Liberties Union Fund of Michigan | 60 W. Hancock<br>Detroit, MI 48201-1343<br>Phone 313.578.6800<br>Fax 313.578.6811<br>E-mail: aclu@aclumich.org<br>www.aclumich.org | P.O. Box 18022<br>Lansing, MI 48901-8022<br>Phone 517.372.8503<br>Fax 517.372.5121<br>E-mail: lansing@aclumich.org<br>www.aclumich.org |

December 2, 2004

Patricia D. Harris, Management Analyst
FOIA/PA Mail Referral Unit
Department of Justice
Room 1070, National Place Building
Washington, DC 20530-0001

Federal Bureau of Investigation
ATTN: Special Agent in Charge Daniel D. Roberts
477 Michigan Avenue, Fl. 26
Detroit, Michigan 48226

Departmental Disclosure Officer
Department of Homeland Security
Washington, D.C. 20528

Michigan Department of State Police
Freedom of Information Unit
7150 Harris Drive
Lansing, MI 48913

**Re: REQUEST UNDER FEDERAL AND MICHIGAN FREEDOM OF INFORMATION
ACTS/ Expedited Processing Requested**

Attention:

This letter constitutes a request under the federal Freedom of Information Act, 5 U.S.C. §
552 ("FOIA"), and the Michigan Freedom of Information Act, MCL 15.231 et seq. ("MFOIA"),
by the American Civil Liberties Union of Michigan and the American Civil Liberties Union
Fund of Michigan (collectively, the "ACLU"), on behalf of the ACLU, the Ann Arbor Area
Committee for Peace (also sometimes known as Michigan Peaceworks), Direct Action, Life for
Relief and Development, the National Lawyers Guild (Detroit Chapter), Students Allied for
Freedom and Equality, Students for Economic Justice, Peace Action of Michigan, Homam
Albaroudi, Phillis Englebert, Saleh Dean Husseini and Kary L. Moss (collectively, "the
Requestors").

**Staff**
Kary L. Moss, Esq.
Executive Director
Michael J. Steinberg, Esq.
Legal Director
Wendy Wagenheim
Communications Director
Leslie White-Jones
Development Director

Brenda Bove
Paralegal
Cynthia Nicely
Bookkeeper
Carmetta Jones
Administrative Assistant

Jay Kaplan, Esq.
Staff Attorney
GLBT Project
Noel J. Saleh, Esq.
Staff Attorney
Shelli Weisberg
Assistant Director for
Legislative Affairs

**Officers**
Jacquelin Washington
President
Mark Granzotto, Esq.
General Counsel
Joseph S. Tuchinsky
Treasurer
James Rodbard, Esq.
Executive Vice President

**National Board Representative**
Ralph Simpson, Esq.

The Requestors seek and request disclosure of any and all records, as that term is defined to the fullest extent under the FOIA and MFOIA, created from January 2000 to the present, that were prepared, received, transmitted, collected and/or maintained by the FBI, the National Joint Terrorism Task Force, any Joint Terrorism Task Force or Foreign Terrorist Tracking Task Force, the Office of Law Enforcement Coordination, The National Intel Share (NIS) Project, the Michigan State Police, any formal or informal group, gathering or coalition involving one or more government employees, representative or agents of any member, representative or agent of or for any of same relating or referring, directly or indirectly, to any of the Requestors or to any of their employees, members, officers or directors or to any activities of any of them.

The Requestors request limitation and waiver of fees pursuant to the provisions of the FOIA and MFOIA which provide for such limitation and waiver where, in the case of FOIA, disclosure of the information is to a news organization or in the public interest or, in the case of MFOIA, where searching for or furnishing copies of the public record can be considered as primarily benefiting the general public, because, among other things, searching for, disclosing and furnishing copies of the records sought by Requestors is likely to contribute significantly to public understanding of the operations or activities of the government and is not in the commercial interest of the Requestors. If our request for a waiver of fees under the FOIA and MFOIA is denied and it would cost more than two hundred fifty dollars ($250.00) to process our request for records, please contact one of the people whose names appear in the last paragraph below before expending any additional sum.

