

 FOUNDATION

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF COLORADO**

CATHRYN L. HAZOURI EXECUTIVE DIRECTOR. MARK SILVERSTEIN, LEGAL DIRECTOR

December 2, 2004

Phillip B.J. Reid, Special Agent in Charge
Denver Division, Federal Bureau of Investigation
1823 Byron G. Rogers Federal Building
1961 Stout Street, Suite 1823
Denver, CO 80294

Re: Request under Freedom of Information Act and Privacy Act

Please consider this letter as a written request under the Freedom of Information Act, 5
U.S.C. § 552 ("FOIA") and the Privacy Act, 5 U.S.C. § 552a. This request is made by
the American Civil Liberties Union of Colorado and the American Civil Liberties Union
Foundation of Colorado (collectively referenced as "ACLU of Colorado"). It is also
made on behalf of the additional organizations defined and described in Section II.A.,
below, as the "Requesting Organizations," and on behalf of the persons defined and
described in Section II.B., below, as the "Requesting Individuals."

I.    **Background**

A.    **The Denver Police Spy Files**

On March 11, 2002, the ACLU of Colorado held a news conference where it
disclosed documents originating from the Intelligence Bureau of the Denver Police
Department (DPD). The documents indicated that officers of the DPD Intelligence
Bureau had been monitoring and collecting information about the peaceful protest
activities of Denver-area residents and keeping files on the constitutionally-protected
advocacy activities of numerous Colorado organizations, in some cases falsely labeling
them in the files as "criminal extremist."

Two days later, Denver Mayor Wellington Webb publicly acknowledged that the
DPD Intelligence Bureau had been collecting information and building criminal
intelligence files, at least some of which he acknowledged amounted to inappropriate
monitoring of lawful First Amendment activity. At the time, Mayor Webb stated that the
Intelligence Bureau had purged most of what had once been a far larger set of hard-copy
files encompassing information on thousands and thousands of persons. According to
Mayor Webb, in 2000 the Intelligence Unit purged 90% of those records and moved all
of its information into a computer database called Orion that, as of 2002, contained files
on 3200 individuals and 208 organizations. Several months later, however, the DPD

Phillip B.J. Reid
December 2, 2004
Page 2 of 24

disclosed that six file cabinets of additional hard-copy intelligence files in the DPD Intelligence Bureau had never been purged. With these hard-copy files included, it is estimated that the DPD Intelligence Bureau in 2002 maintained files on the activities of as many as 1000 organizations and close to 10,000 individuals.

In this document, the term "Spy Files" or "Denver Police Spy Files" refers to these documents maintained at the DPD Intelligence Bureau, many of which were classified as "criminal intelligence files." In fact, many of these files often had nothing whatsoever to do with real or suspected criminal activity but instead consisted solely of information about how Denver-area residents were lawfully exercising their First Amendment rights.

### B.    The Spy Files Lawsuit

In response to disclosures about the Denver Police Spy Files, lawyers for the American Civil Liberties Union Foundation of Colorado filed a class action lawsuit in late March, 2002. The lawsuit, <u>American Friends Service Committee v. City and County of Denver</u>, No. 02-N-0740, United States District Court, District of Colorado, challenged the DPD's practice of collecting information, keeping files, and disseminating information about political views, political activities, and political associations that are not relevant to serious and reasonably suspected criminal activity.   In this document, the term "Spy Files lawsuit" refers to this litigation.

### C.    The Spy Files Settlement Agreement

In May, 2003, Judge Nottingham approved a negotiated settlement of the Spy Files lawsuit. The Settlement Agreement included a new written intelligence policy, negotiated by the parties, that would govern the activities of DPD officers. The Settlement Agreement and the new policy imposed restrictions on the collection, maintenance, and/or dissemination of information about the political views, political activities, or political associations of individuals and organizations. In most cases, collection or maintenance of such information is permitted only when the information is directly relevant to a list of specified criminal activities and there are facts amounting to reasonable suspicion that the individual or organization is involved in that criminal activity.

Some organizations and individuals choose to express their views by participating in symbolic acts of civil disobedience. Although such tactics are a time-honored and respected method by which participants in social and political movements have expressed their opinions, this form of expressive activity violates the criminal law and is not protected by the First Amendment. The new policy of the DPD Intelligence Unit, however, specifically forbids collecting and/or maintaining information about organizations or individuals "on the basis of involvement in expressive activity that takes the form of non-violent civil disobedience that amounts, at most, to a misdemeanor

Phillip B.J. Reid
December 2, 2004
Page 3 of 24

offense." Denver Police Department, Policy 118.03, "Criminal Intelligence
Information," § 6.c.(5).

In this document, the term "Settlement Agreement" or "Spy Files Settlement
Agreement" refers to this negotiated resolution of the Spy Files lawsuit. The term "DPD
Intelligence Policy" refers to Policy 118.03, adopted as part of the Settlement Agreement.

**D.    Implications of the Spy Files Settlement Agreement for
       members of the DPD Intelligence Bureau who are assigned to
       the Denver JTTF**

The Denver Police Department participates in the Denver Joint Terrorism Task
Force (JTTF). Since 1997, it has contributed the services of Tom Fisher, a detective with
the DPD Intelligence Unit, to work full-time for the JTTF. According to a sworn
declaration signed by Detective Fisher in connection with the Spy Files litigation, all of
his work as a law enforcement officer since 1997 has been as a deputized federal agent
working for the JTTF under the supervision of the FBI. Since at least the spring of 2003,
Denver has also been contributing the full-time services of a second officer from the DPD
Intelligence Bureau, Detective Stephen MacKenna.

The Spy Files Settlement Agreement restricts Denver police officers from
gathering information about First Amendment activities except under certain specified
conditions. It is more restrictive than the Attorney General Guidelines that govern the
FBI's gathering of information. Thus, pursuant to the Settlement Agreement, Denver
police officers in general, and particularly officers assigned to the Intelligence Bureau,
are prohibited from collecting, maintaining, or disseminating information that their
counterparts at the FBI are permitted to collect, maintain, or disseminate.

