

# Iowa Civil Liberties Union Foundation

AN AFFILIATE OF THE AMERICAN CIVIL LIBERTIES UNION

505 5th Ave. Suite 901
Des Moines, IA 50309

December 2, 2004

FOIPA Section
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535
(202) 324-5520

Federal Bureau of Investigation
Omaha Division
FBI Omaha Division
10755 Burt Street
Omaha, Nebraska 68114-2000
(402) 493-8688

Matthew G. Whitaker
United States Attorney,
Southern District of Iowa
U.S. Courthouse Annex, Suite 286

110 East Court Avenue
Des Moines, Iowa 50309-2053
(515) 284-6257

Executive Office of the United States
Attorney
Bicentennial Building
600 E Street, N.W., Room 7300
Washington D.C. 20530

Des Moines Resident Agency
Federal Bureau of Investigation--Omaha
Division
3737 Woodland Ave., Suite 601
West Des Moines, Iowa 50266
(515) 223-4278 / 6671

Re: <u>REQUEST UNDER FREEDOM OF INFORMATION ACT</u>

Attention:

This letter is a request by the Des Moines Catholic Workers [*DMCW*], the Drake University Law School Chapter of the national Lawyers Guild [*DUNLG*], the Catholic Peace Ministry [*CPM*], the Iowa Civil Liberties Union [*ICLU*], [*hereinafter collectively designated as the "Requestors"*] under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA).

### I. Background

On May 15, 2003 the Federal Bureau of Investigation [*FBI*] issued its FBI Intelligence Bulletin no. 89 directing the attention and resources of law enforcement agencies involved in critical anti-terrorism work to the monitoring and policing of political demonstrators citing such parochial concerns as the fact that demonstrators can create the possibility of civil disorder at

events. The memo, which was subsequently leaked to the press, directed law enforcement involved in anti-terrorism efforts to look for "possible indicators of protest activity and report any potentially illegal acts to the nearest FBI Joint Terrorism Task Force." [See Memo attached]

The **Catholic Peace Ministry** is an Iowa organization dedicated to working for peaceful change in the United States and opposing the use of military force to advance policies of the United States as well as the possession, creation, and/or use of weapons of mass destruction by the United States.

The **Des Moines Catholic Workers** are an unincorporated group that provides hospitality to poor people in Des Moines, Iowa and also organizes nonviolent protests and acts of resistance to the use of military force to advance policies of the United States as well as the possession, creation, and/or use of weapons of mass destruction by the United States.

The **Drake University Law School Chapter of the National Lawyers Guild** is a group of law students affiliated with the National Lawyers Guild. It is advised by Professor Sally Frank of the law school. The National Lawyers Guild is an organization of progressive lawyers, law students, legal workers, and jail house lawyers located throughout the United States.

In October, 2003, it was learned that e-mail sent by a member of the Catholic Worker Community, Frank Cordaro to about 50 people including Sally Frank about a protest planned for the STARC Armory in Johnston, Iowa, was obtained by the U.S. Attorney's Office and turned over to the Polk County Attorney's Office.

On November 15, 2003, a program was held at Drake University co-sponsored by each of the listed organizations as well as others  The forum was about United States policies in the Middle East, the illegality of the war in Iraq, and the consequences of that war. As part of the conference, there was a nonviolence training in the afternoon. The training was to prepare people to behave and respond in a nonviolent manner during a protest and direct action at the STARC Armory the next day. Two undercover deputies of the Polk County Sheriff's Department attended and participated in the nonviolence training. One of them committed to participating in the direct action the next day. They then issued a report to their superiors about what occurred, though they mischaracterized several things in their report. At a later trial over the direct action that took place on November 16, the Lt. Col. of the Iowa National Guard who was the facilities manager and in charge of preparing for and responding to the action testified that he discussed an intelligence report that the judge advocate general received.

On November 16, 2003, the protest outside the STARC armory took place. In an unprecedented response by law enforcement in at peace protests in Polk County, the Sheriff's Department had approximately twenty officers in full riot gear at the protest. Behind them were several state troopers and behind the fence, a few members of the Iowa National Guard. The

Sheriff's Department ordered the protesters to remain out of a public right-of-way and arrested those who crossed into the right-of-way, whether intentionally or not.

