UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION, *et al.*,

Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION, *et al.*,

Defendants.

Civil Action
No. 1:05-cv-1004 (ESH)

Judge Ellen S. Huvelle

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND STAY**

Plaintiffs respectfully submit this reply memorandum in support of their motion

for a preliminary injunction and in opposition to defendants' motion for partial summary

judgment and an *Open America* stay.

**INTRODUCTORY STATEMENT**

In the face of overwhelming evidence of media interest and public concern about

FBI surveillance of political and religious activity and the role of Joint Terrorism Task

Forces in that surveillance, defendants seek to justify their denial of expedited processing

by positing a constrained and illogical construction of the applicable legal standard.

Defendants' suggestion that a court may consider only contemporaneous news articles

that describe the precise information sought by plaintiffs in evaluating entitlement to

expedition would render FOIA's expedited processing provisions meaningless, since it

would be wholly redundant to seek from the government information that has already

been widely reported in the media.

Plaintiffs have demonstrated their entitlement to expedition under both the

statutory and Agency standards.  Indeed, the lone document thus far released by

defendants pursuant to plaintiffs' FOIA requests – a breathless account of plaintiff United

for Peace and Justice's plans for protesting the Republican National Convention –

powerfully refutes defendants' contention that the media articles submitted by plaintiffs

are somehow attenuated from the subject of their requests.  (Exhibit A, Letter from D.

Hardy to A. Beeson attaching FBI records for Plaintiff United for Peace and Justice.)

Accordingly, this Court should grant plaintiffs' motion for preliminary injunctive relief.

However, even if the Court should determine that plaintiffs have fallen short of the

expedited processing standard, this Court need not, and should not, stay proceedings

indefinitely until such time as defendants are ready to comply fully with plaintiffs' FOIA

requests.  Rather, this Court should, at a minimum, set a reasonable schedule for the

production of documents or order defendants to move for summary judgment on the

merits within a reasonable period of time.

## ARGUMENT

Defendants address plaintiffs' entitlement to preliminary injunctive relief under

only the first of the four relevant factors.  Thus, this motion turns entirely on whether

plaintiffs can demonstrate "a substantial likelihood of success on the merits."  *Al-Fayed*

*v. Central Intelligence Agency*, 254 F.3d 300, 303 (D.C. Cir. 2001).  Plaintiffs have

demonstrated more than a substantial likelihood that they are entitled to expedited

processing under both the Agency and statutory standards.

I.    <u>Plaintiffs Are Entitled to Expedited Processing Under the "Media Interest"</u>
      <u>Standard of 28 CFR 16.5(d)(1)(iv).</u>

Under regulations promulgated by defendant Department of Justice, plaintiffs are

entitled to expedited processing if the subject of their request involves a "matter of

widespread and exceptional media interest in which there exist possible questions about

the government's integrity which affect public confidence."  28 CFR § 16.5(d)(1)(iv).

Defendants do not dispute – and thus effectively concede – that plaintiffs' FOIA requests

raise "questions about the government's integrity which affect public confidence."[1]  *Id.*

Moreover, defendants' assertion that the record does not demonstrate "widespread and

exceptional media interest" is both legally and factually flawed, and therefore fails the

reasonableness test.

The articles in the record report on past and current targeting of political and

religious groups and individuals by the FBI, with specific reference to the role of JTTFs.

The record contains fully 24 articles, reflecting intense and continuous media interest in

these issues during the year leading up to the submission of plaintiffs' FOIA requests.

This selection goes far beyond the "handful of articles" that this Court has deemed

sufficient to demonstrate widespread media interest.  *ACLU v. DOJ,* 321 F. Supp. 2d 24,

32 and n.11 (D. D.C. 2004).

The exceedingly narrow standard proffered by defendants for evaluating whether

news articles demonstrate widespread media interest is supported by neither the FOIA

nor the relevant case law.  Defendants insist, for example, that plaintiffs have failed to

meet their burden of demonstrating widespread media interest because "not a single one

---

[1] Defendants wisely appear to have abandoned at least part of the implausible position staked out in their belated denial of plaintiffs' request for expedited processing.  *See* Exhibits E & F to Plaintiffs' Motion for a Preliminary Injunction (maintaining that DOJ's Director of Public Affairs "did not detect . . . questions concerning the government's integrity regarding the issues raised in [the] request.").

