IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. A. No. 05-CV-1004 (ESH) |
| ) | |
| FEDERAL BUREAU OF INVESTIGATION, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## THIRD DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1, 2002.

Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge

Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight over

Freedom of Information ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From

October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate, serving at various

commands and routinely working with FOIA matters.  I am also an attorney who has been

licensed to practice law in the State of Texas since 1980.

(2)     In my current capacity as Section Chief, I supervise the Freedom of

Information/Privacy Acts Litigation Support Unit ("FOIPA LSU").  My responsibilities also

include the review of FBI information for classification purposes as mandated by Executive

Order 12958, as amended,[1] and the preparation of affidavits/declarations in support of Exemption

1 claims asserted under the FOIA.[2] I have been designated by the Attorney General of the United

States as an original Top Secret classification authority and a declassification authority pursuant

to Executive Order 12958, as amended, §§ 1.3 and 3.1. The statements contained in this

declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance

therewith.

      (3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552 and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware

of the treatment which has been afforded the multi-part FOIA requests of plaintiffs American

Civil Liberties Union ("ACLU"), the ACLU Foundation, the American-Arab Anti

Discrimination Committee ("ADC"), the Muslim Public Affairs Council ("MPAC"), People for

Ethical Treatment of Animals ("PETA"), Greenpeace, and United for Peace and Justice

("UFPJ"), hereinafter collectively "plaintiffs," who collectively seek access to documents related

to the Joint Terrorism Task Force ("JTTF"), the National Joint Terrorism Task Force ("NJTTF"),

---

[1] 60 Fed. Reg. 19825 (1995) and 68 Fed. Reg. 15315 (2003).

[2] 5 U.S.C. § 552 (b)(1).

in connection with plaintiffs' groups and individuals.[3]

(4)    The purpose of this declaration is to provide the Court and plaintiffs with an explanation of the procedures used in the review and processing of these documents. In accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides justification for FBI records which have been withheld from disclosure pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), 7(E), and 7(F), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).

### ADMINISTRATIVE AND LITIGATION
### HISTORY OF PLAINTIFFS' FOIA REQUESTS

(5)    On December 2, 2004, the ACLU filed two FOIA requests that are the subject of this lawsuit, seeking access to FBI documents created from January 1, 2000 to the present "prepared, received, transmitted, collected and/or maintained by the FBI, the [NJTTF], or any [JTTF] relating to" plaintiffs in this action. The first letter, addressed to FBIHQ, sought documents created from January 1, 2000 to the present regarding 40 categories of records, including the creation, purpose, composition and policies of the NJTTF. See Exhibit A to the First Hardy Declaration. The second letter, addressed to FBIHQ and to field offices in New York,  Detroit, Boston, Los Angeles, Washington, Richmond and San Francisco, sought documents related to the monitoring, surveillance, and investigation by JTTFs of ACLU, ACLU Foundation, ADC, Code Pink, Greenpeace, MPAC, PETA, and UFPJ. Plaintiffs requested

---

[3] Documents processed  for NJTTF policies, procedures, and practices as well as investigative records will be coded and addressed in a separate Vaughn declaration following the FBI's final release of documents in March 2006.

expedited processing in both of their December 2, 2004 letters pursuant to 28 C.F.R. §§

16.5(d)(I)(ii) and (iv). See Exhibit B to First Hardy Declaration.

(6)    By eight separate letters dated December 23, 2004, FBIHQ acknowledged receipt

of plaintiffs' requests for each subject matter. Plaintiffs were further notified that their multi-part

requests were also forwarded from the appropriate field offices to FBIHQ and would be handled

in conjunction with the FBIHQ request. Plaintiffs were also advised of the assigned FOIPA

numbers, as follows: ACLU and ACLU Foundation, FOIPA No. 1010242; ADC, FOIPA

No.1010243; Code Pink, FOIPA No. 1010244; Greenpeace, FOIPA No. 1010245; MPAC,

FOIPA No. 1010246; PETA, FOIPA No. 1010247; UFPJ, FOIPA No. 1010248; and NJTTF,

FOIPA No. 1010249. See Exhibit D to First Hardy Declaration.

(7)    By letter dated March 3, 2005, FBIHQ advised plaintiffs that in response to

FOIPA No. 1010244 regarding Code Pink, a search of the automated indices to the Central

Records System had located no responsive records at FBIHQ and the Boston, Los Angeles, New

York, and Washington Field Offices.[4] Plaintiffs were advised of their right to file an

administrative appeal with the Office of Information and Privacy ("OIP"), U.S. Department of

Justice ("DOJ"). See Exhibit F to First Hardy Declaration.

(8)    By letter dated March 16, 2005, FBIHQ advised plaintiffs that in response to

FOIPA No. 1010247 regarding PETA, a search of the automated indices to the Central Records

System had located no responsive records in the Richmond Field Office. Again, plaintiffs were

_____

[4] This March 3, 2005 letter erroneously indicated that FBIHQ had searched for records
related to Code Pink in the Los Angeles, New York and Washington Field Offices, and FBIHQ.
In fact, as indicated supra, only the Boston Field Office was searched.

advised of their right to file an administrative appeal with OIP, DOJ. <u>See</u> Exhibit G to First

Hardy Declaration.

(9)      Plaintiffs filed this Complaint on May 18, 2005 seeking declaratory judgment and

an order for the FBI to produce the requested documents. Code Pink was not included in the

complaint.

(10)      By letters dated May 25, 2005 and June 6, 2005, the FBI informed plaintiffs that

their request for expedition of their December 2, 2004 FOIA requests had been denied both by

DOJ and by the FBI. <u>See</u> Exhibits J and K to First Hardy Declaration.

(11)      On June 16, 2005, plaintiffs moved for a preliminary injunction, seeking review

of the DOJ and FBI decisions to deny expedition of their requests. And on June 20, 2005, the

FBI filed its answer to plaintiff's complaint.

(12)      By letter dated June 27, 2005, FBIHQ released six pages in full regarding UFPJ,

FOIPA No. 1010248. <u>See</u> Exhibit H to First Hardy Declaration.

(13)      On July 5, 2005, the FBI moved for a stay pursuant to <u>Open America</u>, submitting

the First Hardy Declaration dated July 1, 2005, which: (a) described the numerous FOIA requests

filed by plaintiffs and other ACLU chapters across the country; (b) described the FBI and DOJ's

response to plaintiffs' request for expedited processing; (c) provided background on the FBI's

FOIA process and CRS; (d) described the status of the searches and processing of the plaintiffs'

FOIA requests; and (e) described the backlog of FOIA requests and efforts made by the FBI to

deal with that backlog. The FBI also opposed plaintiffs' motion for preliminary injunction.

(14)      The FBI reviewed plaintiffs' declaration submitted with their July 19, 2005

response, which discussed allegedly "incorrect factual statements" in the First Hardy Declaration.

As a result, on July 27, 2005, the FBI submitted the Second Hardy Declaration as well as the

Declaration of Margaret P. Jackson ("Jackson Declaration"), both dated July 26, 2005, to resolve

remaining factual disputes in conjunction with the FBI's reply in support of its motion for partial

summary judgment and request for an Open America stay.  At that time, the FBI explained that

despite its reasonable interpretation of the scope of plaintiffs' December 2, 2004 requests, the

FBI would nevertheless renew its search efforts to remedy any misunderstandings regarding the

scope of the searches to be conducted.  See Exhibit A to Second Hardy Declaration.  Moreover,

at that time, the FBI indicated that with regard to the FOIA request for NJTTF records, FOIPA

No. 1010249, its search for records was continuing based on the FBI's reasonable interpretation

of that request, and anticipated further discussions with plaintiffs regarding the scope of that

request.

(15)    Following a status conference with the Court on July 29, 2005, the parties

engaged in further discussions regarding the scope of the searches for each of the requests.  As a

result of these discussions, combined with the FBI's renewed search efforts, (see Second Hardy

Declaration and Jackson Declaration), the universe of documents to be searched and scoped was

further refined, and the results were reflected in the parties' Joint Status Report filed on August

29, 2005, which set forth a production schedule for documents related to ACLU, ADC, PETA,

Greenpeace, UFPJ, and MPAC ("organizational requests") on or before October 1, 2005; and the

production of documents regarding NJTTF policies, practices and procedures on or before

January 6, 2006, with the balance of documents regarding NJTTF to be released on or before

March 1, 2006. The Court entered an Order on August 29, 2005 reflecting this schedule.

(16)    As a result, in accordance with the Court's August 29, 2005, Order, on September 30, 2005 and October 1, 2005, the FBI completed its search and processing of a total of 3,310 pages related to the organizational requests – ACLU, ADC, PETA, Greenpeace, UFPJ, and MPAC – and released 2,407 pages, with redactions taken pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), 7(E), and 7(F).

(17)    On October 18, 2005, during a telephone status conference with the Court, agreement was reached on the scope and content of the FBI's Vaughn declarations and a briefing schedule, which was entered by the Court on November 1, 2005.

(18)    The November 1, 2005 Order requires the FBI to file a Vaughn declaration with respect to documents related to PETA, UFPJ, ACLU and Greenpeace by December 1, 2005; and to file a Vaughn declaration with respect to documents related to ADC and MPAC by December 22, 2005.

(19)    After reviewing the documents released to date, plaintiffs submitted a list of a subset of these released documents which they determined should be addressed by the FBI in its Vaughn declaration. Plaintiffs Bates stamped the documents (including deleted page sheets indicating both pages withheld in full and duplicate pages) consecutively "1" through "2459" with the following specific breakdown: UFPJ – Bates ##s 1-6; ACLU – Bates ##s 7-90; PETA – Bates ##s 91-298; ADC – Bates ##s 299-509; MPAC – Bates ##s 510-607; Greenpeace – Bates ##s 608-2459. See Exhibit A attached hereto for a detailed breakdown of those documents which plaintiffs requested to be Vaughned.

(20)    This Vaughn declaration addresses a total of 773 pages which have been
identified by plaintiffs related to UFPJ, ACLU, PETA and Greenpeace, and will provide
justifications for the withholding of information from the documents withheld, either in part or in
full, pursuant to the FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), 7(E) and 7(F).  Out of a
total of 773 pages -- 430 pages were released with redactions; 243 pages were withheld in full;
82 pages were released in full; and 18 pages were referred to other government agencies and/or
DOJ components.

