# EXHIBIT A

# Highlights of ACLU in the News
## *Spyfiles*

December 20, 2005
*New York Times*
**F.B.I. Watched Activist Groups, New Files Show**
By Eric Lichtblau
Coverage: Ran in at least 8 outlets including the Salt Lake Tribune, Denver Post, Baltimore Sun, Austin American-Statesman, and Editor & Publisher.

December 20, 2005
*Washington Post*
**FBI Papers Show Terror Inquiries Into PETA; Other Groups Tracked**
By Spencer S. Hsu

December 20, 2005
*Associated Press*
**ACLU Says FBI Misuses Terror Powers**
By Ted Bridis
Coverage: Ran in at least 40 outlets including the Los Angeles Times, San Francisco Chronicle, Minneapolis Star Tribune, Oregonian, Guardian (UK), and the Boston Globe.

December 20, 2005
*MSNBC*
**The Abrams Report**
Transcript

December 20, 2005
*MSNBC*
**The Situation With Tucker Carlson**
Transcript

December 20, 2005
*CNN*
**The Situation Room**
Featuring Ann Beeson & Caroline Frederickson

December 20, 2005
*CNN*
**Lou Dobbs Tonight**
Featuring Caroline Frederickson

December 20, 2005
*National Public Radio (NPR)*
**All Things Considered**
Featuring Ben Wizner

December 20, 2005
*UPI*
**ACLU: FBI Eyed Various Rights Groups**

December 20, 2005
*Copley News Service*
**Bush Should Put an End to Domestic Spying Program**
Editorial

December 20, 2005
*Voice of America News*
**FBI Files Show Agency Tracked US Activist Groups**

December 20, 2005
*Agence France Presse*
**FBI Monitored Activist Groups in the United States: Report**

December 21, 2005
*The Baltimore Sun*
**Op-Ed: An Unnecessary Breach of Law**
By Susan Goering

December 21, 2005
*The San Francisco Chronicle*
**Letters to the Editor**
By Dorothy Ehrlich

December 21, 2005
*Associated Press*
**ACLU Claims FBI Planned to Spy on Event at IU**
Coverage: Ran in at least 5 outlets including the Indianapolis Daily News, Courier Journal (KY), Fort Wayne Journal Gazette, and CBS 2 (IL).

December 21, 2005
*New York Times*
**The Squires of Surveillance**
By Maureen Dowd

December 21, 2005
*Courier Journal (KY)*
**Domestic snooping**
Editorial

January 3, 2006
*The Ledger (FL)*
**FBI Reverts To Old Tactics**
Editorial

The New York Times
nytimes.com

# F.B.I. Watched Activist Groups, New Files Show

December 20, 2005
By Eric Lichtblau

WASHINGTON, Dec. 19 - Counterterrorism agents at the Federal Bureau of Investigation have conducted numerous surveillance and intelligence-gathering operations that involved, at least indirectly, groups active in causes as diverse as the environment, animal cruelty and poverty relief, newly disclosed agency records show.

F.B.I. officials said Monday that their investigators had no interest in monitoring political or social activities and that any investigations that touched on advocacy groups were driven by evidence of criminal or violent activity at public protests and in other settings.

After the attacks of Sept. 11, 2001, John Ashcroft, who was then attorney general, loosened restrictions on the F.B.I.'s investigative powers, giving the bureau greater ability to visit and monitor Web sites, mosques and other public entities in developing terrorism leads. The bureau has used that authority to investigate not only groups with suspected ties to foreign terrorists, but also protest groups suspected of having links to violent or disruptive activities.

But the documents, coming after the Bush administration's confirmation that President Bush had authorized some spying without warrants in fighting terrorism, prompted charges from civil rights advocates that the government had improperly blurred the line between terrorism and acts of civil disobedience and lawful protest.

One F.B.I. document indicates that agents in Indianapolis planned to conduct surveillance as part of a "Vegan Community Project." Another document talks of the Catholic Workers group's "semi-communistic ideology." A third indicates the bureau's interest in determining the location of a protest over llama fur planned by People for the Ethical Treatment of Animals.

The documents, provided to The New York Times over the past week, came as part of a series of Freedom of Information Act lawsuits brought by the American Civil Liberties Union. For more than a year, the A.C.L.U. has been seeking access to information in F.B.I. files on about 150 protest and social groups that it says may have been improperly monitored.

The F.B.I. had previously turned over a small number of documents on antiwar groups, showing the agency's interest in investigating possible anarchist or violent links in connection with antiwar protests and demonstrations in advance of the 2004 political conventions. And earlier this month, the A.C.L.U.'s Colorado chapter released similar

documents involving, among other things, people protesting logging practices at a lumber industry gathering in 2002.

The latest batch of documents, parts of which the A.C.L.U. plans to release publicly on Tuesday, totals more than 2,300 pages and centers on references in internal files to a handful of groups, including PETA, the environmental group Greenpeace and the Catholic Workers group, which promotes antipoverty efforts and social causes.

Many of the investigative documents turned over by the bureau are heavily edited, making it difficult or impossible to determine the full context of the references and why the F.B.I. may have been discussing events like a PETA protest. F.B.I. officials say many of the references may be much more benign than they seem to civil rights advocates, adding that the documents offer an incomplete and sometimes misleading snapshot of the bureau's activities.

"Just being referenced in an F.B.I. file is not tantamount to being the subject of an investigation," said John Miller, a spokesman for the bureau.

"The F.B.I. does not target individuals or organizations for investigation based on their political beliefs," Mr. Miller said. "Everything we do is carefully promulgated by federal law, Justice Department guidelines and the F.B.I.'s own rules."

A.C.L.U officials said the latest batch of documents released by the F.B.I. indicated the agency's interest in a broader array of activist and protest groups than they had previously thought. In light of other recent disclosures about domestic surveillance activities by the National Security Agency and military intelligence units, the A.C.L.U. said the documents reflected a pattern of overreaching by the Bush administration.

"It's clear that this administration has engaged every possible agency, from the Pentagon to N.S.A. to the F.B.I., to engage in spying on Americans," said Ann Beeson, associate legal director for the A.C.L.U.

"You look at these documents," Ms. Beeson said, "and you think, wow, we have really returned to the days of J. Edgar Hoover, when you see in F.B.I. files that they're talking about a group like the Catholic Workers league as having a communist ideology."

The documents indicate that in some cases, the F.B.I. has used employees, interns and other confidential informants within groups like PETA and Greenpeace to develop leads on potential criminal activity and has downloaded material from the groups' Web sites, in addition to monitoring their protests.

In the case of Greenpeace, which is known for highly publicized acts of civil disobedience like the boarding of cargo ships to unfurl protest banners, the files indicate that the F.B.I. investigated possible financial ties between its members and militant groups like the Earth Liberation Front and the Animal Liberation Front.

These networks, which have no declared leaders and are only loosely organized, have been described by the F.B.I. in Congressional testimony as "extremist special interest groups" whose cells engage in violent or other illegal acts, making them "a serious domestic terrorist threat."

In testimony last year, John E. Lewis, deputy assistant director of the counterterrorism division, said the F.B.I. estimated that in the past 10 years such groups had engaged in more than 1,000 criminal acts causing more than $100 million in damage.

When the F.B.I. investigates evidence of possible violence or criminal disruptions at protests and other events, those investigations are routinely handled by agents within the bureau's counterterrorism division.

But the groups mentioned in the newly disclosed F.B.I. files questioned both the propriety of characterizing such investigations as related to "terrorism" and the necessity of diverting counterterrorism personnel from more pressing investigations.

"The fact that we're even mentioned in the F.B.I. files in connection with terrorism is really troubling," said Tom Wetterer, general counsel for Greenpeace. "There's no property damage or physical injury caused in our activities, and under any definition of terrorism, we'd take issue with that."

Jeff Kerr, general counsel for PETA, rejected the suggestion in some F.B.I. files that the animal rights group had financial ties to militant groups, and said he, too, was troubled by his group's inclusion in the files.

"It's shocking and it's outrageous," Mr. Kerr said. "And to me, it's an abuse of power by the F.B.I. when groups like Greenpeace and PETA are basically being punished for their social activism."

washingtonpost.com

# FBI Papers Show Terror Inquiries Into PETA; Other Groups Tracked

December 20, 2005
By Spencer S. Hsu

WASHINGTON -- FBI counterterrorism investigators are monitoring domestic U.S. advocacy groups engaged in antiwar, environmental, civil rights and other causes, the American Civil Liberties Union charged yesterday as it released new FBI records that it said detail the extent of the activity.

The documents, disclosed as part of a lawsuit that challenges FBI treatment of groups that planned demonstrations at last year's political conventions, show the bureau has opened a preliminary terrorism investigation into People for the Ethical Treatment of Animals, the well-known animal rights group based in Norfolk.

The papers offer no proof of PETA's involvement in illegal activity. But more than 100 pages of heavily censored FBI files show the agency used secret informants and tracked the group's events for years, including an animal rights conference in Washington in July 2000, a community meeting at an Indiana college in spring 2003 and a planned August 2004 protest of a celebrity fur endorser.

The documents show the FBI cultivated sources such as a "well insulated" PETA insider, who attended the 2000 meeting to gain credibility "within the animal rights/Ruckus movements." The FBI also kept information on Greenpeace and the American-Arab Anti-Discrimination Committee, the papers show.

The disclosure comes amid recent revelations about the extent of domestic spying by the government after the Sept. 11, 2001, terrorist attacks. Those disclosures include the expansion within the United States of military intelligence and databases covering, among others, peace activists; increased use of "national security letters" by the FBI to examine personal records of tens of thousands of citizens; and, most recently, warrantless eavesdropping of overseas telephone calls and e-mails by U.S. citizens suspected of ties to terrorists.

ACLU leaders contend that the memos show that FBI and government Joint Terrorism Task Forces across the country have expanded the definition of domestic terrorism to people who engage in mainstream political activity, including nonviolent protest and civil disobedience.

"The FBI should use its resources to investigate credible threats to national security instead of spending time tracking innocent Americans who criticize government policy, or monitoring groups that have not broken the law," ACLU Associate Legal Director Ann Beeson said. Previously released papers showed that the FBI kept files that mentioned the organizations, she said, "But we didn't know that they actually launched counterterrorism investigations into these groups."