The Requestors request that their request receive expedited processing because of one or more of the following reasons: (1)the compelling and urgent need of the Requestors to be informed of any surveillance, investigatory or other activities on the part of the FBI, the National Joint Terrorism Task Force, any Joint Terrorism Task Force, the Michigan State Police or any member, representative or agent of any of same relating or referring, directly or indirectly, to any of the Requestors or to any of their employees, members, officers or directors or to any activities of any of them; (2) the fact that there exist possible questions about the government's integrity relating to such activities and records, such as whether there is unlawful "targeting" or selection of groups or individuals for surveillance and investigation in connection with the activities of such government-related entities and individuals, which affect public confidence and which are a matter of widespread and exceptional media interest; (3) the fact that the ACLU and others of the Requestors are primarily engaged in disseminating information; (4) other appropriate reasons under the FOIA.

Pursuant to applicable regulations and statute, the Requestors expect your determination of their request for expedited processing under FOIA within 10 calendar days and your determination of their request for documents under FOIA within 20 days. See 28 C.F.R. 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i). Pursuant to applicable regulations and statute, the Requestors expect your response to their request under MFOIA within the statutorily mandated period of time. See, MCL 15.235(2). If our request under FOIA is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions applicable under the FOIA. If our request under MFOIA is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions applicable under the MFOIA. The Requestors expect you to release all "reasonably segregable portions" of otherwise exempt material under the FOIA and to separate the exempt and nonexempt material and make the nonexempt material available for examination and copying under the MFOIA.

2

The ACLU reserves the right to appeal, without limitation, a decision to withhold any records or information or to deny any request for limitation or waiver of fees.

Attached and made a part of this request is additional supporting and supplementary information and material (see, Addendum to FOIA Request - December 2, 2004).

Please direct all responses to this request to the undersigned. If there are any questions or you require further information about this request, please contact William A. Wichers II at 313-919-0331 or Michael J. Steinberg at 313-578-6814 between the hours of 9:00 a.m. and 5:00 p.m. EST.

Sincerely,

William A. Wichers II, Cooperating Attorney

Michael J. Steinberg, Legal Director
American Civil Liberties Union Fund
   of Michigan
60 West Hancock Street
Detroit, Michigan 48221

3

**Addendum to FOIA Request - December 2, 2004**

This supporting and supplementary information and material is not intended to and should not be construed to limit the scope of the FOIA request to which it is appended.

I.    **The Requestors**

1.    The American Civil Liberties Union of Michigan and the American Civil Liberties Union Fund of Michigan (collectively, "ACLU"), are affiliated with The American Civil Liberties Union and the American Civil Liberties Union Foundation.[1] These organizations, and other affiliates, work to protect civil right and civil liberties. As the leading defenders of freedom, equality, privacy, and due process rights in the United States, these organizations have challenged the U.S. government's broad targeting and surveillance of innocent people as part of the war on terrorism, the government's crackdown on criticism and dissent, the secret and unchecked surveillance powers of the USA PATRIOT Act, the excessive restriction of government information available through the Freedom of Information Act, the unfair questioning and targeting of immigrants, the unfair detention and treatment of people detained in the U.S. as part of the war on terrorism, and the unlawful detention and abuse of prisoners held by the U.S. government in detention facilities overseas.

In particular, attorneys around the country have provided direct representation to individuals and organizations targeted by the FBI and state and local police for exercising their First Amendment right to criticize the government, including people who participated in numerous rallies and marches to protest the war in Iraq, who were excluded from meaningful participation at public presidential speeches, and who protested at the 2004 Republican and Democratic National Conventions. These organizations have also used litigation, lobbying, and public education efforts to limit oppressive FBI, and state and local police monitoring, interrogation and arrest of people at public rallies, marches, and meetings.