Shortly after the Settlement Agreement was signed, a question arose about how it
applies to the officers from the DPD Intelligence Bureau whom Denver assigns to work
for the FBI as part of the Denver JTTF. At a meeting of the Denver Public Safety
Review Commission on May 15, 2003, Denver Chief of Police Gerald Whitman stated
emphatically that the Settlement Agreement applied to all Intelligence Bureau personnel,
including the two officers assigned to JTTF. He stated that he had already instructed the
two JTTF-assigned officers that they must comply with the Settlement Agreement.[1]

---

[1] Chief Whitman stated as follows:

> To clarify one other question that came up about JTTF .... I have already told the two
> detectives who work there: they are under this Policy. Their activity is controlled by the
> Denver Police Department, not the FBI. And that's clear with them. And I will certainly
> make it clear with the SAC [Special Agent in Charge] of the FBI over there. Now I know
> that I have a more restrictive policy to some degree than the JTTF operates under, under
> CFR. But my two detectives are bound by this policy -- their activity, their collection of
> information, their sharing of information is controlled by the Police Department, not the
> FBI.

Statement of Gerald Whitman at the Denver Public Safety Review Commission, May 15, 2003, as
quoted in the Third Denver Police Intelligence Bureau Audit Report, October 27, 2004, at p. 11.

Phillip B.J. Reid
December 2, 2004
Page 4 of 24

Wallace Wortham, Denver City Attorney at the time, then addressed the same question at the same meeting of the Public Safety Review Commission. According to Mr. Wortham, the Settlement Agreement did not apply to the DPD officers assigned to JTTF. Mr. Wortham said that the information-collection activities of these officers would be governed solely by the rules and guidelines of the FBI.

### E.    Denver's Memorandum of Understanding with the JTTF

In the hope of clarifying the role of DPD Intelligence Bureau officers assigned to the Denver JTTF, the ACLU of Colorado requested, pursuant to the Colorado Open Records laws, a copy of the Memorandum of Understanding between Denver and the FBI regarding Denver's participation in the JTTF. Chief Whitman declined to disclose the document, contending that disclosing the document would be "contrary to the public interest." The ACLU filed suit to force disclosure and finally obtained the Memorandum of Understanding in January, 2004.

The Memorandum of Understanding contemplates that officers from some jurisdictions might be bound by restrictions on investigative techniques or information-gathering that do not bind the FBI. It expressly states that officers from non-FBI agencies "shall be required to utilize only those investigative techniques consistent with their given standards and procedures." From this text, it appears that Denver's agreement with the JTTF would not be violated if the DPD officers assigned to JTTF were required to follow the Settlement Agreement and the DPD Intelligence Policy.

Nevertheless, there remains considerable doubt whether the DPD Intelligence officers assigned to JTTF have been carrying out their duties with the understanding that they must comply with the Settlement Agreement. On October 27, 2004, Steve Briggs of the Judicial Arbiter Group, Inc., submitted the Third Denver Police Intelligence Bureau Audit Report. These audits are required by the Settlement Agreement and the DPD Intelligence Policy. The auditor interviewed both DPD Intelligence Bureau officers who are assigned to JTTF:

> "Both stated their understanding that when they are working with DJTTF they are subject only to federal guidelines, such as the United States Attorney General (AG) guidelines. The [DPD Intelligence] Policy does not apply. This is contrary to the understanding of Chief Whitman, as expressed to the Public Safety Review Commission at its meeting on May 15, 2003."

Steve Briggs, Third Denver Police Intelligence Bureau Audit Report, October 27, 2004, at p. 11.

Phillip B.J. Reid
December 2, 2004
Page 5 of 24

**F.**   **Discovery from the Spy Files litigation indicates that the FBI
and the Denver JTTF have been collecting information on
peaceful political activities that have no connection to
terrorism**

Discovery obtained in the course of litigating the Denver Spy Files case revealed
that detectives assigned to the DPD Intelligence Bureau freely and frequently shared
political surveillance information with their counterparts at numerous local, state, and
federal law enforcement agencies, including the FBI. In most cases, the DPD maintained
no systematic record of such intelligence-sharing and left no paper trail. Nevertheless,
ACLU attorneys did obtain a number of documents from the DPD Intelligence Bureau,
many of which are now public and posted on the ACLU of Colorado web site, that
indicate that the FBI and the Denver JTTF have been collecting information on peaceful
political activities that have no connection to terrorism. Descriptions of the contents of
these documents, as well as links to the documents themselves, are available at
http://www.aclu-co.org/spyfiles/fbifiles.htm.

1.   One set of documents obtained in discovery in the Denver Spy
Files case was stored in the DPD Intelligence Unit in a tabbed three-ring binder.
One tab was labeled: "Colorado and local links: JTTF Active Case List." The
pages in that section consist of printouts made in April, 2002, from the web sites
of such local Colorado groups as Colorado Campaign for Middle East Peace,
American Friends Service Committee, Denver Justice and Peace Committee, and
the Human Bean Company.

2.   Discovery in the Spy Files case also uncovered several emails
originally sent by political activists discussing upcoming rallies or plans for
meetings. Although these emails were originally directed to supporters and
potential participants, law enforcement officers received them electronically and
forwarded them, not only to the DPD Intelligence Bureau, but also to the FBI.

3.   The Denver Spy Files case also revealed that intelligence officers
from at least two dozen local, state, and federal law enforcement agencies in
Colorado meet to swap political intelligence information at bimonthly meetings of
a little-known organization known as the Multi-Agency Group Intelligence
Conference (MAGIC). Agendas for these MAGIC meetings state that they are
"limited to sharing of information on extremist groups (left-wing, right-wing,
foreign)." Although the term "extremist groups" is not defined, MAGIC-related
documents indicate that it includes peaceful protesters and law-abiding advocacy
organizations who have no connection to criminal activity, such as the American
Indian Movement, the American Friends Service Committee, End The Politics of
Cruelty, and Amnesty International.

The ACLU of Colorado has obtained a sign-in sheet showing the names
and affiliations of the persons in attendance at one MAGIC meeting held in 1992.

Phillip B.J. Reid
December 2, 2004
Page 6 of 24

They include several law enforcement employees such as Ahmad Taha, Tim Delaria, George Kennedy, Dave Pontarelli, Donald Estep, and Jodie Furlong. These names also appear, 8-10 years later, on the emails discussed in the previous numbered paragraph, which show them receiving and forwarding information about innocent political activities to various law enforcement agencies, including the FBI. The ACLU of Colorado believes that JTTF officers now attend or receive briefings about the information exchanged at MAGIC meetings.

**G.     Information from another ACLU of Colorado lawsuit provides further confirmation that the Denver JTTF has collected information on peaceful political activities**

In 2000-2001, the Campaign for Labor Rights organized a national coalition to conduct a campaign of solidarity with union members who were fighting for better conditions at Chentex plants in Nicaragua. Groups participating in the campaign carried out dozens of nonviolent actions at Kohl's Department Stores that sold Chentex-produced clothing. In Colorado, Denver Justice and Peace Committee (DJPC) joined the campaign. At one DJPC-sponsored rally during the 2000 holiday shopping season at the Kohl's store in Golden, four persons dressed in Santa costumes showed up and vandalized Kohl's merchandise. As it began its investigation of the vandalism, the Golden Police Department quickly obtained the assistance and participation of JTTF agent Tom Fisher.