      On February 4, 2004, a deputy in the Polk County Sheriff's Department assigned to the FBI Joint Terrorism Task Force delivered subpoenas to three peace activists in Des Moines, Iowa and to Drake University. The subpoenas required that the recipients testify before a federal grand jury allegedly investigating the November 16 protest. The Drake subpoena also demanded records regarding the program that was held at Drake on November 15, 2003, and records of the Drake student chapter of the National Lawyers Guild. He left his card identifying himself as being part of the Joint Terrorism Task Force for one of those subpoenaed, Brian Terrell of the Catholic Peace Ministry, when Mr. Terrell wasn't in his office. Mr. Terrell later received his subpoena when he came to his office, called the deputy, and told him that he was now in. On February 6, 2004, a fourth peace activist was served a subpoena to testify before the grand jury from the same sheriff's deputy. Among those subpoenaed was also Elton Davis, a member of the Des Moines Catholic Worker community.

—∞—

II. Request

The requestors seek disclosure of the agency records[1] described below.

1. All files and records relating or referring to any formal or informal agreement, including any memoranda of understanding, between the FBI and the County of Polk in Iowa and/or City of Johnston or Des Moines and/or any subdivisions or agents of Polk County Iowa or the Cities of Des Moines or Johnston relating to the formation of a Joint Terrorism Task Force whose jurisdiction includes the Cities of Des Moines and or Johnston Iowa and/or County of Polk ("Polk JTTF").

2. All records maintained or issued by or transmitted between the FBI, Polk JTTF, the Polk County Iowa Sheriff's Department, the Des Moines or Johnston Police Department ("DMPD" or "JPD"), Iowa Anti-Terrorism officials, the Iowa National Guard or the Iowa State Police Anti-Terrorism Unit relating or referring to monitoring, surveillance, infiltration or investigation of religious organizations or groups, places of worship, community groups, demonstrations, anti-war groups, and other activist groups or individuals in Iowa.

3. All records maintained or issued by or transmitted between the FBI, Polk County JTTF, the Polk County Iowa Sheriff's Department, the DMPD, JPD, Iowa State Police or the Iowa National Guard relating or referring to the factors and/or procedures which are used to determine whether a group or individual engaged in First Amendment activities should become become the target of monitoring, surveillance, infiltration or investigation.

4. All records maintained or issued by or transmitted between the FBI, Polk County JTTF, the Sheriff's Department, the DMPD, JPD, Iowa State Police, or the Iowa National Guard relating or referring--to sharing, gathering or maintenance of information received through monitoring, surveillance, infiltration or investigation of religious organizations or groups, places of worship, community groups, demonstrations, anti-war groups, and other activist groups or individuals in Iowa.

5. All records maintained or issued by or transmitted between the FBI, Polk County JTTF, the Sheriff's Department, the DMPD, JPD, Iowa State Police or the Iowa National Guard relating or referring to policies or procedures governing the destruction of information received through

---

[1] Examples of records covered by this request include memoranda, correspondence, analyses, evaluations, policies, policy directives, procedures, training manuals, guidances, guidelines, reports, notes, data, technical manuals, technical specifications and other written records or records by any other means, including but not limited to records kept on computers, computer source and object code, electronic communications or video tapes.

monitoring, surveillance or infiltration of religious organizations or groups, places of worship, community groups, demonstrations, anti-war groups, and other activist groups or individuals in Iowa.

6. All records maintained or issued by or transmitted between the FBI, Polk County JTTF, the Sheriff's Department, the DMPD, JPD, Iowa State Police or the Iowa National Guard relating or referring to policies or procedures in place to protect the privacy of persons who are observed during the monitoring, surveillance or infiltration of religious organizations or groups, places of worship, community groups, demonstrations, anti-war groups, and other activist groups or individuals in Iowa.