of the media reports on which plaintiffs rely concerns . . . political surveillance of the

plaintiff requestors." Defs.' Mem. at 12. In other words, by defendants' reasoning,

plaintiffs have not demonstrated that their FOIA requests to determine whether the FBI

has maintained files on them qualify for expedition, because plaintiffs have not

demonstrated through media reports that the FBI has maintained files on them. This

circular argument, if accepted as the governing standard, would have far-reaching and

predictable consequences on the ability of eligible requestors to obtain expedited

processing of their FOIA requests. The very purpose of the FOIA is to disgorge from the

government information that is not known to the public. If, in order to qualify for

expedition, plaintiffs were required to demonstrate that the media had already reported on

the precise information that plaintiffs were seeking, then both the statutory and regulatory

expedited processing provisions would be rendered dead letters. Such an unachievable

standard for evaluating public and media interest would result in every instance in the

denial of expedited processing. This never has been, and is not, the law.[2]

If there is an absence of specific reference to monitoring and surveillance of the

plaintiffs in these articles, that absence only highlights the urgency of plaintiffs' FOIA

requests. One article in plaintiffs' record makes this point unequivocally:

> No one knows the extent of the political spying and profiling currently being
> carried out against critics of the Bush administration and American foreign policy
> -- which may be the most disturbing thing about the entire phenomenon.
> "Presumably if they're doing their jobs well, we'll never know," says [Center for
> Constitutional Rights Legal Director Jeffrey] Fogel. Activists have also been
> unsuccessful at finding out why they're being watched and under whose authority.

---

[2] In the same vein, defendants maintain that plaintiffs have not met their burden because there are "no
articles that specifically concern JTTF policies and procedures for general political surveillance." Defs.'
Mem. at 33. Of course, as demonstrated below, several articles in the record specifically address the role of
JTTFs in political surveillance, and there is a great deal of interest in the policies that authorize such
activities. The articles cannot report on the policies, because those policies are not known. That is the
purpose of plaintiffs' FOIA request.

> What we do know is that several of the police departments that have been accused
> of spying on political protestors . . . are part of Joint Terrorism Task Forces.

Michelle Goldberg, *Outlawing Dissent*, Salon.com, February 11, 2004.  This selection vividly demonstrates the media's keen interest in discovering and reporting on the full scope of FBI and JTTF "spying and profiling" of select groups, as well as the policies that authorize such surveillance.

Defendants further misconstrue the standard for evaluating the media record when they characterize plaintiffs' articles as describing past activity rather than current events.  *See* Defs.' Mem. at 18-19.  As an initial matter, the fact that the articles in the record span a lengthy period of time is persuasive evidence of widespread, prolonged media interest in the subjects of plaintiffs' FOIA requests.  More saliently, plaintiffs submitted their FOIA requests in December of 2004.  Defendants chose to ignore those requests for several months, refusing to respond to plaintiffs' repeated inquiries into the status of their request for expedited processing until after this litigation was commenced in May of 2005.  Defendants cannot fairly reap the benefit of their delayed response by now disparaging plaintiffs' factual record as out of date.[3]

In characterizing plaintiffs' record as inadequate, defendants rely heavily on the unpublished decision in *ACLU-NC v. DOJ*, 2005 WL 588354 (N.D. Cal. Mar. 11, 2005).  That reliance is misplaced.  First, the decision provides no guidance whatsoever for analyzing the urgency of plaintiffs' request related to ongoing FBI surveillance of specific political and religious organizations.   Second, even with respect to plaintiffs'

---

[3] Indeed, had defendants timely denied, rather than simply ignored, plaintiffs' request for expedited processing, plaintiffs would have had the opportunity to submit an administrative appeal from defendants' denial.  5 U.S.C. § 552(a)(6).  Plaintiffs would then have supplemented the record with the coast-to-coast media coverage reporting on the submission of plaintiffs' FOIA requests themselves.  (Exhibit B, sampling of the media coverage of plaintiffs' FOIA requests.)  This additional evidence, though not necessary to plaintiffs' claim, provides irrefutable additional evidence of widespread media interest in the subject of plaintiffs' FOIA requests.

JTTF request, the *ACLU-NC* case provides little support for defendants' rejection of expedited processing.