## SEARCH FOR AND DESCRIPTION OF RESPONSIVE DOCUMENTS

(21)    In this case, the FBI employed several mechanisms as part of its search efforts to
identify documents responsive to plaintiffs' request.  As a threshold matter, it is important to note
that the nature of the current FOIA requests do not lend themselves readily or naturally to the
searches that the FBI routinely conducts in response to FOIA requests seeking access to FBI
investigative files.  This is particularly the case where, as here, the subject matter of the request is
relatively recent, and responsive records may not have yet been indexed to the FBI's Central
Records System ("CRS").[5]  As a result, the FBI not only initiated a standard search of records in

---

[5] The FBI's Central Records System ("CRS") consists of administrative, applicant,
criminal, personnel, and other files compiled for law enforcement purposes.  This system consists
of a numerical sequence of files broken down according to subject matter.  The subject matter of
a file may relate to an individual, organization, company, publication, activity, or foreign
intelligence matter.  Certain records in this system are maintained at FBIHQ.  Records which are
pertinent to specific field offices are maintained in those field offices.  Through the General
Indices, FBIHQ and each field office can access the CRS.  The General Indices are arranged in
alphabetical order and consist of an index on various subjects, including the names of individuals
and organizations.  Only information considered pertinent, relevant or essential for future
retrieval is indexed.  Without a "key" (index) to this mass of information, information essential to
ongoing investigations could not be readily retrieved.

the CRS both for FBIHQ and for the requested field offices, but also engaged in individualized inquiries of offices at FBIHQ and the affected field offices via internal communications including Electronic Communication ("EC") dated January 4, 2005, and follow-up search memos and e-mails requesting affected personnel to conduct a thorough search of any documents in their possession, including tickler copies and e-mails responsive to plaintiffs' FOIA requests. Any suggestions or logical leads regarding potentially responsive documents were followed.[6]

(22)    As a result of these search efforts, the following approximate pages were located for each of the four organizational requests which are the subject of this Vaughn declaration: ACLU/ACLU Foundation -- 126 pages; PETA -- 338 pages; Greenpeace -- 2142; and UFPJ -- 6 pages. Specifically, the documents related to ACLU/ACLU Foundation as a whole represent information provided by sources and obtained through a variety of sensitive law enforcement techniques. Although the documents were "indexed" in ACS under "ACLU" they are primarily cross-references to the ACLU, where ACLU is merely mentioned.

(23)    The documents related to Greenpeace consist of court documents; foreign law enforcement agency-derived information; a variety of third-party documents; internal FBI Letterhead Memoranda ("LHMs"), Electronic Communications ("ECs"), and internal FBI email traffic; and documents which originated with other government agencies. Many of the documents concern the criminal trespass arrests of approximately 20 Greenpeace members

---

[6] The FBI conducted searches for documents in the following offices : ACLU and ACLU Foundation -- FBIHQ, New York, Los Angeles, and Washington Field Offices ("WFO"); Greenpeace - FBIHQ, New York, Los Angeles, WFO; PETA -- FBIHQ, Los Angeles, New York, WFO, and Richmond Field Offices; and UFPJ -- FBIHQ, Boston, New York, WFO, and Los Angeles Field Offices.

during demonstrations at the Vandenberg Air Force Base, the group's demonstration at -- and

interference with -- a power plant, and the group's demonstration at Thule Air Force Base,

Greenland, against missile defense systems testing.  The remaining documents contain only

passing references to Greenpeace but they were "indexed" under "Greenpeace" and therefore

were identified during the search process.

(24)    The documents related to PETA as a whole represent information related to

sources, a variety of tax forms; draft documents for internal FBI use only and drafts that did not

originate with the FBI; referrals to other government agencies; and analyses of Title III-derived

information.  Other than the tax documents, these documents contain only passing references to

PETA, although they too were "indexed" under "PETA" nevertheless.

(25)    Finally, the documents related to UFPJ consist of ECs regarding law enforcement

investigations in which UFPJ is merely mentioned.[7]

### EXPLANATION OF PROCESSING OF RESPONSIVE DOCUMENTS

(26)    All documents were processed to achieve maximum disclosure consistent with the

provisions of the FOIA.  Every effort was made to provide plaintiffs with all material in

 the public domain and with all reasonably segregable portions of releasable material.  It is

important to note that, due to the complexities and time pressures associated with reviewing,

processing and releasing documents in this case, and particularly given the nature of the

responsive documents, the FBI made a good faith attempt to process all of the documents in such

---

[7] Certain documents were designated as "O/S" or "out of scope" and by agreement
between the parties are not addressed in this Vaughn declaration.

a way as to insure internal consistency.

(27)    Copies of the documents identified by plaintiff and which relate to UFPJ, PETA,

Greenpeace and ACLU contain, on their face, coded categories of exemptions which detail the

nature of the information withheld pursuant to the provisions of the FOIA. The coded categories

are provided to aid in the review of the FBI's explanations of the FOIA exemptions used to

withhold the protected material. The coded documents are attached as **Exhibit B**.

### MECHANICS OF UTILIZING THE CODED FORMAT

(28)    Each withholding of information from these documents is accompanied by a code

that corresponds to a category within each of the exemptions used to withhold information. For

example, if (b)(7)(C)-1 appears on the page, the "b)(7)(C)" designation refers to the use of the

exemption under the caption "Unwarranted Invasion of Personal Privacy." The Subcategory "1"

narrows and specifically describes the material deleted, which, in this example, are the identities

of FBI employees. The coded categories of exemptions used in the processing of plaintiffs'

request are as follows, and more detailed descriptions of the information withheld will be

provided herein:

### SUMMARY OF JUSTIFICATION CATEGORIES

| **EXEMPTION (b)(1)** | **CLASSIFIED INFORMATION** |
|---|---|
| (b)(1)-1 | Information Properly Classified by an FBI Classification Authority Pursuant to Executive Order 12958, As Amended |
| **EXEMPTION (b)(2)** | **INFORMATION RELATED SOLELY TO THE INTERNAL RULES AND PRACTICES OF AN AGENCY** |
| (b)(2)-1 | Internal Telephone, Facsimile, Room Numbers and |

-11-

E-mail Addresses of FBI Employees
[Cited in conjunction with Exemptions(b)(6)-1 and
(b)(7)(C)-1]

(b)(2)-2                         Internal Telephone, Facsimile, Room Numbers and E-
                                 mail of Other Federal Government Employees
                                 [Cited in conjunction with Exemptions (b)(6)-2 and
                                 (b)(7)(C)-2]

(b)(2)-3                         Confidential Source Symbols or Numbers
                                 [Cited in conjunction with Exemption (b)(7)(D)-3]

(b)(2)-4                         FBI Internal Investigative Techniques and Procedures
                                 [Cited in Conjunction with Exemptions (b)(7)(D)-4 and
                                 (b)(7)(E)-1]

(b)(2)-5                         Internal Telephone, Fax Numbers and Addresses of
                                 Foreign Government Sources
                                 [Cited in conjunction with (b)(7)(D)-5]

**EXEMPTION (b)(3)**             **INFORMATION PROTECTED BY STATUTE**

(b)(3)-1                         Inner Workings of the Federal Grand Jury -- Federal Rule
                                 of Criminal Procedure 6(e)

(b)(3)-2                         Internal Revenue Code -- 26 U.S.C. § 6103
                                 [Cited in conjunction with Exemptions (b)(6)-4 and
                                 (b)(7)(C)-4]


**EXEMPTION (b)(5)**             **PRIVILEGED INFORMATION**

(b)(5)-1                         Deliberative Process and Attorney-Client Privileges

**EXEMPTION (b)(6)**             **CLEARLY UNWARRANTED INVASION OF
                                 PERSONAL PRIVACY**

(b)(6)-1                         Names and/or Identifying Information Pertaining to FBI
                                 Employees
                                 [Cited in conjunction with Exemptions (b)(2)-1 and
                                 (b)(7)(C)-1]

(b)(6)-2                          Names and/or Identifying Information Pertaining to Non-
                                  FBI Federal Government Employees
                                  [Cited in Conjunction with Exemption (b)(7)(C)-2]

(b)(6)-3                          Names and/or Identifying Information of Local, County and
                                  State Law Enforcement Employees
                                  [Cited in conjunction with Exemption (b)(7)(C)-3]

(b)(6)-4                          Names and/or Identifying Information of Third Parties of
                                  Investigative Interest or Who Provided Information to the
                                  FBI
                                  [Cited in conjunction with Exemption (b)(7)(C)-4]

(b)(6)-5                          Names and/or Identifying Information of Third Parties
                                  Merely Mentioned
                                  [Cited in conjunction with Exemption (b)(7)(C)-5]

(b)(6)-6                          Names and/or Identifying Information of Foreign
                                  Government/Law Enforcement Agency Officials
                                  [Cited in conjunction with Exemptions (b)(2)-5, (b)(7)(C)-6
                                  and (b)(7)(D)-5]

**EXEMPTION (b)(7)(A)**           **PENDING LAW ENFORCEMENT
                                  INVESTIGATIONS**

(b)(7)(A)-1                       Information Pertaining to Pending Law Enforcement
                                  Investigations

**EXEMPTION (b)(7)(C)**           **UNWARRANTED INVASION OF PERSONAL
                                  PRIVACY**

(b)(7)(C)-1                       Names and/or Identifying Information Pertaining to FBI
                                  Employees
                                  [Cited in conjunction with Exemptions (b)(2)-1 and
                                  (b)(6)-1]

(b)(7)(C)-2                       Names and/or Identifying Information Pertaining to Non-
                                  FBI Federal Government Employees
                                  [Cited in conjunction with Exemption (b)(6)-2]

(b)(7)(C)-3                       Names and/or Identifying Information of Local, County and
                                  State Law Enforcement Employees

-13-

|  | [Cited in conjunction with Exemptions (b)(6)-3 and (b)(7)(D)-3] |
|---|---|
| (b)(7)(C)-4 | Names and/or Identifying Information of Third Parties of Investigative Interest or Who Provided Information to the FBI<br>[Cited in conjunction with Exemption (b)(6)-4] |
| (b)(7)(C)-5 | Names and/or Identifying Information of Third Parties Merely Mentioned<br>[Cited in conjunction with Exemption (b)(6)-5] |
| (b)(7)(C)-6 | Names and/or Identifying Information of Foreign Government/Law Enforcement Agency Officials<br>[Cited in conjunction with Exemption (b)(2)-5, (b)(6)-6 and (b)(7)(D)-5] |

**EXEMPTION (b)(7)(D)**      **CONFIDENTIAL SOURCE INFORMATION**

| (b)(7)(D)-1 | Names and/or Identifying Information Furnished by Third Parties with Express Assurance of Confidentiality |
|---|---|
| (b)(7)(D)-2 | Names and/or Identifying Information Furnished by Third Parties with Implied Assurance of Confidentiality |
| (b)(7)(D)-3 | Confidential Source Symbols or Numbers<br>[Cited in conjunction with (b)(2)-3] |
| (b)(7)(D)-4 | Investigative Material Compiled by State, County or Local Law Enforcement Agencies and Provided to the FBI<br>[Cited in conjunction with (b)(6)-3 and (b)(7)(C)-3] |
| (b)(7)(D)-5 | Investigative Material Compiled by Foreign Government/Law Enforcement Agencies<br>[Cited in conjunction with (b)(2)-5, (b)(6)-6 and (b)(7)(C)-6] |

**EXEMPTION (b)(7)(E)**      **INVESTIGATIVE TECHNIQUES AND PROCEDURES**

| (b)(7)(E)-1 | FBI Laboratory Rules and Procedures, Polygraph Charts, etc.[Cited in conjunction with (b)(2)-4] |
|---|---|

## JUSTIFICATION FOR REDACTIONS

(29)     The paragraphs that follow explain the FBI's rationale for withholding each

particular category of information under the specific exemption categories described above.  In

addition, **Exhibit C** attached hereto consists of a chart which provides additional details

regarding those pages which have been withheld in full.