FBI officials said that the agency is not using the threat of terrorism to suppress domestic dissent and that is has no alternative but to investigate if a group or its members have ties to others that are guilty or suspected of violence or illegal conduct.

"As a matter of policy, the FBI does not target individuals or organizations for investigation because of any political belief. Somewhere, there has to be a crime attached," FBI spokesman John Miller said. "At the same time, the fact that you have ties to an organization or political beliefs does not make you immune from ending up in FBI files when you go and commit a crime."

The status of the PETA inquiry is unclear. Justice Department spokesman Brian Roehrkasse said: "The Justice Department does not comment on or confirm the existence of criminal investigations. All matters referred to the department by the intelligence agencies for purposes of further investigation are taken seriously and thoroughly reviewed."

PETA general counsel Jeff Kerr called the FBI's conduct an abuse of power that punishes activists for speaking out.

"These documents show a disturbing erosion of freedom of association and freedom of speech that we've taken for granted and that set us apart from oppressive countries like the former Iraq," Kerr said, adding that the documents show no illegal activity by PETA. "You shouldn't have to wonder when you go to a speech at a college campus, or when you go to a meeting, whether you're being surveilled by the FBI. It goes back to the dark days of Nixon and the enemies list."

John Lewis, the FBI's deputy assistant director for counterterrorism, told a Senate panel in May that environmental and animal rights militants posed the biggest terrorist threats in the United States, citing more than 150 pending investigations.

The ACLU said it received 2,357 pages of files on PETA, Greenpeace, the American-Arab Anti-Discrimination Committee and the ACLU itself. One file referring to the committee included a contact list for students and peace activists who attended a 2002 conference at Stanford University aimed at ending sanctions then in place in Iraq.

The FBI has said that when it interviewed members of groups planning demonstrations at last year's conventions, it did not yield information into criminal activity. But the agency said the interviews were prompted by specific threats. The latest data lay out a similar, broader pattern regarding 150 groups whose FBI files the ACLU has asked to see.

For example, a June 19, 2002, e-mail cites a source offering information on Greenpeace regarding "activists who show a clear predisposition to violate the law." Other documents contain suspicions that PETA funds, supports or otherwise acts as a front for "eco-terrorist" groups that use arson, bombs or vandalism, such as the Animal Liberation Front or Earth Liberation Front.

*Researcher Julie Tate contributed to this report.*



# ACLU Says FBI Misuses Terror Powers

December 20, 2005
By Ted Bridis

WASHINGTON (AP) - The American Civil Liberties Union accused the FBI of misusing terrorism investigators to monitor some domestic political organizations, despite apparently disparate views within the FBI whether some groups supported or committed violent acts.

Citing hundreds of pages of heavily-censored documents it obtained from the FBI under the Freedom of Information Act, lawyers for the ACLU described this disputed use of terrorism resources as the latest illustration of intensified surveillance aimed toward Americans.

"Using labels like domestic terrorists to describe peaceful protest activity can chill robust political debate in this country," ACLU lawyer Ben Wizner said in New York. The ACLU said it will publish the FBI reports it obtained on its Web site Tuesday.

In one case, government records show the FBI launched a terrorism investigation of the People for the Ethical Treatment of Animals in Norfolk, Va., despite acknowledgment by one FBI official that, "The FBI does not consider PETA a terrorist organization."

The FBI responded that it conducts its investigations appropriately - subject to U.S. laws and Justice Department guidelines. It said the ACLU mischaracterized some passing references to political groups in FBI files to suggest those groups were under investigation; in other cases the FBI confirmed it was acting on tips tying groups to alleged illegal activities.

"You end up in FBI files with your name and your group's name because you're doing stuff," Assistant Director John Miller said. "By and large, the FBI has done a pretty good job sticking to those rules."

The FBI documents indicate the government launched its terrorism investigation of PETA because the group was "suspected of providing material support and resources to known domestic terrorism organizations," including the Animal Liberation Front and Earth Liberation Front.

The PETA investigation began in August 2003 and lasted at least 12 months, according to documents. Miller could not say whether the investigation was concluded.

The FBI reports also linked PETA to the government's investigation of a bombing outside the Shaklee Cosmetic Corp. in Pleasanton, Calif., in September 2003. The FBI said Shaklee conducted animal testing of cosmetic products and its parent company was a frequent target of campaigns by PETA and another group, Stop Huntington Animal Cruelty.

Separately, the FBI files said PETA protested a rodeo in Las Vegas in December 2003 with representatives from the Animal Liberation Front and Earth Liberation Front.

PETA's lawyer, Jeffrey S. Kerr, denied his organization has provided support or resources to the Animal Liberation Front and Earth Liberation Front, calling such claims "tired old allegations." Kerr said any terrorism investigation was "a scurrilous waste of resources."

"This is really an abuse of power," Kerr said. "PETA and other groups are really being targeted because we are being social activists and engaging in free speech. This is un-American and unconstitutional and contrary to the interests of any definition of a healthy democracy."

The ACLU said the FBI documents also suggest that federal terrorism investigators infiltrated the Washington-based American-Arab Anti-Discrimination Committee. One document, sent to an FBI counterterrorism unit in Los Angeles, describes a list of attendees from the group at a conference in Stanford, Calif., to protest sanctions against Iraq in May 2002.

Other FBI documents obtained by the ACLU describe efforts in May 2001 by Greenpeace and the Los Angeles-based Catholic Workers Group to disrupt missile tests in California. The FBI said the Catholic Workers Group "advocates a communist distribution of resources."

On the Net: ACLU repository of FBI files: http://www.aclu.org/spyfiles



# The Abrams Report

December 20, 2005
By Dan Abrams

ABRAMS: Federal authorities say thieves used blowtorches to steal 400 pounds of explosives, 400 pounds, from a New Mexico bunker. It`s being called the largest chemical heist in history and it`s making many people very jittery.

And pro wrestler Diamond Dallas Page is suing rapper Jay-Z over the use of this hand signal. Diamond Dallas is with us for a legal smack down.

Your e-mails abramsreport@msnbc.com. Please include your name and where you`re writing from. I respond at the end of the show.

(BEGIN VIDEO CLIP)

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES: My personal opinion is it was a shameful act for someone to disclose this very important program at a time of war. The fact that we`re discussing this program is helping the enemy.

(END VIDEO CLIP)

ABRAMS: But is it really? In an effort to thwart terror attacks here in the U.S. the president has repeatedly authorized the National Security Agency to eavesdrop on certain Americans` international phone calls and e- mails without court-ordered warrants to do so. The president admitted the program was in place after "The New York Times" revealed its existence on Friday.

Some say without any court supervision even from the secret FISA Court, President Bush`s actions are illegal. What about the government insiders who leaked the story to the press? Should they be held accountable? The president says the past proves this disclosure of information is helping the enemy.

(BEGIN VIDEO CLIP)

BUSH: In the late 1990`s our government was following Osama bin Laden because he was using a certain type of telephone. And then the fact that we were following Osama bin Laden because he was using a certain type of telephone made it into the press as a result of a leak. And guess what happened? Saddam -- Osama bin Laden changed his behavior. He began to change how he communicated.

(END VIDEO CLIP)

ABRAMS: "My Take" -- this is nothing like that example, where bin Laden may have learned that we knew about his cell phone, and therefore he stopped using it. What, in this instance, terrorists learned that their conversations may be monitored without a warrant from the special FISA Court? Oh so they`re going to say well, when they have to get a warrant that I would have never known about, I wasn`t worried, but now that I know they can do it without going to that secret court that changes everything.

Come on. Al Qaeda operatives have long assumed their phones are bugged. That`s why they talk in code, and that is also why it`s important to monitor their conversations. But that says nothing about why it has to be done without even notifying the secret court. Americans deserve to know this and for the terrorists, there`s no difference to being monitored with or without a secret court`s approval.

Joining me now MSNBC political analyst and former presidential candidate Pat Buchanan and criminal defense attorney, civil rights advocate Gerry Lefcourt.

Pat, what am I getting wrong?

PAT BUCHANAN, MSNBC POLITICAL ANALYST: What you`re getting wrong is it`s the individual who leaked this presumably had access to a top secret of the United States government in a time of war that the president of the United States considered critical to national security. Mr. Rockefeller apparently did, to the extent that he was writing handwritten notes...

ABRAMS: Talking about Senator Rockefeller.

BUCHANAN: Senator Rockefeller, yes. And no individual who takes an oath to secure the secrets of the United States has a right to blab to the press in time of war and reveal and expose a national security secret.

(CROSSTALK)

BUCHANAN: They ought to be indicted, convicted and put in prison.

ABRAMS: But Pat, and I know you`ve been -- you`re one of the few intellectually consistent people out there. But this is the same argument that was made during Vietnam, right, about those who were opposing the war and the release of the Pentagon papers, et cetera...

(CROSSTALK)

BUCHANAN: Well, Dan, you recall yourself that General Ellsberg was rightly prosecuted for that. The conviction or the prosecution was overturned because it was an

abuse during the investigation. But he was rightly prosecuted. Dan, for heaven`s sakes, our network has been all over the case, the terrible case of who leaked Valerie Plame`s name.

Now which is more of a threat to the national security, the fact that somebody said Valerie works at the CIA or the fact that the president of the United States and the NSA have a secret program, which deals with foreigners in the United States, maybe some Americans, calling overseas to people with contacts with al Qaeda.

Nobody, no GS-13 or 15 should take it upon themselves to take and blab these secrets to "The New York Times" and if they do it, they shouldn`t be working for the government and they ought to be in Louisburg.

ABRAMS: Gerry?

GERALD LEFCOURT, CRIMINAL DEFENSE ATTORNEY: Well you know this is much ado about nothing. I mean can you imagine intelligence people in foreign countries monitoring the United States not knowing that the National Security Agency has the capability to do exactly what this so- called secret program says they were doing. What is really outrageous about the reaction of the administration to the disclosure is that you know they`re now attacking people when they should be attacked.