Attorneys also have filed lawsuits challenging three of the most controversial surveillance provisions of the USA Patriot Act: Section 215, which authorizes the FBI to obtain an unlimited array of personal records about innocent people through secret court orders; Section 505, which authorizes the FBI to issue National Security Letters demanding certain kinds of personal records without court oversight; and Section 218, which greatly expands the FBI's power to obtain wiretaps. In the lawsuit challenging the National Security Letter (NSL) power, organization attorneys represent an anonymous Internet Service Provider who received an NSL from the FBI, and remain under a strict gag order that prevents them from disclosing certain information about the case.

---

[1] The American Civil Liberties Union Foundation and the American Civil Liberties Union Fund of Michigan are 501(c)(3) organizations that provide legal representation free of charge to individuals and organizations in civil liberties cases, and educate the public about civil liberties issues. The American Civil Liberties Union and the American Civil Liberties Union of Michigan are separate non-profit, non-partisan, 501(c)(4) membership organizations that educate the public about the civil liberties implications of pending and proposed state and federal legislation, provide analyses of pending and proposed legislation, directly lobby legislators, and mobilize their members to lobby their legislators.

Attorneys working for and with these organizations have also provided direct representation to thousands of individuals interrogated by the FBI as part of the FBI's "voluntary" interview and special registration programs for Muslims and people of Arab and South Asian descent.

The ACLU regularly holds public membership meetings at which a wide range of civil liberties issues are discussed and debated. FBI Director Robert Mueller spoke at the national annual membership conference in June 2003. FBI whistleblower Colleen Rowley, and former national security advisor Richard Clarke, spoke at the American Civil Liberties Union annual membership conference in July 2004. The American Civil Liberties Union also routinely provides information to the public and the media through print and online communications about the erosion of civil rights and civil liberties after September 11, and encourages members and activists to oppose government anti-terrorism policies that unnecessarily violate civil rights and civil liberties.

The ACLU Fund of Michigan, in conjunction with the ACLU Foundation, successfully challenged the policy of blanket closures of immigration court proceedings after September 11. See Detroit Free Press v. Ashcroft, 303 F.3d 681 (6th Cir. 2002).

In 2004, the ACLU Fund of Michigan challenged Michigan State Police ("MSP") participation in MATRIX (the "Multistate Anti-Terrorism Information Exchange"), an interstate intelligence gathering organization that collects information on, among other things, Michigan residents who are not suspected of any wrongdoing. MATRIX is a "pilot project" to "leverage proven technology to assist criminal investigations by implementing factual data analysis from existing data sources and integrating disparate data from many types of Web-enabled storage systems" and its "Michigan Contact" is identified as Inspector Karen R. Halliday of the Investigative Services Bureau of the MSP according to the MATRIX website at http://www.matrix-at.org/.

The ACLU of Michigan and the ACLU Fund of Michigan were instrumental in exposing the fact that the Michigan State Police had spied upon and maintained "red squad" files on hundreds of law-abiding citizens who were active in the civil rights and anti-war movements of the 1960's and 1970's. The organizations also sued the Michigan State Police to return the files to the individuals who were being surveilled.    1010251

2.    Direct Action is a community organization based in Lansing, Michigan dedicated to fighting for democracy while combating poverty and inequality. The organization formed in the wake of the September 11th terrorist attacks to create a voice for people who felt that the U.S. reaction to the 9/11 attacks would create a base for more terrorism and violence. It began by opposing the USA Patriot Act and the U.S. war in Afghanistan. Instead of simply complaining about the state of the world, it also wants to put forward an alternative vision for a world worth living in.    1010252

3.    The Ann Arbor Area Committee for Peace, or Michigan Peaceworks, is an organization which promotes peaceful solutions to international conflicts and the protection of civil rights and civil liberties. Its work around peace involves collaborating with low-income

communities around issues that affect their quality of life while making the link between local and global issues.    1010253    \Do +u p......