In a currently-pending ACLU lawsuit, DJPC challenges the validity of a search warrant that authorized Golden police to seize the organization's 800-person membership list as well as any papers, pamphlets, and posters that are "protest-related." After the search, the Golden police provided DJPC's membership list to JTTF Agent Tom Fisher for what one Golden detective referred to as "cross-referencing." Detective Fisher also asked for, and obtained from Kohl's, approximately 100 pages of documents detailing the constitutionally-protected activities that the Campaign for Labor Rights had organized around the country.

**H.     The FBI Intelligence Bulletin dated October, 2003**

In anticipation of antiwar rallies scheduled to take place around the country in October 2003, the FBI issued a detailed "Intelligence Bulletin" that it distributed to state and local law enforcement agencies. The memo, titled "Tactics Used During Protests and Demonstrations," asks police to "be alert" to "possible indicators of protest activity." Although the memo discusses some specific forms of possible criminal activity such as trespass and vandalism, it warns that even peaceful civil disobedience "can create a climate of disorder." The memo also details legitimate activities that are protected by the First Amendment, such as "us[ing] the internet to recruit, raise funds, and coordinate their activities" and "fundraising in support of the legal defense of accused protesters." It describes activists' videotaping of police officers as an "intimidation technique" and warns that it may be used "for documenting potential cases of police brutality and for

Phillip B.J. Reid
December 2, 2004
Page 7 of 24

distribution of information over the internet." After asking law enforcement to be on the lookout for "these possible indicators of protest activity," the memo concludes by asking all law enforcement officers to "report any potentially illegal acts to the nearest FBI Joint Terrorism Task Force."

Many law enforcement agencies likely interpreted this memorandum as an invitation to provide the Joint Terrorism Task Force with information about constitutionally-protected political activities and peaceful expressive activities that have no connection to terrorism. Even in the portion of the memorandum that refers to "potentially illegal acts," the JTTF invites law enforcement agencies to provide information about plans for peaceful symbolic non-violent civil disobedience. In Colorado, organizations that planned and carried out peaceful nonviolent civil disobedience in protest of the war on Iraq later learned that police officers working undercover for Denver-area local law enforcement agencies had infiltrated their groups; participated in their non-violence training; and in some cases had even pretended to submit to "arrest." The FBI's memo of October, 2003, provides grounds to believe that information obtained by local law enforcement agencies in the course of such undercover work, as well as additional information on political activities with no connection to terrorism, may have been forwarded to the Denver JTTF.

I.    **The Denver JTTF's questioning of activists, summer 2004**

On July 22, 2004, two separate teams of JTTF agents, accompanied by Denver police officers, some of whom were dressed in SWAT gear, simultaneously appeared at two neighboring residences in Denver that are home to a number of young political activists who have participated in local rallies and demonstrations. At the first residence, the JTTF agents gathered together everyone who was present (both residents and some guests) and posed three questions. Are you planning to commit any crimes at the upcoming Democratic and Republican conventions in Boston and New York? Do you know anyone who is planning any crimes? Are you aware that you commit a crime if you have some information but fail to tell the FBI? The JTTF agents had a stack of approximately two dozen pages, each of which contained a photograph and what appeared to be narrative text pertaining to the individual pictured. One resident said that the photos she was able to view resembled persons she did not know but had seen at lawful demonstrations in Denver. When the young people declined to provide their names, the FBI responded that they would therefore have to use more "intrusive means" to complete their job.

One of the DPD Intelligence officers working full-time for the JTTF, Detective Stephen MacKenna, participated in the visit to the second home, where JTTF agents asked basically the same questions. MacKenna told one of the residents that the FBI had the address "in the file" from a flyer advertising a meeting that was circulated on the Auraria campus a year earlier.

Phillip B.J. Reid
December 2, 2004
Page 8 of 24

The next day, a JTTF agent visited a third activist at his workplace in Fort Collins to ask similar questions. JTTF agents made similar visits and telephone calls to additional activists not only in Colorado, but in at least five additional states. After a number of media inquiries, the FBI acknowledged that "JTTFs in several states" were assigned the job of conducting these and other interviews, though the FBI denied that the individuals were targeted for questioning because of their political views or associations.

After an article about the JTTF program of questioning political activists appeared on the front page of the New York Times, three members of the House Judiciary Committee called for a Justice Department investigation to determine whether the JTTF was engaged in "systematic political harassment and intimidation of legitimate antiwar protesters."

## J.    Labeling nonviolent protesters as "members of a terrorist organization" in the FBI's Violent Gang and Terrorist Organization File (VGTOF)

There is evidence that the FBI has labeled nonviolent protesters as "members of a terrorist organization" in a computerized FBI-maintained database called the Violent Gang and Terrorist Organization File ("VGTOF"). Similarly, there is evidence that the FBI has labeled organizations as "terrorist" in this database even when they are engaged solely in peaceful expression of views that has no connection with terrorism.

Whenever a police officer performs a routine computer check of names or vehicles at a traffic stop, the VGTOF database is among the databases that are searched. Although the VGTOF database was originally begun in 1995 for the primary purpose of tracking violent criminal street gangs that plague urban communities, the FBI in 2002 began expanding the number of persons entered in the database because of their perceived connection to domestic "terrorism." According to the Wall Street Journal, by the spring of 2003, VGTOF contained the names of 7000 persons listed as terrorists, including persons who had no criminal record. Ann Davis, "Data Collection Is Up Sharply Following 9/11," The Wall Street Journal, May 22, 2003, at B1.

An FBI memo obtained by the ACLU of Colorado during the Spy Files lawsuit lists 11 categories of what the FBI called "extremists" that had recently been added to the VGTOF database: 1) "Anarchists," 2) "Militia," 3) "White Supremacist," 4) "Black Extremist," 5) "Animal Rights Extremist," 6) "Environmental Extremist," 7) "Domestic Extremist," 8) "Radical Islamic Extremist," 9) "European Origin Extremist," 10) "Latin Origin Extremist," and 11) "Asian Origin Extremist." None of the terms are defined. See http://www.aclu-co.org/spyfiles/Documents/20382.pdf. The memo asks law enforcement agencies to notify the Joint Terrorism Task Force whenever any officers encounter any person listed in the VGTOF database.