7. All records prepared, received, collected and/or maintained by the FBI or Polk County JTTF relating or referring to Des Moines Catholic Worker ("DMCW"), the Catholic Peace Ministry ("CPM"), the Drake Chapter of the National Lawyers Guild ("DUNLG"), including but not limited to records regarding:

   a. what data about any DMCW, CPM, or DUNLG has been obtained;

   b. what types of data about DMCW, CPM, or DUNLG have been obtained;

   c. whether data about DMCW, CPM, or DUNLG is contained in any agency databases;

   d. how data about DMCW, CPM, or DUNLG was obtained;

   e. how DMCW, CPM, or DUNLG were each selected as a subject to investigate, monitor or surveil;

   f. orders, agreements, or instructions to gather data regarding DMCW, CPM, or DUNLG;

   g. how data about DMCW, CPM, or DUNLG has been or might be used;

   h. any procedures for analyzing data about DMCW, CPM, or DUNLG;

   i. any procedures for cross-referencing data about DMCW, CPM, or DUNLG with other information;

   j. whether data about DMCW, CPM, or DUNLG has been destroyed; and

   k. how any data about DMCW, CPM, or DUNLG will be destroyed in the future.

8. All records prepared, received, collected and/or maintained by the FBI or the Polk County JTTF indexed or maintained under the names or identifying information of identified or suspected individual members of, or advisers of, DMCW, CPM, or DUNLG, including but not limited to:

   a. what data about each member or adviser has been obtained;

   b. what types of data about each member or adviser have been obtained;

  c. whether data about each member or advisor is contained in any agency databases;

  d. how data about each member or adviser was obtained;

  e. how each member or advisor was selected as a subject to investigate, monitor or surveil;

  f. orders, agreements, or instructions to gather data regarding each member or adviser;

  g. how data about each member or adviser has been or might be used;

  h. any procedures for analyzing data about each member or adviser;

  i. any procedures for cross-referencing data about each member or adviser with other information;

  j. retention of data about each member or adviser, including but not limited to retained records ;

  k. whether data about each member or adviser has been destroyed, and documentation of any policies permitting such destruction;

  l. how any data about each member or adviser will be destroyed in the future;

  m. any procedures in place to protect each member's or adviser's privacy; and

  n. a complete list of all recipients of data about each member or adviser.'

9. All records relating or referring to the following assemblies: the weekly anti-war protest outside the STARC Armory in Johnston, Iowa, which have taken place in 2004; the November 2003 meeting at Drake University, the November 2003 protest at the STARC Armory and at Camp Dodge in Johnston, Iowa; the March 2003 protest at the STARC Armory in Johnston, Iowa, the March 2004 protest at the STARC Armory in Johnston, Iowa, the criminal trials over any of these protests, the meetings of DMCW, CPM, or DUNLG.

10. All records referring or relating to surveillance, monitoring and investigation and infiltration of DMCW, CPM, or DUNLG from January, 2003 to the present.

11. All records referring or relating to surveillance, monitoring, investigation and/or infiltration of DMCW, CPM, or DUNLG other than records referring or relating to the infiltration.

12. All records relating to the monitoring, reception or interception of email and other communications between or among members of DMCW, CPM, DUNLG, including Sally Frank

## III. Additional Request

We further request the disclosure of any agency records containing the following information, if (and to such extent as) such information is not already contained in the records disclosed pursuant to paragraphs 1 through 11 above:

1. The number of incidents since the creation of the Polk County JTTF at which the FBI and/or Polk County JTTF or the state police with the JTTF has employed undercover officers in Iowa.

2. The number of incidents since the creation of the Polk County JTTF or the state of Iowa JTTF at which the FBI and/or Polk County or state of Iowa JTTF has employed undercover officers in Polk County, Iowa.

3. The number of anti-war groups in Iowa the FBI and/or Polk County or state of Iowa JTTF has monitored through the use of undercover officers since September 11, 2001.

4. The number of places of worship in Iowa the FBI and/or state or Iowa or Polk County JTTF has monitored through the use of undercover agents since September 11, 2001.

5. The amount of federal funding that has been directed toward the Polk County and State of Iowa JTTF

6. The amount of local and state funding that has been used for the operations of the State or Iowa and Polk County JTTF.

7. The number of individual officers of the FBI and/or State of Iowa or Polk County JTTF that have been employed as undercover agents within demonstrations, rallies, marches, assemblies and community and activist group meetings in Iowa since September 11, 2001

8. The number of individual officers of the FBI and/or State or Iowa or Polk County JTTF that have been employed as undercover agents in places of worship and/or religious groups, events or meetings in Iowa since September 11, 2001.