That case involved a request for records relating to the creation of a local JTTF in Northern California and the policies and procedures used by that local JTTF for monitoring, investigating, and questioning individuals. In stark contrast to the extensive documentation of media interest presented in this case, the evidentiary record before the court in *ACLU-NC* was limited to eight articles from a brief two-month period. Here, the record consists of 24 articles representing nearly a year of intense coverage regarding the possible use of JTTFs for domestic surveillance, as well as the targeting of political and religious groups for surveillance and investigation. Moreover, none of the eight articles cited in the *ACLU-NC* request addressed the sole subject of that FOIA request – namely, the activities of the local JTTF in Northern California. Instead, as Judge Hamilton explained, "[t]hree of the reports . . . do not mention or refer to Northern California or the JTTFs," and "the remaining four articles refer primarily to the FBI approaching Muslims or Arab-Americans for interviews, some in Southern California and some in Northern California . . . and some in other states such as Arizona and Missouri." *Id.* at *14.[4]

In plaintiffs' record, on the other hand, several articles speak directly to national concerns over the organization and activity of the JTTFs – the precise subject matter of the FOIA request. *See, e.g.,* Camille T. Taiara, *New FBI Witch-Hunt*, San Francisco Bay Guardian, August 4-10, 2004 (detailing JTTF role in targeting Muslims and Arabs for FBI monitoring); Karen Abbott, *FBI Queries Rattle Activist*, Rocky Mountain News, July

---

[4] Judge Hamilton refused to consider the eighth article because it was an op-ed piece rather than a news story. *Id.* at *14. Op-ed pieces, however, reflect the editorial priorities of news publications, and thus the presence of widespread media interest, as much as do news reports. Thus, Judge Hamilton's rejection of that article on that basis was flawed.

27, 2004 (describing JTTF infiltration and investigation of political activists); Jeff

Eckhoff & Mark Siebert, *Group Fights Anti-War Inquiry*, Des Moines Register, Feb. 7,

2004 (noting JTTF investigation of anti-war groups); Jeff Eckhoff & Mark Siebert, *Anti-

War Inquiry Unrelated to Terror*, Des Moines Register, February 10, 2004 (same); Alex

Bradley & John Mayer, *The War at Home*, www.saveourcivilliberties.com, Sept. 2, 2004

(reporting JTTF role in monitoring peace groups and political activists); Michelle

Goldberg, *Outlawing Dissent*, Salon.com, February 11, 2004.

Finding no support in the law for their excessively restrictive standard for

evaluating widespread media interest, defendants devote several pages of their

Memorandum to parsing plaintiffs' record and describing in tedious detail the *least*

relevant portions of the 24 news articles.  Defendants' "piecemeal approach" deliberately

misses the forest for the trees.  *ACLU v. DOJ*, 321 F. Supp. 2d at 30.  The record as a

whole plainly demonstrates widespread media and public attention to the issues at the

center of plaintiffs' requests – namely, whether the FBI and JTTFs are using their

expanded authority to monitor, infiltrate, and investigate political and religious

organizations.

Moreover, as explained in greater detail below, each article in the record

highlights media interest in at least one aspect of plaintiffs' FOIA requests.

A.    <u>Articles on the Monitoring, Questioning, and Surveillance of Muslim and
       Arab Americans</u>

Several articles in the record report on the FBI's targeted monitoring and

surveillance of Muslim and Arab Americans. Those articles are directly relevant to the

requests submitted by the American-Arab Anti Discrimination Committee ("ADC") and

the Muslim Pubic Affairs Council ("MPAC"), as well as to the request submitted by the

ACLU, which works on behalf of Muslim and Arab communities affected by federal government activity. The articles are also directly relevant to plaintiffs' FOIA request seeking documents describing JTTF policies and procedures regarding surveillance and monitoring on the basis of national origin and religion. *See* Exhibit B to Plaintiffs' Motion for a Preliminary Injunction at ¶¶ 21 - 38.

Defendants challenge the general relevance of these articles by observing that some of them relate to one particular round of FBI questioning targeted at Muslim and Arab Americans that occurred directly before the 2004 election. What defendants neglect to mention is that most articles in the record contextualize such examples as part of an ongoing and systemic government effort. JTTFs are described in several of these articles as an integral part of this systemic effort. *See* Camille T. Taiara, *New F.B.I. Witch-Hunt*, S.F. Bay Guardian, August 4-10, 2004 at C-01 ("Federal Bureau of Investigation agents working with the Joint Terrorism Task Force have been showing up in recent months at the homes and workplaces of Arabs and Muslims . . . . This isn't the first time the FBI has conducted this sort of campaign . . . .); Richard Schmitt & Donna Horowitz, *FBI Starts to Question Muslims in U.S. About Possible Attacks*, L.A. Times, July 18, 2004 ("FBI agents are beginning another round of interviews with Muslims and Arab Americans around the country . . . . To many, the interviews are a bewildering case of *deja vu*. The FBI interviewed thousands of Muslims and Arab Americans after the Sept. 11 attacks and in the walk-up to the war in Iraq last year . . . . Stacy Tolchin . . . said her group got four calls recently from Muslims and Arab Americans contacted by the FBI or the local Joint Terrorism Task Force."); Jayashri Srikantiah, *Few Benefits to Questioning Targeted Groups*, S.F. Chronicle, August 6, 2004 ("Once again, FBI agents are fanning

out in Muslim and immigrant communities in the Bay Area and across the country, targeting people for questioning based on ethnicity and religion . . . .  The Department of Justice is now repeating its practice of targeting innocent Americans based on ethnicity.").[5]  Thus, these articles demonstrate the media's interest in the overall pattern of FBI and JTTF targeting of Muslim and Arab individuals and groups, a subject relevant to both of plaintiffs' FOIA requests.[6]