### APPLICATION OF FOIA EXEMPTION (b)(1) and E.O. 12958, AS AMENDED

(30)     The FBI's analysis of the withholding of classified information contained in its

records in a FOIA context is based on the standards articulated in the FOIA statute, 5 U.S.C. §

552 (b)(1).  Exemption 1 protects from disclosure those records that are "(A) specifically

authorized under criteria established by an Executive Order to be kept Secret in the interest of

national defense or foreign policy; and (B) are in fact properly classified pursuant to such

Executive Order."

(31)     The FBI's analysis of whether Exemption 1 permits the withholding of agency

records consists of two significant steps.  First, the FBI must determine whether the information

contained in the records is information that satisfies the substantive and procedural criteria of the

applicable Executive Order governing the classification and protection of national security

information.  Only after those criteria have been satisfied may the FBI proceed to analyze

whether the documents are exempt under FOIA Exemption 1.

(32)     First therefore, I must determine whether the information in these records is

information that satisfies the requirements of the current Executive Order which presently

governs the classification and protection of information that affects the national security.[8] I must

further ensure that the information at issue complies with the various substantive and procedural

criteria of the current Executive Order, E.O. 12958, as amended.  The current Executive Order

which applies to the protection of national security information was amended on March 25, 2003.

I am bound by the requirements of E.O. 12958, as amended, when making classification

determinations.

(33)    For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption 1, the information must meet the requirements set forth in E.O.

12958, as amended, § 1.1 (a):

> (a) an original classification authority is classifying the information;
>
> (b) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (c) the information falls within one or more of the categories of information listed in § 1.4 of this order; and
>
> (d) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(34)    All information which I determined to be classified in this case, and which is

under the control of the United States Government, is marked at the "Secret" level since the

unauthorized disclosure of this information reasonably could be expected to cause serious

---

[8] Section 6.1 (y) of E.O. 12958, as amended, defines "National Security" as "the national defense or foreign relations of the United States."

damage to the national security.[9]  In addition to these substantive requirements, certain

procedural and administrative requirements of E.O. 12958, as amended, must be followed before

information can be considered to be properly classified, such as, proper identification and

marking of documents.  I made certain that all procedural requirements of E.O. 12958, as

amended, were followed in order to ensure that the information was properly classified.  I made

certain that:

> (a) each document was marked as required and stamped with the proper
> classification designation;[10]
>
> (b) each document was marked to indicate clearly which portions are classified
> and which portions are exempt from declassification as set forth in E.O. 12958, as
> amended, § 1.5 (d) and which portions are unclassified;[11]
>
> (c) the prohibitions and limitations on classification specified in E.O. 12958, as
> amended, § 1.7, were adhered to;
>
> (d) the declassification policies set forth in E.O. 12958, as amended, § 3.1 were
> followed; and
>
> (e) any reasonably segregable portion of these classified documents that did not
> meet the standards for classification under E.O. 12958, as amended, were
> declassified and marked for release, unless withholding was otherwise warranted
> under applicable law.[12]

---

[9] See E.O. 12958, as amended, § 1.2 (a)(2).

[10] E.O. 12958, as amended, §§ 1.6 (a)(1)-(5).

[11] E.O. 12958, as amended, § 1.6 (c).

[12] 5 U.S.C. § 552 (b) provides, in part, that "[a]ny reasonably segregable portion of a
record shall be provided to any person requesting such record after deletion of the portions which
are exempt under this subsection."  In this case, the information at issue has been carefully
examined and we have determined that no additional reasonably segregable portions may be
declassified and released.

-17-

**FINDINGS OF DECLARANT**

(35)     With the above requirements in mind, I personally and independently examined the information withheld from plaintiff pursuant to FOIA Exemption 1. I determined that the remaining portions of classified information withheld, warrant continued classification at the "Secret" level, pursuant to E.O. 12958, as amended, § 1.4, namely, (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology.

**INTELLIGENCE ACTIVITIES AND METHODS**

(36)     E.O. 12958, as amended, § 1.4 (c), exempts intelligence activities (including special activities), intelligence sources and methods, or cryptology. The information withheld on Bates pages 87 and 89 consists of intelligence activities and methods utilized by the FBI for gathering intelligence data. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method and information generated by it is needed by U.S. Intelligence/ Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.

(37)     The classification redactions were made to protect from disclosure information that would reveal the actual intelligence activities and methods utilized by the FBI against

-18-

specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The intelligence activities or methods detailed in the withheld information are effective means for the FBI to gather, store or disseminate intelligence information. The criteria utilized by the FBI in these instances to decide what actions by an individual or organization warranted the commencement of an investigation, or caused a certain activity to be given investigative attention over others, could be revealed though disclosure of these intelligence methods. The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations, and are in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

(38)    The information on Bates pages 87 and 89 concerns one method and one intelligence activity that is very specific in nature and known to very few individuals. Disclosure of the specific information would describe the method and intelligence activity which are still used by the FBI today to gather intelligence information. The release of this information could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current methods and activities used; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal or determine the criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering

-19-

capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

(39)    The FBI protected the following categories of information specific to intelligence activities and methods because disclosure reasonably could be expected to cause serious damage to the national security. The information withheld on Bates page 87 identifies the character of the case for a foreign counterintelligence investigation and Bates page 89 contains a symbol number with detailed information. A more detailed discussion of each of these categories is contained within the paragraphs below.

### A. Character of Case

(40)    The classified information withheld on Bates page 87 identifies the character of a case for a specific type of intelligence activity directed at a specific target of national security interest. Disclosure of the characterization could reasonably be expected to cause serious damage to the national security, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal the manner of acquisition of the intelligence or counterintelligence information. This information is properly classified at the "Secret" level, and withheld pursuant to E.O. 12958, as amended, § 1.4 (c) and exempt from disclosure pursuant to Exemption 1.

### B. Symbol Number With Detailed Information

(41)    The classified information withheld on Bates page 89 contains a numerical designator which serves as a single identifier for an intelligence method utilized to provide information on a specific individual or organization determined to be of national security interest.

A singular identifier is any word, term or phrase used in lieu of the true identity of a source. This includes code names, code words, numerical designators and file numbers. The numerical designator assigned to this specific source is unique to and solely used for this source. The numerical designator is assigned sequentially and is usually prefixed with the geographic location of the FBI office from which the source is operated.

(42)    Detailed information provided by this intelligence method is also withheld. The method and intelligence activities described in the withheld information are effectively utilized at present as a means to collect intelligence information. The release of this information could permit hostile governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these methods and activities and render them useless in providing intelligence information. This would severely disrupt the FBI's intelligence gathering capabilities.

(43)    The disclosure of this information could reasonably be expected to cause serious damage to the national security and severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws. This information is properly classified at the "Secret" level, pursuant to E.O. 12958 § 1.4 (c), as amended and exempt from disclosure pursuant to Exemption 1.

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION (b)(1) CLAIMS

(44)    The classified information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense of

the United States. This information was not examined in isolation. Instead, each individual

piece of information was evaluated with careful consideration given to the impact that disclosure

of this information could have on other sensitive information contained elsewhere in the United

States intelligence community's files. Equal consideration was given to the impact that other

information either in the public domain or likely known or suspected by present or potential

adversaries of the United States, would have upon the information I examined.

     (45)    In those instances where, in my judgement, the disclosure of this information

could reasonably be expected to cause serious damage to the national security, and its

withholding outweighed the benefit of disclosure, I exercised my prerogative as an original

classification authority and designated that information as classified in the interest of national

security, and invoked Exemption 1 of the FOIA to prevent disclosure. Likewise, the

justifications for the withheld classified information were prepared with the intent that they be

read with consideration given to the context in which the classified information is found. This

context includes not only the surrounding unclassified information, but also other information

already in the public domain, as well as information likely known or suspected by other hostile

intelligence entities. It is my judgement that any greater specificity in the descriptions and

justifications set forth with respect to intelligence sources, activities and methods, could

reasonably be expected to jeopardize the national security of the United States. Exemption

(b)(1)-1 is asserted on the following ACLU pages: 187, 89 - 90 and 92.

## EXEMPTION (b)(2) – INFORMATION RELATED SOLELY TO THE INTERNAL RULES AND PRACTICES OF AN AGENCY

     (46)    5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the

internal personnel rules and practices of an agency." This exemption protects routine internal

administrative matters and functions of the FBI which have no effect on the public at large and

which is predominantly internal information. This exemption also protects information, the

disclosure of which would risk circumvention of agency regulations or statutes. Disclosure of

this information could impede the effectiveness of the internal operations of the FBI and risk the

circumvention of a regulation or a law.

### (b)(2)-1    Internal Telephone, Facsimile, Room Numbers and E-Mail Addresses of FBI Employees

(47)    Exemption (b)(2)-1 has been asserted, at times in conjunction with Exemptions

(b)(6)-1 and (b)(7)(C)-1, to protect to protect the internal business telephone numbers, facsimile

numbers, room numbers and e-mail addresses of FBI Special Agents ("SAs") and FBI

Professional Support employees (including the direct dial telephone numbers of these employees)

responsible for conducting investigations of individuals who pose a threat to the United States in

terrorism and espionage cases and support employees responsible for providing legal advice to

FBI SAs conducting investigations of these individuals. Furthermore, Exemption (b)(2)-1 has

been asserted to protect the unit within which an FBI employee was assigned. The business

telephone numbers, facsimile numbers, room numbers, and the unit to which an FBI Professional

Support employee is assigned relates directly to the internal practices of the FBI in that they are

used by these individuals during the performance of their duties. Disclosure of the telephone

numbers of FBI SAs and FBI Professional Support employees could subject these individuals to

harassing telephone calls which could disrupt official business (including impeding the ability of

these employees to conduct and conclude law enforcement investigations in a timely manner). In

-23-

addition, disclosure of the internal facsimile numbers of the FBI could cause these offices to be inundated with faxes which could also disrupt official business. Lastly, disclosure of the room numbers and the unit to which FBI Professional Support employees are assigned could likewise subject these individuals to harassing inquiries which could disrupt official business.