As you know Senator Leahy said, no act of Congress, not the Patriot Act, not the Foreign Intelligence Security Act authorizes this. This is totally illegal and thank God there are whistleblowers. You know this country is about preserving freedom, not about destroying it in the name of some kind of national security and foreign war. This was a good act to disclose it.

BUCHANAN: All right, well Gerry...

LEFCOURT: It`s important that "The New York Times"...

BUCHANAN: Right.

LEFCOURT: ... has it on the front page just like they had the Pentagon papers. Certainly, Ellsberg or whoever leaked it, who took an oath shouldn`t be doing that and they should be prosecuted, but we want to know when it is done because we want to preserve our freedom and not allow it to go down the drain.

BUCHANAN: Well first off, OK, then we agree that Ellsberg was rightly prosecuted. I think he could have gotten 35 years in jail for what he did.

(CROSSTALK)

BUCHANAN: This individual...

(CROSSTALK)

BUCHANAN: Hold it, Gerry.

(CROSSTALK)

BUCHANAN: Let me talk briefly. This individual ought to be put in the penitentiary and so should the individual who leaked to "The Washington Post" the fact that we have these camps in Poland. Suppose some terrorist blows up a bomb in Warsaw in retaliation for some jerk leaking this news...

(CROSSTALK)

LEFCOURT: Aren`t you talking about the wrong thing here...

BUCHANAN: ... "The New York Times"...

LEFCOURT: Why do you support...

BUCHANAN: As for "The New York Times"...

LEFCOURT: ... camps torture, national security...

BUCHANAN: I don`t...

LEFCOURT: ... wiretapping without court order?

BUCHANAN: I don`t...

LEFCOURT: Why do you support those things?

BUCHANAN: I don`t support any of that thing. What I do support...

(CROSSTALK)

BUCHANAN: ... is that those of us...

(CROSSTALK)

ABRAMS: Let him respond...

BUCHANAN: ... those of us...

ABRAMS: Hang on, Gerry. Let him respond. Go ahead, Pat.

BUCHANAN: ... those of us who put up their right-hand as I did and take an oath to

preserve the national security secrets of the United States. I knew about the Cambodian bombing because the president of the United States told me and he told me why we were doing it. Now if I had gone out and leaked that I should have been put in prison.

And people who take an oath, Gerry, you might not understand these things being an ACLU type, but they have to do with the national security of the country and they make those judgments. You don`t. "The New York Times" should not either.

(CROSSTALK)

LEFCOURT: Are you saying "The New York Times" should not publish what is an illegal act by the United States government? Is that what you`re saying?

BUCHANAN: Well "The New York Times" withheld information...

LEFCOURT: ... should they or should they not have published that...

BUCHANAN: ... and rightly should. They should not have published the Bay of Pigs...

LEFCOURT: No, no...

(CROSSTALK)

LEFCOURT: ... what about this last Friday. Last Friday they published a story that our government is committing illegal acts by illegally wiretapping American citizens...

(CROSSTALK)

LEFCOURT: ... without the approval...

(CROSSTALK)

LEFCOURT: Do you think they should publish that?

BUCHANAN: Here`s what I think. I think "The New York Times" did that deliberately and politically to (A) sink the Patriot Act thing and (B) because a book`s coming out which this guy wrote. Why did they hold it for a year? You tell me that.

LEFCOURT: Well because they were asked to hold it. It was some kind of frightening threat to national security. That`s what the government does.

(CROSSTALK)

LEFCOURT: They try to prevent...

(CROSSTALK)

LEFCOURT: ... the truth from coming out.

BUCHANAN: Apparently...

(CROSSTALK)

BUCHANAN: Apparently, then the people from "The New York Times"...

LEFCOURT: ... you cannot support torture and illegal acts like that...

(CROSSTALK)

BUCHANAN: I don`t support torture...

LEFCOURT: ... and just attack the accusers.

(CROSSTALK)

LEFCOURT: You`re attacking the messenger.

BUCHANAN: Let me just tell you Keller and Sulzberger withheld it at the request of the government for a year. Now they apparently thought themselves, considered the gravity of what they were doing, withheld it for a year, decided to withhold some material and then go with it. At least they considered this as a serious matter. I consider it a grave matter for the individual who takes it upon himself to say I`m a hero and I`m a whistleblower. I don`t like this secret being kept...

(CROSSTALK)

ABRAMS: Wait, wait, wait...

(CROSSTALK)

ABRAMS: Pat, when you talk about...

(CROSSTALK)

ABRAMS: ... the person being a hero...

(CROSSTALK)

ABRAMS: Pat, when you talk about the person being a hero, and the bottom line is they`re not out there getting any credit for it, it`s not as if people are saying hey, great job out there. And it was the legitimate belief of whoever was doing this that there was something illegal going on in the government.

BUCHANAN: Well look, people might have leaked Valerie Plame`s name thinking we`re helping the country. I`m a whistleblower, and you guys, Dan, have been all over their case. "HARDBALL" has been, MSNBC. Did Rove do it? Shouldn`t Rove be in prison? Is it more serious...

ABRAMS: I have a lot of problems with that investigation, I`ll tell you that right now...

BUCHANAN: I`ve got a lot of problems with that investigation, too...

ABRAMS: Yes. Yes. No, I mean...

(CROSSTALK)

LEFCOURT: You know, it`s all right to keep a secret that the United States and my name is torturing people, to keep a secret that the United States, in my name, without going to a court that would approve any act that`s requested of them, to go to a court before you illegally wiretap American citizens and look at their e-mails for no reason without any suspicion...

(CROSSTALK)

LEFCOURT: ... without any probable cause.

BUCHANAN: Gerry, why don`t we have somebody...

LEFCOURT: Why don`t you oppose that...

(CROSSTALK)

ABRAMS: Pat gets the final word.

(CROSSTALK)

ABRAMS: Go ahead, Pat.

BUCHANAN: What I want to see is people stand up and be heroic. Now I disagreed with Elliot Richardson when he wouldn`t take (INAUDIBLE) but he stood up and he resigned. If you feel that badly about it, be a man, stand up and say there are things going on in this government I can`t live with. I`m resigning. But you don`t sneak around to "The New York Times" and then hide behind anonymity and expect to be called a hero when you`re breaking the law. People don`t have a right to choose...

LEFCOURT: Pat...

BUCHANAN: ... what laws to obey.

LEFCOURT: ... you`re sidestepping the real issue. You`re sidestepping...

BUCHANAN: No, we`re not. We`re right on the issue.

LEFCOURT: ... the real issue. It`s whether this is an appropriate thing for the government of the United States to be doing.

(CROSSTALK)

BUCHANAN: Look, that`s something I agree, the Congress of the United States should take it up. Bush made his case. Attorney general did...

(CROSSTALK)

BUCHANAN: ... but there are no heroes up there in Congress...

ABRAMS: We got to wrap it up...

BUCHANAN: ... who are going to move against the president on this and you know it.

ABRAMS: Sometimes you get two good guests, and I can just shut up. It doesn`t happen all that often, as my viewers know. Pat Buchanan and Gerry Lefcourt, thanks a lot. Appreciate it.

BUCHANAN: Thank you.



# The Situation with Tucker Carlson

December 20, 2005
By Tucker Carlson

TUCKER CARLSON, HOST: Thanks a lot. And thanks to you at home for tuning in. We always appreciate it.

Tonight, the war of words between the U.S. and Canada is escalating into a fever pitch. I`ll talk with a Canadian talk show host who objects to comments made about his country on this very show.

Also, a leading Democrat is looking into whether President Bush ought to be impeached over domestic eavesdropping. Revelations that have rocked Washington, could it really happen?

Plus, THE SITUATION investigation into jihad on campuses. Are some of America`s leading colleges harboring professors who promote deadly terrorist groups?

We begin tonight with the ongoing transit strike in New York. It left seven million people stranded today, causing historic traffic jams and leaving many businesses shuttered on one of the busiest days of the year.

It is the doing of the Transit Workers Union and its 33,000 employees, none of whom showed up for work this morning. Economists say that if the strike continues, it could have a devastating effect on the national economy.

For more on what`s becoming a pretty dire situation, we go down to NBC`s Michelle Franzen, who is standing by at the Brooklyn Bridge -- Michelle.

MICHELLE FRANZEN, NBC NEWS CORRESPONDENT: Good evening, Tucker.

Millions of New Yorkers dealt with their evening commute, much like they did with their morning commute. And that was on foot. Let`s give you a look at what it looks like this hour on the Brooklyn Bridge.

Still thousands of people heading across, this time back to Brooklyn, from their workday in Manhattan, as well as a back log of traffic. And that is because this transit strike is still on, despite the court imposing a $1 million a day fine on the union. And a city that had hoped that that would be enough incentive to get the transit workers back, at least to work, if not the negotiating table.

But at this hour, it looks like neither side -- neither the MTA or the union is talking to one another.

Earlier today, though, Michael Bloomberg had said that the impact, the economic impact on this city is definitely taking its toll, just in the first day, on the first day. Four hundred million dollars it`s estimated that it`s costing the city each day.

And Mayor Bloomberg said on this first day of the strike, many of the retailers during this last holiday push couldn`t even get into the city to open their doors.

I`m Michelle Franzen in New York -- Tucker.

CARLSON: Thanks, Michelle. Of course, if any news breaks on that story within this hour, we`ll bring it to you first.

On now to Washington, where the White House is continuing to defend its eavesdropping programs aimed at American citizens. The existence of the programs was originally reported by the "New York Times."

According to "Newsweek`s" Jonathan Alter, President Bush so desperate to quash that story, he called both the paper`s publisher and its top editor into the Oval Office on December 6 and asked them not to publish.

Joining me now to discuss what happened, and what it means, Jonathan Alter.

Jonathan, thanks a lot for coming on.

JONATHAN ALTER, "NEWSWEEK": Good to see you, Tucker.

CARLSON: So the president calls the publisher and the top editor of "The New York Times" in and says what?

ALTER: I wish I could tell you. I don`t have an account, and I didn`t put on Newsweek.com what transpired there. And I simply don`t know. The "New York Times" is not commenting about it, but I did establish that the visit took place.