4.    Life for Relief and Development ("LIFE") is a 501(c)(3) non-profit/non-governmental organization in Consultative Status with the Economic and Social Council of the United Nations and registered with the United States Agency for International Development ("USAID"). LIFE was founded in 1992 by concerned Iraqi-American professionals in response to the humanitarian crisis that developed in Iraq as a result of the 1991 Gulf War conflict. LIFE is dedicated to alleviating human suffering around the world regardless of race, color, religion or cultural background. The organization strives to offer a variety of humanitarian, health, educational services and programs to aid refugees and victims of natural or man-made disasters. LIFE has established partnerships with many international non-governmental organizations ("NGO's") including UNDP, UNICEF, Brother's Brother Foundation, Nour International Relief Aid, AmeriCares, Veterans For Peace, American Friend's Service Committee (AFSC), Care International and the Wheelchair Foundation. In March 2003, LIFE became a member of the American Council for Voluntary International Action (InterAction), which is the largest alliance of American international NGO's. LIFE's website, http://www.lifeusa.org/index.php, provides additional information about this organization.    1010254    \Do \o pr.....

5.    The National Lawyers Guild (Detroit Chapter) is an affiliate of the National Lawyers Guild, an association dedicated to the need for basic change in the structure of our political and economic system. It seeks to unite the lawyers, law students, legal workers and jailhouse lawyers of America in an organization that will function as an effective political and social force in the service of the people, to the end that human rights will be regarded as more sacred than property interests.    1010255

6.    Students Allied for Freedom and Equality (SAFE) was started in 2001 as an independent progressive student movement advocating for human rights, specifically those of the Palestinians, and since 2003 has taken a stance against the war in Iraq. SAFE has been involved in the Divestment Movement, a national movement aimed at pushing universities to withdraw their investments from companies that directly support the Israeli occupation of the West Bank and Gaza. SAFE hosted the Second National Conference of the Palestine Solidarity Movement in October of 2002 at the University of Michigan.    1010256    \... \o pr....

7.    Students for Economic Justice is a student organization at Michigan State University working to support local, national, and international economic, labor rights, and human rights issues. Its primary purpose is to monitor the university's ties to the sweatshop industry. It is a chapter of United Students Against Sweatshops. In 2001, it learned that an undercover MSU police officer was attending meetings of the organization prior to the May, 2000 commencement appearance of the World Bank president. It was also reported that then university president M. Peter McPherson had agreed to the surveillance by the university police.    1010257    \Do \o pr....

8.    Peace Action of Michigan is the Michigan affiliate of the nation's largest grassroots peace and disarmament group. Peace Action believes that war is not a suitable response to conflict and actively works to eliminate the threat of nuclear weapons and other weapons of mass destruction. Peace Action of Michigan has organized several demonstrations against the war in Iraq and works to bring about the withdrawal of U.S. troops from Iraq.

3

9.      Homam Albaroudi is an individual who is active in Muslim charities, a board member of the Muslim Community Association and active in the Muslim community generally.

10.     Phillis Englebert is the Director of the Ann Arbor Area Committee for Peace (the name of this organization will become Michigan Peaceworks in January, 2005)

11.     Salah Dean Husseini is an individual who is a student at the University of Michigan and president of SAFE (see, above).

12.     Kary L. Moss is the Executive Director of the American Civil Liberties Union of Michigan.

## II.    The Request for Information

The Requestors seek and request disclosure of any records[2] created from January 2000 to the present, that were prepared, received, transmitted, collected and/or maintained by the FBI, the National Joint Terrorism Task Force, any Joint Terrorism Task Force or Foreign Terrorist Tracking Task Force, the Office of Law Enforcement Coordination, The National Intel Share (NIS) Project, or any member, representative or agent of any of same relating or referring, directly or indirectly, to any of the Requestors or to any of their employees, members, officers or directors or to any activities of any of them including but not limited to:

1.      Any records that document any monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about, any of the Requestors or any of their employees, members, officers or directors or their activities;[3]

2.      Any orders, agreements, or instructions to monitor, observe, question, interrogate, investigate, infiltrate, and/or collect information about or conduct surveillance of any of the Requestors or any of their employees, members, officers or directors or their activities;

3.      Any records relating or referring to how, why or when any of the Requestors or any of their employees, members, officers or directors or their activities was

_____

[2] The term "records" as used herein includes, but is not limited to, all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.