A memo obtained by the ACLU of Colorado in the Spy Files Litigation documents a Denver patrol officer's receipt of a VGTOF "hit" during a routine

Phillip B.J. Reid
December 2, 2004
Page 9 of 24

investigation of a fender-bender. According to the memo, when the officer ran a computer check on one of the drivers, "a caution warning came up, stating he was a member of a terrorist organization."[2]

An almost identical warning was returned in 2002 after a routine computer check of William Sulzman, a former Catholic priest whose history of protest activity reflects a consistent commitment to peace and nonviolence. As he sat in a patrol car, Sulzman heard the radio report come back, saying that the FBI listed Sulzman as a "member of a terrorist organization." Although Sulzman has been arrested and convicted in connection with protest activity, his violations of the law have always been limited to nonviolent civil disobedience.

## II.    Requesting Organizations and Requesting Individuals

### A.    Requesting Organizations

This request for documents and information covers documents referring to or relating to a number of specific organizations, which are referenced collectively as the "Requesting Organizations." The Requesting Organizations are the following:

1010305

1.    Rocky Mountain Animal Defense, also known as RMAD, is based on Boulder, Colorado. It works to end human-imposed suffering of animals in the Rocky Mountain region, though public education, investigation and research, the legislative process, direct action, and appeals to reason and compassion. Falsely labeled as "criminal extremist" by the Denver Police Department (DPD) Intelligence Unit, the group's members, its peaceful protests, and its constitutionally-protected organizing activities were the subject of numerous pages in the Denver Police Spy Files. Some of those pages, including emails discussed in Section I.F.2, above, indicated that copies were sent to the FBI.

1010306

2.    Campaign for Labor Rights based in Washington, D.C., works through public education and leafleting/picketing campaigns to inform and mobilize grassroots activists in solidarity with major, international anti-sweatshop struggles. As indicated in Section I.G., above, JTTF Agent Tom Fisher received approximately 100 pages of documents detailing the

---

[2] The memo was written in August, 2002, after the Spy Files controversy and the pending litigation had already prompted the DPD Intelligence Bureau to stop adding information to its computerized Spy Files database. Discovery in the Spy Files litigation revealed that the subject of the patrol officer's memo had already been entered into the Spy Files computer database, where he was listed as a member of an organization that Denver police listed as "militia." The only information about this organization available in the Spy Files, however, documented only its lawful advocacy for Second Amendment rights. There was no information in the Spy Files supporting the labeling of the group as either a "militia" group or a terrorist organization of any kind.

Phillip B.J. Reid
December 2, 2004
Page 10 of 24

constitutionally-protected activities that the Campaign for Labor Rights
has organized around the country.

\01030ๆ

3.  Denver Justice and Peace Committee, Inc., also known as DJPC, began as
    a grass-roots interfaith organization in the early 1980s. It promotes human
    rights, economic justice and lasting peace in Latin America through
    education, solidarity projects, and nonviolent activism.

    As indicated in Section I.G., above, DJPC is currently challenging the
    validity of a search warrant that authorized Golden police to seize the
    organization's 800-person membership list as well as any papers,
    pamphlets, and posters that are "protest-related." After the search, the
    Golden police provided DJPC's membership list to the JTTF for what one
    Golden detective referred to as "cross-referencing." In addition,
    documents regarding DJPC appear in the DPD Intelligence Unit file from
    2002, described above in Section I.F.1., that is titled "Colorado and local
    links: JTTF Active Case List."

    \010308

4.  American Friends Service Committee, also known as AFSC, winner of the
    Nobel Peace Prize in 1947, carries out service, development, social justice,
    and peace programs throughout the world. Founded by Quakers in 1917,
    its work is based on the Quaker belief in the worth of every person and
    faith in the power of love to overcome violence and injustice.

    As one of the plaintiffs in the Denver Spy Files case, AFSC learned that
    the DPD Intelligence Bureau had long monitored the group's Colorado
    activities, had falsely labeled it as "criminal extremist," and had compiled
    an extensive file, complete with photographs and names, addresses, and
    license plate numbers of participants in AFSC events. The political
    activities of AFSC are listed as a subject for discussion on a document that
    appears to be an agenda for a meeting of the intelligence-sharing
    organization know as MAGIC described above in Section I.F.3.
    Documents detailing AFSC events appear in the DPD Intelligence Unit
    file from 2002, described above in Section I.F.1., that is titled "Colorado
    and local links: JTTF Active Case List." In addition, it is likely that the
    JTTF has collected information about AFSC's peaceful antiwar activities
    pursuant to the "Intelligence Bulletin" discussed in Section I.H., above.

    \010309

5.  Colorado Campaign for Middle East Peace has been active in Colorado
    since the early 1990s. It has sponsored numerous peaceful demonstrations
    and vigils to raise public awareness about the effects of United States
    policies in the Middle East, with a focus on Iraq and Palestine.

    The Denver Spy Files revealed that the organization was a frequent target
    of political surveillance by Denver police, and pages detailing the

Phillip B.J. Reid
December 2, 2004
Page 11 of 24

organization's First Amendment activities appear in the 2002 DPD
Intelligence Bureau file titled "Colorado and local links: JTTF Active
Case List." See Section I.F.1, above. It is also likely that the JTTF has
collected information about the group's peaceful antiwar activities
pursuant to the "Intelligence Bulletin" discussed in Section I.H., above.
101 0310

6. Chiapas Coalition is a Denver-based organization that conducts education
and advocacy activities in support of the human rights struggle of
indigenous persons in the Mexican state of Chiapas. It has organized
many vigils and rallies outside the Mexican consulate in Denver.

The Denver Spy Files litigation uncovered numerous documents
confirming that the DPD Intelligence Bureau, which falsely labeled the
Chiapas Coalition as "criminal extremist," regularly monitored its
activities and kept files on members and participants. When activists
conducted a meeting with officials at the Mexican consulate to discuss the
situation in Chiapas, the DPD sent an undercover officer to attend. The
Denver Police freely shared their information about Chiapas Coalition
with other law enforcement agencies. An apparent agenda for a MAGIC
meeting lists "Chiapas" and "Mexican Consulate" as items for discussion.
Documents related to Chiapas Coalition appear in a DPD Intelligence Unit
file compiled in 2002 that is titled "JTTF Active Case List."
1010 311

7. End the Politics of Cruelty, also known as EPOC is a Denver-based
human rights organization that conducts rallies, educational programs,
demonstrations, and other activities to promote its views. In recent years
it has focused on issues of police accountability in Denver.