### IV. Limitation of Processing Fees under the Freedom of Information Act

The ICLU requests a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media . . .") and 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not be charged to "representatives of the news media."). As a "representative of the news media," the ICLU fits within this statutory and regulatory mandate. Fees associated with the processing of this request should, therefore, be limited and waived accordingly.

The ICLU meets the definition of a "representative of the news media" because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." National Security Archive v. Department of Defense, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ICLU is a statewide organization which here is acting in close cooperation with the American Civil Liberties Union [ACLU] which serves the entire courty to obtain and disseminate vital information to the public. Both organizations are dedicated to the defense of civil rights and civil liberties. Dissemination of information to the public is a critical and substantial component of the ICLU and ACLU's mission and work. The ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public through its own efforts, a highly popular website, and also through the resources of the ICLU. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through public channels of distribution, including the national ACLU website, http://aclu.org.

The Iowa Civil Liberties Union, Inc. [ICLU] engages in several significant media and publication activities in the course of its week to week operations. These include the following conducted in cooperation with our sister organization, the Iowa Civil Liberties Union Foundation, Inc.:

1. Regularly maintaining and updating a website (www.iowaclu.ors) which includes news and information about ACLU and ICLU cases and various subject areas related to civil liberties.

2. Publishing a quarterly newsletter that is sent to the over 3,200 ACLU/ICLU member households in Iowa and distributed via the ICLU website.

3. Distributing reports on various civil liberties issues. The ICLU also produces and/or distributes numerous pamphlets, informational flyers, and brochures on various topics related to civil liberties in coordination with the ACLU national office and projects.

4. The ICLU produces and distributes to the general public an annual voting record. with respect to the activities of Iowa state legislators.

5. Engaging the media including issuing press releases, and organizing press conferences related to significant civil liberties issues on multiple occasions each year.

6. Submission of OpEd pieces for publication in local media and the provision of quotes, commentary, analysis and background on civil liberties issues for publication in other media newspapers, broadcasts and publications. ICLU staff respond to several hundred media and press inquiries each year and are routinely consulted and quoted statewide on civil liberties issues and concerns.

7. Public speaking and outreach including regularly attending and speaking at community meetings and other public forums to inform people about various civil liberties issues. For this purpose the ICLU has employed a staff member whose position title is "Community Outreach Coordinator."

8. The ICLU makes archived materials available for historical research at its archival depository in Cedar Falls, Iowa.

9. The maintenance and use of special email alert lists for the dissemination of fast breaking news on legislative, organizational, special issue-oriented and other events affecting civil liberties.

Depending on the results of the Request, the ICLU plans to "disseminate the information" gathered by this Request "among the public" through these kinds of publications in these kinds of channels in close cooperation with the ACLU. The ICLU is therefore a "news media entity." *Cf.* Electronic Privacy Information Ctr. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

Finally, disclosure is not in the ICLU's commercial interest. The ICLU is a "non-profit, non-partisan, public interest organization." *See* Judicial Watch Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003). Any information disclosed by the ICLU as a result of this FOIA will be available to the public at no cost.

V.   Waiver of all Costs

The ICLU additionally requests a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'").

Disclosure of the requested information is in the public interest. This request will further public understanding of government conduct; specifically, the FBI's monitoring, surveillance, and infiltration of organizations on the basis of national origin, racial and/or ethnic background, religious affiliation, organizational membership, political views or affiliation, or participation in protest activities or demonstrations. This type of government activity concretely affects many individuals and groups and implicates basic privacy, free speech, and associational rights protected by the Constitution.

Moreover, disclosure of the requested information will aid public understanding of the implications of the Department of Justice's recent decision to relax guidelines that previously restricted the FBI's ability to spy on organizations without a threshold showing of suspected criminal activity. These restrictions were created in response to the Hoover-era FBI's scandalous spying on politically active individuals and organizations, despite the complete lack of evidence that such individuals and organizations had been involved in any unlawful behavior. Understanding the current scope of the FBI's surveillance and infiltration of law-abiding organizations is, therefore, crucial to the public's interest in understanding the consequences of the Department of Justice's important change in policy.