Unable to dispute persuasively the relevance of plaintiffs' articles, defendants seek to diminish their significance by pointing to the ACLU (and its "associates") as sources for the articles in question.  *See* Defs.' Mem. at 23-24.  This is a red herring.  As the nation's oldest and largest civil liberties organization, the ACLU is often mentioned in media coverage of issues related to the First Amendment, political protest, and religious liberty.  A fair reading of the record makes clear that the ACLU's voice is part of a much larger chorus that includes the media, lawmakers, and the general public.  The ACLU did not instigate widespread media interest in this issue, and even if it had, the nation's news outlets are in no way beholden to the ACLU's judgments about what is newsworthy.  Thus, even if defendants could demonstrate that each and every article in the record originated as an ACLU press release – which is, of course, far from the truth –

---

[5] *See also* David Shepardson, *FBI Agents Hunt for Terror Leads, Agency Combs Muslim Neighborhoods for Help in Preventing Election Day Attack*, The Detroit News, October 1, 2004; Kelly Thornton, *F.B.I.'s Home Visits Have Some Muslims Feeling Harassed*, San Diego Union, signonsandeigo.com, August 2, 2004; Daily Star Staff, *American Arabs Concerned Over FBI's 'October Plan'*, www.dailystar.com.lb, October 6, 2004.

[6] Though some of these articles do not expressly refer to JTTFs, other media reports cited by plaintiffs indicate that the FBI's targeting of Muslim and Arab Americans for questioning and surveillance is coordinated through the JTTFs.  S*ee* Beth Sheridan, *Interviews of Muslims to Broaden*, Wash. Post, July 17, 2004 ("FBI agents have launched a series of interviews of Muslims and Arab Americans in the Washington area and across the country . . . .  The FBI is carrying out the interviews in collaboration with the regional Joint Terrorism Task Forces, which include law enforcement officers from other agencies.").  Thus, articles referring to the targeting of Muslims and Arabs by the FBI implicate the JTTFs and reflect media interest in JTTF activities and operations – the subject of plaintiffs' NJTTF request.

there would no legal basis for using that allegation as a reason for denying expedited

processing, when indisputable widespread media interest has been shown.

    B.    <u>*Articles On the Monitoring, Questioning, and Surveillance of Political*</u>
           <u>*Protestors*</u>

        In their analysis of the articles in the record that discuss FBI and JTTF

surveillance of political protestors, defendants once again improperly isolate portions of

the record, removing significant context and cumulative evidence of widespread and

sustained media interest in the subjects central to plaintiffs' request.  Each article in this

category directly relates to some elements of plaintiffs' requests.  In particular, these

articles are directly relevant to the requests submitted by Code Pink and United for Peace

and Justice, both of which regularly engage in political protest activities, including but in

no way limited to protests of the 2004 political conventions, and to the request submitted

by the ACLU, a prominent defender of the rights of political protestors. These

organizations believe (and, in the case of UFPJ, have now definitively confirmed) that, as

a consequence of their political activities, they may have been subjected to FBI and/or

JTTF monitoring or surveillance.  These articles are also directly relevant to plaintiffs'

JTTF request, specifically to those portions of the request seeking records related to

monitoring, surveillance, and questioning of persons and organizations engaged in

political protest.  *See* Exhibit B to Plaintiffs' Motion for a Preliminary Injunction at ¶¶

20-38.