(48) Routine internal administrative information such as the telephone numbers, facsimile numbers, room numbers and unit to which an FBI employee is assigned referenced above serves no public benefit, and there is no indication that there is a genuine public interest in the disclosure of this information. Accordingly, because the internal business telephone numbers, facsimile numbers, room numbers and unit to which an FBI employee is assigned are solely related to the FBI's internal practices, because disclosure would not serve any public benefit, and because disclosure would impede the FBI's effectiveness. Accordingly, the FBI properly withheld this information pursuant to Exemption 2. Exemption (b)(2)-1 may be cited in conjunction with Exemptions (b)6)-1 and (b)(7)(C)-1. Exemption (b)(2)-1 has been cited on the following ACLU pages: 1, 5, 45, 53, 58, 87, 92, 141, 144, 186, 254, 256 - 263, 265 - 267, 273, 278, 281, 284 - 285, 287, 291, 294 - 298, 622, 685, 792, 1072, 1335-8, 1335-11, 1481-31 - 1482-5, 1486-29, 2003-3, 2003-4, 2003-6 - 2003-8, 2003-17, and 2003-21.

### (b)(2)-2    Internal Telephone, Facsimile, Room Numbers and E-Mail of Other Federal Government Employees

(49) Exemption (b)(2)-2 has been asserted, at times in conjunction with Exemptions (b)(6)-2 and (b)(7)(C)-2, to protect the internal business telephone numbers, facsimile numbers, room numbers, and e-mail addresses of non-FBI federal government employees. The business telephone numbers, facsimile numbers, and room numbers relate directly to the internal practices

of the government in that they are used by these individuals during the performance of their duties. Disclosure of the telephone numbers of these employees could subject these individuals to harassing phone calls which could disrupt official business (including impeding the ability of these employees to conduct and conclude law enforcement investigations in a timely manner). In addition, disclosure of the internal facsimile numbers could cause these offices to be inundated with faxes which could also disrupt official business. Lastly, disclosure of the room numbers could likewise subject these individuals to harassing inquiries which could disrupt official business.

(50)    Routine internal administrative information such as the telephone numbers, facsimile numbers, and room numbers referenced above serves no public interest, and there is no indication that there is a genuine public interest in the disclosure of this information. Accordingly, the FBI properly withheld this information pursuant to Exemption 2. Exemption (b)(2)-2 may be cited in conjunction with Exemptions (b)(6)-2 and (b)(7)(C)-2. Exemption (b)(2)-2 has been cited on the following ACLU pages: 178, 196, 841, 1335-8 - 1335-10 and 1712 - 1715.

### (b)(2)-3      Confidential Source Symbols or Numbers

(51)    Exemption (b)(2)-3 has been asserted, at times, in conjunction with Exemption (b)(7)(D)-3 to protect the permanent source symbol numbers of FBI sources. Permanent symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality. The symbol number is used as an administrative reporting tool to protect the actual, sensitive identity of an informant in documents

-25-

generated by the FBI. A symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number. For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two letter abbreviation "NY" reveals that this is a source of the New York Field Office and the source is the 1,234[th] symbol-numbered source of that office. The symbol number would be used in all written reports in which DOE provided information to the FBI. Therefore, every time "NY 1234" was released, the reader of the document would know that the source behind the symbol number was the same individual reporting. Thus, every time "NY 1234" was used by the FBI in a record, the number would always identify JOHN DOE.

(52)    Release of these source symbol numbers would indicate both the scope and location of FBI informant coverage within a particular geographic area. If a particular symbol number such as "NY 1234" is released to the public at repeated times and in various documents, the identity of the source could be determined. Each release of information in which the symbol number is disclosed, reveals connections to dates, times, places, events and names from which the source's identity could be deduced. A person familiar with the facts being reported by DOE could easily identify NY 1234's identity as being JOHN DOE given enough instances in which NY 1234 provided information to the FBI. Releasing the symbol number, along with information provided by the source from the source's personal perspective concerning the matters being investigated by the FBI, would allow an individual with knowledge of such matters to extrapolate the source's true identity. This is especially true given the fact that regardless of

-26-

the law enforcement investigative file in which the symbol number appears, NY 1234 would always be the symbol number used to protect the true identity of informant JOHN DOE. Thus, a confidential source symbol number is protected under FOIA Exemption (b)(2) since it is an internal administrative tool used by the FBI to protect informants' identities. The protection of these identifiers is essential to maintaining the integrity of the FBI's confidential source program where release could endanger the lives of informants or discourage cooperation by information sources. Accordingly, because these source symbol numbers are related solely to the FBI's internal practices, because disclosure would not serve any public interest, and because disclosure would impede the FBI's effectiveness, the FBI withheld this information pursuant to Exemption 2. Exemption (b)(2)-3 may be cited in conjunction with Exemption (b)(7)(D)-3. Exemption (b)(2)-3 has been cited on the following ACLU pages: 97 - 98, 659, 730, 731, 738, 740, 742, 744 - 750, 752 - 758, 793 and 2003-2.

### (b)(2)-4     FBI Internal Investigative Techniques and Procedures

(53)     Exemption (b)(2)-4 has been asserted, at times in conjunction with Exemptions (b)(7)(D)-4 and (b)(7)(E)-1, to protect information consisting of specific internal investigatory techniques and procedures. To describe this information in further detail on the public record would identify that very information which the FBI seeks to protect pursuant to these exemptions. The revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important national security law enforcement technique. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(2)-4 in conjunction with Exemptions

(b)(7)(D)-4 and (b)(7)(E)-1. Exemption (b)(2)-4 has been cited on the following ACLU pages: 1
- 2, 50 - 51, 193-6 - 193-15, 194, 220 - 221, 250, 292, 1057 - 1058, 1072 and
1482-19 - 1482-20.

      **(b)(2)-5**      **Internal Telephone, Fax Numbers and Addresses of Foreign Government Sources**

(54)    Exemption (b)(2)-5 has been asserted, at times in conjunction with Exemption
(b)(7)(D)-5, to protect the internal telephone and facsimile numbers and addresses provided to
the FBI by foreign law enforcement agencies under circumstances from which an assurance of
confidentiality may be implied. The internal telephone numbers, facsimile numbers, and
addresses of foreign law enforcement agencies relate directly to internal practices of the
government in that they are used by these individuals during the performance of their duties.
Disclosure of the telephone numbers, facsimile numbers and addresses could subject these
individuals to harassing telephone calls which could disrupt official business.

(55)    Routine internal administrative information such as the telephone numbers,
facsimile numbers, and room numbers referenced above serve no public interest, and there is no
indication that there is a genuine public interest in the disclosure of this information.
Accordingly, the FBI properly withheld this information pursuant to Exemption 2. Exemption
(b)(2)-5 has been cited on the following ACLU pages: 194 and 689 - 690.

## EXEMPTION (b)(3)
## INFORMATION PROTECTED BY STATUTE

(56)  5 U.S.C. § 552 (b)(3) exempts from disclosure information which is:

specifically exempted from disclosure by statute . . . provided that such statute (A)
requires that the matters be withheld from the public in such a manner as to leave

-28-

no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

### (b)(3)-1    Inner Workings of the Federal Grand Jury -- Federal Rule of Criminal Procedure 6(e)

(57)    Exemption (b)(3)-1 has been asserted in conjunction with Rule 6(e) of the Federal Rules of Criminal Procedure to withhold Federal Grand Jury information. It is well-established that Rule (6)(e) embodies a broad, sweeping policy of preserving the secrecy of grand jury material regardless of the substance in which the material is contained. In the documents responsive to plaintiffs' requests, only that information which explicitly discloses matters occurring before a Federal Grand Jury has been withheld pursuant to Exemption (b)(3). Specifically, Federal Grand Jury subpoenas, as well as the names, identifying information of individuals subpoenaed to testify before the Federal Grand Jury, information that identifies specific records subpoenaed by the Federal Grand Jury, and Federal Grand Jury meetings were withheld pursuant to this exemption. Accordingly, any such disclosure would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of the federal grand jury that considered this case. Exemption (b)(3)-1 has been cited on the following ACLU pages: 86, 140-1 - 140-7, 162, 187, 189-1 - 189-9, 190 and 220 - 221.

### (b)(3)-2    Internal Revenue Code -- 26 U.S.C. § 6103

(58)    Exemption (b)(3)-2 has been asserted in conjunction with 26 U.S.C. § 6103 of the Internal Revenue Code, and at times in conjunction with Exemptions (b)(6)-4 and (b)(7)(C)-4, to protect tax records and related information of third parties. It is well-established that the withholding of tax return information is appropriate under this exemption since individuals are

generally not entitled to access to tax returns or return information of other taxpayers.

Exemption (b)(3)-2 has been cited on the following ACLU pages: 159-1 - 159-38.

### EXEMPTION (b)(5) – PRIVILEGED INFORMATION

(60)    Exemption 5, 5 U.S.C. § 552 (b)(5), allows the FBI to protect information

contained in "inter-agency or intra-agency memorandums or letters which would not be available

by law to a party other than an agency in litigation with the agency." This exemption has been

construed to exempt those documents or information normally privileged in the civil discovery

context, including, as is the case here, the deliberative process privilege and the attorney-client

privilege.

**(b)(5)-1        Deliberative Process Privilege**

(61)    The deliberative process privilege protects the internal deliberations of an agency

by exempting from release recommendations, analyses, speculation and other non-factual

information prepared in anticipation of agency decision-making. The general purpose of the

deliberative process privilege is to prevent injury to the quality of agency decisions. Thus,

material that contains or was prepared in connection with the formulation of opinions, advice,

evaluations, deliberations, policy formulation, proposals, conclusions or recommendations may

properly be withheld. Release of this type of information would have an inhibitive effect upon

the development of policy and administrative direction of an agency because it would chill the

full and frank discussion between agency personnel regarding a decision. If agency personnel

knew that their preliminary opinions, evaluations and comments would be released for public

consumption, they may be more circumspect in what they put in writing, and thereby, impede a

-30-

candid discussion of the issues surrounding a decision.

(62)    To invoke the deliberative process privilege, an agency must show that an allegedly exempt document or particular information is both (a) "predecisional" – antecedent to the adoption of agency policy; and the agency must also pinpoint agency decision or policy to which the document or information contributed . . . or . . . identify a decisionmaking process to which a document or information contributed – and (b) "deliberative" – a direct part of the deliberative process in that it makes recommendations or express opinions on legal or policy matters, reflects the give and take of the consultative process, and bears on the formulation or exercise of agency policy-oriented judgment. Furthermore, an agency must identify the role of a contested document or information in a specific deliberative process.

(63)    In this case, the FBI has asserted Exemption 5, the deliberative process privilege to protect draft answers to questions posed to the FBI, and draft internal memoranda. These draft answers also reflect the preliminary assessments of FBI personnel regarding the issues on which they have been asked to prepare an official response. Similarly, a draft internal EC and draft internal form, reflect the preliminary assessments of FBI personnel regarding the proper use of the investigatory tools. All of these drafts are both predecisional and deliberative. If draft documents that are not formally adopted by the agency are routinely released to the public, FBI personnel will be reluctant to provide candid recommendations necessary for efficient and proper decision-making.