CARLSON: But it`s your belief that the president was not concerned so much about national security, as he said yesterday in his news conference, but about the embarrassment that would occur when the story came to light?

ALTER: Yes, and it`s been compounded today, because tape was discovered of the president saying, "We don`t spy on American citizens without warrants." He says that explicitly in this tape that surfaced. So he knew this story would cause him a lot of embarrassment.

We know it`s not a big national security problem because all of the critics of the "New York Times," of all of them, none have said, "Oh, this is a terrible threat to national security." There`s nothing about means of gathering intelligence or other sensitive material in that story.

CARLSON: Right.

ALTER: So for them to claim that it`s this huge security breach, as he did in this press conference just doesn`t stand the test...

CARLSON: I`m not against it. I`m for leaking. I`m for leaking in every case. I think we have a right to know. I like knowing. We can make our own judgments; we`re citizens of this country.

But don`t you think there`s a little bit of a double standard going on here? People reacted, partisan opponents to the president reacted with outrage when Valerie Plame`s name was leaked. "We need to get to the bottom of this." Investigation, special counsel, et cetera.

And then you`ve seen silence in a couple of cases since then, this included, where information, secret information, that the administration says is central to national security has been leaked, and no one says boo.

ALTER: Well, I think the bigger double standard is a lot of conservatives, some of whom even think of themselves as libertarians, who this doesn`t seem to bother. You know?

CARLSON: No, I think it`s an entirely fair point, but -- but just to the specific question of leaking, the White House is going up and saying, it`s an outrage that the "New York Times" published this. To be clear, I am not on the administration`s side on that. Good for the "New York Times" for publishing this.

But don`t you think if you`re going to hold news organizations to this standard, you ought to hold them to the standard?

ALTER: Well, I mean, fine. Let them have -- let them have an investigation, you know, try to find out who the leaker is. Personally, I think it was patriotic of the person who leaked, because this is not -- unlike the Plame case, where actually the stakes were not huge, you know, it was really a political intrigue case.

CARLSON: Yes.

ALTER: Or a normal sort of scandal in Washington about sex or corruption or whatever it is.

CARLSON: Right.

ALTER: This one, Snoopgate, is about serious things. It`s about the separation of powers.

It`s about security versus liberty. It`s about whether the president violated the law. You know, he doesn`t even claim that he was operating under the 1978 statute. In his press conference, he claimed that he was operating under some vague constitutional authority that doesn`t exist.

CARLSON: And the congressional mandate.

ALTER: Where you can make up your own laws.

CARLSON: He said he got a congressional -- a mandate from Congress after 9/11 when Congress voted to give the president, quote, "all necessary powers to prosecute the war on terror."

ALTER: No, no, no. All necessary force.

CARLSON: Use all necessary force.

ALTER: That resolution -- this was really ridiculous of the president to say, because every member of Congress who voted for him knows exactly what they voted for.

They voted for him to go into Afghanistan, go after the terrorists, do what was necessary to catch and kill the terrorists. They did not give him a blank check to do absolutely anything he wanted in the war on terror.

If they had done that, what would this whole John McCain thing be about with torture? It wouldn`t matter, because the president could torture if thought that he needed to for national security. The Congress did not give the president the license to be a dictator on the question of...

CARLSON: Here`s how the -- here`s how the White House responds to that. They say, A, this program has helped us stop at least one terrorist attack attempt to destroy the Brooklyn Bridge.

B, here`s what Dick Cheney said in Pakistan today. This has not been reported yet. "You know it`s not an accident we haven`t been hit in four years. I think there`s a temptation for people to sit around and say, `Well, gee, that was a one-off affair; they didn`t really mean it.` The bottom line is, we`ve been very active, very aggressively defending the nation and using the tools at our disposal to do that."

In other words, it`s because of programs like this that we are terrorist incident-free.

ALTER: I think it`s just great that they`re doing this, and I`m all for connecting the dots, eavesdropping on American citizens if they seem to be engaged in terrorist activity. All that is great.

The point, Tucker, is it can be done within the law.

CARLSON: Right.

ALTER: There`s a law, 1978. It established a special court. You can call them in the middle of the night and get permission. In fact, you can do it after the fact. You can eavesdrop on American citizens, and then two days later, you can call up the FISA court and get retroactive approval to do it. There are no restrictions, really, on your ability to do it, so it`s puzzling.

CARLSON: So why not do it?

ALTER: Why they would have to circumvent this law, actually violate the law, when only four times since 1979 has this court said no. It`s not like they were being handcuffed.

CARLSON: Right.

ALTER: Or prevented from what they needed to do.

CARLSON: I think that`s -- if what you`re saying is right, that you can do it after the fact, I think that`s a really fair point and a good question to ask. Why violate the law gratuitously?

ALTER: And then the president says, "Well, it`s a timing thing. We needed to do it right away." The law allows him to do it right away. Why go around the law?

CARLSON: We`re going to find out, because this is going to be the subject of hearings, as you know.

ALTER: Yes, it is.

CARLSON: Thank you very much, Jonathan Alter of "Newsweek." Appreciate it.

ALTER: Great to see you, Tucker.

CARLSON: Nice to see you.

Almost exactly seven years ago today, the House decided to impeach President Clinton. Now two Democrats, California Senator Barbara Boxer and Congressman John Lewis of Georgia, are exploring the possibility of impeaching President Bush for authorizing the NSA to spy on Americans.

Here to talk about that and other spy stories, Air America Radio host, Rachel Maddow -- Rachel.

RACHEL MADDOW, AIR AMERICA RADIO HOUSE: Hi, Tucker. Nice to see you.

CARLSON: It`s great -- it`s great to see you.

Barbara Boxer, and I am not in any way defending this NSA case, because Jon Alter, I thought, raised some pretty interesting points. I`m not exactly sure what I think, to be totally honest with you. But I know what I think of Barbara Boxer`s plan to impeach Bush.

She got this idea on a radio show she was appearing on with former White House counsel, John Dean, late of the Nixon administration, who said that this was impeachable defense. Barbara Boxer, John Dean, on the same radio show, complete freak show. And she says in a statement later, "I take very seriously Mr. Dean`s comments."

Is this where the Democratic leadership, is this where the Democratic senators go for legal advice? John Dean? Come on.

MADDOW: Tucker, I love that you said that you don`t know how you feel about why she might want to impeach him, but you know that you hate that she wants to impeach him. A little bit of a -- you`re kind of tipping your cards here a little bit.

CARLSON: No, no, that`s exactly the point.

MADDOW: Right.

CARLSON: I don`t -- that`s exactly the point I`m making. There are so many things we don`t know about this...

MADDOW: Yes.

CARLSON: ... that it`s premature, to put it mildly, to be talking about impeachment. And to get the idea from John Dean on a radio show, and then, as a U.S. senator, throw it out there strikes me as ridiculous.

MADDOW: Well, she didn`t endorse impeachment. What she did is she wrote a letter to some legal scholar saying, "Do you think this rises to the level of high crimes and misdemeanors?" She said, "We need to be starting to talk about impeachment."

She`s not the only one either. And I don`t actually think you can make this a Barbara Boxer question. I mean, people from the American Enterprise Institute, and Jonathan Turley, who`s a really mainstream NBC legal analyst, have brought it up. And former Reagan administration officials have brought it up. A lot of people have been using the "I" word, because this seems like a clear case of the president breaking the law.

It`s not very arcane. You know, Congress makes laws. When the president breaks them, what does Congress do? They`re supposed to impeach him. It`s not a very complicated, crazy Democratic wing-nut thing.

That said, Barbara Boxer is only asking the question. She hasn`t said she wants to impeach him yet.

CARLSON: Well, that`s an argument I`m very familiar with, having heard it in great detail seven years ago. President Clinton broke a law. He was impeached for it.

How did that turn out for the Republican Party? Not very well in the end. Why? Because the crime for which he was impeached was not considered a crime by most Americans. And my political protection today is no matter how -- what we learn about this in the end, the backlash will actually hurt the Democrats in this, because most Americans want the president to do whatever he can, including breaking laws, to protect them.

MADDOW: But you know, Tucker, it`s one thing for there to have been a backlash against the Republicans after the impeachment of President Clinton because he lied about having sexual relations with an intern.

It`s another thing for there to be an expected backlash for trying to impeach the president potentially in this case when what the president did was break the law to spy on Americans without warrants. That kind of seems more serious. I mean, if you want to try too compare the two impeachment cases.

CARLSON: No, it`s -- there`s absolutely no question. There`s absolutely no question it`s more serious. My only point is, that I think most Americans, and I haven`t seen polling on this, but I bet you 20 bucks I`m right, most Americans don`t care.

And if they believe -- the president the White House can show that acts of terror were prevented because of this program, everyone is for it. I may be against it, you may be against it. But average people, totally for it.

MADDOW: I think people are starting to get creeped out about a big secretive, intrusive government that`s looking at our medical records and our tax records and our financial records, and looking at our e-mails and looking at our phone calls and all of this stuff.

CARLSON: Right.

MADDOW: All under the guise of 9/11 gives us clearance to do it. Well, you know what? It`s starting to wear a little bit thin, because we don`t actually feel safer because of all this stuff.

CARLSON: We have been pretty safe, though.

Well, not only looking at our medical records and library cards, but also looking at political groups, especially those on the fringe, particularly those on the left: PETA, different environmental groups. It turns out the FBI has been taking a close look at all of these groups. It turns out, in fact, that most domestic terrorism, the overwhelming

majority of domestic terrorism, committed by animal rights and environmental groups.

Here`s what -- here`s what the ACLU is saying. The FBI should use its resources to investigate credible threats to national security, instead of spending time tracking innocent Americans who criticize government policy.

I completely agree with that. Following PETA around is a total waste of time. The FBI ought to be staking out radical mosques, but they don`t. You know why? Or don`t enough. Because of concerns that they`re going to be sued by the ACLU for racial profiling.

That`s the bottom line. They should be doing this but to different people.

MADDOW: But it`s not like these two stories that we`re talking about are unconnected. I mean, if the FBI wants to be staking out radical mosques, they can go get a warrant to do that and they can make a case for doing that.