[3] The term "activities" as used herein includes, but is not limited to, any activities of the Requestors or any of their employees, members, officers or directors described in Section I above, and any advocacy, provision of services, litigation, lobbying, organizing, fundraising, meetings, marches, rallies, protests, conventions, or campaigns, and any media or communications to, from or about the Requestors or any of their employees, members, officers or directors or their activities in any form (including any oral, written, electronic or online communications, including but not limited to any books, pamphlets, brochures, newsletters, fundraising letters, correspondence, action alerts, e-mail, web communications, discussion groups, or listservs).

4

selected to be a subject of monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information;

4.     Any records relating or referring to how monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about, any of the Requestors or any of their employees, members, officers or directors or their activities was or will be conducted;

5.     Any records relating or referring to the names of any other federal, state, or local government agencies participating in any monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about, any of the Requestors or any of their employees, members, officers or directors or their activities;

6.     Any records relating or referring to the specific role of the National Joint Terrorism Task Force or any local Joint Terrorism Task Force or any other Joint Terrorism Task Force or Foreign Terrorist Tracking Task Force, the Office of Law Enforcement Coordination, The National Intel Share (NIS) Project, or any formal or informal group, gathering or coalition involving one or more government employees, representative or agents or any member, representative or agent of or for any of same in any monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about, any of the Requestors or any of their employees, members, officers or directors or their activities;

7.     Any records relating or referring to the specific role of any federal, state, or local government agency, employee, representative or agent participating in any monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about, any of the Requestors or any of their employees, members, officers or directors or their activities;

8.     Any records relating or referring to how records about any of the Requestors or any of their employees, members, officers or directors or their activities have been, will be, or might be used;

9.     Any policies or procedures for analyzing records about any of the Requestors or any of their employees, members, officers or directors or their activities;

10.    Any policies or procedures for cross-referencing records about any of the Requestors or any of their employees, members, officers or directors or their activities with information contained in any database;

11.    Any policies or procedures for cross-referencing records about any of the Requestors or any of their employees, members, officers or directors or their activities with information about any other organizations or individuals;

12. Any policies or procedures for cross-referencing records about any of the Requestors or any of their employees, members, officers or directors or their activities with any other information not covered in numbers 10 and 11 above;

13. Any policies or procedures regarding retention of records about any of the Requestors or any of their employees, members, officers or directors or their activities;

14. Any records referring or relating to the destruction of records about any of the Requestors or any of their employees, members, officers or directors or their activities, including any policies permitting or prohibiting the destruction of records;

15. Any records referring or relating to how records about any of the Requestors or any of their employees, members, officers or directors or their activities were destroyed or might be destroyed in the future;

16. Any records referring or relating to the recipient(s) of records about any of the Requestors or any of their employees, members, officers or directors or their activities;

17. Any policies or procedures in place to protect the privacy of records that refer or relate to the Requestors or any of their employees, members, officers or directors or their activities;

18. Any records relating or referring to how, why or when monitoring, surveillance, observation, questioning, interrogation, investigation or infiltration of, and/or collection of information about any of the Requestors or any of their employees, members, officers or directors or their activities was or will be suspended or terminated.

19. Any matching agreements which may be between, among or relate to the FBI, the National Joint Terrorism Task Force, any Joint Terrorism Task Force or Foreign Terrorist Tracking Task Force, the Office of Law Enforcement Coordination, the National Intel Share (NIS) Project, the Michigan State Police, any formal or informal group, gathering or coalition involving one or more government employees, representative or agents or any member, representative or agent of or for any of same or any of them and serve as a purported basis for the exchange of information and/or records between or among any of them.