EPOC was a plaintiff in the Denver Spy Files lawsuit, which uncovered
documents demonstrating that the DPD Intelligence Bureau had falsely
labeled the group as "criminal extremist." The Denver police also shared
information about the group's First Amendment activities with dozens of
law enforcement agencies participating in MAGIC, see Section I.F.3.,
above. Several pages of documents discussing an EPOC-sponsored
program titled "Denver Activist Legal Trainings" appear in the DPD
Intelligence Bureau filed compiled in 2002 that is titled "JTTF Active
Case List." See Section I.F.1., above.
1010 312

3. The Human Bean Company, with a retail store at 218 S. Broadway, is a
leading Denver example of the growing "fair trade" movement. It
supports the struggle of indigenous persons in Chiapas, Mexico by
providing a direct commercial outlet for their locally-produced coffee,
honey, and other products. Meetings of the Chiapas Coalition have been
held at the store, and it was a target of surveillance and monitoring by the
DPD's Intelligence Unit. Documents about The Human Bean Company

Phillip B.J. Reid
December 2, 2004
Page 12 of 24

appear in a DPD Intelligence Bureau file compiled in 2002 titled "JTTF
Active Case List."

\1010313

9.  American Indian Movement of Colorado, also known as AIM or Colorado
AIM, is the subject of one of the most voluminous of the Denver Spy
Files, which falsely labeled the organization as "criminal extremist."
Among other activities, AIM has been active in nonviolent efforts to end
the celebration of October 12 as Columbus Day.

The Spy Files revealed that Denver police shared information about
AIM's political activities not only with the FBI, but also with intelligence
officers from a wide variety of federal, state, and local law enforcement
agencies in Colorado, including participants at meetings of MAGIC
discussed above in Section I.F.3. Several pages of documents discussing
an AIM co-sponsored program titled "Denver Activist Legal Trainings"
appear in a DPD Intelligence Bureau file compiled in 2002 titled "JTTF
Active Case List."

\1010314

10. Ancient Forest Rescue, labeled falsely in the Denver Spy Files as
"criminal extremist," is an environmental organization dedicated to
preserving the biodiversity and ecosystems of Colorado's forests and road
less areas through education, litigation, and nonviolent direct action.
Information from the Denver Spy Files indicates that the organization's
activities have been a target of surveillance by the FBI as well as the DPD
Intelligence Unit.

\1010315

11. Transform Columbus Day (TCD) is a coalition of organizations, including
Colorado AIM, working to raise public consciousness about the actions of
Christopher Columbus and his legacy of oppression and subjugation of
Native Americans and to end official celebration of October 12 as
Columbus Day. An email sent to supporters about events planned by
Transform Columbus Day in 2002 was received by law enforcement
officers and forwarded to the FBI. See Section I.F.2., above.

\1010316

12. Dandelion Center is a Denver-based social action group that focuses on
human rights and civil liberties issues. It sponsors educational forums,
produces and distributes literature; organizes rallies and demonstrations;
and sponsors training on legal and medical issues for participants in public
demonstrations. Several pages of documents discussing a Dandelion
Center co-sponsored program titled "Denver Activist Legal Trainings"
appear in a DPD Intelligence Bureau file compiled in 2002 titled "JTTF
Active Case List."

\1010320

13. Creative Resistance is an activist student organization with a presence at
three Colorado college campuses. It began in 2002 as an antiwar group

Phillip B.J. Reid
December 2, 2004
Page 13 of 24

dedicated to channeling its message through creative and artistic means. In addition to organizing antiwar protests, it has appeared at committee hearings to oppose the so-called Academic Bill of Rights and has protested the activities of anti-choice groups on Colorado campuses. In the summer of 2004, as part of the program discussed in Section I.I., above, JTTF agents visited the faculty sponsor at one campus, displayed photographs of several members, and attempted to ask questions about their political activities.
                    1010321

14.    <u>Citizens for Peace in Space</u>, also known as CPIS, organized in Colorado Springs in 1987 to continue the work of an earlier organization, STARS, (Committee to Stop the Arms Race in Space), and to oppose President Reagan's "Star Wars" initiative. CPIS advocates the demilitarization of outer space and works to heighten public awareness concerning the dangers of, as well as legal and moral issues surrounding, programs instituted by the United States and other nations to expand military weaponry beyond the earth's atmosphere.

CPIS members have frequently stood peacefully outside of U.S. military bases and the Air Force Academy holding signs and handing out leaflets to communicate their views on peace, nuclear weapons, and military policy. Some members such as longtime participant Bill Sulzman (see below) have also expressed their views by occasionally participating in acts of symbolic and nonviolent civil disobedience. Apparently as a result of those activities, Sulzman is listed in an FBI database as a member of a "terrorist organization." <u>See</u> Section I.J., above. CPIS believes that it is listed as the "terrorist organization" to which the FBI connects Mr. Sulzman.    1010322

15.    <u>Denver CopWatch</u> is a non-violent grass-roots organization working for increased police accountability. Its volunteers – usually equipped with their trademark video cameras – monitor, photograph, and otherwise document police interactions with citizens at ordinary on-the-street encounters as well as rallies and demonstrations. Copwatch also organizes "know your rights" educational workshops; provides assistance to victims of police abuse; lobbies for police reform, and publishes reports about its observations of police conduct.

Denver Copwatch is listed in a document that appears in a DPD Intelligence Bureau file compiled in 2002 titled "JTTF Active Case List." In addition, the FBI "Intelligence Bulletin" described above in Section I.H. invited law enforcement agencies to provide their nearest JTTF with information about groups and individuals carrying out such standard Copwatch activities as videotaping police at demonstrations.

Phillip B.J. Reid
December 2, 2004
Page 14 of 24          1010323

16.   Rocky Mountain Peace and Justice Center, based in Boulder, has worked
      for progressive social change on a variety of issues for more than twenty
      years.  Despite the organization's consistent commitment to what it
      describes as "unconditional nonviolence," it was falsely labeled as
      "criminal extremist" in the Denver Spy Files.  In 2003, undercover police
      officers from the City of Aurora spent several days spying on the
      organization's plans for symbolic civil disobedience at Buckley Air Force
      Base to protest the war in Iraq.  Because the organization and its members
      are consistent participants in antiwar demonstrations, law enforcement
      agencies responding to the FBI "Intelligence Bulletin," see Section I.H.,
      are likely to have provided the JTTF with information about the group's
      lawful organizing activities as well as any participation in peaceful civil
      disobedience.  Rocky Mountain Peace and Justice Center is also listed in a
      document that appears in a DPD Intelligence Bureau file compiled in 2002
      titled "JTTF Active Case List."