As a nonprofit organization and "representative of the news media" as discussed in Section III, the ICLU is well-situated to disseminate information it gains from this request to the general public as well as to immigrant, religious, politically active, and other targeted communities, and to groups that protect constitutional rights. Because the ICLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ICLU.

The records requested are not sought for commercial use, and the Requestors plan to disseminate the information disclosed as a result of this FOIA request through the channels described in Section IV. As also stated in Section III, the ICLU will make any information disclosed as a result of this FOIA available to the public at no cost.

## VI. Expedited Processing Request

Expedited processing is warranted because there is "an urgency to inform the public about an actual or alleged federal government activity" by organizations "primarily engaged in disseminating information" 28 C.F.R. § 16.5(d)(1)(ii). This request implicates a matter of urgent public concern; namely, the consequences of a recent change in government policy that has likely resulted in increased surveillance and infiltration of political, religious, and community organizations by the FBI. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease, future violations are prevented, and any chilling effect on public participation in potentially targeted groups and/or political activity be halted.

In addition, this request deals with potential disparate treatment of groups on the basis of categories such as religion, nationality and political viewpoint. Such potential unequal treatment is a matter necessitating immediate attention. There is also intense public concern, particularly among potentially targeted groups, about the actual or alleged federal government activity addressed by this request. This intense public concern is illustrated by the selection of news coverage detailed in the paragraph below.

A requestor may also demonstrate the need for expedited processing by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the request relates to possible violations of Constitutional rights by federal law enforcement and potential targeting of groups by federal law enforcement based on illicit categories of political viewpoint, race, religion and nationality. The exceptional media interest in this issue is reflected in widespread news coverage at both the local and national level. *See e.g.* Daily Star Staff, *American Arabs Concerned Over FBI's 'October Plan,'* www.dailystar.com.lb, October 6, 2004; David Shepardson, *FBI Agents Hunt for Terror Leads: Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack*, The Detroit News, October 1, 2004; Eric Lichtblau, *Subpoena Seeks Records About Delegate Lists on Web*, NY Times, August 30, 2004 at P10; Alex Bradley and John Mayer, *The War at Home: Nationwide Crackdown on Activists Part*, www.saveourliberties.com, September 2, 2004; Eric Lichtblau, *Protestors at Heart of Debate on Security vs. Civil Rights*, NY Times, August 27, 2004 at A9; Larry Abramson, *FBI Questioning Political Demonstrators*, NPR.org; Susan Greene, *Activists Decry Pre-Convention Security Tactics: Questions by FBI, The Feds Say They're Trying to Avoid Terror Threats, But Many People Say the Steps Veer Toward Intimidation*, The Denver Post, August 26, 2004 at A-08; Eric

Lichtblau, *F.B.I. Goes Knocking for Political Troublemakers*, NY Times, August 16, 2004 at A1; Amy Herder, *Teaching the Silent Treatment*, The Denver Post, August 8, 2004 at C-01; Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups*, San Francisco Chronicle, August 6, 2004; Camille T. Taiara, *New F.B.I. Witch-Hunt*, San Francisco Bay Guardian, August 4-10, 2004; Kelly Thornton, *F.B.I.'s Home Visits Have Some Muslims Feeling Harrassed, Alienated*, Signonsandiego.com, August 4, 2004; Richard Schmitt and Donna Horowitz, *FBI Starts to Question Muslims in U.S. About Possible Attacks*, latimes.com, July 18, 2004; Karen Abbott, *FBI's Queries Rattle Activist*, www.rockymountainnews.com, July 27, 2004; Mary Beth Sheridan, *Interviews of Muslims to Broaden*, www.washingtonpost.com, July 17, 2004; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry*, The Des Moines Register, February 7, 2004; Jeff Eckhoff and Mark Siebert, *Anti-war Inquiry Unrelated to Terror*, The Des Moines Register, February 10, 2004 at 1A; Jeff Eckhoff and Mark Siebert, *Group Fights Anti-war Inquiry*, The Des Moines Register, February 7, 2004; Monica Davey, *An Antiwar Forum in Iowa Brings Federal Subpoenas*, NY Times, February 10, 2004 at A14; Monica Davey, *Subpoenas on Antiwar Protest Are Dropped*, NY Times, February 11, 2004 at A18; Michelle Goldberg, *A Thousand J. Edgar Hoovers*, www.salon.com, February 12, 2004; Michelle Goldberg, *Outlawing Dissent*, www.salon.com, February 11, 2004; Kerri Ginis, *Peace Fresno Seeks Damages*, The Fresno Bee, February 28, 2004; Eric Lichtblau, *F.B.I. Scrutinizes Antiwar Rallies*, www.nytimes.com, November 23, 2003.