        The record amply demonstrates that media attention to FBI and JTTF monitoring

and surveillance of political protest activities has been robust.  That many of the articles

expressly concern FBI and JTTF activities during the run-up to the 2004 political

conventions comes as no surprise; nor does it diminish in any way their relevance to

overall subject of plaintiffs' requests.  Plaintiffs submitted their FOIA requests on

December 2, 2004, just months after the political conventions were held, thus it should be

expected that, in demonstrating widespread media interest, plaintiffs would point largely

to recent as opposed to distant events.  Moreover, the political conventions marked a

significant early opportunity for former Attorney General Ashcroft's more permissive

information-gathering guidelines, and the more aggressive FBI and JTTF tactics they

engendered, to be put in practice.  A fair reading of these articles, however, makes clear

that the primary subject of the media's interest is surveillance of political protestors – not

surveillance of political protestors at political conventions.  *See, e.g.,* Eric Lichtblau, *FBI

Goes Knocking for Political Troublemakers*, New York Times, August 16, 2004 ("The

Federal Bureau of Investigation has been questioning political demonstrators across the

country, and in rare cases even subpoenaing them, in an aggressive effort to forestall

what officials say could be violent and disruptive protests at the Republican National

Convention in New York . . . .  'The message I took from it,' said Sarah Bardwell, 21, an

intern at a Denver antiwar group who was visited by six investigators a few weeks ago,

'was that they were trying to intimidate us into not going to any protests and to let us

know that "hey, we're watching you."'  The unusual initiative comes after the Justice

Department, in a previously undisclosed legal opinion, gave its blessing to controversial

tactics used last year by the F.B.I. in urging local police departments to report suspicious

activity at political and antiwar demonstrations."); Susan Greene, *Activists Decry Pre-

Convention Security Tactics*, The Denver Post, August 26, 2004 ("In five years of peace

activism, little has infuriated . . . software engineer Paul Bame more than a visit last

month from a man who introduced himself as Ted.  Ted is an FBI agent who, on behalf of

the Joint Terrorism Task Force, showed up at his office inquiring about his plans to protest at the Republican National Convention . . . or elsewhere this election season. That same week, agents also questioned two dozen activists in Colorado, Kansas, and Missouri."); Amy Herder, *Teaching the Silent Treatment*, The Denver Post, August 8, 2004 ("Denver FBI spokeswoman Monique Kelso said the visits and phone calls by members of the Joint Terrorism Task Force were designed to gather intelligence on any plans for violence at the political conventions or the presidential inauguration. And, she said, they would continue.").[7]

Indeed, the sole document produced by defendants' pursuant to plaintiffs' FOIA requests unequivocally confirms the relevance of these articles to the subject of plaintiffs' requests. It consists of six pages describing the planning of plaintiff UFPJ and other peaceful protestors in preparation for the 2004 political conventions. *See* Exhibit A. The first portion is a report, addressed to FBI "Counterterrorism" personnel and based on the author's "Review of the Internet," that identifies plaintiff UFPJ and quotes extensively from the organization's call on its web site for an anti-war protest during the Republican National Convention. *Id.* The second portion, entitled "Threat to Disrupt Democratic National Convention," is addressed to the JTTF and misidentifies plaintiff UFPJ as an "anarchist group." *Id.* It is difficult to imagine a tighter correlation between the document defendants have produced and the record plaintiffs submitted to establish media interest and current exigency.

---

[7] *See also* Karen Abbott, *FBI Queries Rattle Activist*, Rocky Mountain News, July 17, 2004; Eric Lichtblau, *Protestors at Heart of Debate on Security vs. Civil Rights*, New York Times, August 27, 2004; Eric Lichtblau, *Subpoena Seeks Records About Delegate Lists on Web*, New York Times, August 30, 2004; Kerri Ginis, *Peace Fresno Seeks Damages*, The Fresno Bee, February 27, 2004; Michelle Goldberg, *A Thousand J. Edgar Hoovers*, www.salon.com, February 12, 2004.

The remaining articles in this category cast FBI and JTTF monitoring and surveillance of political protest activity in broader terms.  A front-page article in the *New York Times*, for example, specifically discusses former Attorney General John Ashcroft's controversial relaxation of the guidelines that previously restricted FBI information gathering in the absence of criminal suspicion, and the relationship between the new, relaxed guidelines and increased FBI monitoring, surveillance, and questioning of political activists. *See* Eric Lichtblau, *FBI Scrutinizes Antiwar Rallies*, New York Times, November 23, 2003 at A-1 ("The Federal Bureau of Investigation has collected extensive information on the tactics, training and organization of antiwar demonstrators and has advised local law enforcement officials to report any suspicious activity at protests to its counterterrorism squads, according to interviews and a confidential bureau memorandum . . . .  The abuses of the Hoover era . . . led to tight restrictions on F.B.I. investigations of political activity.  Those restrictions were relaxed significantly yesterday, when Attorney General John Ashcroft issued guidelines giving agents authority to attend political rallies, mosques and any event 'open to the public.'"); *see also* Alex Bradley & John Mayer, *The War At Home: Nationwide Crackdown on Activists Part*, www.saveourcivilliberties.com, September 2, 2004.  And several articles in the record discuss a grand jury investigation of four peace activists and Drake University.  *See* Jeff Eckhoff & Mark Siebert, *Anti-war Inquiry Unrelated to Terror*, The Des Moines Register, Feb. 10, 2004; Monica Davey, *An Anti-war Forum in Iowa Brings Federal Subpoenas*, New York Times, February 10, 2004 at A-14; Monica Davey, *Subpoenas on Antiwar Protest Are Dropped*, New York Times, February 11, 2004.  The subpoenas were served by an agent who "left behind at least two business cards identifying himself as a member of an FBI-Joint Terrorism Task