(64)    Exemption 5 has also been asserted to protect internal deliberations that are reflected in a collection of internal e-mails among FBI Special Agents, FBI attorneys and other

federal government employees, which reflect case-related discussions of issues that have arisen in connection with the use of the investigatory tools. In addition, these deliberations reflect preliminary advice, opinions and recommendations among FBI attorneys, Special Agents, and FBI field office attorneys, and in certain instances, with an OIPR employee, who was working in concert with the FBI on some of these issues. In these e-mails FBI personnel are discussing: (1) case-related questions regarding the use of certain investigatory tools in intelligence cases (2) requests for legal advice regarding the use of such tools, and (3) the development of procedures for implementing such investigatory tools.

(65) The withheld communications are both predecisional and deliberative. They reflect the thinking of individuals, rather than adopted policy of the FBI. E-mail communication serves as a way for individual FBI employees to communicate with each other about current matters without having to leave their offices. These "discussions," which get memorialized online, are part of the exchange of ideas and suggestions that accompanies all decision-making and typically reflect the very preliminary assessments by FBI personnel about issues on which they may be asked to make recommendations. Before the advent of computers, these discussions probably would have occurred only orally with no record of their existence being kept. The fact that these discussions are now recorded should not obscure the fact that they are simply conversations among and between FBI personnel and, in some instances, with other federal government employees. These discussions are part of the give and take of agency deliberations. If e-mail messages such as these are routinely released to the public, FBI employees will be much more circumspect in their online discussions with each other. This lack of candor will seriously

impair the FBI's ability to foster the forthright, internal discussions necessary for efficient and proper decision-making. Furthermore, exempting such documents and information from disclosure also protects against public confusion that might result from disclosure of preliminary opinions and information that do not, in fact, reflect the final views or policies of the FBI. The deliberative process privilege is designed to protect not only documents and information but also the integrity of the deliberative process itself where the exposure of the process would result in harm.

### Attorney-Client Privilege

(66)    The attorney-client privilege is appropriately asserted when legal advice of any kind is sought, from a professional legal adviser in his or her capacity as such; the communications relating to that purpose are made in confidence by the client; and are, at the client's instance, permanently protected from disclosure by the client or by the legal adviser unless the attorney-client protection is waived. This privilege encompasses confidential communications made to the attorney not only by decision-making personnel but also by lower-echelon employees who possess information relevant to an attorney's advice-rendering function. In addition, the attorney-client privilege covers the two-way communications between a client and an attorney, and which relates to legal advice.

(67)    Certain of the above-described e-mail communications have also been withheld pursuant to Exemption 5, the attorney-client privilege, as they contain client-supplied information. These documents consist of internal e-mails, draft reports, internal procedures, and MOUs ("Memorandum of Understanding"), which reflect communications among FBI attorneys

and FBI SAs and other FBI support employees and include discussions of hypothetical scenarios. The information contained in these documents reflects attorney advice, opinions, and recommendations offered at the employees' request by FBI attorneys. These communications/exchanges occurred by means of the secure internal e-mail system of the FBI, based on client-supplied information regarding investigative activities. The redacted material reveals the candid exchanges of information among FBI attorneys and FBI SAs and support employees seeking legal advice regarding the FBI's role and responsibilities in various law enforcement investigations. Disclosure of these communications would breach the confidential relationship between these individuals and repress and stifle such critical communications in the future. For these reasons, the FBI asserts Exemption 5, the attorney-client privilege, to protect the confidential communications among FBI attorneys and FBI SAs and support employees. Exemption (b)(5)-1 has been cited on the following ACLU pages: 14-32, 50, 51, 56, 59, 62, 63, 76, 77, 131, 133-139, 193-5 thru 193-15, 255, 256, 273, 276, 279, 280, 282, 284, 285, 660-669, 961, 963, 1055, 1072, 1481-1 thru 1481-30, 1482-6 thru 1482-13, 1482-21 thru 1482-28.

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(68)    5 U.S.C. § 552(b)(6) exempts from disclosure:

personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(69)    In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue. In withholding the information, the

individual's privacy interest was balanced against the public's interest in disclosure. In making this analysis, public interest information was determined to be information which would shed light on the FBI's performance of its statutory duties. In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest.

**(b)(6)-1        Names and/or Identifying Information Pertaining to FBI Employees**

(70)    Exemption (b)(6)-1 has been asserted, at times in conjunction with Exemptions (b)(2)-1 and (b)(7)(C)-1, to protect the names and identifying information of FBI SAs responsible for conducting investigations of individuals who pose a threat to the United States in terrorism and espionage cases and support employees responsible for providing legal advice to FBI SAs conducting investigations of these individuals.  More specifically, the FBI protected the telephone numbers, facsimile numbers, and room numbers of FBI SAs and Professional Support employees.  Disclosure of the names, telephone numbers, fax numbers, and room numbers could subject these employees to unauthorized inquiries by members of the media and the general public who seek access to this type of information.  Accordingly, the FBI determined that the FBI SAs and Professional Support employees referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed.

(71)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and Professional Support employees.  The FBI could not identify any discernible public interest.  The disclosure of the names of FBI SAs and Professional Support employees would not demonstrate how the FBI performs its statutory duties.  There have been no allegations that the FBI SAs or Professional

Support employees engaged in any type of significant misconduct which would establish a public interest in the disclosure. Ultimately, disclosure of the names of FBI SAs and Professional Support employees would shed no light on the performance of the FBI's statutory duties. Thus, disclosure of the names of these employees would constitute a clearly unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption 6. Exemption (b)(6)-1 has been cited on the following ACLU pages: 1, 4, 5, 40, 41, 45, 53, 56, 58, 77, 82-1, 82-2, 82-3, 82-4, 83-1, 83-3, 84-1, 85-1, 85-2, 85-4, 85-5, 85-7, 86, 87, 89, 90, 92, 96, 100, 103, 140-4, 141, 144, 162, 177-1, 184-186, 193-12, 193-15, 227, 238, 241, 242, 248, 251, 254-298, 622, 660, 662, 663, 665, 667, 668, 685, 738, 740, 742, 753, 756, 792, 793, 841, 951, 952, 1057, 1058, 1061, 1062, 1072, 1335-1-1335-3, 1335-5-1335-8, 1335-11, 1480, 1481-1-1481-25, 1481-28-1481-31, 1482-1, 2003-3-2003-8, 2003-17 and 2003-21.

### (b)(6)-2    Names and/or Identifying Information Pertaining to Non-FBI Federal Government Employees

(72)    Exemption (b)(6)-2 has been asserted in conjunction with Exemption (b)(7)(C)-2 to protect the names and identifying information concerning non-FBI federal government employees. The relevant inquiry here is whether public access to this information would violate a viable privacy interest of the subjects of such information. Disclosure of this identifying information could subject these employees to unauthorized inquiries and harassment which could constitute a clearly unwarranted invasion of their personal privacy. The rationale for protecting non-FBI federal employees is the same as that for FBI employees.

(73)    In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any bona fide public interest in

-36-

disclosure of this information because this type of information will not shed light on the operations and activities of the federal government. Accordingly, the FBI properly withheld this information pursuant Exemption 6. Exemption (b)(6)-2 has been cited on the following ACLU pages: 4, 88, 162, 178, 196, 624, 661, 666, 689, 841, 1335-3-1335-6, 1481-26-1481-30, 1896-1 and 1896-2.

### (b)(6)-3     Names and/or Identifying Information of Local, County and State Law Enforcement Employees

(74)     Exemption (b)(6)-3 has been asserted in conjunction with Exemption (b)(7)(C)-3 to protect the identities of third parties who provided information to the FBI during the course of their employment by local law enforcement agencies.

(75)     In this case, because the third parties provided information to the FBI during the course of employment in furtherance of ongoing investigations, disclosure of information about these third parties could reasonably be expected to constitute a clearly unwarranted invasion of personal privacy. In addition, if the FBI disclosed the identities of these third parties, the disclosure would have a chilling effect on the FBI's relationship with these individuals and other individuals who provide valuable information to the FBI. In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any public interest in disclosure of this information because this type of information will not shed light on the operations and activities of the federal government. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(6)-3. Exemption (b)(6)-3 has been cited on the following ACLU pages: 96, 288, 1249-1257, 1797-1799, 1812.

### (b)(6)-4     Names and/or Identifying Information of Third Parties of

### Investigative Interest or Who Provided Information to the FBI

(76)     Exemption (b)(6)-4 has been asserted, at times in conjunction with Exemption (b)(7)(C)-4 and (b)(7)(F)-1, to withhold the names of third parties contained in various communications which reflect the internal discussion of individuals who are the subjects of law enforcement investigations or who provided information regarding these investigations. These individuals are of investigative interest to the FBI or provided information of investigative interest to the FBI, and are discussed in numerous communications. Disclosure of the identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them and disclosure may embarrass them. For these reasons, the FBI has determined that the third party individuals in the responsive communications maintain a strong privacy interest in not having their identities disclosed.

(77)     After identifying the substantial privacy interest of the third parties in the communications, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of third parties' names and identifying information will not shed light on the operations and activities of the FBI. Accordingly, the FBI determined that the disclosure of this information would constitute a clearly unwarranted invasion of personal privacy. Thus, the FBI properly withheld the names of these third parties pursuant to Exemption (b)(6)-4. Exemption (b)(6)-4 has been cited on the following ACLU pages: 1, 2, 5, 6, 7-1 thru 7-5, 7-7 thru 7-22, 19, 62, 79-1, 79-2, 80-1 thru 80-5, 81-1, 81-2, 82-1 thru 82-4, 83-1 thru 83-4, 84-1, 84-2, 85-1 thru 85-8, 88, 93-95, 97, 98, 100-103, 121-125, 127, 128, 134, 138, 139, 140-3, 145-147, 155, 162,

168, 170-175, 177-2, 179-181, 187, 189-1 thru 189-9, 190-192, 193-5 thru 193-11, 193-16, 194-196, 199, 220-222, 229-243, 249, 250, 253, 260, 262, 267, 271, 286, 294-297, 622-624, 659-669, 685, 690, 693, 694, 730, 731, 738, 739, 741-751, 753-758, 792, 793, 795-799, 800-821, 841, 949, 950-953, 955, 956, 961, 963, 1055-1058, 1061-1063, 1126-1128, 1129-1147, 1149-1170, 1172-1187, 1207-1226, 1249-1257, 1335-1 thru 1335-11, 1478-1480, 1481-7 thru 1481-21, 1481-23, 1481-25, 1481-27, 1481-28, 1481-30 thru 1481-35, 1482-1 thru 1482-28, 1712-1715, 1797-1802, 1809-1812, 1896-3, 2003-1 thru 2003-5, 2003-7, 2003-9 thru 2003-17, 2003-21, 2003-25 thru 2003-31, 2003-37, 2003-38, 2003-40 thru 2003-44, 2004-1, 2004-2, 2004-4 thru 2004-10, 2127-2130, 2130a, 2131, 2131a, 2132-2148, 2150.