CARLSON: You don`t need a warrant to stake out a building.

MADDOW: Sure. But if you wanted to do -- if you wanted to be tapping the phones of the people who were members of the mosque, calling people outside the country or something, you could get a FISA warrant to do that, right?

The problem is the administration is not getting warrants to do stuff. They`re just breaking the law and doing it. And don`t you wonder...

CARLSON: Wait. Hold on. Just as a factual matter, I don`t think there`s any evidence that in this story, that the FBI has broken any law, in keeping these groups under surveillance.

MADDOW: Right, but connect the dots here. Connect these two stories. Don`t you wonder why it is that, if what you just heard from Jonathan Alter is right, that they`ve turned down -- these courts have turned down warrants four times in 25 years, why on earth would you then go outside the law and circumvent that court? You`re going to get whatever you want from it.

Maybe it`s because what the FBI is doing with this domestic surveillance stuff, is they`re surveilling the llama fur protests and the anti-war protests and stuff that they would be embarrassed to have to actually ask permission for.

CARLSON: But again, they don`t need permission to watch people. You don`t need permission in a public place to observe people. You don`t need permission to use informants. You need permission to monitor electronic communications.

But again, the bottom line is I think they are looking at the wrong people. I mean, PETA, as annoying as they may be, as over the top as they may be, I don`t think is a threat to

national security. Islamic extremism is. And just think because of concerns about being accused of racial profiling, we`re not surveilling the right people, and it`s really troublesome.

CARLSON: I don`t think anybody looking at these same stories as you tonight, I don`t think most people are looking at this and thinking, you know, what we need is more surveillance. I think what we realize is that we`ve got a surveillance system in this country that`s run amuck and that isn`t focusing on the right priorities. And the Bush administration has some weird ideas about how to spend its time and its money.

CARLSON: I think part of what you said is right. On the other hand, I would like to hear a good argument for why we haven`t been attacked in the last four years. I think it says something. I don`t know.

MADDOW: Maybe we can talk about it tomorrow.

CARLSON: Maybe we can. Rachel Maddow, I hope so. We`ll see you then.

MADDOW: Thanks, Tucker.

CARLSON: Still ahead, the war of words heats up between the U.S. And Canada. Why do our neighbors to the north hold such an enormous grudge against us? We`ll try to get some answers in just a minute.

Plus, college professors moonlighting as terrorist sympathizers. There are a lot of them. Why are universities still allowing these radical teachers on their campuses? A SITUATION investigation, when we come back.

CARLSON: Still ahead, why is one prominent New York University employing an anti-American professor who is quoted as saying, quote, "The only true heroes are those who find ways to help defeat the U.S. military"? THE SITUATION investigates jihad on campus when we come back.



# The Situation Room

December 20, 2005
By Wolf Blitzer

WOLF BLITZER, CNN ANCHOR: You're in THE SITUATION ROOM, where pictures and information are arriving all the time. Standing by, CNN reporters across the United States and around the world, to bring you today's top stories.

Happening now at 7:00 p.m. here in Washington: Were his words meant to deceive? A past statement by President Bush on wiretaps and warrants comes under close scrutiny, and some lawmakers are demanding closer scrutiny into an investigation into domestic spying.

Off the coast of Miami, they're raising the wreckage of a seaplane that crashed with 20 aboard, hoping to find out what made it go down in flames.

And it's 7:00 p.m. in New York, where it's strike and counterstrike. Transit workers leaving millions in the lurch. A judge tries to crack down. I'm Wolf Blitzer, and you're in THE SITUATION ROOM.

The White House is under even more fire over the president's admission of a secret domestic spying program. Tonight, the former chairman of the Senate Intelligence Committee, Democrat Bob Graham of Florida, is strongly disputing the administration's claim he was informed about the specifics of the wiretap plan. We'll hear from Senator Graham. That's coming up this hour.

Some other Democrats are now asking if Mr. Bush may have committed an impeachable offense. And they have additional ammunition, a past statement by the president seems to contradict what he's saying right now.

President Bush stepping forward this week to say he absolutely has the authority to approve spying on terror suspects without court warrants. But listen to what he said just last year.

(BEGIN VIDEO CLIP)

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES: There are such things as roving wiretaps. By the way, anytime you hear the United States government talking about wiretap, it requires -- a wiretap requires a court order. Nothing has changed, by the

way. When we're talking about chasing down terrorists, we're talking about getting a court order before we do so.

(END VIDEO CLIP)

BLITZER: That was more than two years after the 9/11 attacks and after Mr. Bush first approved this secret wiretap program. White House press secretary Scott McClellan was asked if Mr. Bush's 2004 comments were misleading.

(BEGIN VIDEO CLIP)

SCOTT MCCLELLAN, WHITE HOUSE PRESS SECRETARY: I reject that suggestion. You're asking me to look back at something that's in relation to the Patriot Act. And it's in relation to the Patriot Act. And I'll be glad to take a look at his comments.

(END VIDEO CLIP)

BLITZER: The Bush White House argues that the secret eavesdropping program is limited and crucial to the war on terror.

In Pakistan, Vice President Dick Cheney added his voice to the debate.

(BEGIN VIDEO CLIP)

DICK CHENEY, VICE PRESIDENT OF THE UNITED STATES: It is good, solid, sound policy. It is, I'm convinced, one of the reasons we have not been attacked for the last four years.

(END VIDEO CLIP)

BLITZER: But some top Democrats are accusing the president of crossing a legal line, and even raising questions about whether he committed an impeachable offense.

(BEGIN VIDEO CLIP)

SEN. BARBARA BOXER (D), CALIFORNIA: Lots of people are after the truth, and I think we will find out exactly why they couldn't take time to get a check and balance on their work, go to the court.

HOWARD DEAN, DNC CHAIRMAN: Why is it that President Bush went in front of the American people and said that a wiretap, quote, "requires a court order," unquote, after having approved a wiretap program without a court order two years earlier? It's time for the president to be truthful with the American people.

(END VIDEO CLIP)

BLITZER: And now, the Bush administration must deal with this growing controversy in what are usually the quiet days before Christmas.

Let's bring in our White House correspondent, Suzanne Malveaux. What specifically are they saying, when the president flatly said in his comments of April of last year, "nothing has changed, by the way," referring to the wiretaps. Well, something had changed -- namely, he had authorized wiretaps without court orders. How do they explain that?

SUZANNE MALVEAUX, CNN WHITE HOUSE CORRESPONDENT: Well, Wolf, I actually talked to press secretary Scott McClellan on a number of occasions today to kind of clarify and specify exactly that particular point. What Scott McClellan says is that the president, during that April 2004 speech, was specifically talking about provisions within the Patriot Act, and essentially he was not talking about the National Security Agency's program and the program we're talking about at the heart of this controversy, that secret domestic spying program.

He says that the president's comments were correct, that he was talking about provisions that had not changed when it came to wiretapping within the provisions of the Patriot Act. So you can look at this and say, of course the president did not mention the NSA program that's at the heart of the controversy.

I spoke with an intelligence official as well, who says he does agree that the president's statement was correct, but there are critics, Democrats today, who have been complaining, saying that the president was dishonest by omission. It has become very clear that the White House, the president stating himself, he did not want that particular program to come to light -- Wolf.

BLITZER: And will the White House cooperate, make witnesses available? Senator Specter, the chairman of the Judiciary Committee, among others, they want formal hearings. Will the White House make everyone available to testify?

MALVEAUX: Well, so far the White House is not committing anyone to go before it and testify. They're going to wait and see how all of this plays out. Of course, it looks like there are going to be hearings early next year, but what the White House is banking on now is that they're moving forward very aggressively, making their case that the president, the administration did not break the law, but what they're also looking at as well is what are members of Congress going to be dealing with when they go back home for the holidays? Are Americans going to be complaining about this?

They do not believe that this is a watercooler conversation. They believe that most Americans will look at this and say, OK, there's some exceptions here, that there's some maneuvers within the law that the president used to protect the American people, that this does not necessarily apply to us or our family, and therefore this will not be an issue that sticks.

That is their hope, but they're going to wait and see until Republican members of

Congress in particular come back and report to the president and say what Americans are saying.

BLITZER: Suzanne Malveaux at the White House for us, thank you very much.

And later this hour, we'll ask this question -- did the president keep senior senators in the dark about this new program involving domestic spying without court orders? I'll ask a former Democratic senator, Bob Graham, about that. He was the chairman of the Senate Intelligence Committee when the order was given. And Republican Senator John Cornyn of Texas. That's coming up this hour.

Now that these secret orders and operations have all come to light, how broad a net does the government cast to ensnare those it considers a threat? Let's get some more specifics. Brian Todd is joining us from the newsroom -- Brian.

BRIAN TODD, CNN CORRESPONDENT: Wolf, the story of potential government -- of spying on Americans has now broadened with the claim by some top activist groups that they've come under FBI surveillance.

(BEGIN VIDEOTAPE)

TODD (voice-over): John Passacantando wasn't shocked to learn the government was paying attention to him. As executive director of the environmental activist group Greenpeace, Passacantando has led countless anti-administration protests, and been arrested for civil disobedience. He was surprised to see FBI documents with information about the political leanings of a relative.

JOHN PASSACANTANDO, EXEC. DIRECTOR, GREENPEACE: The absurd thing is, there's the FBI, in this time when we want them to be going after terrorists, and there they are, spending their time and their research dollars going after Greenpeace.

TODD: Greenpeace and the group People for the Ethical Treatment of Animals, or PETA, are under scrutiny by FBI counter-terrorism units, and have been targeted for surveillance -- that's according to the American Civil Liberties Union, which obtained FBI documents in a lawsuit.

ANN BEESON, ACLU: The FBI has placed confidential informants inside organizations including PETA and Greenpeace.

TODD: ACLU officials aren't sure if other methods, like wiretaps, were used.

Contacted by CNN, the FBI issued a statement, saying, quote -- "The FBI does not investigate any public interest or advocacy group based on the group's lawful activities or political beliefs."

The bureau and one of its former top counter-terror officials told us why they would

investigate.