## III.    Limitation of Processing Fees and Waiver of Search and Review Fees

The Requestors request a limitation of processing fees pursuant to 5 U.S.C. § 52(a)(4)(A)(ii)(II), which states that "fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by...a representative of the news media....," and of search and review fees under 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not be charged to "representatives of the

news media."). As a "representative of the news media," the ACLU fits within this statutory and regulatory mandate. Fees associated with responding to this request should, therefore, be limited accordingly.

The ACLU meets the definition of a representative of the news media because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." National Sec. Archive v. Department of Def., 880 F.2d 1381, 1387 (D.C. Cir. 1989). In addition, searching for and furnishing the records requested will primarily benefit the general public.

The ACLU is an organization dedicated to the defense of civil liberties. Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Specifically, the ACLU publishes or distributes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed web site: http://www.aclumich.org/. The web site addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains many hundreds of documents relating to the issues on which the ACLU is focused. This website and the website of its national organization, http://www.aclu.org/, specifically include features on information obtained through the FOIA. *See, e.g.*, www.aclu.org/patriot_foia *and see* www.aclu.org/torturefoia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail. In addition to the Detroit ACLU office, there are 9 ACLU branch offices located throughout Michigan. These offices further disseminate ACLU material to local residents, schools and organizations through a variety of means including websites, publications and newsletters. Further, the ACLU makes archived material available to the public at various locations. Also, ACLU publications are often disseminated to relevant groups across the country that then further distribute them to their members or to other parties.

Depending on the results of this request, the ACLU plans to "disseminate the information" gathered by the Request "among the public" through these kinds of publications in these kinds of channels. The ACLU is therefore a "news media entity." Cf. Electronic Privacy Information Ctr. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of the FOIA).

Finally, disclosure is not in the ACLU's commercial interest. The ACLU is a "non-profit, non-partisan, public interest organization." See Judicial Watch v Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003) In addition, the ACLU will make any information disclosed as a result of this FOIA and MFOIA request available to the public at no cost.

## IV. Waiver of all Costs Under the FOIA and the MFOIA

The Requestors additionally request a waiver of all fees associated with responding to this request pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government

and is not primarily in the commercial interest of the requester.") and pursuant to MCL 15.234(1) ("A search for a public record may be conducted or copies of public records may be furnished without charge or at a reduced charge if the public body determines that a waiver or reduction of the fee is in the public interest because searching for or furnishing copies of the public record can be considered as primarily benefiting the general public." Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA [See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'"] and the intent of the Michigan legislature in enacting the MFOIA provision cited above.

Disclosure of the requested information is in the public interest and will primarily benefit the general public. This request and disclosure of the requested information will further public understanding of government conduct; specifically, the monitoring, surveillance, and infiltration of organizations by the FBI, the MSP and other governmental agencies and organizations  on the basis of national origin, racial and/or ethnic background, religious affiliation, organizational membership, political views or affiliation, or participation in protest activities or demonstrations. This type of government activity concretely affects many individuals and groups and implicates and may threaten basic privacy, free speech, and associational rights protected by the Constitution.

Moreover, disclosure of the requested information will aid public understanding of the implications of such matters as the Department of Justice's recent decision to relax guidelines that previously restricted the FBI's ability to spy on organizations without a threshold showing of suspected criminal activity.  These restrictions were created in response to the Hoover-era FBI's scandalous spying on politically active individuals and organizations, despite the complete lack of evidence that such individuals and organizations had been involved in any unlawful behavior.  Understanding the current scope of the FBI's surveillance and infiltration of law-abiding organizations and the extent and nature of the involvement of other governmental agencies, entities and personnel in connection with such activities is, therefore, crucial to the public's interest in understanding the consequences of the Department of Justice's important change in policy. As a three-member panel of the 11th U.S. Circuit Court of Appeals recently ruled "We cannot simply suspend or restrict civil liberties until the war on terror is over, because the war on terror is unlikely ever to be truly over...Sept. 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country." Bourgeois v. Peters, No. 02-16886 (Oct. 15, 2004).