## B.   Requesting individuals

      This request for documents and information also covers documents referring to or
relating to a number of specific individuals, who are referenced collectively as the
"Requesting Individuals."  Each of the Requesting Individuals has signed a notarized
authorization that is provided in Appendix 1 to this letter, along with a page providing
specific identifying information for each of the Requesting Individuals.  The Requesting
Individuals are the following persons:

      1.    Kirsten Atkins 1010324
      2.    William Sulzman 1010325
      3.    Mark Cohen 1010326
      4.    Pavlos Stavropoulos 1010327
      5.    Kerry Appel, 1010342
      6.    Sarah Bardwell 1010343
      7.    Scott Silber 1010344
      8.    Stephen Polk 1010345
      9.    Mackenzie Liman 1010346
      10.   Christopher Riederer 1010347

## III.   The Request for Information

### A.   Definitions

      1.    Requesting organizations:  The term "Requesting Organizations" as used
            in this request for information is defined as all of the organizations
            identified in Section II of this letter, as well as their employees, members,
            and persons serving on their boards of directors.

Phillip B.J. Reid
December 2, 2004
Page 15 of 24

2. <u>Records:</u> The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, photographs, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.

3. <u>Activities:</u> The term "activities" as used herein includes, but is not limited to, any activities of the Requesting Organizations or Requesting Individuals as described in Section II above, and any advocacy, provision of services, litigation, lobbying, organizing, fundraising, meetings, marches, rallies, protests, conventions, or campaigns, and any media or communications to, from or about the Requestors Organizations or Requesting Individuals in any form (including any oral, written, electronic or online communications, including but not limited to any books, pamphlets, brochures, newsletters, fundraising letters, correspondence, action alerts, e-mail, web communications, discussion groups, or listserves).

## B. Records Requested

The ACLU of Colorado, and the Requesting Organizations and Requesting Individuals described in Section II, seek disclosure of any records created from January, 1998, to the present, that were prepared, received, transmitted, collected and/or maintained by the Denver Division of the FBI and/or the Denver Joint Terrorism Task Force,[3] that relate to or refer to the following:

1. Any records that refer to or relate to any of the Requesting Organizations or to any of the Requesting Individuals, including but not limited to records that document any monitoring, surveillance, observation, questioning, interrogation, investigation, infiltration, and/or collection of information regarding any of the Requesting Organizations or Requesting Individuals or their activities, as defined above.

2. Emails sent to, forwarded to, or otherwise received by the Denver Division of the FBI, the Denver Joint Terrorism Task Force or any of the individual officers assigned to the Denver FBI or Denver JTTF, that contain addresses indicating that the emails were originally sent to persons receiving messages from an organized email group or email list that

---

[3] This includes, but is not limited to, records to which officers of the Denver Division of the FBI and/or the Denver Joint Terrorism Task Force have access, such as, for example, records that may be accessible from the Denver Division in electronic form even though the data is maintained in a computer at another location. It also includes records maintained at any of the Resident Agency Offices of the Denver Division of the FBI.

Phillip B.J. Reid
December 2, 2004
Page 16 of 24

discusses or concerns social or political issues; political activism,
including rallies and demonstrations; and/or announcements of activities
of organizations engaged in such activity.

This request includes, but is not limited to, emails that contain text
indicating that they were originally sent to participants in, or recipients of,
any of the following email lists or email groups:

    a.   members@rmad.org
    b.   announce@rmad.org
    c.   announce-dan@egroups.com
    d.   waake-up@lists.Colorado.EDU
    e.   action-medical@yahoogroups.com
    f.   djpc-action@yahoogroups.com
    g.   palestine-den@yahoogroups.com
    h.   ccmep-delegation@yahoogroups.com
    i.   palestine-delegation@yahoogroups.com
    j.   colorado-delegation@yahoogroups.com
    k.   ccmep-den@yahoogroups.com
    l.   cocamep@yahoogroups.com
    m.   ccmep_announce@riseup.net
    n.   ccmep@yahoogroups
    o.   iraq-den@yahoogroups.com
    p.   cuaf@egroups.com
    q.   cuaf@yahoogroups.com
    r.   coan@yahoogroups.com
    s.   Colo_Justice-Peace_Discussion@yahoogroups.com
    t.   ccjp-discuss@yahoogroups.com
    u.   ccjp-announce@yahoogroups.com
    v.   tcd-medical@yahoogroups.com
    w.   tcd-news@yahoogroups.com
    x.   denver-ana@yahoogroups.com

3.    Any records relating to or referring to any participation by officers of the
Denver Division of the FBI or the Denver Joint Terrorism Task force in
meetings of the Multi-County Group Intelligence Conference, also known
as MAGIC.   For purposes of this request, the term "participation"
includes receiving any information about what transpired or what was
discussed at any meetings of MAGIC.

4.    Any orders, agreements, or instructions to collect information about,
monitor, conduct surveillance of, observe, question, interrogate,
investigate, and/or infiltrate any of the Requesting Organizations or
Requesting Individuals.

Phillip B.J. Reid
December 2, 2004
Page 17 of 24

5.    Any records relating or referring to how, why or when any of the
      Requesting Organizations or Requesting Individuals was selected for
      collection of information, monitoring, surveillance, observation,
      questioning, interrogation, investigation, and/or infiltration.

6.    Any records relating or referring to how collection of information about,
      monitoring, surveillance, observation, questioning, interrogation,
      investigation, and/or infiltration of any of the Requesting Organizations or
      Requesting Individuals was or will be conducted;

7.    Any records relating to or referring to the names of any federal, state, or
      local government agencies that participate or have participated in any
      monitoring, surveillance, observation, questioning, interrogation,
      investigation, infiltration, and/or collection of information regarding any
      of the Requesting Organizations or Requesting Individuals.

8.    Any records relating or referring to the specific role of the National Joint
      Terrorism Task Force or any local Joint Terrorism Task Force in any
      collection of information about, monitoring, surveillance, observation,
      questioning, interrogation, investigation and/or infiltration of any of the
      Requesting Organizations or Requesting Individuals.

9.    Any records relating or referring to the specific role of any federal, state,
      or local government agency participating in any collection of information
      about, monitoring, surveillance, observation, questioning, interrogation,
      investigation, and/or infiltration of any of the Requesting Organizations or
      Requesting Individuals.

10.   Any records relating or referring to how records about any of the
      Requesting Organizations or Requesting Individuals have been, will be, or
      might be used.

11.   Any policies or procedures for analyzing records about any of the
      Requesting Organizations or Requesting Individuals.