The potential targeting of individuals and groups by the federal government on the basis of group membership, religion, political protest, nationality, and other similar categories raises many questions about the government's integrity and affects public confidence in a profound way. The government's – and particularly the FBI's – treatment of persons on the basis of their political viewpoints is a critical issue with a long history dating back to the founding of the nation. Questions about the government's integrity in these areas substantially affect the public's confidence in the government's ability to protect all of its citizens. And in law enforcement and the legal system. This issue has been of concern to lawmakers, including three members of the House of Representatives. See, e.g., Eric Lichtblau, *Inquiry into F.B.I. Question Is Sought*, NY Times A16, August 18, 2004.

In Iowa Several News articles reflect the strong public interest in FBI-sponsored government surveillance in general and the surveillance and monitoring of DMCW, CPM, or DUNLG in particular. *See* Eric Lichtblau, "FBI Scrutinizes Antiwar Rallies" *New* York Times (Nov. 23, 2003); "D.M. Activists Ordered To Testify In U.S. Court", Eckhoff and Seibert, *Des Moines Register*, February 5, 2004; "Fourth Activist In D.M. Ordered To Testify: The Federal Probe Also Focuses On A November Antiwar Forum Held At Drake University", Eckhoff and Seibert, *Des Moines Register*, February 6, 2004.

The potential targeting of individuals and groups by the federal government on the basis of group membership, religion, political protest, nationality, and other similar categories raises many questions about the government's integrity and affects public confidence in a profound way. The government's – and particularly the FBI's – treatment of persons on the basis of their political viewpoints is a critical issue with a long history dating back to the founding of the nation. Questions about the government's integrity in these areas substantially affect the public's confidence in the government's ability to protect all of its citizens. And in law enforcement and the legal system. This issue has been of concern to lawmakers, including three members of the House of Representatives. *See, e.g.*, Eric Lichtblau, *Inquiry into F.B.I. Question Is Sought*, NY Times A16, August 18, 2004.

### Affirmation in Support of Expedited Processing and Waiver Requests

I affirm that the information provided in support of the above request for expedited processing and waiver of fees is true and correct to the best of my knowledge and belief.

*(signature)*

Randall C. Wilson,   Counsel for Requestors

### VII. Requested Response

If our request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all non-exempt portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees. Pursuant to applicable regulations and statute, we will anticipate you determination on our request within 20 days. See 5 U.S.C. Â 552(a)(6)(A)(i).

Please respond to Randall Wilson, Legal Director and counsel, Iowa Civil Liberties Union, 505 5th Avenue, Suite 901, Des Moines, Iowa 50309, (515) 243-3988 (ext 20) or Sally Frank, ICLU Cooperating Attorney, 2400 University Avenue, Des Moines, IA 50311 (515) 271-3909.

Thank you for your prompt attention to this matter

Sincerely,

*(signature)*                                      *(signature)*

Randall Wilson                                    Sally Frank
Legal Director, ICLU                              Co-counsel

LAW ENFORCEMENT SENSITIVE



FBI INTELLIGENCE BULLETIN no. 89
October 15, 2003

THREAT LEVEL:   YELLOW (ELEVATED)

THE FBI INTELLIGENCE BULLETIN, DISSEMINATED ON A WEEKLY BASIS, PROVIDES LAW ENFORCEMENT WITH CURRENT, RELEVANT TERRORISM INFORMATION DEVELOPED FROM COUNTERTERRORISM INVESTIGATIONS AND ANALYSIS. THE INTELLIGENCE BULLETIN DOES NOT CONTAIN THREAT WARNING INFORMATION.