Force -- alarming those subpoenaed as well as other peace activists." Jeff Eckhoff &

Mark Siebert, *Anti-war Inquiry Unrelated to Terror*, The Des Moines Register, Feb. 10,

2004. Defendants denigrate the relevance of those articles by observing that one of the

articles reports that the subpoenas were not part of an anti-terrorism probe,

notwithstanding that the agent who served them used JTTF business cards. *Id*. But

defendants misconstrue the issue at hand and the purpose for which the record should be

evaluated. In determining plaintiffs' entitlement to expedited processing, the issue is not

whether the JTTF was or was not involved in the reported investigation, but whether the

record indicates a widespread media interest in the subject of plaintiffs' request. That

numerous articles were written about this investigation, several of which discussed in

some detail whether or not the JTTF was involved, supports plaintiffs' claim that the role

of JTTFs in such investigations is a matter of current exigency garnering widespread

media attention.

      Finally, as in *ACLU v. DOJ*, plaintiffs' entitlement to expedition under the

Agency standard is strengthened by the interest that prominent lawmakers have shown in

the subject of these requests. 321 F. Supp. 2d at 32. That members of Congress have

expressed concern about FBI and JTTF surveillance and monitoring activities has only

heightened the media's interest in those matters. *See* Eric Lichtblau, *Inquiry Into F.B.I.*

*Questioning is Sought*, New York Times, August 16, 2004 at A-16 ("Several Democratic

lawmakers called on Tuesday for a Justice Department investigation into the Federal

Bureau of Investigation's questioning of would-be demonstrators about possible violence

at the political conventions, saying the questioning may have violated the First

Amendment . . . . The inquiries were made after a legal opinion in April by the Office of

Legal Counsel in the Justice Department endorsed the constitutionality of past efforts by

F.B.I. counterterrorism agents to solicit help from local police forces to gather

intelligence on antiwar and political demonstrations."); *see also* Jeff Eckhoff & Mark

Siebert, *Anti-war Inquiry Unrelated to Terror*, The Des Moines Register, Feb. 10, 2004

("Lawyers worked Friday to derail a federal grand jury investigation into an ant-war

conference held three weeks ago at Drake University . . . .  Officials with the National

Lawyers Guild, host of the Nov. 15 conference, said they intend to move Monday to

block the subpoena, one of five delivered this week by the FBI's Joint Terrorism Task

Force . . . .  [M]embers of the Iowa congressional delegation . . . expressed concern about

the appearance that the government is investigating activists involved in peaceful

opposition to war.  'I don't like the smell of it,' said Sen. Tom Harkin . . . .  Other

members of Iowa's congressional delegation want to know more.  Rep. Leonard Boswell

. . . said . . . 'I am increasingly concerned about Attorney General John Ashcroft's

disregard for explaining the actions of the Justice Department to the public . . . .'  Rep.

Steve King said it appeared the government was using significant resources to investigate

a relatively minor protest.").

  The articles in the record, analyzed individually and cumulatively, plainly

demonstrate widespread media and public attention to the issues at the very center of

plaintiffs' request.  The record before this Court "easily meets [the Agency] standard,"

thus entitling plaintiffs to expedited processing of their requests.  *Edmonds v. FBI,* 2002

WL 32539613 at *3 (D. D.C. Jun. 27, 2002).

II.    <u>Plaintiffs Are Entitled to Expedited Processing Under the "Urgency to Inform" Standard of 28 CFR § 16.5(d)(1)(ii).</u>

Plaintiffs are also entitled to expedited processing under the statutory "compelling need" standard, because their requests involve an "urgency to inform the public concerning actual or alleged Federal Government activity" and are made by a person or entity "primarily engaged in disseminating information."  28 CFR § 16.5(d)(1)(ii).