### (b)(6)-5    Names and/or Identifying Information of Third Parties Merely Mentioned

(78)    Exemption (b)(6)-5 has been asserted in conjunction with Exemption (b)(7)(C)-5 to withhold the names of third parties who are merely mentioned in various communications which reflect the FBI's internal discussion of individuals who are the subjects of law enforcement investigations. These individuals are not of investigative interest to the FBI, but are merely mentioned in these communications. Disclosure of the identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them and disclosure could embarrass them. For these reasons, the FBI has determined that the third party individuals merely mentioned in the responsive communications maintain a strong privacy interest in not having their identities disclosed.

(79)    After identifying the substantial privacy interest of the third parties merely mentioned in the communications, the FBI balanced those interests against the public interest in

disclosure. The FBI could identify no discernible public interest in the disclosure of this

information because the disclosure of third parties' names will not shed light on the operations

and activities of the FBI. Accordingly, the FBI determined that the disclosure of this information

would constitute a clearly unwarranted invasion of personal privacy. Thus, the FBI properly

withheld the names and identifying information of these third parties merely mentioned in the

responsive communications pursuant to Exemption (b)(6)-5. Exemption (b)(6)-5 has been cited

on the following ACLU pages:  7-1 - 7-5, 7-7 - 7-22, 19, 62, 79-1, 79-2, 80-1 - 80-5, 81-1, 81-2,

82-1 - 82-4, 83-1 - 83-4, 84-1 - 84-2, 85-1 - 85-8, 88, 162, 201-202, 265, 624, 1173, 1174, 1481-

31, 1481-32, 1482-1, 1482-2, 1478, 1797 - 1799, 1801 - 1802, 2004-5, 2004-10, 2127-2129,

2130, 2130a, 2131, 2131a, 2132-2141, 2148 and 2150.

### (b)(6)-6    Names and/or Identifying Information of Foreign Government/Law Enforcement Agency Officials

(80)    Exemption (b)(6)-6 has been asserted in conjunction with Exemption (b)(7)(C)-6

to protect the names and identifying information of foreign government/law enforcement agency

officials which appear in the documents at issue here. The relevant inquiry here is whether

public access to this information would violate a viable privacy interest of the subjects of such

information. Disclosure of this identifying information could subject these employees to

unauthorized inquiries and harassment which would constitute a clearly unwarranted invasion of

their personal privacy.

(81)    In balancing the legitimate privacy interests against any public interest in

disclosure, the FBI has determined that there is a complete lack of any bona fide public interest in

disclosure of this information because this type of information will not shed light on the

operations and activities of the federal government. Accordingly, the FBI properly withheld this information pursuant Exemption 6. Exemption (b)(6)-6 has been cited on the following ACLU pages: 1481-31 - 1481-35, 1482-1 - 1482-5.

## EXEMPTION 7 THRESHOLD

(82)    Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subparts of the exemption. See 5 U.S.C. § 552(b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns interference with pending law enforcement proceedings, invasion of personal privacy, revealing the identity of confidential sources, revealing sensitive law enforcement techniques, and endangering the life or physical safety of individuals.

(83)    Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency. The various records at issue in this case were compiled for criminal law enforcement purposes during the course of the FBI's performance of its law enforcement mission, including the investigation of criminal activities, and of preventing and deterring terrorist attacks within the United States and around the world, and reducing the vulnerability of the United States to terrorism.

(84)    Because the records clearly meet the Exemption 7 threshold, the remaining

inquiry is whether their disclosure would interfere with pending law enforcement proceedings,

invade personal privacy, reveal the identity of confidential sources, reveal sensitive law

enforcement techniques, and endanger the life or physical safety of individuals.

## EXEMPTION (b)(7)(A)
## PENDING LAW ENFORCEMENT INVESTIGATION

(85)    5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

records or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or information (A)
could reasonably be expected to interfere with enforcement proceedings . . . .

(86)    Application of this exemption requires the existence of law enforcement records;

a pending or prospective law enforcement proceeding; and a reasonable expectation that release

of the information would interfere with the enforcement proceeding.  Furthermore, normally the

assertion of this exemption to withhold documents involves documents found in an investigatory

file.  In this case, the information in question is contained in a series of internal communications

which represent discussions between FBI attorneys and FBI SAs regarding case-related issues

arising in various pending investigations.  Specifically Exemption (b)(7)(A)-1 has been asserted

to protect the names of the subjects of pending investigations and the details concerning these

investigations.

(87)    Based on its statutory authority, the FBI has established standard operating

procedures by which to implement the FOIA and Privacy Act as efficiently as possible.  In that

respect, when a FOIA/Privacy Act request is received for an on-going FBI investigation, the FBI

in most instances asserts Exemption (b)(7)(A) for that request.  However, the FBI does review

the materials responsive to the request and releases information contained within the file(s)

-42-

which will not jeopardize future investigative or prosecutive efforts. The FBI's review of the responsive records for the preparation of this declaration revealed that no material responsive could be released, as all information reviewed would jeopardize further investigations and/or prosecutive efforts.

(88)    Any release of information from the responsive files would be premature due to the harm which could ensue. Once documents are released and are in the public domain, the information concerning the investigation could reach the individuals who are under investigation. This would allow these individuals to critically analyze the information in the documents pertinent to the investigation of themselves. Such individuals possess the unique advantage of knowing the details surrounding the investigation, the identities of potential witnesses, direct and circumstantial evidence, etc., and could use the released information to their advantage. In this regard, the following potential harms from the release of these documents exist:

(a) The identification of individuals, sources, and potential witnesses who possess information relative to the investigations and possible harm to, or intimidation of these individuals;

(b) The use of information released to counteract evidence developed by investigators;

(c) The identification of third parties who are also under investigation;

(d) The identification of the subject matter concerning classified information; and

(e) The locations in the United States, as well as foreign countries where the FBI is focusing the investigation and collection of investigative and source material.

(89)    Furthermore, the release of this information to third parties not directly involved

-43-

in these matters could allow these third parties to interfere with the pending proceedings by
harassment, intimidations, and creation of false evidence dispensing facts discussed during the
FBI's investigation. Once a release is made to a set of plaintiffs under the FOIA, the use and
dissemination of the information to third parties is unrestricted.

(90)    Historically, the FBI has responded to requests for pending FBI investigatory files,
or portions thereof, with great regard for the intent of the FOIA. The FBI makes every effort to
provide information which will not interfere with the pending law enforcement proceedings. The
FBI is continuously working in conjunction with other federal agencies in pending investigations;
any waiver of FOIA Exemption (b)(7)(A) would inhibit the FBI's assistance to the justice system
at the Federal level. Exemption (b)(7)(A)-1 has been cited on the following ACLU pages: 93-
98, 141-153, 155-158, 162, 195, 221, 956, 1057-1058, 2003-1 - 2003-4, 2003-22, 2003-25 -
2003-44, 2004-1 - 2004-10.

## EXEMPTION (b)(7)(C)
## UNWARRANTED INVASION OF PERSONAL PRIVACY

(91)    5 U.S.C. § 552 (b)(7)(C) exempts from disclosure

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . .
> could reasonably be expected to constitute an unwarranted invasion of personal
> privacy . . . .

(92)    In withholding information from disclosure pursuant to this exemption, the FBI is
required to balance the privacy interests of the individual mentioned in the documents against
any public interest in disclosure. In asserting this exemption, each piece of information was
scrutinized to determine the nature and strength of each individual's privacy interest. The FBI

-44-

identified the public interest in disclosure of the information to be whether the information in question would inform plaintiffs or the general public about the FBI's performance of its mission to enforce federal criminal and national security statutes and/or how the FBI actually conducts its statutory duties, namely, its internal operations and investigations. Every effort has been made to release all segregable information contained in these pages without infringing upon the privacy rights of the individuals mentioned in these documents.

### (b)(7)(C)-1    Names and/or Identifying Information Pertaining to FBI Employees

(93)    Exemption (b)(7)(C)-1 has been asserted, at times in conjunction with Exemptions (b)(2)-1 and (b)(6)-1, to protect the names and identifying information of FBI SAs responsible for conducting investigations of individuals who pose a threat to the United States in terrorism and espionage cases and support employees responsible for providing legal advice to FBI SAs conducting investigations of these individuals. More specifically, the FBI protected the telephone numbers, facsimile numbers, and room numbers of FBI SAs and Professional Support employees. Disclosure of the names, telephone numbers, fax numbers, and room numbers could subject these employees to unauthorized inquiries by members of the media and the general public who seek access to this type of information. Accordingly, the FBI determined that the FBI SAs and Professional Support employees referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed.

(94)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and Professional Support employees. The FBI could not identify any discernible public interest. The disclosure of

-45-

the names of FBI SAs and Professional Support employees would not demonstrate how the FBI

performs its statutory duties. There have been no allegations that the FBI SAs or Professional

Support employees engaged in any type of significant misconduct which would establish a public

interest in the disclosure. Ultimately, disclosure of the names of FBI SAs and Professional

Support employees would shed no light on the performance of the FBI's statutory duties. Thus,

disclosure of the names of these employees would constitute an unwarranted invasion of their

personal privacy; therefore, the FBI has properly asserted Exemption 7(C). The rationale for

protecting the identities of FBI SAs and Professional Support employees pursuant to (b)(7)(C)-1

is the same as the rationale for protecting the identities of FBI SAs and Professional Support

employees pursuant to Exemption (b)(6)-1. Exemption (b)(7)(C)-1 has been cited on the

following ACLU pages: 1, 4, 5, 40, 41, 45, 53, 56, 58, 77, 82-1, 82-2, 82-3, 82-4, 83-1, 83-3, 84-

1, 85-1, 85-2, 85-4, 85-5, 85-7, 86, 87, 89, 90, 92, 96, 100, 103, 140-4, 141, 144, 162, 177-1,

184-186, 193-12, 193-15, 227, 238, 241, 242, 248, 251, 254-298, 622, 660, 662, 663, 665, 667,

668, 685, 738, 740, 742, 753, 756, 792, 793, 841, 951, 952, 1057, 1058, 1061, 1062, 1072, 1335-

1-1335-3, 1335-5-1335-8, 1335-11, 1480, 1481-1-1481-25, 1481-28-1481-31, 1482-1, 2003-3-

2003-8, 2003-17 and 2003-21.

### (b)(7)(C)-2    Names and/or Identifying Information Pertaining to Non-FBI Federal Government Employees

(95)    Exemption (b)(7)(C)-2 has been asserted in conjunction with Exemption (b)(6)-2

to protect the names and identifying information concerning non-FBI federal government

employees. The relevant inquiry here is whether public access to this information would violate

a viable privacy interest of the subjects of such information. Disclosure of this identifying

information could subject these employees to unauthorized inquiries and harassment which could constitute an unwarranted invasion of their personal privacy. The rationale for protecting non-FBI federal employees is the same as that for FBI employees.