PAT D'AMURO, FORMER ASSISTANT DIRECTOR-IN-CHARGE, FBI: There needs to be the threat of a crime, a threat of violence, a threat of loss of property. There have been numerous domestic groups that have been involved in that type of activity. That would cause the FBI to conduct an investigation.

(END VIDEOTAPE)

TODD: Now, one of the documents says, quote, "PETA is known to hire interns from Asia and other locations for the sole purpose of criminal acts." Contacted by CNN, an attorney for PETA said its members may engage in civil disobedience, but he has no way of knowing whether any of them also associate with other activist groups known to use violence. The attorney says PETA is a completely lawful organization, and he calls the FBI's actions outrageous -- Wolf.

BLITZER: Brian Todd reporting. Thank you, Brian, very much.

Let's go to the Senate floor right now. New York Senator Chuck Schumer speaking out about the president's order for domestic spying. Let's listen in briefly.

SEN. CHARLES SCHUMER (D), NEW YORK: ... beyond discussion, that if you're going to wiretap an American citizen you need a court permission. In emergencies, of course, it's allowed 72 hours after it is done. That that was more or less the consensus in this country, it has been for 30 years, and it was a consensus the president was part of, at least as of a year and a half ago.

What made the president change his views? What made him reverse the universally accepted view that a wiretap requires a court order is beyond me.

But let us move forward here. Let us come together, realize that we must protect ourselves, but that we can protect ourselves and protect our liberties at the same time.

BLITZER: All right, Chuck Schumer speaking on the Senate floor. We'll continue to monitor what he's saying, go back there if he makes some news. We're watching this story from all angles.

*** 

BLITZER: We have learned much in recent days about the National Security Agency's eavesdropping on American citizens. That's raising questions about a possible role by the United States military in domestic spying.

Let's go live to our Pentagon correspondent Barbara Starr.

What are you picking up, Barbara?

BARBARA STARR, CNN PENTAGON CORRESPONDENT: Well, Wolf, the Pentagon has been trying very hard to stay out of this whole mess about domestic intelligence and surveillance. But they're having a hard time of it.

(BEGIN VIDEOTAPE)

STARR (voice-over): Five months after the 9/11 attacks, the Pentagon established one of its most secretive units. This document created the Counterintelligence Field Activity, or CIFA.

No one will say how many people work there or how big the budget is. It's supposed to track any threats against the Defense Department. But now some are asking, is the Pentagon spying on Americans? This anti-war protest last March in New York was one of many demonstrations listed in one of CIFA's databases called Talon.

CAROLINE FREDRICKSON, ACLU WASHINGTON DIRECTOR: Talon is one of those databases in which the -- the Pentagon has put all sorts of information about people participating in protests, perhaps against the Iraq war, environmental demonstrations, or other types of events, have put this information on these individuals in the database.

STARR: The law allows the Pentagon to collect information about potential domestic threats. But if the information doesn't pan out, it's supposed to be deleted from all computers. In the wake of disclosures that the Pentagon inadvertently kept Talon information on Americans who are not a threat, this man, Stephen Cambone, the Pentagon's intelligence chief, ordered a review of the entire effort and ordered all his intelligence staff to get training on what's legal and what's not.

(END VIDEOTAPE)

STARR: Now, Wolf, the Pentagon insists that the disclosures about its counterintelligence, its own domestic intelligence programs, just is simply a matter of bad timing, that it came at the same time as the disclosures about the National Security Agency, that the two have absolutely nothing to do with each other.

But, indeed, just two months ago, the Pentagon's own Counterintelligence Field Activity expanded its operations even further -- Wolf. BLITZER: Barbara Starr at the Pentagon, thank you very much.

Did President Bush cross the wire with domestic spying? Are the wiretaps worth it?

The former Secretary of Defense William Cohen standing by -- he will join us to answer those questions.

Stay with us.

BLITZER: Did President Bush go too far in allowing wiretaps without court orders?

Joining us now, a key member of our CNN Security Council, the former Defense Secretary William Cohen. He was a vice chairman of the Senate Intelligence Committee back in the 1980s. He's now chairman and CEO of The Cohen Group here in Washington.

You heard about this when we all heard about it.

WILLIAM COHEN, CNN WORLD AFFAIRS ANALYST: Right.

BLITZER: I assume you didn't know anything about it in advance. What do you think?

COHEN: Well, we live under a system in which power has to be entrusted to someone, but no one can be trusted with power.

And we also have a famous Latin phrase, which, translated roughly, is, who will guard the guardians? How are we sure that the people who we choose or elect to guard us themselves are complying with the rule of law?

So, in this particular case, the president has rested his power, under the Constitution -- and, also, he believes Congress either gave him implicit authority to him when it authorized him to go to war against al Qaeda or the Taliban. If that's the case, it is going to raise serious questions about voting for the Patriot Act again, because they -- I think members of Congress are not going to want to implicitly authorize or condone this particular activity.

So, I think what's called for are hearings, as Senator Specter has suggested we do so, in a calm, deliberate fashion. There may be very important intelligence information to be gathered. But, if it's that important, it's important also that there be rules and procedures whereby the American people can be assured that they are not being spied upon illegally or arbitrarily or that there's an abuse of power.

You can't have just the president declare, I have got the power and not have any kind of effective oversight, either by the judiciary or the Congress, if we are going to maintain this democracy in the face of increased threats of terrorism. And this is really the debate that's long overdue. What are the American people willing to trade off, if anything, of privacy and their liberty, in order to be safe and secure? That's a debate that needs to take place.

BLITZER: It sounds to me like you're sort of uncomfortable with what he did.

COHEN: I, as a former member of the administration, Clinton administration, I certainly was concerned about the leaking of sensitive information that could jeopardize our ability to collect information, but, also, having served for 10 years on the Intelligence Oversight Committee in the Senate, very sensitive to the need to keep key members of Congress fully informed of any kind of intelligence activities which call into question the power of

the president.

BLITZER: They informed the chairman, the vice chairman and the leaders of both the House and the Senate.

COHEN: The question is -- that will be important to determine how expensive was that information.

For example, if a call is picked up in this country that emanates from outside the country, and that individual who is then being targeted talks to a number of other people, are those other people, who may be innocent individuals, have no notice of what this individual is up to, they suddenly could be -- had an effect of dragnet putting them into it?

Are they going to be subject to oversight by the administration? These are serious issues, which ought to be looked at very carefully, and, I would suggest, privately, or on a classified basis, initially.

But this has to be explained to the American people that there are serious intelligence issues that have to be debated. And the weighing of security vs. privacy is going to be even more important as we move into the future, because technology has far exceeded the policy that is in place today.

BLITZER: And that's the argument the administration makes, that, when you were in House of Representatives in the '70s and you observed all the abuses during the Nixon administration, you were there in '78, when they created this new FISA court, that was with old technology, before 9/11.

After 9/11, the world changed, and the old rules simply had to go away.

COHEN: Well, it's not a question of the old rules going away.

But the question is, because technology is so advanced and the ability of government to collect information on millions of people -- as a matter of fact, private companies have databases which have a profile of you and me and every citizen in this country, detailed information about who we are, what we -- where we go, how we travel, what we buy, what we sell, the price we pay. All of that is -- it's contained in databases now, some of which is marketed, or attempted to be marketed, to the government. So, the question becomes, do we want to have in place clear, very definite rules on how far the government can go in collecting information, given the tools that we now have and the facility to collect it? How far do we want them to go, without some kind of serious check and balance to make sure that the people who are guarding us are being watched as well?

BLITZER: William Cohen, thanks usual -- as usual.

Up next, commuters in New York City having to come up with new ways to get home. There are some legal maneuvers under way to talk about as well.



## Lou Dobbs Tonight

December 20, 2005
Hosted by Lou Dobbs

PILGRIM: The Bush White House is facing a barrage of questions about the National Security Agency's spying activities in this country. But the Pentagon is also monitoring terrorist suspects inside the United States with a secretive new intelligence unit.

Barbara Starr has the report.

(BEGIN VIDEOTAPE)

BARBARA STARR, CNN PENTAGON CORRESPONDENT (voice over): Five months after the 9/11 attacks, the Pentagon established one of its most secretive units. This document created the counterintelligence field activity, or CIFA. No one will say how many people work there, how big the budget is. It's supposed to track any threats against the Defense Department. But now some are asking, is the Pentagon spying on Americans?

This antiwar protest last March in New York was one of many demonstrations listed in one of CIFA's databases called Talon.

CAROLINE FREDERICKSON, ACLU: Talon is one of those databases in which the Pentagon has put all sorts of information about people participating in protests, perhaps against the Iraq war, environmental demonstrations, or other types of events have put this information on these individuals in the database.

STARR: The law allows the Pentagon to collect information about potential domestic threats. But if the information doesn't pan out, it's supposed to be deleted from all computers.

In the wake of disclosures that the Pentagon inadvertently kept Talon information on Americans who are not a threat, this man, Stephen Cambone, the Pentagon's intelligence chief, ordered a review of the entire effort and ordered all his intelligence staff to get training on what's legal and what's not.

As the controversy boils in Washington, led by the revelations the National Security Agency monitored communications in the U.S. without court warrants, Defense Secretary

Donald Rumsfeld making it clear on "LARRY KING LIVE" he believes President Bush obeyed the law.

DONALD RUMSFELD, SECRETARY OF DEFENSE: He is very sensitive to the importance of privacy issues, just as we are at the Pentagon.

(END VIDEOTAPE)

STARR: And Kitty, the Pentagon says it's really just a matter of bad timing, that the revelations about their domestic intelligence programs came at the same time as the news about the National Security Agency conducting surveillance without court warrants inside the United States. Officials here say the two programs have absolutely nothing to do with each other -- Kitty.

PILGRIM: There's no doubt, though, that the personal privacy issue is very central to the consciousness of the American public. Barbara, help us sort out a little bit what's legal, what's not at the Pentagon.

STARR: Well, under the law, under the regulations, when there is a problem, when they believe they have a threat to the United States military, or to military bases, they can, indeed, investigate and collect information on that. When it's counterintelligence, when it's espionage, they work very closely with domestic law enforcement, and the presumption is that domestic law enforcement, the FBI, would take the lead in any case such as that.