This topic is one of widespread public concern at this unique historical moment as the wide array of newspaper articles referenced in Section V below illustrate. It is of particular concern to citizens and organizations in the metropolitan Detroit area. According to an article in The Washington Times, October 24, 2001:

> This city (Detroit) has been cited in a state police report as a "major financial support center for many Middle East terrorist groups," setting the sizable Arab-American community on edge. The report, presented to the Michigan Legislature last week, also says that "members of [terrorist] groups commit criminal acts to raise financial resources to support terrorist operations overseas. ... [I]t is also conceivable that sleeper cells may be located in [the Southeast] area of the state. Southeast Michigan is known as a lucrative recruiting area and potential support base for [terrorist] groups." The 22-page report,

obtained by The Washington Times, says that 374 "potential threat elements" were located in Michigan, home to the largest Arab population outside the Middle East. A state police spokesman said yesterday that the document was not intended to be public, but instead was part of an effort to solicit federal money for terrorism-response programs... The report was compiled over two years through data from law enforcement agencies from all 83 counties in the state, as well as several local jurisdictions. "According to the Detroit Field Office, FBI, most of the 28 [terrorist] groups recently identified by the State Department, some of which are known to target U.S. citizens and U.S. interests, are represented in Michigan," the report states. "Examples include such well-known terrorist organizations as Hezbollah, Hamas, Islamic Jihad, Egyptian Brotherhood, Al-Gama'at, Al-Islamiyya, and Osama bin Laden's terrorist organization - Al Qaeda."

In addition, disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the relationship between federal and local law enforcement agencies with regard to the operations and activities of the National and local Joint Terrorism Task Forces. The public has an interest in understanding this relationship as it affects both national and local law enforcement practices and their application to the public. In addition, the public has an increased interest in such understanding since this relationship has, to the best of our knowledge, changed over the course of the last several years. Disclosure of the requested information is also in the public interest because such information may provide the public with information about overly aggressive and/or discriminatory policing.

As a nonprofit 501(c)(3) organization and "representative of the news media" as discussed in Section III, the ACLU is well-situated to disseminate information it gains from this request to the general public as well as to immigrant, religious, politically active, and other targeted communities, and to groups that protect constitutional rights. Because the American Civil Liberties Union meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the organization.[4]

The records requested are not sought for commercial use, and the Requestors plan to disseminate the information disclosed as a result of this FOIA and MFOIA request through the channels described in Section III. As also stated in Section III, the ACLU will make any information disclosed as a result of this FOIA and MFOIA request available to the public at no cost.

## V.   <u>Expedited Processing Request</u>

Expedited processing is warranted where there is "an urgency to inform the public about an actual or alleged federal government activity" by organizations "primarily engaged in disseminating information" 28 C.F.R. § 16.5(d)(1)(ii).[5] This request implicates an urgent matter of public concern; namely, the potentially extensive monitoring and surveillance of individual citizens, as well as political, religious, and community organizations, throughout the

---

[4] For example, the Department of Health and Human Services granted a fee waiver to the American Civil Liberties Union with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the organization in August 2003. In addition, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the organization fees associated with a FOIA request submitted by the organization in August 2002.

[5] The ACLU is "primarily engaged in disseminating information," as discussed in Sections III and IV.

9

nation by the FBI, "Task Forces" of various sorts and other agencies and entities as well as such activity by the MSP, various "Task Forces" and other state and local agencies and entities in Michigan. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease, future violations are prevented, and any chilling effect on public participation in potentially targeted groups and/or political activity is halted.

In addition, this request deals with potential disparate treatment of groups on the basis of categories such as religion, nationality and political viewpoint. Such potential unequal treatment is a matter necessitating immediate attention. There is also intense public concern, particularly among potentially targeted groups, about the actual or alleged federal government activity addressed by this request. This intense public concern is illustrated by the selection of news coverage detailed in the paragraph below.