12.   Any policies or procedures for cross-referencing records about any of the
      Requesting Organizations or Requesting Individuals with information
      contained in any database.

13.   Any policies or procedures for cross-referencing records about any of the
      Requesting Organizations or Requesting Individuals with information
      about any other organizations or individuals.

Phillip B.J. Reid
December 2, 2004
Page 18 of 24

14.    Any policies or procedures for cross-referencing records about any of the
Requesting Organizations or Requesting Individuals with any other
information not covered in numbers 12 and 13 above.

15.    Any policies or procedures regarding retention of records about any of the
Requesting Organizations or Requesting Individuals.

16.    Any records referring or relating to the destruction of records about any of
the Requesting Organizations or Requesting Individuals, including any
policies permitting or prohibiting the destruction of records.

17.    Any records referring or relating to how records about any of the
Requesting Organizations or Requesting Individuals were destroyed or
might be destroyed in the future.

18.    Any records referring or relating to the recipient(s) of records about any of
the Requesting Organizations or Requesting Individuals.

19.    Any policies or procedures in place to protect the privacy of records that
refer or relate to the employees, members, and/or board of directors of any
of the Requesting Organizations.

20.    Any records relating or referring to how, why or when collection of
information about, monitoring, surveillance, observation, questioning,
interrogation, investigation, and/or infiltration of any of the Requesting
Organizations or Requesting Individuals was or will be suspended or
terminated.

## IV.    <u>Limitation of Processing Fees</u>

The ACLU of Colorado requests a limitation of processing fees because it does
not seek the requested records for commercial use and because it qualifies as a
representative of the news media. <u>See</u> 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be
limited to reasonable standard charges for document duplication when records are not
sought for commercial use and the request is made by . . . a representative of the news
media . . ."); <u>see also</u> 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees
shall not be charged to "representatives of the news media."). As a "representative of the
news media," the ACLU fits within this statutory and regulatory mandate. Fees
associated with the processing of this request should, therefore, be limited accordingly.

First, the ACLU of Colorado does not seek disclosure of the records for
commercial use. The ACLU of Colorado is a "non-profit, non-partisan, public interest
organization." <u>See Judicial Watch, Inc., v. Rossotti</u>, 326 F.3d 1309, 1310 (D.C. Cir.
2003). In addition, the ACLU of Colorado intends to make any information disclosed as
a result of this FOIA available to the public at no cost.

Phillip B.J. Reid
December 2, 2004
Page 19 of 24

Second, the ACLU of Colorado meets the applicable definition of a representative of the news media. It is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." National Security. Archive v. Department of Defense, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU of Colorado is part of a national organization, the American Civil Liberties Union (ACLU), which is dedicated to the defense of civil liberties. Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Specifically, the ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed web site: http://www.aclu.org/. The web site addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains many hundreds of documents relating to the issues on which the ACLU is focused. The website specifically includes features on information obtained through the FOIA. See, e.g., www.aclu.org/patriot_foia and see www.aclu.org/torturefoia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail. In addition, the ACLU makes archived material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. Moreover, after ACLU publications are disseminated to relevant groups across the country, they often circulate them to their members or to additional groups and organizations.

The ACLU of Colorado intends to share the information obtained in response to this request for records with the national ACLU for use in any and all of the publications and communications described here.

In addition, the ACLU of Colorado engages directly in the activities that qualify it as a representative of the news media. For example, it maintains a web site, www.coloradoaclu.org, which features extensive coverage of the specific civil liberties issues related to political surveillance that prompt this request for records. It also regularly publishes a newsletter that has featured regular editorial coverage of similar issues. Depending on the results of this request for records, the ACLU of Colorado intends to disseminate the results to the public, not only by sharing the information with the national ACLU and the other 52 ACLU affiliates and national chapters around the country, but also on the ACLU of Colorado website and through the ACLU of Colorado newsletter. Accordingly, the ACLU of Colorado fulfills the test articulated in the National Security Archive decision quoted above. See also Electronic Privacy Information Center. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003)

Phillip B.J. Reid
December 2, 2004
Page 20 of 24

(finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

## V.     Waiver of All Costs

The ACLU of Colorado also requests a waiver of all costs, pursuant to the provision of the Freedom of Information Act that provides as follows:

> Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

5 U.S.C. §552(a)(4)(A)(iii).  Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA.  See Judicial Watch. Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'").

Disclosure of the requested information is in the public interest.  This request will further public understanding of government conduct; specifically, the FBI's political surveillance of political views, activities, and associations of groups and individuals who do not constitute any threat and have no connection to terrorism.  This type of government activity concretely affects many individuals and groups and implicates basic privacy, free speech, and associational rights protected by the Constitution.

Moreover, disclosure of the requested information will aid public understanding of the implications of the Department of Justice's recent decision to relax guidelines that previously restricted the FBI's ability to spy on organizations without a threshold showing of suspected criminal activity.  These restrictions were created in response to the Hoover-era FBI's scandalous spying on politically active individuals and organizations, despite the complete lack of evidence that such individuals and organizations had been involved in any unlawful behavior.  Understanding the current scope of the FBI's monitoring of the expressive activities and associations of groups and organizations that are not involved in serious criminal activity or terrorism is, therefore, crucial to the public's interest in understanding the consequences of the Department of Justice's important change in policy.

As a nonprofit organization and "representative of the news media" as discussed in Section IV, the ACLU of Colorado is well-situated to disseminate information it gains from this request to the general public; to the individuals and organizations whose

Phillip B.J. Reid
December 2, 2004
Page 21 of 24

political views and activities subject them to monitoring under the FBI's current practices; and to groups that protect civil liberties and constitutional rights.[4]

The records requested are not sought for commercial use, and the ACLU of Colorado plans to disseminate the information disclosed as a result of this FOIA request through the channels described in Section IV. As also stated in Section IV, the ACLU of Colorado will make any information disclosed as a result of this FOIA available to the public at no cost.

## VI.    Request for Expedited Processing

The ACLU of Colorado requests expedited processing of this request. The Freedom of Information Act and Department of Justice regulations provide for expedited processing in the circumstances presented here. The applicable regulation of the Department of Justice provides in relevant part:

> Expedited Processing.  (1) Requests and appeals will be taken out of order and given expedited treatment whenever it is determined that they involve:
> . . . .
>
> (ii)  An urgency to inform the public about an actual or alleged government activity, if made by a person primarily engaged in disseminating information; or
> . . . .
>
> (iv)  A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

28 C.F.R. § 16.5(d)(1)(ii), (iv). The ACLU of Colorado is entitled to expedited processing on the basis of Subsection (ii) as well as Subsection (iv).