HANDLING NOTICE: Recipients are reminded that the Intelligence Bulletin is designated "Law Enforcement Sensitive" and should not be disseminated beyond law enforcement circles.

ITEM:  TACTICS USED DURING PROTESTS AND DEMONSTRATIONS

On October 25, 2003, mass marches and rallies against the occupation in Iraq are scheduled to occur in Washington, D.C. and San Francisco, California. While the FBI possesses no information indicating that violent or terrorist activities are being planned as part of these protests, the possibility exists that elements of the activist community may attempt to engage in violent, destructive, or disruptive acts. Most protests are peaceful events; however, a number of demonstrations, including the biannual International Monetary Fund and World Bank meetings, are more likely to be violent and disruptive and to require enhanced law enforcement security. Several effective and innovative strategies are commonly used by protestors prior to, during, and after demonstrations. The following tactics have been observed by U.S. and foreign law enforcement agencies while responding to criminal activities conducted during protests and demonstrations.

Protestors often use the internet to recruit, raise funds, and coordinate their activities prior to demonstrations. Activists may also make use of training camps to rehearse tactics and counter-strategies for dealing with the police and to resolve any logistical issues.

If a demonstration is going to take place in a secure facility, activists may seek to gain access to the site using false documentation. Surveillance of sites prior to demonstrations can allow activists to identify locations of command posts and law enforcement personnel in order to plan effective countermeasures.

LAW ENFORCEMENT SENSITIVE

**LAW ENFORCEMENT SENSITIVE**

Traditional demonstration tactics by which protestors draw attention to their causes include marches, banners, and forms of passive resistance such as sit-ins. Extremist elements may engage in more aggressive tactics that can include vandalism, physical harassment of delegates, trespassing, the formation of human chains or shields, makeshift barricades, devices used against mounted police units, and the use of weapons–such as projectiles and homemade bombs. Even the more peaceful techniques can create a climate of disorder, block access to a site, draw large numbers of police officers to a specific location in order to weaken security at other locations, obstruct traffic, and possibly intimidate people from attending the events being protested.

During the course of a demonstration, activists often communicate with one another using cell phones or radios to coordinate activities or to update colleagues about ongoing events. Other types of media equipment (video cameras, photographic equipment, audio tape recorders, microphones, and computer and radio equipment) may be used for documenting potential cases of police brutality and for distribution of information over the internet.

Extremists may be prepared to defend themselves against law enforcement officials during the course of a demonstration. Masks (gas masks, goggles, scarves, scuba masks, filter masks, and sunglasses) can serve to minimize the effects of tear gas and pepper spray as well as obscure one's identity. Extremists may also employ shields (trash can lids, sheets of plexiglass, truck tire inner tubes, etc.) and body protection equipment (layered clothing, hard hats and helmets, sporting equipment, life jackets, etc.) to protect themselves during marches. Activists may also use intimidation techniques such as videotaping and the swarming of police officers to hinder the arrest of other demonstrators.

After demonstrations, activists are usually reluctant to cooperate with law enforcement officials. They seldom carry any identification papers and often refuse to divulge any information about themselves or other protestors. Post-demonstration activities can include fundraising in support of the legal defense of accused protestors and demonstrations of solidarity calling for the release of the accused.

Law enforcement agencies should be alert to these possible indicators of protest activity and report any potentially illegal acts to the nearest FBI Joint Terrorism Task Force.

**ADMINISTRATIVE NOTE:** **LAW ENFORCEMENT RESPONSE**

Information contained in the FBI Intelligence Bulletin is Law Enforcement Sensitive and intended for official use only. No portion of this Bulletin should be released to the media, the general public or over non-secure Internet servers. Release of Law Enforcement Sensitive material could adversely affect or jeopardize investigative activities.

Departments are requested to contact the nearest FBI field office or resident agency in their area

**LAW ENFORCEMENT SENSITIVE**

Page

**LAW ENFORCEMENT SENSITIVE**

should additional information be developed related to the above matter. Questions regarding the content of these Bulletins should also be directed to the nearest FBI field office or resident agency. Specific comments or suggestions about the format or content can be provided to lesc@leo.gov.

**LAW ENFORCEMENT SENSITIVE**