A.    <u>Plaintiffs Have Demonstrated an Urgency to Inform the Public.</u>

As established above and in plaintiffs' opening brief, the record plainly demonstrates that plaintiffs' FOIA requests concern matters of current exigency to the public, and that a significant recognized interest would be compromised if expedited processing were denied.  The domestic political surveillance activities that form the basis for plaintiffs' requests, like the Patriot Act provisions at issue in *ACLU v. DOJ,* "unquestionably implicate[] important individual liberties and privacy concerns which are of immediate public interest," as demonstrated by the substantial media record submitted by plaintiffs.  321 F. Supp. 2d at 29.  Moreover, "[b]ecause the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of a finding of expediency." *Id*. at 30.

B.    <u>The ACLU Is Primarily Engaged in the Dissemination of Information.</u>

Defendants, citing to various portions of the ACLU's website, seek to characterize the ACLU as essentially a large law firm with a specialized litigation docket. It is understandable that defendants' counsel would view the ACLU in those terms, because their principal interactions with the ACLU occur during litigation.  However, the

16

ACLU is a great deal more than a public interest law firm. Indeed, the ACLU's principal

mission is not to litigate important civil rights and civil liberties cases, but to preserve and

defend the guarantees of the Bill of Rights and civil rights laws, using litigation as one

major tactic. Every aspect of the ACLU's work in furtherance of this mission – including

litigation – can fairly be described as information dissemination. Indeed, the much-visited

website upon which defendants rely in describing the ACLU's activities is itself a highly

effective vehicle for information dissemination.

Last year alone, in its more conventional information dissemination activities, the

ACLU published more than 20 formal reports, in addition to its regular newsletters, news

briefings, and e-mail alerts. *See* http://www.aclu.org/publications/publicationsmain.cfm.

Defendants' portrayal of a strict dichotomy between these aspects of the ACLU's work

on the one hand, and its litigation docket on the other, is misleading. How, for example,

should the ACLU's FOIA litigation be characterized? The very purpose of such

litigation is to obtain information from the government for dissemination to the public,

and it cannot be that the ACLU's use of the courts to enforce the FOIA places it at a

disadvantage in qualifying for expedition.

The ACLU's litigation surrounding the issue of torture demonstrates the centrality

of information dissemination in the ACLU's work. The ACLU submitted a FOIA request

on Oct. 7, 2003, demanding the release of information about the treatment of detainees

held overseas by the United States. *See* http://action.aclu.org/torturefoia/. As a result of

that request, and the litigation that has followed, thousands of pages of documents have

been released, making the ACLU the primary source of information about this issue. The

unique information obtained and disseminated by the ACLU has broadened the already

widespread media coverage of this issue, further contributing to the public's knowledge.

Litigation has been an essential component of this information dissemination effort, since

without the ACLU's legal challenge to the government's refusal to turn over documents,

a vast amount of information now known about the abuse of detainees held by the United

States abroad would still be secret.

This Court has already held that an organization similar to the ACLU in material

respects is primarily engaged in information dissemination for purposes of expedited

processing. *See ACLU v. DOJ*, 321 F. Supp. 2d at 30 n.5 (holding that Electronic Privacy

Information Center ("EPIC") satisfies statutory standard). It is difficult to conceive of a

coherent, much less workable, rule by which this Court could reach the opposite

conclusion for the ACLU. EPIC and the ACLU are both advocacy organizations that

employ multiple strategies, including litigation, public education, and legislative and

political advocacy, to accomplish their policy goals.

Like the ACLU, EPIC frequently serves as counsel and writes amicus briefs in

federal litigation. Last year, for example, EPIC successfully litigated or submitted

amicus briefs in five major cases dealing with privacy issues. Annual Report at 11-13,

http://www.epic.org/epic/annual_reports/2003.pdf. EPIC's web site lists an additional

five pending lawsuits in which EPIC's lawyers are participating. *See*

http://www.epic.org/privacy/litigation/. This non-exhaustive list of EPIC's litigation

activity is in addition to the large docket of FOIA cases the organization litigates. EPIC's

lawyers currently have no fewer than nine pending FOIA cases in federal courts. *Id.*[8]

---

[8] Although the ACLU's docket is certainly larger, that is a reflection of size. While the ACLU has more than one hundred lawyers on its staff and in affiliates around the country, EPIC has only seven. *See* http://www.epic.org/epic/staff_and_board.html. As a much larger organization, the ACLU also disseminates correspondingly more information by traditional means.