(96)    In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any bona fide public interest in disclosure of this information because this type of information will not shed light on the operations and activities of the federal government. Accordingly, the FBI properly withheld this information pursuant Exemption 7(C). Exemption (b)(7)(C)-2 has been cited on the following ACLU pages:    4, 88, 162, 178, 196, 624, 661, 666, 689, 841, 1335-3-1335-6, 1481-26-1481-30, 1896-1 and 1896-2.

### (b)(7)(C)-3    Names and/or Identifying Information of Local, County and State Law Enforcement Employees

(97)    Exemption (b)(7)(C)-3 has been asserted to protect the identities of third parties who provided information to the FBI during the course of employment at local law enforcement agencies. In this case, because the third parties provided information to the FBI during the course of employment in furtherance of ongoing investigations, disclosure of information about these third parties could reasonably be expected to constitute an unwarranted invasion of personal privacy. In addition, if the FBI disclosed the identities of these third parties, the disclosure would have a chilling effect on the FBI's relationship with these individuals and other individuals who provide valuable information to the FBI. In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any public interest in disclosure of this information because this type of information will

-47-

not shed light on the operations and activities of the federal government.  Accordingly, the FBI

has properly withheld this information pursuant to Exemption 7(C).  Exemption (b)(7)(C)-3 has

been cited on the following ACLU pages:  96, 288, 1249-1257, 1797-1799, 1812.

### (b)(7)(C)-4    Names and/or Identifying Information Third Parties of Investigative Interest or Who Provided Information to the FBI

(98)    Exemption (b)(7)(C)-4 has been asserted, at times in conjunction with Exemption

(b)(6)-4 and (b)(7)(F)-1, to withhold the names of third parties contained in various

communications which reflect internal discussion of individuals who are the subjects of law

enforcement investigations or who provided information regarding these investigations.  These

individuals are of investigative interest to the FBI, and are discussed in numerous

communications.  Disclosure of the identities of these third parties in this context could cause

unsolicited and unnecessary attention to be focused on them and disclosure could embarrass

them.  For these reasons, the FBI has determined that the third party individuals in the responsive

communications maintain a strong privacy interest in not having their identities disclosed.

(99)    After identifying the substantial privacy interest of the third parties in the

communications, the FBI balanced those interests against the public interest in disclosure.  The

FBI could identify no discernible public interest in the disclosure of this information because the

disclosure of third parties' names and identifying information will not shed light on the

operations and activities of the FBI.  Accordingly, the FBI determined that the disclosure of this

information would constitute an unwarranted invasion of personal privacy.  Thus, the FBI

properly withheld the names of these third parties merely mentioned in the responsive

communications pursuant to Exemption 7(C).  Exemption (b)(7)(C)-4 has been cited on the

following ACLU pages: 1, 2, 5, 6, 7-1 thru 7-5, 7-7 thru 7-22, 19, 62, 79-1, 79-2, 80-1 thru 80-5, 81-1, 81-2, 82-1 thru 82-4, 83-1 thru 83-4, 84-1, 84-2, 85-1 thru 85-8, 88, 93-95, 97, 98, 100-103, 121-125, 127, 128, 134, 138, 139, 140-3, 145-147, 155, 162, 168, 170-175, 177-2, 179-181, 187, 189-1 thru 189-9, 190-192, 193-5 thru 193-11, 193-16, 194-196, 199, 220-222, 229-243, 249, 250, 253, 260, 262, 267, 271, 286, 294-297, 622-624, 659-669, 685, 690, 693, 694, 730, 731, 738, 739, 741-751, 753-758, 792, 793, 795-799, 800-821, 841, 949, 950-953, 955, 956, 961, 963, 1055-1058, 1061-1063, 1126-1128, 1129-1147, 1149-1170, 1172-1187, 1207-1226, 1249-1257, 1335-1 thru 1335-11, 1478-1480, 1481-7 thru 1481-21, 1481-23, 1481-25, 1481-27, 1481-28, 1481-30 thru 1481-35, 1482-1 thru 1482-28, 1712-1715, 1797-1802, 1809-1812, 1896-3, 2003-1 thru 2003-5, 2003-7, 2003-9 thru 2003-17, 2003-21, 2003-25 thru 2003-31, 2003-37, 2003-38, 2003-40 thru 2003-44, 2004-1, 2004-2, 2004-4 thru 2004-10, 2127-2130, 2130a, 2131, 2131a, 2132-2148, 2150.

### (b)(7)(C)-5     Names and/or Identifying Information of Third Parties Merely Mentioned

(100)   Exemption (b)(7)(C)-5 has been asserted in conjunction with Exemption (b)(6)-5 to withhold the names of third parties who are merely mentioned in various communications which reflect the internal discussion of individuals who are the subjects of law enforcement investigations. These individuals are not of investigative interest to the FBI, but are merely mentioned in these communications. Disclosure of the identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them and disclosure could embarrass them. For these reasons, the FBI has determined that the third party individuals merely mentioned in the responsive communications maintain a strong privacy interest in not

having their identities disclosed.

(101)    After identifying the substantial privacy interest of the third parties merely mentioned in the communications, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of third parties' names will not shed light on the operations and activities of the FBI. Accordingly, the FBI determined that the disclosure of this information would constitute an unwarranted invasion of personal privacy. Thus, the FBI properly withheld the names and identifying information of these third parties merely mentioned in the responsive e-mail pursuant to Exemption 7(C). Exemption (b)(7)(C)-5 has been cited on the following ACLU pages: 7-1 - 7-5, 7-7 - 7-22, 19, 62, 79-1, 79-2, 80-1 - 80-5, 81-1, 81-2, 82-1 - 82-4, 83-1 - 83-4, 84-1 - 84-2, 85-1 - 85-8, 88, 162, 201-202, 265, 624, 1173, 1174, 1481-31, 1481-32, 1482-1, 1482-2, 1478, 1797 - 1799, 1801 - 1802, 2004-5, 2004-10, 2127-2129, 2130, 2130a, 2131, 2131a, 2132-2141, 2148 and 2150.

### (b)(7)(C)-6    Names and/or Identifying Information of Foreign Government/Law Enforcement Agency Officials

(102)    Exemption (b)(7)(C)-6 has been asserted in conjunction with Exemption (b)(6)-6 to protect the names and identifying information of foreign government/law enforcement agency officials. The relevant inquiry here is whether public access to this information would violate a viable privacy interest of the subjects of such information. Disclosure of this identifying information could subject these employees to unauthorized inquiries and harassment which could constitute an unwarranted invasion of their personal privacy. The rationale for protecting foreign government/law enforcement agency officials pursuant to Exemption (b)(7)(C)-6 is the same as

that articulated for Exemption (b)(6)-6, <u>supra</u>.

(103)   In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any bona fide public interest in disclosure of this information because this type of information will not shed light on the operations and activities of the federal government.  Accordingly, the FBI properly withheld this information pursuant Exemption (b)(7)(C)-6.  Exemption (b)(7)(C)-6 has been cited on the following ACLU pages:  1481-31 - 1481-35, 1482-1 - 1482-5.

**EXEMPTION (b)(7)(D)**
**CONFIDENTIAL SOURCE INFORMATION**

(104)   5 U.S.C. § 552(b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes, but only to the extent that the production of law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

(105)   Numerous confidential sources report to the FBI on a regular basis and are "informants" within the common meaning of the term.  These sources provide information under a variety of circumstances, including either an express or an implied assurance of confidentiality.  Releasing the information provided by these sources may likely reveal a confidential source's identity.  The release of a source's identity would forever eliminate that source as a future means of obtaining information.  In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources.  It is only with the

understanding of complete confidentiality (whether expressed or implied) that the aid of such

sources can be enlisted, and only through this confidence that these sources can be persuaded to

continue providing valuable assistance in the future. Thus, the information provided by, as well

as the identities of these sources has been protected pursuant to Exemption 7(D).

### (b)(7)(D)-1    Names and/or Identifying Information Furnished by Third Parties with Express Assurance of Confidentiality

(106)  Exemption (b)(7)(D)-1 has been asserted to withhold names, identifying

information and data provided to the FBI by commercial or non-governmental entities with an

"express" assurance of confidentiality. During the course of the FBI's intelligence investigations,

certain commercial/private companies provided information to the FBI relating to the subjects of

these investigations. The FBI obtained this information pursuant to investigative authorities. To

disclose the fact that these companies provided information to the FBI during the course of an

investigation could harm the commercial interests of the enterprise by deterring the public from

employing their services. Some of this information is also classified and to provide more detail

regarding these sources may reveal the very classified information that the FBI is attempting to

protect. In addition, such a disclosure has wider implications. If the FBI disclosed the identities

of confidential sources that provide information to the FBI on a continuing basis, that revelation

would have a chilling effect on the activities and cooperation of other FBI confidential sources.

It is only with the understanding of complete confidentiality that the aid of such sources can be

enlisted, and only through this confidence that these sources can be persuaded to continue

providing valuable assistance in the future. The FBI has released as much segregable

information as possible without disclosing these sources' identities. Accordingly, the FBI

properly withheld this information pursuant to Exemption (b)(7)(D)-1. Exemption (b)(7)(D)-1

has been cited on the following ACLU pages: 79-1, 79-2, 80-1 - 80-5, 81-1-81-2, 82-1 - 82-4,

83-1 - 83-4, 84-1, 84-2, 85-1 - 85-3, 146, 183, 193-6 - 193-11, 193-16, 195, 221, 236-243, 659,

685, 690, 693-694, 730-731, 738-758, 792-794, 1257, 1481-31 - 1481-35, 1482-1 - 1482-5,

2003-2 and 2003-15.

### (b)(7)(D) -2   Names and/or Identifying Information Furnished by Third Parties with Implied Assurance of Confidentiality

(107)   Exemption (b)(7)(D)-2 has been asserted to withhold information provided to the

FBI by commercial or non-governmental entities under circumstances from which an assurance

of confidentiality may be implied. During the course of the FBI's intelligence investigations,

certain commercial/private companies provided information to the FBI relating to the subjects of

these investigations. The FBI obtained this information pursuant to investigative authorities. To

disclose the fact that these companies provided information to the FBI during the course of an

investigation could harm the commercial interests of the enterprise by deterring the public from

employing their services. Some of this information is also classified and to provide more detail

regarding these sources may reveal the very classified information that the FBI is attempting to

protect. In addition, such a disclosure has wider implications. If the FBI disclosed the identities

of confidential sources that provide information to the FBI on a continuing basis, that revelation

would have a chilling effect on the activities and cooperation of other FBI confidential sources.