But what is very clear, Kitty, is the law prohibits the United States military and the Defense Department from collecting intelligence about Americans who simply may have a different political point of view -- Kitty.

PILGRIM: Very interesting stuff. Thank you very much. Barbara Starr.



# All Things Considered: ACLU says files show FBI spied on activist groups

December 20, 2005
By Robert Siegel and Michele Norris

ROBERT SIEGEL, host: From NPR News, this is ALL THINGS CONSIDERED. I'm Robert Siegel.

MICHELE NORRIS, host: And I'm Michele Norris.

In this week of revelations about domestic spying, here's another one. The FBI has been watching activist groups in the United States, including People for the Ethical Treatment of Animals, Greenpeace and the Catholic Workers group. The news comes from FBI documents that the American Civil Liberties Union obtained through a Freedom of Information Act request. The ACLU released the papers today, and NPR's Ari Shapiro has this report.

ARI SHAPIRO reporting:

People for the Ethical Treatment of Animals, or PETA, became suspicious even before they saw these documents. Jeff Kerr is the group's general counsel.

Mr. JEFF KERR (General Counsel for PETA): Several of our people have been harassed either at protests, stopped at airports, stopped along highways, harassed at their homes or offices.

SHAPIRO: He says PETA members were interrogated sometimes for hours.

Mr. KERR: So we had suspicion, which is what generated the FOIA request to the Department of Justice.

SHAPIRO: FOIA is the Freedom of Information Act. The American Civil Liberties Union submitted the request a year ago. After a court battle, the FBI gave up the documents. Ben Wisner is an ACLU staff lawyer.

Mr. BEN WISNER (Staff Lawyer, American Civil Liberties Union): It's really a patchwork of redactions and half-sentences.

SHAPIRO: Whole pages are whited out, but between the blanks are some nuggets that Wisner finds troubling.

Mr. WISNER: One of the documents has the FBI conceding that it does not consider PETA a terrorist organization, even as other documents label PETA as a subject of domestic terrorism investigations.

SHAPIRO: The documents show the FBI looking for a connection between PETA and an organization that the government has labeled an ecoterrorist group called the Animal Liberation Front. PETA has passed two IRS audits; it holds that as proof that there is no connection between PETA and terrorist groups. Another document says the Catholic Workers group advocates a communist distribution of resources. That organization mainly provides services to the poor. FBI Assistant Director John Miller says agents have to follow terrorism investigations wherever they lead.

Mr. JOHN MILLER (Assistant Director, FBI): You can't draw the line in the middle of a case and say, `Well, this lead, you know, went from the underground shadowy terrorist group to a mainstream above-ground group. I guess we can't pursue it.'

SHAPIRO: He says there are checks in place to make sure those investigations don't go too far: congressional oversight, Justice Department guidelines and an inspector general's office that monitors FBI behavior.

Mr. MILLER: We have that oversight built in, with the idea that we're dealing with a force of human beings. We don't recruit FBI agents from the planet Perfect. They will make errors and mistakes, even well-meaning ones. And there are systems set up to catch that. But on the other side of the coin, you cannot wrap yourself in the flag of a particular cause, no matter what side of the political spectrum it's on, and then say that gives you blanket immunity from being looked at when individuals who operate under the name of your group surface in a criminal investigation.

SHAPIRO: But PETA lawyer Jeff Kerr says there a difference between blanket immunity and freedom from harassment.

Mr. KERR: The FBI has got to tread incredibly carefully when they encounter entirely lawful groups like PETA, Greenpeace and the Catholic Worker, for example. And what these documents show is that there isn't any kind of care like that being done.

SHAPIRO: The documents show informants for the FBI monitoring environmental and animal rights conferences and protests. That worries the ACLU's Ben Wisner.

Mr. WISNER: There's a real danger that the tradition of robust political dissent in this country will be chilled. No one wants to think that by going to a conference on global warming, by going to a protest of logging, that their name or their license plate number will end up in an FBI file.

SHAPIRO: Until recently federal restrictions said the FBI could only investigate criminal acts. Attorney General John Ashcroft rolled back some of those requirements

after the 9/11 attacks. That made investigations like these possible. Ari Shapiro, NPR News, Washington.



# ACLU: FBI Eyed Various Rights Groups

December 20, 2005

WASHINGTON--Documents obtained by the American Civil Liberties Union show the FBI has conducted surveillance on animal rights and poverty relief groups.

One FBI document obtained under a Freedom of Information Act request indicates that agents in Indianapolis planned to conduct surveillance as part of a "Vegan Community Project."

Another document talks of the Catholic Workers group's "semi-communistic ideology." A third indicates the bureau's interest in determining the location of a protest over llama fur planned by People for the Ethical Treatment of Animals.

After the attacks of Sept. 11, 2001, restrictions on the FBI were loosened, giving the bureau greater ability to visit and monitor Web sites, mosques and other public entities in developing terrorism leads.

However, FBI officials told The New York Times many of the references may be much more benign than they seem to civil rights advocates, and that the documents offer an incomplete and sometimes misleading snapshot of the bureau's activities.

"Just being referenced in an FBI file is not tantamount to being the subject of an investigation," said John Miller, a spokesman for the bureau.



# Bush Should Put an End to Domestic Spying Program

December 21, 2005
By The Detroit News

President Bush crossed the legal line in allowing the federal government to spy on Americans without a court warrant.

The president has not made a persuasive case for selectively suspending Constitutional rights, and he owes the country a fuller explanation.

The Foreign Intelligence Surveillance Act (FISA), passed in 1978, makes provisions for spying on U.S. soil, and that should give the president all of the leeway he needs to act quickly and decisively to intercept terrorist threats. The measure sets up a secret court to handle sensitive requests for warrants, and even allows officials to wait 72 hours after a wiretap begins before seeking court approval.

Approval can be obtained in hours, or even minutes, according to some security experts.

The act properly balances security needs with individual rights. It gives federal agents access to a flow of suspect e-mails and phone calls, but requires a court to square that action with the law and the Constitution.

No one denies Bush or any president the power to defend and protect the country, including extraordinary powers during war. But even war does not suspend the Constitution, or give leaders the right to ignore laws they find inconvenient. The spy controversy is also a heads up for lawmakers as they continue to debate renewal of the Patriot Act. The original law ripped down safeguards that required the government to have probable cause before investigating someone, or collecting their records.

Even the current rewrite of the act allows government to continue seizing law-abiding Americans' most sensitive personal records without requiring a link between the records sought and a suspected foreign terrorist, according to analysis by the American Civil Liberties Union. The draft also would have kept the automatic gag order that makes it difficult to challenge secret demands for records. Checks and balances were built into the Constitution for a reason. They should not be traded for a false sense of security.

In the current spying controversy, the administration acknowledged it monitored phone calls and e-mails of people inside the country believed to be plotting with terrorists overseas.

The president said he authorized skating around even the secret FISA courts to make the country faster on its feet to counter terrorism.

No matter how well intended, the spy plan is an unacceptable and unnecessary shortcut that the president should halt immediately.

Reprinted from The Detroit News.



# FBI Files Show Agency Tracked US Activist Groups

December 20, 2005

The American Civil Liberties Union (ACLU) has released documents they say shows the FBI has monitored the activities of various domestic activist groups.

The ACLU says it has obtained more than 2,300 pages of files as part of a lawsuit filed under the federal Freedom of Information Act.

The heavily-edited documents show the FBI has investigated organizations such as People for the Ethical Treatment of Animals and the environmental group Greenpeace. Some of the groups placed under surveillance had planned demonstrations at last year's Democratic and Republican presidential conventions.

The FBI says it monitored the groups to determine if they had any links to any extremist groups that engaged in violent or illegal acts.



# FBI Monitored Activist Groups in the United States: Report

December 20, 2005

WASHINGTON-- The US Federal Bureau of Investigation has monitored numerous activist groups dealing with the environment, animals and poverty relief, The New York Times said Tuesday.

While FBI officials said their operations were above board and driven by evidence of criminal or violent activity at public protests and in no other setting, human rights groups were concerned they may have been improper.

The American Civil Liberties Union said the FBI's activity and the latest disclosures about domestic surveillance by the National Security Council and military intelligence units reflected a pattern of overreaching by the government.

"It's clear that this administration has engaged every possible agency, from the Pentagon to NSA to the FBI, to engage in spying on Americans," said ACLU associate legal director Ann Beeson.

Heavily-edited FBI documents the ACLU gave to the Times show plans to conduct surveillance of protest groups suspected of having links to violent or disruptive activities.

FBI officials said many of the documents' references to such groups as Greenpeace, Catholic Workers and by People for the Ethical Treatment of Animals, may be more benign than they seemed to civil rights advocates.

"Just being referenced in an FBI file is not tantamount to being the subject of an investigation," FBI spokesman John Miller told the daily.

"The FBI does not target individuals or organizations for investigation based on their political beliefs," Miller said.

"Everything we do is carefully promulgated by federal law, Justice Department guidelines and the FBI's own rules," he added



# ACLU Claims FBI Planned to Spy on Event at IU

December 21, 2005

BLOOMINGTON, IN -- The American Civil Liberties Union claims government documents it obtained show that the FBI planned to have terrorism investigators spy on a 2003 animal rights event at Indiana University.

The alleged plan to infiltrate a campus speech by an environmental activist was contained in hundreds of pages of heavily censored documents ACLU lawyers obtained from the FBI under the Freedom of Information Act. An FBI spokeswoman denied the agency took any such action.

One of the documents, which the ACLU posted on its Web site Tuesday, is from the Indianapolis FBI office and referred to plans to conduct surveillance and collect "general intelligence" during an April 2003 speech by animal-rights advocate Gary Yourofsky at the Indiana Memorial Union.

"It's hard to see how surveillance of animal-rights groups makes us safer from terrorism, but it's easy to see how it threatens our constitutional rights to free speech and privacy," said Fran Quigley, executive director of the Indiana Civil Liberties Union, an ACLU affiliate.

Wendy Osborne, a spokeswoman for the FBI's Indianapolis office, said the surveillance did not take place.