A requestor may also demonstrate compelling need by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the request relates to possible violations of Constitutional rights by federal law enforcement and potential targeting of groups by federal law enforcement based on illicit categories of political viewpoint, race, religion and nationality. The exceptional media interest in this issue is reflected in widespread news coverage at both the local and national level. *See e.g.* Daily Star Staff, *American Arabs Concerned Over FBI's 'October Plan,'* www.dailystar.com.1b, October 6, 2004; David Shepardson, *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack,* The Detroit News, October 1, 2004; Eric Lichtblau, *Subpoena Seeks Records About Delegate Lists on Web,* NY Times, August 30, 2004 at P10; Alex Bradley and John Mayer, *The War at Home: Nationwide Crackdown on Activists Part,* www.saveourliberties.com, September 2, 2004; Eric Lichtblau, *Protestors at Heart of Debate on Security vs. Civil Rights,* NY Times, August 27, 2004 at A9; Larry Abramson, *FBI Questioning Political Demonstrators,* NPR.org; Susan Greene, *Activists Decry Pre-Convention Security Tactics: Questions by FBI, The Feds Say They're Trying to Avoid Terror Threats, But Many People Say the Steps Veer Toward Intimidation,* The Denver Post, August 26, 2004 at A-08; August 17, 2004; Eric Lichtblau, *F.B.I. Goes Knocking for Political Troublemakers,* NY Times, August 16, 2004 at A1; Amy Herder, *Teaching the Silent Treatment,* The Denver Post, August 8, 2004 at C-01; Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups,* San Francisco Chronicle, August 6, 2004; Camille T. Taiara, *New F.B.I. Witch-Hunt,* San Francisco Bay Guardian, August 4-10, 2004; Kelly Thornton, *F.B.I.'s Home Visits Have Some Muslims Feeling Harassed, Alienated,* Signonsandiego.com, August 4, 2004; Richard Schmitt and Donna Horowitz, *FBI Starts to Question Muslims in U.S. About Possible Attacks,* latimes.com, July 18, 2004; Karen Abbott, *FBI's Queries Rattle Activist,* www.rockymountainnews.com, July 27, 2004; Mary Beth Sheridan, *Interviews of Muslims to Broaden,* www.washingtonpost.com, July 17, 2004; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry,* The Des Moines Register, February 7, 2004; Jeff Eckhoff and Mark Siebert, *Anti-war Inquiry Unrelated to Terror, The Des Moines Register,* February 10, 2004 at 1A; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry,* The Des Moines Register, February 7, 2004; Monica Davey, *An Antiwar Forum in Iowa Brings Federal Subpoenas,* NY Times, February 10, 2004 at A14; Monica Davey, *Subpoenas on Antiwar Protest Are Dropped,* NY Times, February 11, 2004 at A18; Michelle Goldberg, *A Thousand J. Edgar Hoovers,* www.salon.com, February 12, 2004; Michelle Goldberg, *Outlawing Dissent,* www.salon.com, February 11, 2004; Kerri Ginis, *Peace Fresno Seeks Damages,* The Fresno Bee, February 28, 2004; Eric Lichtblau, *F.B.I. Scrutinizes Antiwar Rallies,* www.nytimes.com, November 23, 2003.

The potential targeting of individuals and groups by the federal government on the basis of group membership, religion, political protest, nationality, and other similar categories raises many questions about the government's integrity and affects public confidence in a profound way.  The government's – and particularly the FBI's and MSP's – treatment of persons on the basis of their political viewpoints is a critical issue with a long history. Questions about the government's integrity in these areas substantially affect the public's confidence in the government's ability to protect all of its citizens and in law enforcement and the legal system. This issue has been of concern to lawmakers, including three members of the House of Representatives.  *See, e.g.*, Eric Lichtblau, *Inquiry into F.B.I. Question Is Sought,* NY Times A16, August 18, 2004.

We reserve the right to supplement and amend this request.

I, Michael J. Steinberg, affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Michael J. Steinberg

Dated: December 2, 2004