### A.    28 C.R.R. § 16.5(d)(1)(ii)

Subsection (ii) applies here because the ACLU of Colorado is "primarily engaged in disseminating information," and there is an urgency to inform the public about the actual and alleged activities of the FBI and the JTTF in the Colorado area. As explained

---

[4] Because the national ACLU clearly meets the standard for a waiver of costs, fees associated with responding to FOIA requests are regularly waived for the ACLU.  For example, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies, the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Phillip B.J. Reid
December 2, 2004
Page 22 of 24

earlier in Section IV, the ACLU of Colorado must be considered a representative of the
news media for FOIA purposes. In addition to dissemination activities carried out
through the national ACLU and its publications and web site, the Colorado ACLU's web
site, the ACLU of Colorado newsletter, and the other activities discussed in Section IV
also demonstrate that the ACLU of Colorado is primarily engaged in disseminating
information. The ACLU of Colorado web site, in particular, disseminates detailed and
comprehensive information about the issues that are the subject of this FOIA request.
This detailed information includes posting original documents obtained from government
agencies as well as original documents obtained in the Spy Files lawsuit that provide
concrete documentary examples of the kind of political surveillance that prompts this
request for government information.

In addition, the ACLU of Colorado also operates a speaker's bureau that
disseminates information on civil liberties issues to a variety of community groups and
organizations. The ACLU of Colorado disseminates news releases about developments
in ACLU litigation and other civil liberties issues. The Legal Director and Executive
Director of the ACLU of Colorado regularly and frequently communicate with
representatives of the news media to disseminate information and analysis of about civil
liberties issues; ACLU of Colorado litigation; and other ACLU activities. The ACLU of
Colorado further disseminates information by regularly sending "action alerts" to its
members and other individuals throughout Colorado to apprise them of such issues as
proposed or pending legislation that may implicate civil liberties issues. It also
disseminates information through the national ACLU web site at www.aclu.org, which
posts news releases issued by the ACLU of Colorado and contains links that lead web
surfers to the Colorado web site. The ACLU of Colorado further disseminates
information by providing special-issue projects of the national ACLU with information
on civil liberties developments in Colorado on particular issues, which the national
ACLU then compiles into larger reports discussing developments in multiple states,
which are then disseminated by the national ACLU as well as the ACLU of Colorado.

This request implicates a matter of urgent public concern: the consequences of
recent changes in government policy that has likely resulted in increased political
surveillance of organizations and individuals who do not constitute a threat. Such
government activity poses the risk of chilling the exercise of First Amendment rights of
speech and association as well as implicating the right of privacy. It may well violate
rights protected by the Constitution. This is especially true if the requested records reveal
that individuals and organizations are being targeted because they express particular
viewpoints, or because of their religion or nationality, which may well violate rights
protected by the Due Process and Equal Protection Clauses as well as the First
Amendment. Requests for information bearing upon potential violations of the
Constitution require an immediate response so that any violations are stopped, future
violations are prevented, and so that the deterrent effect on targeted groups, which chills
their willingness to participate in public affairs and political activity, can be halted.

Phillip B.J. Reid
December 2, 2004
Page 23 of 24

As explained below, the subject of government agencies collecting dossiers on political beliefs, associations and activities that have no connection to criminal activity is a subject of widespread media interest. That in itself provides grounds for urgency. In addition, the FBI has denied that it collects information about the political activities of persons who do not constitute a threat. To the extent that the requested records demonstrate otherwise, there is additional urgency to inform the public about a matter in which public officials have not been candid.

### B.    28 C.F.R. § 16.5(d)(1)(iv)

The ACLU of Colorado is also entitled to expedited processing because the information sought in this request relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R § 16.5(d)(1)(iv). This request clearly meets these standards.

There is a widespread and exceptional media interest in the issue of law enforcement agencies collecting information on how persons exercise their First Amendment rights. The controversy over the Denver Spy Files generated intense media interest, in Colorado and around the country. There has also been widespread and continuing media interest in the question whether other law enforcement agencies around the country, including the FBI and the Joint Terrorism Task Force, have been engaging in similar information collection. There has been intense media interest in the question whether the Joint Terrorism Task Force is targeting individuals and groups for monitoring and surveillance on the basis of religion, political viewpoint, and nationality. Citations to some of the extensive news coverage of the Spy Files controversy, political spying in general, and allegations of political spying by the JTTF, are provided in Appendix 2 to this letter, which contains citations to more than 250 articles about these issues published since the beginning of 2002.

In addition, the subject of this request clearly raises possible questions about the government's integrity which affect public confidence. The potential targeting of individuals and groups on the basis of group membership, religion, political viewpoints or nationality raises many questions about the government's integrity and affects public confidence in a profound way. The government's – and particularly the FBI's – treatment of persons on the basis of their political viewpoints is a critical issue with a long history dating back at least several generations. Questions about the government's integrity in these areas substantially affect the public's confidence in the government's ability to protect all of its citizens. It also affects the public's confidence in law enforcement and the legal system. This issue has been of concern to lawmakers, including three members of the House of Representatives who asked the Justice Department to investigate whether the JTTF was engaging in "systematic political harassment and intimidation of legitimate antiwar protesters." See, e.g., Eric Lichtblau, Inquiry into F.B.I. Question Is Sought, N.Y.Times August 18, 2004, at A16.

Phillip B.J. Reid
December 2, 2004
Page 24 of 24

The information sought in this request also bears on the question whether the activities of DPD officers assigned to the Joint Terrorism Task Force comply with the Settlement Agreement in the Denver Spy Files case, <u>American Friends Service Committee v. City and County of Denver</u>, No.02-N-0740, United States District Court, District of Colorado. <u>See</u> Sections I.E., F. That also bears on a question of widespread media interest in which there exist possible questions about the government's integrity that affects public confidence.

Finally, pursuant to applicable regulations and statute, the ACLU of Colorado expects the determination of this request for expedited processing within 10 calendar days and the determination of this request for documents within 20 days. <u>See</u> 28 C.F.R. 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).

If this request is denied in whole or in part, I ask that you justify all deletions by reference to specific exemptions to the governing statute. The ACLU of Colorado expects the release of all segregable portions of otherwise exempt material. The ACLU of Colorado reserves the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter.

Please furnish all responsive records to: Mark Silverstein, Legal Director, ACLU of Colorado, 400 Corona Street, Denver, CO 80218.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

Mark Silverstein,
Legal Director, ACLU of Colorado