EPIC, like the ACLU, devotes substantial resources to advocating before Congress and the executive branch. In 2003 alone, EPIC's staff testified or submitted comments to Congress on at least seven occasions and filed comments with federal agencies on at least 12 occasions. Annual Report at 9-10; 14-16, http://www.epic.org/epic/annual_reports/2003.pdf. In furtherance of its multi-pronged advocacy strategy, EPIC participates in at least ten advocacy coalitions on various issues related to privacy. *See* www.epic.org/; *see also* http://www.aclu.org/Legislative/LegislativeMain.cfm (describing ACLU's extensive legislative advocacy and lobbying).

In short, the mix of activities in which EPIC and the ACLU engage is not distinguishable in any relevant way. Treating them differently for purposes of expedited processing would create unnecessary confusion for subsequent FOIA requestors, litigants, and even courts. Under the standard set by this Court in *ACLU v. DOJ*, the ACLU is "primarily engaged in the dissemination of information."

Finally, as this Court acknowledged in *ACLU v. DOJ*, that a requestor has been found to be a "representative of the news media" and therefore entitled to a fee waiver under FOIA is at least probative of its entitlement to expedition under the statutory standard. *See* 321 F. Supp. 2d at 30 n.5 (citing to prior court's holding that EPIC was entitled to fee waiver in holding that EPIC met requirements for expedited processing). The ACLU is a "representative of the news media," because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *see*

*also* Exhibit C, Letter from NIST to ACLU (granting ACLU fee waiver as representative of news media).  This additional factor, viewed alongside the full range of the ACLU's information dissemination activities, is sufficient to satisfy the statutory requirement and entitles the ACLU to expedited processing of these requests.

Accordingly, because plaintiffs have demonstrated a substantial likelihood of success on the merits, this Court should grant the motion for preliminary injunctive relief and direct defendants to process plaintiffs' requests expeditiously.

III.    This Court Should Deny Defendants' Motion for an *Open America* Stay

Plaintiffs have no basis upon which to dispute the FBI's general factual presentation concerning the current workload of its FOIA unit.  By the FBI's calculations, absent expedition, the FBI will complete its processing of plaintiffs' FOIA request seeking records of FBI and JTTF surveillance of the ACLU, American-Arab Anti-Discrimination Committee, Code Pink, Greenpeace, the Muslim Public Affairs Council, People for the Ethical Treatment of Animals, and United for Peace and Justice by June of 2006,[9] although that estimate is predicated on a significant misreading of plaintiffs' FOIA requests that has resulted in an improperly circumscribed search with respect to several of the organizational requestors. (Declaration of Ben Wizner, attached as Exhibit D; see also Exhibit A to Plaintiffs' Motion for Preliminary Injunction at 1) The FBI has declined even to provide an estimate of how long it will take to complete the processing of plaintiffs' FOIA request concerning the policies and practices of JTTFs,

---

[9] Although the FBI insists that it cannot process and release records related to the ACLU and Greenpeace prior to March and June of 2006, respectively, unnamed FBI and DOJ officials have assured leading news media outlets that the contents of these records are likely benign.  *See* Eric Lichtblau, *Large Volume of F.B.I. Files Alarms U.S. Activist Groups,* New York Times, July 18, 2005, at A12 (FBI and DOJ officials "said there might be an innocuous explanation for the large volume of files on the A.C.L.U. and Greenpeace, like preserving requests from or complaints about the groups in agency files."); Michael Dobbs, *FBI Monitored Web Sites for 2004 Protests,* Washington Post, July 18, 2005, at A03 ("Speaking on background, an FBI official said that many of the records were routine correspondence.").

stating only that it is "impossible" for the FBI to do so.  Accordingly, there literally is no telling how long defendants will take to complete the processing of plaintiffs' requests in the absence of judicial supervision.

For the reasons stated above and in plaintiffs' opening brief, plaintiffs have presented a compelling showing of entitlement to expedited processing under either or both applicable standards.  The records sought by plaintiffs include information that is critical to the public's understanding of federal government policy and to an ongoing debate about the proper role of federal law enforcement and the participation of state and local law enforcement officers in these policies.  However, should this Court disagree, plaintiffs request that the Court set a concrete and reasonable schedule for the processing of plaintiffs' requests, or direct defendants to move for summary judgment within a reasonable period of time.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs motion for a preliminary injunction.

Respectfully submitted,

_____
Arthur B. Spitzer
D.C. Bar No. 235960
American Civil Liberties Union
   of the National Capital Area
1400  20th Street, N.W. #119
Washington, D.C. 20036
Phone:  (202) 457-0800
Fax: (202) 452-1868

Ann Beeson
Ben Wizner
Corey Stoughton
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2629

*Counsel for Plaintiffs*

July 19, 2005