It is only with the understanding of complete confidentiality that the aid of such sources can be

enlisted, and only through this confidence that these sources can be persuaded to continue

providing valuable assistance in the future. The FBI has released as much segregable

information as possible without disclosing these sources' identities. Accordingly, the FBI

properly withheld this information pursuant to Exemption (b)(7)(D)-2. Exemption (b)(7)(D)-2

has been cited on the following ACLU pages: 1-2, 5, 7-1 - 7-22, 145, 194, 220-221, 622-624,

951-952, 961, 963, 1055, 1061-1063, 1335-8 - 1335-11, 2003-1 - 2003-4, 2003-7 and 2003-9.

### (b)(7)(D)- 3    Confidential Source Symbols or Numbers

(108)   Exemption (b)(7)(D)-3 has been asserted in conjunction with Exemption (b)(2)-3

to withhold the information provided by source symbols or numbers contained in certain

responsive documents. The redacted material describes the administrative aspect of using

source symbols or numbers to protect the identity of FBI sources. Source symbols or numbers

are assigned to confidential sources who have been developed, instructed, closely monitored and

in many cases paid for their services. These sources report information to the FBI under an

express grant of confidentiality. Within the FBI, knowledge of these sources' identities is limited

to those FBI employees who have a legitimate need for the information. Also, sources to whom

the FBI has assigned source symbols or numbers are not referred to by name in any document

which contains information that they provided.

(109)   In this case, the FBI protected the source symbols or numbers of confidential

sources that provided information about the subjects of on-going intelligence investigations. The

sources' names are not referenced, and the informants' source symbols or numbers are cited

where the source is referenced in the responsive documents. The fact that a source symbol or

number was assigned is a positive indicator that supports an express assurance of confidentiality.

If the FBI disclosed these source symbols or numbers, the sources' identities could be ascertained

by a person knowledgeable of the events that gave rise to the FBI's investigation of plaintiffs.  If

the FBI disclosed these source symbols or numbers, the sources, could be subjected to

embarrassment, humiliation, and physical/mental harm.  In addition, such a disclosure has wider

implications.  If the FBI disclosed the identities of confidential sources that entered into express

agreements of confidentiality, that revelation would have a chilling effect on the activities and

cooperation of other FBI confidential sources.  It is only with the understanding of complete

confidentiality that the aid of such sources can be enlisted, and only through this confidence that

these sources can be persuaded to continue providing valuable assistance in the future.  The FBI

has released as much segregable information as possible without disclosing these sources'

identities.  Accordingly, the FBI properly withheld this information pursuant to Exemption

(b)(7)(D)-3.  Exemption (b)(7)(D)-3 has been cited on the following ACLU pages:  97 and 98.

**(b)(7)(D) -4     Investigative Material Compiled by State, County or Local Law
Enforcement Agencies and Provided to the FBI**

(110)   Exemption (b)(7)(D)-4 has been asserted, at times in conjunction with

Exemptions (b)(6)-3 and (b)(7)(C)-3, to withhold information compiled and provided to the FBI

by local, county or state law enforcement agencies under an express grant of confidentiality.

During the course of the FBI's intelligence investigations it received information from local,

county or state law enforcement agencies regarding the on-going investigations.  The FBI has

many agreements with local, county or state law enforcement agencies under which security

and/or criminal law enforcement information is exchanged.  The agreements specify the extent of

confidentiality requested by the respective local, county or state law enforcement agencies.  In

some circumstances, these local, county or state law enforcement agencies could request

confidentiality for its identity and information provided, while in other circumstances, may

request that its information be protected while it does not object to the disclosure of its

relationship and interaction with the FBI.

(111)  In this case, the FBI has express confidentiality agreements with numerous law

enforcement agencies which provided information to the FBI during the conduct of intelligence

investigations.  The FBI's agreements with these law enforcement agencies provides that the FBI

will not disclose their identities, as well as the information that they provided to the FBI.  If the

FBI were to disclose the identities and the information provided by these law enforcement

agencies under express assurances of confidentiality, such a disclosure would have a chilling

effect on the FBI's relationship with these entities.  Furthermore, the disclosure would have a

chilling effect on the FBI's relationship with other law enforcement entities which have entered

into similar agreements with the FBI.  Accordingly, the FBI has properly withheld information

provided by these local, county or state law enforcement agencies pursuant to Exemption 7(D).

Exemption (b)(7)(D)-4 has been cited on the following ACLU pages:  5, 96, 1126-1171, 1173-

1187, 1249-1256, 1797-1799, and 2003-15.

### (b)(7)(D)-5    Investigative Material Compiled by Foreign Government/Law Enforcement Agencies

(112)  Exemption (b)(7)(D)-5 has been asserted, at times in conjunction with

Exemptions (b)(2)-5, (b)(6)-6 and (b)(7)(C)-6, to withhold information provided to the FBI by a

foreign law enforcement agencies under circumstances from which an assurance of

confidentiality may be implied.  During the course of the FBI's development of its law

enforcement response requirements, the FBI received information from certain foreign

governments under which security and/or criminal law enforcement information is exchanged. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign government or entity.  In some circumstances, a foreign government or entity could request confidentiality for its identity and information provided, while in other circumstances, a foreign government or entity would request classification for both its identity and information provided, and yet a third foreign government or entity may request that its information be protected while it does not object to the disclosure of its relationship with the FBI.

(113)  In this case, a foreign government law enforcement agency provided court orders/outcomes and lists of offenses/charges against third parties to the FBI.  If the FBI were to disclose the identities and the information provided by this foreign law enforcement agency, such a disclosure would have a chilling effect on the FBI's relationship with the agency.  Furthermore, the disclosure would have a chilling effect on the FBI's relationship with other foreign law enforcement agencies which have entered into similar agreements with the FBI.  Accordingly, the FBI has properly withheld information provided by the foreign law enforcement agency pursuant to Exemption (b)(7)(D)-5.  Exemption (b)(7)(D)-5 has been cited on the following ACLU pages: 1481-31 - 1431-35, and 1482-1 - 1482-5.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(114)  5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

records or information compiled for law enforcement purposes, but only to the

extent that the production of such law enforcement records or information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . . .

In order for this exemption to apply, the specifics and use of the technique or procedure at issue must not be well-known to the public.

### (b)(7)(E)-1    FBI Laboratory Rules and Procedures, Polygraph Charts, Etc.

(115)    The FBI has asserted Exemption (b)(7)(E)-1, at times in conjunction with Exemption (b)(2)-4, to withhold information which affords "categorical" protection for techniques and procedures used in law enforcement investigations or prosecutions. While exemption 7(E)'s protection is generally limited to techniques and procedures that are not well known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness in scientific analysis or details of a polygraph examination, the type of test and machine used and questions asked in sequence.

(116)    The revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important law enforcement technique. Accordingly, the FBI properly withheld this information pursuant to Exemption (b)(7)(E)-1. Exemption (b)(7)(E) has been cited on the following ACLU pages: 1-2, 121-124, 193-12 - 193-15, 194, and 292.

## DOCUMENTS REFERRED TO OTHER AGENCIES FOR DIRECT RESPONSE

(119)    In the course of reviewing the documents responsive to plaintiffs' requests, the

FBI identified certain documents which contained information originating with other government

agencies as well as other DOJ components, specifically the Department of the Air Force, the

Executive Office for the U.S. Attorneys, and the U.S. Office of Personnel Management, Office of

the Inspector General. In accordance with DOJ regulations, 28 C.F.R. § 16.4(c), the FBI referred

these documents to the Department of the Air Force, the Executive Office for the U.S. Attorneys,

and the U.S. Office of Personnel Management, Office of the Inspector General for direct

response to the plaintiffs.

(120)    By letter dated September 22, 2005, FBIHQ forwarded a referral package to the

Department of Air Force, HAF/ICIOD (FOIA), regarding Greenpeace, consisting of 21 pages

which originated with this agency, for direct response to plaintiffs. These pages are identified as

five (5) unclassified documents: file number 266D-LA-226745, serial 4 (6 pages), serial 5 (2

pages), serial 55 (Attachment of 2 pages), serial 1A9 (2 pages), serial 213 (9 pages). None of the

documents which were referred to the Department of the Air Force were included in those

documents which plaintiffs have requested be Vaughned. As a result, no separate Vaughn

declaration will be submitted with regard to these Department of the Air Force documents.

(121)    By letter dated September 22, 2005, FBIHQ forwarded a referral package to the

Executive Office for United States Attorneys ("EOUSA") regarding Greenpeace, consisting of 25

pages which originated with this DOJ component, for direct response to plaintiffs. These pages

are identified as unclassified documents: file number 266D-LA-227827, serial 198 (20 pages)

and serial 214 (5 pages). Plaintiffs have identified serial 198 as a document to be Vaughned --

ACLU Bates Stamp ##s 1482-29 through 1482-40. These pages will be addressed in a separate

Vaughn declaration prepared by EOUSA. Plaintiffs did not request that Serial 214 be Vaughned.

(122)  By letter dated October 4, 2005, FBIHQ forwarded a referral package to the Department of Justice, U.S. Office of Personnel Management, Office of Inspector General, regarding PETA consisting of four (4) pages which originated with this agency, for direct response to plaintiffs. These pages consist of one unclassified document -- a facsimile transmittal sheet with memorandum attachment dated October 29, 2003. The referral pages are represented on the Vaughn declaration as ACLU Bates Stamp ##s 193-2 thru 193-4. The FBI will request OPM to prepare a separate Vaughn declaration to address these three (3) pages.

(123)  In addition, plaintiffs have requested a Vaughn declaration for ACLU Bates ##s 2003-32 through 2003-36, which are among the documents related to Greenpeace, FOIPA No. 1010245. These five pages contain information which originated with the Department of Homeland Security ("DHS"). The FBI will consult with DHS and either request DHS to prepare a separate Vaughn declaration to address these five (5) pages or submit its own supplemental Vaughn declaration following consultation with DHS.

## CONCLUSION

(124)  FBIHQ has processed and released all segregable information from the documents responsive to plaintiffs' request. The FBI has carefully examined the records related to UFPJ, PETA, Greenpeace and ACLU and released 2,127 pages with tailored redactions made pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Furthermore, the FBI carefully examined the remaining pages withheld in full and in part, and determined that the

information withheld from plaintiffs in this case, if disclosed, could reasonably be expected to damage national security, impede the effectiveness of the FBI's internal law enforcement procedures and practices, interfere with and damage attorney-client privileged communications, as well as chill internal intra and inter-agency deliberations, interfere with pending law enforcement investigations, cause unwarranted invasions of privacy interests of numerous individuals, disclose the identities of confidential sources, and disclose techniques and procedures for law enforcement investigations or was considered to be out of scope of the requests. Accordingly, the FBI has released all reasonably segregable, nonexempt information in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through C attached hereto are true and correct copies.

Executed this 2nd day of December, 2005.

DAVID M. HARDY
Section Chief
Record/Information Dissemination
 Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.