"I can tell you we did not conduct surveillance in Bloomington at that meeting or any meeting like that," she told The Herald-Times.

"The FBI has to operate under the attorney general's guidelines," she said. "We don't just go around and watch organizations and go to meetings to see who's showing up. We're not allowed to do that, nor do we do that."

Yourofsky was sentenced to six months in jail in Ontario, Canada, for his part in releasing more than 1,500 minks from a mink farm. The activist, who has been affiliated with People for the Ethical Treatment of Animals and Animals Deserve Absolute Protection Today and Tomorrow, has lectured at several college campuses.

In May, Fresno State University's president warned authorities no police surveillance would be permitted on campus unless it was required by law and approved by

administrators, following student complaints that undercover officers attended a lecture by Yourofsky in November 2004.

The New York Times
nytimes.com

# The Squires of Surveillance

December 21, 2005
By Maureen Dowd

Dick and Rummy are holed up in the den of Rummy's Chesapeake Bay retreat, Mount Misery, pawing through sheafs of transcripts of wiretapped telephone conversations, hunting for inside dope.

Chinook helicopters patrol the skies above the red-brick waterfront mansion. Rummy loves the take-no-prisoners lineage of his $1.5 million getaway, built in the 19th century by Edward Covey, an evil slave owner.

Winter weekends by a crackling fire are cozy and conspiratorial, now that the two men have nearby spreads in St. Michaels, Md.

These squires of surveillance while away their evenings sipping from goblets of Glenlivet and perusing the illegally bugged phone conversations of any American they please. Getting in the holiday spirit, they're mining data to revise their naughty and nice lists.

"Check this one out, Dick," Rummy says excitedly. "I've been reading Jennifer Aniston's conversations for the last six months now, and I gotta say, I don't get what she sees in this guy Vince Vaughn. 'Wedding Crashers' was funny. They shot that here in this village, you know. But I don't trust the guy. No way he's going to give up lap dancers and be true. I just don't want to see Jen get hurt again."

Dick grunts. He's deeply absorbed in the classified reports on the F.B.I. infiltration of a Vegan Community Project and a People for the Ethical Treatment of Animals protest against llama fur. He's ruminating over a naked picture of Pamela Anderson emblazoned with the PETA slogan, "I'd rather go naked than wear fur."

"Porter Goss tells me that Pam was shacking up with Mark McGrath - you know, he used to be with that band, Sugar Ray?" Rummy says. "Listen, Dick, we need to jawbone about this flapdoodle about our stateside spying operation that developed while you were on your whirlwind tour of American torture chambers in Iraq and Afghanistan."

Dick interrupts, "More torture."

"Some pansies are making unwarranted claims that we should have gotten warrants," Rummy continues. "But we can't worry about the Constitution's fine print during war. Besides, it's fun to secretly blow off the super-secret court. Sure, warrants would have been no problem - the court has turned down only five government requests since 1979.

Why the dickens shouldn't we go in and eavesdrop on whoever we want? Who says we can't do sneak and peak searches whenever we dadburn please?

"Junior can try to model himself after Reagan, but you can't beat our old boss Nixon when it came to channeling paranoia in a productive way. Nixon and J. Edgar Hoover had it right: dark times call for dark measures. We're thinking too small, really. Let's sic the I.R.S. on Murtha, McCain and Feingold. Let's bug Condi and Lieberman - those back-stabbing sons-of-guns want our jobs. Condi has no clue who she's dealing with, right, Dick? I perfected the black art of infighting before Condi was born. And while we're at it, let's tap Risen's phone. His story in The Times about our wiretaps was an outrageous invasion of our privacy and an assault on our monarchy's - I mean, our executive branch's absolute power. We'll smoke out the rat who leaked that story."

Dick takes a sip of Scotch and nods. "More snooping," he says.

"Karl's new game plan of pretending to admit that we made some mistakes in Iraq seems to be working," Rummy muses. "The Kid's approval ratings are picking up. But I hope Georgie's not falling for that contrition guff he's peddling. We don't want him to go wobbly on us. We have a long way to go in Iraq. The Iraqi security forces are still curled in a fetal position. Oh, by the way, Chalabi called today. He thinks Iran did a better job trucking in stuffed ballot boxes for the Shiites than we did for the Sunnis." He adds slyly, "You'd think we'd be better by now at stealing elections."

"More fraud," Dick rumbles. "More rigged elections."

Dick points at the flat-screen TV over the roaring fireplace. It's time for their favorite Sunday night program.

"It isn't on yet, big guy," Rummy sighs. "The Kid is yakking again to the nation. He's so desperate he's pre-empting 'Desperate Housewives.' The gals won't be on for 20 minutes."

Dick glowers, sinking deep into his leather chair.

"Hey, I've got a great idea!" Rummy grins. "You wanna read a phone transcript of a big cat fight between Teri Hatcher and Nicollette Sheridan? Mueller just sent it over. Hot stuff!"

Dick perks up. Half his mouth inclines, indicating extreme joy. "More Nicollette Sheridan," he nods.



# Domestic snooping

December 21, 2005
Editorial

Another day, more bad news about abuses in federal surveillance under the Bush administration's imperial watch.

The latest revelations concern records -- obtained by the American Civil Liberties Union and shared with *The New York Times* -- that indicate that counterterrorism agents at the FBI have conducted frequent intelligence-gathering operations against domestic protest groups.

In addition to monitoring anti-war units, the FBI has attended to a vegetarian community project in Indianapolis, the "semi-communistic ideology" of an outfit called Catholic Workers, a protest over llama fur by People for the Ethical Treatment of Animals, a protest in Colorado over logging practices and the financial dealings of the Greenpeace environmental organization.

Many of the documents are heavily redacted, making it hard to determine the full context of the FBI's interest. Agency spokesmen deny that it is monitoring political or social activity, and claim investigations were triggered only by suspected links to criminal or violent behavior.

They have made, however, no assertion that these groups were tied to foreign terrorists.

Moreover, FBI credibility is at low tide. A Justice Department draft report, for example, says the FBI botched a promising Florida probe into connections between terrorism financing and sales of illegal drugs, tried to conceal its mistakes and retaliated against an undercover agent who called attention to the problems.

And an FBI official complained in an e-mail message that became public that terrorism surveillance was being thwarted by "radical militant librarians."

Most important, the reports about the FBI come during a cascade of troubling revelations about domestic spying.

The Defense Department, for instance, has been expanding its intelligence gathering within the United States, and has been pushing for access to FBI files on people not suspected of terrorism or espionage.

And in the last week, Washington has been roiled by reports that President Bush authorized warrantless eavesdropping on U.S. citizens and residents -- in apparent violation of federal law and the Fourth Amendment.

The White House says such authority is implicit in congressional authorization after the 9/11 attacks to use military force against terrorists. (Recall what conservatives say about judges who find "implicit" rights to abortion or gay sex in the Constitution.)

But what this administration really seems to believe is that (1) the law means only what the President says it does, and (2) the President is free to disregard laws and constitutional provisions he finds cumbersome.

Such assertions of sweeping presidential authority pose a far greater danger to America's democracy and rule of law than the most fiery vegetarian or librarian could ever mount.



# FBI Reverts To Old Tactics

January 3, 2006
Editorial

It was right out of the J. Edgar Hoover Playbook: In times of national crisis, round up the usual suspects. Thus, in the wake of the attacks of 9/11, then-Attorney General John Ashcroft gave the FBI its head to pursue America's enemies, foreign and domestic. And just as in Hoover's days, the agency spent a fair amount of time and effort going after . . . environmentalists, peaceniks, war protesters and the rest of the usual suspects.

It wasn't activists for Greenpeace who flew hijacked jets into the Twin Towers. But the FBI opened a file on that suspect environmental group anyway. Neither did the Catholic Workers group hit the Pentagon. But it attracted the FBI's attention, post-9/11. Nor did the People for the Ethical Treatment of Animals conspire with alQaida, but that didn't stop the bureau either.

What we are learning in the wake of a Freedom of Information lawsuit by the **American Civil Liberties Union** seeking public records of FBI surveillance files is that the "new" FBI used its postcrisis license to spy on Americans pretty much the same way as the "old" FBI.

In his day, Director Hoover confronted what was known as the "communist menace" by, among other things, investigating threatening characters such as Martin Luther King Jr. and Elvis Presley. Now we learn that, after 9/11, the bureau took an unusual interest in something called the "Vegan Community Project" -- a most unlikely name for a terrorist cell. Meanwhile, The Palm Beach Post and others have reported that a program under the Defense Department has included scrutiny of a group meeting in a Quaker meeting house in Lake Worth, in Palm Beach County.

Coming on the heels of disclosures that President Bush authorized the National Security Agency to spy on Americans without bothering to seek prior, albeit secret, judicial approval, as required by federal law, the news that the FBI has been snooping on environmental and social justice groups begins to take on a rather sinister cast.

"It's clear this administration has engaged in every possible agency, from the Pentagon to NSA, to the FBI, to engage in spying on Americans," said Ann Beeson, a legal director for the American Civil Liberties Union, to The New York Times recently.

Not to worry though. From an FBI spokesman comes assurances that "Just being referenced in an FBI file is not tantamount to being the subject of an investigation."

"The FBI does not target individuals or organizations for investigation based on their

political beliefs," John Miller, bureau spokesman, told The Times.

We'll have to take his word for it. Of the 2,300 pages of internal files released to the ACLU under the Freedom of Information Act litigation, many "are heavily redacted, making it difficult or impossible to determine the full context of references and why the FBI may have been discussing events like a PETA protest," reports The Times.

We've been down this road before. Hoover's Cold War-era efforts to spy on civil rights leaders, widely known entertainment figures and anti-government protesters did about as much to defeat the "communist menace" as current probes into the workings of Greenpeace and Catholic Workers are likely to run Osama bin Laden to ground.

We have no reason to doubt that the great bulk of intelligence efforts by the government were directed at substantive threats to the country, but that doesn't excuse the tendency to, when all else fails, round up the usual suspects. At least domestic snooping beefs up the agency's "stats," and gives the impression that the FBI is doing something -- even if it's wrong.